July 6, 2026


Honorable Lisa G. Beckerman
United States Bankruptcy Judge
United States Bankruptcy Court
Alexander Hamilton U.S. Custom House
New York, New York 10004

Re:     Jeffrey Solomon Simpson, Debtor, Case No. 26-10359 (LGB)
        <u>Request that the Court Write a Letter Recommending a Criminal Investigation</u>

Dear Judge Beckerman:

I greatly appreciate Your Honor's having agreed, during Your Honor's interceding during my deposition on June 5, 2026, to write a letter recommending a criminal investigation. I am writing to provide a brief description of the framework for this investigation.

As Your Honor well knows, I was removed from my position at the Arch companies and at JJ Arch in a systematic way beginning in August of 2023 with the well-documented removal of my access to bank accounts, email, and electronic information of not only these businesses but also of those belonging to me, personally. This the subject of proceedings in the New York State Court, Index No. 158055/2023, which has been euphemistically described as "self-help" by Jared Chassen. Nevertheless, it proceeded from a certain pre-ordained plan, described in what was supposed sent to my counsel, Len Breslow, in an email as a supposed settlement proposal on July 19, 2023 from Oak's counsel, Andrew Silberstein. I attach a copy of this email to this letter as Exhibit 1.

It is clear that Mr. Chassen and Oak were working together to accomplish my ouster from Arch and JJ Arch by virtue of their Common Interest, Joint Prosecution and Joint Defense Agreement, made on August 6, 2023, but effective as of August 3, 2023. I attach a copy of this agreement to this letter as Exhibit 2. This document was concealed from me for a very long time. Everything that happened to me in connection with my loss of position, assets, and income derived from this corrupt arrangement. I say corrupt arrangement, because it is counter to the corporate documents for the Arch companies and JJ Arch, which are available on the public record. Mr. Chassen has testified that while he was controlling JJ Arch, he received $50,000 to $75,000 from Oak and that his legal fees have been funded by Oak. He refuses to say whether he is now or has otherwise been employed by Oak.

Notably, I obtained a copy of a communication that says that Mr. Chassen needs to be represented by former judges. I attach a copy of that communication to this letter as Exhibit 3. In point of fact, Mr. Chassen has been represented by at least one former judge, John M. Leventhal, Esq., as shown on the docket of the 158055/2023 case. I believe the former judges

referred to in the communication are connected to the former judge, Edward Harold King, who is the subject of a newly announced criminal case by the U.S. Attorney for Eastern District of New York, along with a man named Sam Sprei. I attach a copy of the May 13, 2026 press release from the U.S. Attorney's Office regarding the arrest of former Judge King and Mr. Sprei to this letter as Exhibit 4. Significantly, I was told that if I wanted a favorable outcome in my litigation with Mr. Chassen and Oak, I should deliver $1 million to Mr. Sprei. I have not done that or anything like that. I have neither paid nor offered to pay anyone to corruptly fix any legal matter for me.

The results of my removal from Arch and JJ Arch and the legal disputes have been the subject of three bankruptcy cases in this district, those of JJ Arch, YJ Simco LLC, and my own. I believe that the statements made to this Court originating from the so-called "self-help" engineered by Mr. Chassen, and the subsequent events in pursuit of claims against me are not ordinary civil factual disputes. Rather, they have been motivated by the program initially laid out in the July 19, 2023 email, implemented through the Common Interest, Joint Prosecution and Joint Defense agreement, and connected to a shadowy network of former judges and fixers that has resulted in false statements and false claims made to the state court and in three bankruptcy cases in this Court. I have been requesting state and federal authorities take up an investigation for some time. I believe that a letter from Your Honor requesting a criminal investigation is not only appropriate, but will certainly promote the ends of justice.

My sincere thanks to Your Honor once again.

Respectfully yours,

Jeffrey Solomon Simpson

2



# Exhibit 1

**Ostrow, Alec P.**

| | |
|---|---|
| **From:** | Len Breslow <LBreslow@breslowwalker.com> |
| **Sent:** | Wednesday, July 19, 2023 11:01 PM |
| **To:** | Jeffrey Simpson |
| **Subject:** | FW: Oak/JJ Proposal |

See below. Can discuss tomorrow. I should be at my office by 10am or so.

Len Breslow
Breslow & Walker, LLP
www.breslowwalker.com

-------- Original message --------
From: "Silberstein, Andrew" <Andrew.Silberstein@haynesboone.com>
Date: 7/19/23 9:33 PM (GMT-05:00)
To: Len Breslow <LBreslow@breslowwalker.com>
Cc: "Lavender, Brad" <Brad.Lavender@haynesboone.com>, "Thorne, Leslie" <Leslie.Thorne@haynesboone.com>
Subject: Oak/JJ Proposal

Len,

On behalf of our client, the below outlines the terms on which Oak proposes to resolve the major issues with JJ/Arch. Please let us know if you can jump on a call tomorrow after you've spoken with your client. Thanks.

Subject to FRE 408 and Equivalent State Statutes

- Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries. He would make himself available as a consultant on an agreed hourly rate to help out with specific properties as and when Arch requires. The settlement documents will include customary mutual non-disparagement, confidentiality, and similar provisions. Jeff would also agree to a period of non-solicitation of Arch employees.
- The JJ Operating Agreement is amended such that Jared has sole control over JJ. Any further amendment involving control or otherwise granting any person approval rights would require Oak consent. JJ would remain the managing member of Arch (subject to the below).
- The applicable provisions of the Arch Operating Agreement will be amended such that no direct or indirect transfer or change to JJ's structure can be made that would result in Jared ceasing to have sole control of JJ without Oak consent in its sole discretion.
- Arch and Oak will agree to a reasonable budget for the Properties and for Arch's operations for a reasonable period of time, and Oak will commit to funding that budget in accordance with the JV agreement. Amendments to the budget, adopting any further budget, or incurring or calling for capital for expenses outside the approved budget will require the consent of Oak. The budget will take into account the timing of expenses, fee payouts, etc so that as much as possible Oak contributions towards the capital of Arch and the Properties is funded by money coming out of the properties.

1

- Oak will have the right to appoint the Arch controller/CFO
- Oak/JJ will discuss a broker (including ACRE) but Oak should have the right to bring in Infinity without a fee and to otherwise bring third party capital on board to help fund/replace capital in on some of these properties
- JJ and Oak work together in good faith to see if they can get alternative managers to come in and run the portfolio or specific properties at the end of the initial budgeted period (the "Interim Period")
- After the end of the Interim Period, if (a) alternative managers are not engaged (b) a new budget/business plan for the next one year period is not agreed-to, or (c) there is any other material deadlock between Oak and JJ, then, at Oak's option, at any time thereafter Oak or its designee will become the managing member of Arch.
- JJ will cooperate in good faith to enable Oak/Arch to obtain all required third party consents in connection with any change in the manager/managing member. JJ will also confirm that Jared taking control of JJ does not violate any applicable agreement.
- If Oak or its designee becomes the managing member of Arch, JJ would then remain as a non-managing member with a right to its proportionate share of distributions. Oak/JJ to discuss compensation for work done by JJ up to date of the change of control, including any promote that would then be earned based on current valuations and recognizing their will need to be an incentive for any replacement manager.
- Customary mutual releases between Oak and Jeff, other than for fraud or willful misconduct

# HAYNES BOONE

**Andrew Silberstein**
Counsel
andrew.silberstein@haynesboone.com

**Haynes and Boone, LLP**
30 Rockefeller Plaza
26th Floor
New York, NY 10112

(t) +1 212.835.4835
(f) +1 212.884.8243

vCard | Bio | Website

CONFIDENTIALITY NOTICE: This electronic mail transmission is confidential, may be privileged and should be read or retained only by the intended recipient. If you have received this transmission in error, please immediately notify the sender and delete it from your system.

# Exhibit 2

# COMMON INTEREST, JOINT PROSECUTION AND JOINT DEFENSE AGREEMENT

This Common Interest, Joint Prosecution and Joint Defense Agreement (the "Agreement"), made on August 6, 2023, but *nunc pro tunc* effective as of August 3, 2023 ("Effective Date"), memorializes certain understandings by and among 608941 NJ Inc. ("35Oak") and Jared Chassen ("Mr. Chassen," and with 35Oak, the "Parties" and individually, a "Party"), and among the Parties' respective undersigned counsel and any advisers acting on their behalf with reference to the following:

**WHEREAS,** Jeffrey Simpson ("Mr. Simpson") has threatened legal action against the Parties in connection with disputes related to Mr. Simpson's role with and removal from JJ Arch LLC ("JJ") and Arch Real Estate Holding LLC ("AREH") (the "Disputes");

**WHEREAS,** the Parties recognize that they share a common legal interest with respect to the Disputes and that their respective and common legal interests will be best served if they can exchange information related to the Disputes subject to and without waiver of the continued protection of the attorney-client privilege, attorney work product doctrine, common interest privilege, joint defense privilege and/or any other applicable privileges or protections.

**NOW THEREFORE,** in consideration of the mutual agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree to the following:

1. **DEFINITIONS.** The following definitions shall apply herein to this Agreement:

(a) **"Privileged Information"** means communications (oral, written and electronic) between the Parties, their representatives and/or their respective counsel ("Communications"), and documents generated by, or exchanged between, the Parties, their representatives and/or their respective counsel ("Documents"), each of which may include attorney work product, opinions or attorney-client privileged communications exchanged among the Parties, their representatives and/or their respective counsel in the course of or in connection with the Disputes, and information contained in, referred to or reflected in any such Communications or Documents.

(b) **"Exempted Information"** means information that would otherwise be considered Privileged Information, except one or more of the following specific exemptions applies: (i) the information was in the possession of or known by the receiving Party prior to the time it was first communicated by the supplying Party; (ii) the information was independently developed by the receiving Party without the use of Privileged Information of any other Party; or (iii) the information becomes known to the receiving Party from a source other than the supplying Party, without breach of this Agreement.

(c) **"Third Party"** means anyone besides a Party to this Agreement or attorneys and staff at the law firms of counsel listed below.

2. **MUTUALITY OF INTEREST / MAINTENANCE OF PRIVILEGE.** A mutuality of interest exists between the Parties with respect to the Disputes. Privileged Information is deemed

to be confidential and may be protected from disclosure to any Third Party by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, joint prosecution / defense privilege or any other applicable grounds of immunity from discovery. The Parties agree to ensure that the exchange and disclosure of information, materials or opinions does not diminish in any way the confidentiality of the Privileged Information and does not constitute a waiver of any privilege or immunity otherwise available. This Agreement itself constitutes Privileged Information and is subject to all the confidentiality restrictions contained in this Agreement, unless its production is required by legal process or its disclosure is needed to support a privilege or claim arising from this Agreement. Each Party shall use its reasonable best efforts to resist any attempt by any Third Party to obtain or gain access to Privileged Information and shall avail affirmatively (and assist any other Party in availing affirmatively) of all lawful steps, remedies and recourses for asserting, maintaining and defending the privileged and confidential status of such Privileged Information of any Party. This Agreement is in no way intended to encourage or commit any violation of law or unlawful interference with any official proceeding or investigation.

3.      **PROTECTIVE ORDERS.** Nothing in this Agreement operates to modify the protections afforded by any protective order that may be entered in this case. Upon entry of a protective order of the Court, any Privileged Information will be treated in accordance with the terms therein, those terms supplementing these. If there is any inconsistency between this Agreement and any protective order subsequently issued by the Court, then the terms of the protective order shall govern.

4.      **NUNC PRO TUNC.** Prior to the execution of this Agreement, certain of the Parties, after agreeing that there was a common legal interest among them relating to the Disputes and that their Communications would be privileged, may have shared information and materials with one another that would be deemed Privileged Information as defined in and governed by this Agreement. The Parties agree and acknowledge that such previously shared information is, *nunc pro tunc*, subject to: (a) the same legal privileges and protections as though it had been shared after the execution of this Agreement; and (b) all the terms and conditions of this Agreement.

5.      **AUTHORIZED USES OF PRIVILEGED INFORMATION.** Privileged Information of another Party may be disclosed, published or disseminated to a Third Party only in the following circumstances:

(a)     A Party may disclose Privileged Information to an outside consultant or outside expert retained in connection with the Disputes, provided that (a) such consultant or expert is under an obligation of confidentiality, (b) the consultant or expert agrees to be bound by the terms of this Agreement and (c) such disclosure is otherwise under circumstances that maintain applicable confidentiality, privileges and immunities.

(b) A Party may disclose Privileged Information to a Third Party in response to an order, subpoena, request or demand for disclosure from any court or governmental agency, or from a party to any litigation or administrative proceeding (a "Disclosure Demand"); provided, however, that a Party receiving a Disclosure Demand shall as soon as reasonably possible give written notice to the other Parties of such Disclosure Demand so that such Parties shall have sufficient opportunity, if desired, to prevent such disclosure. Additionally, the disclosing Party shall assert any and all applicable privileges and protections and shall take any additional reasonable steps to ensure that any Privileged Information is protected from disclosure. If such information is ordered to be disclosed, the disclosing Party shall take reasonable steps to ensure the information is produced pursuant to a confidentiality or protective order.

(c) A Party may disclose, publish or disseminate its own Privileged or Exempted Information. Such disclosure shall not include any Privileged Information of another Party.

The authorized use described above will not by itself establish an entitlement to use or disclose Privileged Information on behalf of any other Party or on behalf of a Third Party.

6. **FURTHER RESTRICTION ON USE OF PRIVILEGED INFORMATION.** None of a Party's Privileged Information can be used against it by any other Party to this Agreement in connection with any lawsuit or any subsequent proceedings relating to the same subject matter. This prohibition does not apply to a Party's use of its own Privileged or Exempted Information. This obligation does not apply to materials or information that are obtained independently without breach of this Agreement; that are properly obtained through the discovery process of any litigation or that were originated by a Party or its counsel and do not incorporate Privileged Information received from another Party or its counsel.

7. **RESPONSIBILITY FOR COSTS.** This Agreement does not impose any cost-sharing responsibilities and does not alter or abridge other separate cost-sharing or indemnification agreements between the Parties.

8. **INDEPENDENCE OF PARTIES.** Nothing in this Agreement will be construed as limiting, altering or otherwise affecting the independent status of each of the Parties hereto, or their rights to independently manage and direct their legal and business strategy, including but not limited to the right to independently analyze and take action with respect to the Disputes.

9. **NO ATTORNEY-CLIENT RELATIONSHIP CREATED.** The existence of this Agreement alone or of a joint prosecution / defense effort shall not be deemed to create an attorney-client relationship. Rather, said relationship may only be created by a fully executed engagement letter between the attorney and the respective party. The Parties expressly understand and acknowledge that each counsel will be acting only as the attorney for his respective client or clients and will owe a duty of loyalty only to that client or those clients. The Parties expressly agree that neither this Agreement nor the underlying relationship it documents will be used to attempt to disqualify any counsel that is a signatory hereto.

10. **FORMAL DISCOVERY.** This Agreement is not intended to prevent or to limit any Party from seeking documents from any other Party to this Agreement through formal discovery

processes. By executing this Agreement, no Party waives any objections that may be asserted in response to a formal discovery request.

11. **AMENDMENTS / COUNTERPARTS.** This Agreement may be modified, amended or supplemented only by written mutual agreement of all Parties then part of the joint prosecution / defense effort. Any such modification, amendment or supplement shall not be binding on the other Parties until set out in writing, dated and signed by all the Parties, and thereafter shall be attached to this Agreement. This Agreement may be executed by electronic signature (facsimile or email (PDF)) and in any number of counterparts, all of which when taken together shall be deemed as an original, but all of which together shall constitute one and the same agreement.

12. **ADDITIONAL PARTIES / ADDITIONAL COUNSEL.** Additional Parties can join this Agreement only with the express written consent of all then existing Parties. Any Party that retains additional or substitute counsel shall promptly give notice thereof to the other Parties and such additional or substitute counsel shall subscribe to this Agreement by giving notice to all Parties of the intention to abide by its terms before being given access to any Privileged Information.

13. **RIGHT TO TERMINATE, TERMINATION IS PROSPECTIVE ONLY.** Each Party has the right to terminate its participation in this Agreement at any time. Such termination shall be effective upon tendering written notice to each other Party. A terminating Party remains bound to maintain the confidentiality of all Privileged Information, made or received under this Agreement and bound by the limitations on use of such materials as set forth in this Agreement. Any and all materials provided by the terminating Party can be utilized in connection with the Disputes as long as such use does not violate other non-disclosure provisions in this Agreement.

14. **AUTOMATIC TERMINATION.** The privileges and immunities that exist by law and are confirmed in this Agreement shall not be waived upon final resolution of the Disputes and will be deemed to continue in full force and effect. Upon final resolution of the Disputes, each Party shall promptly return all tangible things, documents or other written communications or information that constitutes, contains or refers to Privileged Information provided pursuant to this Agreement to the Party that originally provided the tangible thing, document or other written communication or information. Upon final resolution of the Disputes, each Party shall also destroy all electronic information and documents received pursuant to this Agreement.

15. **RETURN OF CONFIDENTIAL INFORMATION.** Upon request at any time, all written and electronic Privileged Information exchanged, including any copies (but not including written outside counsel work product that refers to Privileged Information), shall be returned or destroyed as directed by the Party who furnished the materials.

16. **EQUITABLE RELIEF.** Disclosure of any Privileged Information in violation of this Agreement will cause the Parties or their counsel hereto to suffer irreparable harm for which there is no adequate legal remedy. The Parties and their counsel agree that equitable relief, including immediate injunctive relief or specific performance, is an appropriate and necessary remedy for violation of this Agreement.

17. **BINDING EFFECT, ASSIGNMENT.** The respective obligations provided in this Agreement will be binding upon not only the Parties, but also their employees, representatives,

agents, legal successors and assigns. No Party may assign any of the rights contained herein without the written consent of all the other Parties to the Agreement.

**18.      ATTORNEY REPRESENTATIONS / NO AGENCY.** This Agreement shall not create any agency or similar relationship among the Parties.

**19.      RESERVATION OF CLAIMS.** Any claims the Parties may have against one another are not waived by the terms of this Agreement and are expressly reserved. This Agreement or any conduct of joint prosecution / defense by any Party does not waive any right to indemnity by any Party.

**20.      NO WARRANTY.** The Parties are not required to provide any information pursuant to this Agreement. No Party shall accept any responsibility or liability for any expenses, losses, damages or action incurred or undertaken by another Party as a result of the receipt of any information received in connection with this Agreement and/or the Disputes.

**21.      APPLICABLE LAW.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York. The Parties hereby irrevocably agree to submit any action, suit or proceeding arising out of, or connected with, this Agreement to the appropriate State Courts of the State of New York, which shall have the exclusive jurisdiction to adjudicate any such action, suit or proceeding.

**22.      ENTIRE AGREEMENT / SEVERABILITY.** In the event that any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, then such provision shall have no force or effect, but the illegality or unenforceability of such provision(s) shall neither affect nor impair the enforceability of any other provisions of this Agreement. The Parties shall negotiate in good faith to replace any illegal, invalid or unenforceable provision as soon as possible. This Agreement constitutes the entire agreement between and among the Parties and supersedes any prior oral or written agreement, representations, discussions or understandings between or among the Parties related to the Disputes.

**IN WITNESS HEREOF,** the Parties hereby execute and deliver this Agreement as of the Effective Date.

**PARTIES:**

**Jared Chassen**                                                    608941 NJ Inc.

                                                                               By: _____

_____                   Name: ____Kevin Wiener_____
                                                                                       Authorized representative

COUNSEL:

HAYNES AND BOONE. LLP

By: _____
Leslie C. Thorne

*Attorneys for 608941 NJ Inc.*

MISHAAN DAYON LLP

By: _____
Saul Mishaan

THE LAW OFFICES OF JASON J. REBHUN, P.C.

By: _____
Jason J. Rebhun

*Attorneys for Jared Chassen*



**Exhibit 3**

tigation

jcnassen@arcncre.com | arcncorealestate.com
15 West 27th Street, 6th Floor, New York, NY 10001

On Aug 10, 2023, at 8:53 AM, Kevin Wiener <kwiener@35oak.com> wrote:

Jeff our view is we feel we need Jared to primarily have a litigation team our firm has worked with and can work with seamlessly. I believe some if not all of them have retired judges. We would prefer if you guys figure out if you guys like any of the lawyers we are suggesting rather than having a further call with the firm from yesterday.

If you haven't yet please connect with Brad and he can walk you through why we like these lawyers.

Sent from my Galaxy

-------- Original message --------
I don't think we've done work with Fried Frank under Arch so may work

USD/EUR

# Exhibit 4






**PRESS RELEASE**

# Former New York State Judge and Brooklyn Real Estate Investor Charged with Wire Fraud Conspiracy

Wednesday, May 13, 2026

**For Immediate Release**

U.S. Attorney's Office, Eastern District of New York

### Sam Sprei and Edward Harold King Allegedly Perpetrated Schemes to Defraud Real Estate Investors of Millions of Dollars

Earlier today, at the federal courthouse in Brooklyn, a complaint was unsealed charging Sam Sprei, also known as "Yechiel Sprei," "Shimon Sprei," and "Eli Shapiro," and Edward Harold King, a former Kings County Supreme Court Justice, with wire fraud conspiracy. Both defendants were arrested this morning and are scheduled to make their initial appearance this afternoon before United States Magistrate Judge Clay H. Kaminsky.

Joseph Nocella, Jr., United States Attorney for the Eastern District of New York, and Harry T. Chavis, Jr., Special Agent in Charge, Internal Revenue Service Criminal Investigation, New York (IRS-CI New York), announced the arrests and charges.

"As alleged, the defendants stole millions of dollars from investors by cynically leveraging King's position as a sitting judge to lend false legitimacy to supposed investment opportunities," stated United States Attorney Nocella. "Today's arrests demonstrate that this Office will hold

accountable those who exploit victims for their own financial gain. Holding corrupt individuals accountable for the abuse of public trust will always be a priority of our Office."

"Fraud that hides behind a veneer of legitimacy — especially the authority of a judge — strikes at the heart of public trust," stated IRS-CI New York Special Agent in Charge Chavis. "IRS-CI will relentlessly follow the money, expose deception, and ensure that those who manipulate and mislead investors are brought to justice. Today's arrests send a clear message: schemes dressed up as opportunity will not shield wrongdoers from accountability."

As set forth in court filings, Sprei and King perpetrated numerous schemes to defraud, including multiple schemes to defraud real estate investors in which they solicited the victims' funds in fictitious investment opportunities, represented to the victims that their invested funds would be returnable on demand if the victims decided to end their involvement in the investments, and then later refused to return the money based on false excuses and converted a significant portion of the victims' funds for their own use.

For example, in November 2024, Sprei presented two investors (the Investors) with an opportunity to purchase commercial real estate located in Freehold, New Jersey (the Property). Sprei told the Investors that to take advantage of this opportunity, they would first have to show "proof of liquidity" by depositing funds in escrow. In addition, Sprei told the Investors that King was an independent escrow agent and a New York judge. Sprei also made numerous misrepresentations designed to deceive the Investors, including that if the Investors decided not to pursue the investment, they could so advise the escrow agent and would receive the full amount deposited within two business days. Based on these representations from Sprei, the Investors wired a total of $6.5 million to a bank account in King's name pursuant to written escrow agreements signed by the Investors and King. In the days immediately following the wire transfers from the Investors to the bank account in King's name, millions of dollars of the Investors' funds were withdrawn or transferred to a bank account in Sprei's name. When the Investors subsequently wrote to King to request the return of their deposited funds, King provided false excuses as to why he could not return the $6.5 million. Months later, King and Sprei returned to the Investors $1.5 million, representing only a portion of the Investors' investment. To date, Sprei and King have not returned any further funds to the Investors.

The charge in the complaint is an allegation, and the defendants are presumed innocent unless and until proven guilty. If convicted of wire fraud conspiracy, the defendants face up to 20 years' imprisonment.

The government's case is being handled by the Office's Public Integrity Section. Assistant United States Attorneys Rebecca Schuman and Andrew Wang are in charge of the prosecution, with assistance from Special Agent Anthony J. Cunder and Paralegal Specialist Melissa Bennett.

## The Defendants:

SAM SPREI (also known as "Yechiel Sprei," "Shimon Sprei," and "Eli Shapiro")
Age:  37
Brooklyn, New York

EDWARD HAROLD KING
Age:  72
Brooklyn, New York

E.D.N.Y. Docket No. 26-MJ-91

26mj0091_complaint.pdf


**Contact**
John Marzulli
Denise Taylor
United States Attorney's Office
(718) 254-6323


*Updated May 13, 2026*


**Topic**

FRAUD


**Component**

USAO - New York, Eastern


# Related Content