# EXHIBIT 5

-------------------------------------------------------------x

|  |  |
|---|---|
| In re: JJ Arch LLC., | Chapter 11 |
| Debtor. | Case No.: 24-10381 (JPM) |

-------------------------------------------------------------x


|  |  |  |
|---|---|---|
| Jeffrey Simpson, et al., | Plaintiffs, | Adv. Pro. No. 24-1335 (JPM) |
| – v – | | |
| First Republic Bank, et al., | | |
| Defendants. | | |

-------------------------------------------------------------x

**MEMORANDUM OPINION AND ORDER, AND FINDINGS OF FACT AND CONCLUSIONS OF LAW, ON JARED CHASSEN AND ARCH REAL ESTATE HOLDINGS LLC'S JOINT MOTION TO REMAND BASED ON LACK OF JURISDICTION OR, IN THE ALTERNATIVE, PRINCIPLES OF ABSTENTION OR EQUITY**

*A P P E A R A N C E S:*

**WIGGIN AND DANA LLP**
*Proposed Co-Counsel for JJ Arch LLC*
437 Madison Avenue, 35th Floor
New York, New York 10022
By:    Nathan Denning
        Andrew Ritter

**GRIFFIN LLP**
*Proposed Co-Counsel for JJ Arch LLC*
420 Lexington Avenue, Suite 400
New York, New York 10170
By:    Scott Anthony Griffin

**HAYNES AND BOONE, LLP**
*Counsel for 608941 NJ, Inc.*
30 Rockefeller Plaza
New York, New York 10112
By:     Leslie C. Thorne
        Richard Kanowitz
        Aishlinn Bottini
        Jordan Chavez

**KIRBY AISNER & CURLEY LLP**
*Co-Counsel for Jared Chassen*
700 Post Road, Suite 237
Scarsdale, New York 10583
By:     Dawn Kirby

**SCHWARTZ LAW PLLC**
*Co-Counsel for Jared Chassen*
150 Broadway, Suite 701
New York, New York 10038
By:     Allen Schwartz

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**
*Co-Counsel for Jared Chassen*
200 West 41st Street, 17th Floor
New York, New York 10036
By:     Sean C. Southard
        Fred Stevens
        Brendan M. Scott

**OFFIT KURMAN, P.A.**
*Counsel for Jeffrey Simpson*
590 Madison Avenue, 6th Floor
New York, New York 10022
By:     Jason A. Nagi
        Kenneth J. Flickinger

**OLSHAN FROME WOLOSKY LLP**
*Counsel for Arch Real Estate Holdings LLC*
1325 Avenue of the Americas
New York, New York 10019
By:     Jonathan T. Koevary
        Adam H. Friedman
        Katherine Mateo

1

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**[1]

Before the Court is *Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Remand Based on Lack of Jurisdiction or, in the Alternative, Principles of Abstention or Equity* (the "Remand Motion") filed by Jared Chassen ("Mr. Chassen") and Arch Real Estate Holdings LLC ("AREH"). [Doc. 2]. Filed in support of the Remand Motion is *Oak's Joinder to Motion to Remand* (Oak's "Joinder") filed by 608941 NJ Inc. ("Oak"). *See* [Doc. 4]. Both the Remand Motion and Oak's Joinder seek generally the remand of the adversary proceeding *Jeffrey Simpson, et al., v. First Republic Bank, et al.*, Case No. 24-1335 (April 3, 2024), to the Supreme Court of the State of New York.

Filed in response to the Remand Motion is the *Debtor's Objection to (I) Jared Chassen and Arch Real Estate Holdings LLC's Joint Motion to Remand Based on Lack of Jurisdiction Or, in the Alternative, Principles of Abstention or Equity and (II) Oak's Joinder to Motion to Remand* (the "Remand Objection") filed by JJ Arch LLC (the "Debtor"), the debtor-in-possession in the above-captioned Chapter 11 case. [Doc. 20]. In support of the Objection is *Jeffrey Simpson's Joinder to Objection to Remand and Response to Oak's Joinder* (Mr. Simpson's "Joinder") filed by Jeffrey Simpson ("Mr. Simpson"), the purported managing member of the Debtor. [Doc. 21, p. 2].

---

[1]     Unless otherwise specified, references to "[Doc. __]" are to filings entered on the docket in *Jeffrey Simpson, et al., v. First Republic Bank, et al.*, Case No. 24-1334 (April 3, 2024). References to "[Ch. 11 Dkt., Doc. __]" are to filings entered in the bankruptcy case *In re: JJ Arch LLC,* Case No. 24-10381 (March 7, 2024).

References to "Bankruptcy Rule __" are to the Federal Rules of Bankruptcy Procedure. References to "Local Rule __" are to the Local Bankruptcy Rules for the Southern District of New York.

Also before the Court is: (i) the *Motion for Entry of an Order (I) Confirming that the Automatic Stay Does Not Apply to Certain Corporate Governance Disputes, and/or (II) Modifying the Automatic Stay as Necessary In Order to Address Such Corporate Governance Disputes* filed by AREH; and (ii) the *Motion for Entry of an Order (I) Confirming that the Automatic Stay Does Not Apply to Certain Corporate Governance Disputes, and/or (II) Modifying the Automatic Stay as Necessary in Order to Address Such Corporate Governance Disputes* (collectively, the "Lift Stay Motions"). *See* [Ch. 11 Dkt., Doc. 38]; [Ch. 11 Dkt., Doc. 40]. The Lift Stay Motions seek generally the lifting of the automatic stay issued upon the filing of the bankruptcy case *In re: JJ Arch LLC*, Case No. 24-1335 (March 7, 2024).

Filed in response to the Lift Stay Motions are: (i) the *Debtor's Omnibus Objection to Motions for Entry of Order (I) Confirming that the Automatic Stay Does Not Apply to Certain Corporate Governance Disputes and/or (II) Modifying the Automatic Stay as Necessary in Order to Address Such Corporate Governance Disputes*, [Ch. 11 Dkt., Doc. 60]; and (ii) the *Omnibus Response of Jeffrey Simpson Opposition Jared Chassen's Motion to Lift the Automatic Stay and Arch Real Estate Holding LLC's Motion to Lift the Automatic Stay*, [Ch. 11 Dkt., Doc. 62] (collectively, the "Lift Stay Objection").

After careful consideration, and for the reasons set forth below, the Court finds that the Remand Motion should be GRANTED, and that this proceeding be REMANDED to the Supreme Court of the State of New York.[2] The Court will separately rule on the Lift Stay Motions.

---

[2] As discussed *infra*, Part III(a)(i), this adversary proceeding is not a "core" proceeding within the meaning of 11 U.S.C. § 157(b)(1). Accordingly, with respect to the Remand Motion, the Court hereby submits the following "proposed findings of fact and conclusions of law" to the United States District Court for the Southern District of New York (the "District Court") pursuant to 11 U.S.C. § 157(c)(1).

## I.     FACTUAL BACKGROUND

The Debtor is a real estate holding company formed by Mr. Chassen and Mr. Simpson under the laws of New York in December of 2017.  [Ch. 11 Dkt., Doc. 16, p. 54] (the Debtor's Operating Agreement).  The relevant provisions of the Debtor's original operating agreement are as follows:

(i)      Mr. Simpson was given the "unilateral power and authority . . . to make and implement all decisions with respect to" the Debtor's day-to-day operation, including the power to "conduct, manage and control the affairs and business of the [Debtor and its subsidiaries]," *see* [Ch. 11 Dkt. 16, p. 55]; but

(ii)     the Debtor could not engage in certain actions—what the operating agreement calls "Major Decisions"—without Mr. Chassen's written consent, *see id.* at p. 56 (defining "Major Decisions" as, *inter alia*, the "tak[ing] of a Bankruptcy Action," the sale of "any asset of the [Debtor]," and the execution of "any agreement requiring the expenditure of more than $10,000 per annum"); and

(iii)    either member of the Debtor was deemed to "Resign" when that member either "fail[ed] to provide substantially all of his business time for the benefit of the [Debtor]," or that member engaged in a "Cause Event," e.g., willful misconduct, breach of fiduciary duty, or "gross negligence in relation to the business or affairs of [AREH] or a Subsidiary," *id.* at pp. 53, 77.

The Debtor generates revenue largely as the managing member of AREH, a position that Mr. Simpson describes as the Debtor's "most valuable asset." [Ch. 11 Dkt., Doc. 16, p. 5] (the First Day Affidavit of Mr. Simpson); *see also* [Doc. 20, p. 11] (claiming that the Debtor was formed "for the primary purpose of managing AREH, AREH's various direct and indirect subsidiaries and investments and certain non-AREH investment vehicles").[3]

---

[3]      According to Mr. Simpson, AREH generates revenue by managing various subsidiaries and affiliates (the "Arch Companies") that provide services relating to "low-cost [] asset management, property management, advisory, direct construction trades, and construction management . . . ." [Ch. 11 Dkt., Doc. 16, p. 5–7] (noting that AREH is "responsible for the Arch Companies' overall business direction, including investment decisions, executing corporate strategy and fostering and maintaining relationships with the Arch Companies' prospective and existing capital partners and investors").

Oak is AREH's sole other member. *See* [Ch. 11 Dkt., Doc. 16, pp. 75–110] (AREH's operating agreement). The relevant details of AREH's corporate composition are as follows:

(i)      the Debtor holds an 80% interest in AREH and acts as AREH's "Managing Member," a role that allows the Debtor to exercise "exclusive and complete discretion" over the "business, affairs and assets of [AREH]," *see id.* at pp. 90–91; and

(ii)     Oak holds a 20% interest in AREH and acts as AREH's "Investor Member," a role that gives Oak the right to "remove [the Debtor] as 'managing member' [of AREH] upon a Cause Event," *see id.* at p. 93;[4] and

(iii)    notwithstanding the Debtor's operational control over AREH, the AREH operating agreement—much like the Debtor's—provides that Oak's consent is required for "Major Decisions," including, *inter alia*, the "tak[ing] of any Bankruptcy Action," the acquisition of "any direct or indirect interests in any real property," and the "enter[ing] into any agreement requiring the expenditure of more than $50,000 per annum," *see id.* at pp. 92–93.

The Debtor's business operated relatively smoothly in the years following its formation. Indeed, prior to this dispute, the Debtor—through AREH and various subsidiaries and affiliates (the "Arch Companies")—accumulated a real estate portfolio purportedly worth over $1 billion. *Id.* at p. 2.

The relationship between Mr. Chassen and Mr. Simpson became strained in mid-2023.[5] Sometime during the weekend of August 5, 2023, Mr. Chassen and Mr. Simpson exchanged emails (the "August Exchange") that attempted to "resign" the other from the Debtor on the basis of several Cause Events, ostensibly in accordance with the terms of the Debtor's operating agreement. *See* [Doc. 3, ¶ 5]; [Doc. 1-2, p. 24]. Following this exchange, on August 6, 2024, Oak apparently

---

[4]     The Debtor's operating agreement defines "Cause Event" using the same definition provided in the AREH operating agreement. [Ch. 11 Dkt., Doc. 16, pp. 51, 77–78].

[5]     The parties dispute the events precipitating this litigation. The accuracy of the allegations made in the course of the State Court Proceeding are, however, wholly irrelevant to the instant Remand Motion, the resolution of which requires only a review of the record developed before this Court and Justice Cohen. For this reason, this opinion should not be read to decide either a pending claim or a disputed fact.

contacted Mr. Simpson and "advised [him] that he had committed multiple Cause Events . . . [as] identified in the JJ Arch Operating Agreement." *See* [Doc. 1, pp. 25, 200]; [Ch. 11 Dkt., Doc. 14-1, p. 12]; [Ch. 11 Dkt., Doc. 4-3, pp. 348–49] ("[The Debtor], through the actions of Jeffrey Simpson . . . has committed multiple Cause Events . . . [and] [w]e reserve all of our rights and remedies under the [AREH operating agreement], at law, or in equity . . . ."). This litigation followed.

## II.  **PROCEDURAL HISTORY**

### a.  **The State Proceeding**

On August 15, 2023, Mr. Simpson filed a derivative action on behalf of the Debtor and AREH in New York State Supreme Court before the Honorable Joel M. Cohen (the "State Court Proceeding"). *See generally* [Doc. 1-2, pp. 10–45] (the initial state court complaint). What followed was a complex, contentious series of pleadings and motions involving no less than five parties and no less than 37 causes of action.[6] Those causes of action included, *inter alia*, breach of fiduciary duty, conversion, breach of contract, defamation, fraud, and tortious interference with a prospective business advantage. *See* [Doc. 2-1, pp. 1–5].

During the pendency of the State Court Proceeding, Justice Cohen issued a series of interim orders (the "Interim Orders") apparently intended to preserve the operational status quo of both AREH and the Debtor. *See* [Doc. 3-8, pp. 22–23] (where, during a hearing held on September 11,

---

[6]  Though the claims asserted in the State Court Proceeding are numerous, a fair reading of that record suggests that—at their core—those claims seek to identify the party that is properly in control of the Debtor (and, relatedly, AREH). *See* [Doc. 1. at p. 12] (where Mr. Simpson describes this lawsuit as a means of "undo[ing] a coup d'état executed by [Mr.] Chassen . . . ."); *but see id.* at p. 81 (where Mr. Chassen asserts counterclaims seeking to "recover for [Mr.] Simpson's breach of fiduciary duty and other corporate wrongdoing, to declare that [Mr.] Chassen is the sole managing member of [the Debtor], and to declare [Mr.] Simpson resigned as a member of [the Debtor]").

The Court notes that a full accounting of the claims and parties involved in the State Court Proceeding is attached as Exhibit A to the Remand Motion. *See* [Doc. 2-1, pp. 1–5].

2023, Justice Cohen states that the governance of the Debtor is "clearly something that should go back to the status quo . . . [to] [g]et the business back on track"); [Ch. 11 Dkt., Doc. 14-1, p. 82] (where, at a hearing held on November 20, 2023, Justice Cohen indicates his desire to "do[] [his] level best to keep the ship afloat while the litigation proceeds").

Following oral argument, Justice Cohen issued an Interim Order on August 21, 2023, providing that:

> [t]he August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are *hereby void and of no force or effect* . . . [and] the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in . . . the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen. Simpson and Chassen *shall cooperate with each other in good faith* to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement . . . .

[Ch. 11 Dkt., Doc. 41-6, p. 3] (emphasis added). Thereafter, on November 28, 2023, Justice Cohen issued two Interim Orders addressing the provisional governance of both the Debtor and AREH. The first of those Interim Orders (the "AREH Interim Order") appointed Oak as AREH's "sole managing member" and enjoined Mr. Simpson and the Debtor from:

> [a]cting as (or holding themselves out to third parties to be) managing members of Arch Real Estate Holdings LLC ("AREH"), and . . . [d]enying prompt consent to any Major Decision proposed by Oak as Managing Member . . . unless *both* JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such consent . . . . [and] [o]therwise interfering with Oak's ability to exercise its responsibility as Managing Member of AREH.

[Ch. 11 Dkt., Doc. 38-3, pp. 2–3] (emphasis added). The second Interim Order issued November 28, 2023, provided that:

> [d]uring the pendency of this litigation and subject to further order of the Court[,] Simpson and Chassen are enjoined from unilaterally seeking to terminate or force the resignation of the other member without permission of the Court . . . [and] [e]xcept as limited by the Court's preliminary injunction orders granting Oak the

status of Acting Managing Member in [AREH] . . . the Court's prior Order [issued August 21, 2023] remains in full force and effect . . . .

[Ch. 11 Dkt., Doc. 38-3, pp. 3–4]. Justice Cohen indicated that the Interim Orders remained in place at a hearing held February 2, 2024, and thereafter set an evidentiary hearing for June 7, 2024, to decide the "ultimate issue" of Mr. Simpson and Mr. Chassen's respective rights vis-à-vis the Debtor. *See* [Doc. 20-2, pp. 63–64]; [Ch. 11 Dkt., Doc. 4-5, pp. 42, 63]; [Ch. 11 Dkt., Doc. 41-19].

b. **The Bankruptcy**

Mr. Simpson unilaterally filed a petition for chapter 11 relief on behalf of the Debtor on March 7, 2024. *See generally* [Ch. 11 Dkt., Doc. 1] (designating this case as one arising under subchapter V). The Debtor's petition—which lists Mr. Simpson as its sole equity holder—includes the following footnote:

> Jared Chassen of [] Irvington, NY 10533, previously owned a 49.9% membership interest in the Debtor JJ Arch LLC []. Mr. Chassen, however, was deemed to have resigned as a member of JJ Arch, as of August 5, 2023, pursuant to the definition of "Resignation" as set forth in the Limited Liability Operating Agreement of JJ Arch LLC . . . Accordingly, Mr. Simpson currently owns 100% of the equity interests in the Debtor.[7]

---

[7]    Local Rule 1007-2 provides that "[a] debtor in a chapter 11 case must file an affidavit setting forth[] the nature of the debtor's business and a concise statement of the circumstances leading to the debtor's filing under chapter 11. . . [as well as] the names of the individuals who comprise the debtor's existing senior management, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience."

Curiously, Mr. Simpson's 1007-2 affidavit contains the following narrative:

> I have been involved in litigation in New York State court with Jared Chassen [], the former minority member of the Debtor regarding, *inter alia*, the management of the Debtor. Mr. Chassen *voluntarily* decided to cease providing substantially all of his business time for the benefit of the Debtor no later than January 2024 and, as a result, was deemed to have resigned from the Debtor under the under [sic] the terms of the [Debtor's] Operating Agreement. As a result of such resignation, Mr. Chassen's interest in the Debtor was "deemed automatically redeemed by the [Debtor]," Mr. Chassen was "no longer . . . deemed a 'Member' of the [Debtor]" and Mr. Chassen was no longer "entitled to any rights as a Member of the [Debtor] for any period from and after such Resignation[]" . . . [A]lthough certain of the New York state court orders did enjoin the Debtor's members from unilaterally seeking to terminate or force the resignation of the other

*Id.* at p. 12, n.1.  One week later, on March 14, 2024, Mr. Chassen filed a *Motion for an Order Dismissing the Debtor's Bankruptcy Case* (Mr. Chassen's "Motion to Dismiss").  *See* [Ch. 11 Dkt., Doc. 4].  That Motion argued that the Debtor's petition should be dismissed because "[t]he [Debtor's] Operating Agreement, together with the orders in the [State Court] Proceeding, leave no doubt that Mr. Simpson not only lacked authority to bring the Petition, but that this filing is in bad faith and in contempt of court."  *Id.* at p. 4.  AREH—making a functionally identical argument—joined Mr. Chassen's Motion to Dismiss on March 18, 2024. [8]  *See* [Ch. 11 Dkt., Doc. 13] (collectively with Mr. Chassen's Motion to Dismiss, the "Motions to Dismiss").

### c. The Lift Stay Motions and the Remand Motion

Mr. Chassen and AREH filed the Lift Stay Motions on March 25, 2024. Both Motions argue that, in the Second Circuit, "[t]he automatic stay generally only applies to the debtor and its

---

without permission of the court, such orders did not prohibit Mr. Chassen from *voluntarily* resigning from the Debtor in the manner in which he chose to do so.

[Ch. 11 Dkt., Doc. 16, p. 11, n. 14] (emphasis added); *see also* [Ch. 11 Dkt., Doc. 6, p. 4] (arguing that Mr. Chassen resigned under the Debtor's operating agreement when "counsel for [Oak], the ultimate 20% owner of AREH, confirmed in writing that Mr. Chassen was not devoting substantially all of his business time for the benefit of [the Debtor] . . . [and] [s]uch resignation was voluntary and not forced by Mr. Simpson"); [Ch. 11 Dkt., Doc. 56, pp. 16–17] ("We absolutely have an argument that we don't believe has been addressed by the state court, which is the -- you know, what we referred to as the voluntary resignation in our objection to the motion to shorten notice, which is whether or not Mr. Chassen's been devoting substantially all of his business time for the benefit of [the Debtor].").

[8]     The Bankruptcy Code provides certain time limits applicable to the resolution of a motion to dismiss a bankruptcy.  *See* 11 § U.S.C. 1112(b)(3) (following the filing of a motion to dismiss, a court must "commence the hearing on [the] motion [to dismiss] not later than 30 days after filing . . . and shall decide the motion not later than 15 days after commencement of such hearing . . . .").  The Bankruptcy Code, however, makes those time periods inapplicable where "the movant expressly consents to a continuance for a specific period of time or compelling circumstances prevent the court from meeting th[ose] time limits . . . ."  *Id.*

A hearing on the Motion to Dismiss was initially set for April 5, 2024.  [Ch. 11 Dkt., Doc. 50, p. 2].  However, on March 27, 2024, counsel for Mr. Chassen wrote a letter to this Court indicating that Mr. Chassen, AREH and the Debtor "have agreed to adjourn the Motion to Dismiss pending the Court's determination of the Stay Relief Motions, so that the Court and all parties may collectively preserve resources that would otherwise be expended in a contention discovery process . . . ."  *See id.* at p. 1.  The Court therefore finds the time periods set by Section 1112(b)(3) inapplicable.

9

property and does not extend to third parties, such as third party guarantors, co-debtors, officers and members of a debtor." [Ch. 11 Dkt., Doc. 38, pp. 7–8, 13] (describing this bankruptcy as "an attempt to use the automatic stay as [both] a sword and a shield"); [Ch. 11 Dkt., Doc. 40, pp. 22–31]. Those Motions request an order confirming that the automatic stay does not apply to the State Court Proceeding or, alternatively, modifying the automatic stay as necessary such that the State Court Proceeding can go forward. [Ch. 11 Dkt., Doc. 40, p. 7]; [Ch. 11 Dkt., Doc. 38, pp. 7–8].

The Debtor removed the State Proceeding to the District Court on April 1, 2024, ostensibly pursuant to 28 U.S.C. §§ 1334 and 1452 and Bankruptcy Rule 9027. *See generally* [Doc. 1]. Mr. Simpson and the Debtor filed their Lift Stay Objections that same day. [Ch. 11 Dkt., Doc. 60] (where, among other things, the Debtor argues the Lift Stay Motions are moot because "the State [Court Proceeding] has been removed to this Court and is no longer pending in the State Court"); [Ch. 11 Dkt., Doc. 62, p. 1–2] (where Mr. Simpson argues that "*this Court* must resolve the questions of who is in control of the Debtor and whether the Debtor is in control of AREH, as these issues are fundamental to the administration of th[e] Bankruptcy") (emphasis in original). The District Court referred the case to this Court on April 3, 2024, in accordance with the Amended Standing Order of Reference, M-431 (S.D.N.Y. Jan. 31, 2012) (Preska, C.J.). *See* [Doc. 1-3].

Mr. Chassen and AREH filed the Remand Motion on April 10, 2024.[9] [Doc. 2]. That Motion makes, in essence, two arguments:

---

[9]     As noted above, Oak has also filed a Joinder to the Remand Motion. *See* [Doc. 4]. In addition to echoing the arguments made by the Remand Motion, the Oak Joinder includes several factual allegations regarding Mr. Simpson's conduct before and during the State Court Proceeding. *See id.* at p. 3 ("Simpson's forum shopping is not surprising: the Commercial Division wrested managerial control of AREH from the Debtor on a finding that Oak had shown a substantial likelihood of proving Simpson's breaches of fiduciary duty, among other misconduct."); *id.* at pp. 9–11 (describing Mr. Simpson's alleged misconduct including, *inter alia*, "[t]hreaten[ing] to fire all AREH employees and cease operations if Oak would not accede to demands for money," "[m]isappropriat[ing] funds from

(i)      Mr. Chassen and AREH first argue that "[r]emoval of this action to federal court was improper because [any basis for] federal jurisdiction is lacking . . . [a]nd even if there were a basis for federal bankruptcy court jurisdiction, remand would nevertheless be required on principles of mandatory abstention," *see* [Doc. 2, pp. 8–25] (discussing 11 U.S.C § 1334(c)(2)); and

(ii)     in the alternative, Mr. Chassen and AREH argue that this adversary proceeding should be dismissed on the grounds of either permissive abstention under 28 U.S.C. § 1334(c)(1), or equitable remand in accordance with *Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*, 130 B.R. 405 (S.D.N.Y. 1991) and its progeny, *see id.* [Doc. 2, pp. 26–39].

The Remand Objection contests both arguments. With respect to subject matter jurisdiction, Mr. Simpson and the Debtor maintain that the State Court Proceeding is "core" under 28 U.S.C. § 157(b)(2)) because it "involves and directly affects the property of the estate." [Doc. 20, p. 16]. As to the Remand Motion's second argument, Mr. Simpson and the Debtor claim that "the exercise of either equitable remand or permissive abstention of a core proceeding is appropriate in only a few extraordinary and narrow contexts," and, given these restraints, "Chassen, AREH and Oak have failed to . . . establish[] that permissive abstention or equitable remand is warranted . . . ." *Id.* at pp. 10, 24. Mr. Chassen and AREH filed a reply to the Remand Objection on April 30, 2024. *See* [Doc. 23].

---

AREH by using AREH's employees to perform services for JJ Arch and JJ Arch's non-AREH businesses," and "engag[ing] in a series of belated and wholly improper legal attacks on the [Interim Orders]").

Much like Oak's Joinder, Mr. Simpson's Joinder reiterates—in form and substance—arguments made in the Remand Opposition, in addition to "disput[ing] every allegation Oak makes in its purported joinder . . . ." *See generally* [Doc. 21] (asserting that Oak's Joinder "should be disregarded or stricken" because it contains nothing more than "advocacy intended to prejudice this Court against Mr. Simpson").

Both Joinders thus: (i) allege facts that—although disputed—do not bear on the instant Motions; and (ii) make arguments that are already thoroughly briefed. Put differently, the Court finds that neither Joinder presents matters necessary to the disposition of the instant Motions, and therefore does not rely on either Joinder in rendering this decision.

## III. REMAND

### a. Mandatory Abstention

Section 1334 of title 28 provides the prerequisites for mandatory abstention. That statute provides:

> Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

*See* 28 U.S.C § 1334(c)(2). Abstention is thus mandated when six conditions are met: (i) the request for abstention is timely; (ii) the action is based on a state law claim; (iii) the action "relate[s] to" but does not "arise in" a bankruptcy case or "arise under" the Bankruptcy Code; (iv) section 1334 is the sole basis for federal jurisdiction; (v) an action is commenced in state court; and (vi) that action can be "timely adjudicated" in state court. *See In re George Washington Bridge Bus Station Dev. Venture LLC,* 2022 WL 1714176, at *5 (Bankr. S.D.N.Y. May 25, 2022) (citing 28 U.S.C § 1334(c)(2)).

In this case, the Debtor and Mr. Simpson maintain that "mandatory abstention is clearly inapplicable [] because the removed State [Court Proceeding] constitutes a core proceeding" and therefore "arise[s] in" or "arise[s] under" the Bankruptcy Code.[10]  [Doc. 20, p. 21]. The Debtor

---

[10]    Although AREH and Mr. Chassen have moved for remand, the parties opposing remand under Section 1334(c)(2) (here, the Debtor and Mr. Simpson) bear the burden of proving that remand is improper. *See Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir.1998) ("It is [] hornbook law that the party invoking federal jurisdiction bears the burden of proving facts to establish that jurisdiction."); *see also In re AOG Ent., Inc*., 569 B.R. 563, 573 (Bankr. S.D.N.Y. 2017) ("[P]lacing the burden of proof on the party opposing remand . . . is [] patently correct with respect to the jurisdictional [question] because the party invoking jurisdiction has the burden of proving that jurisdiction exists."); *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 316–17 (S.D.N.Y. 2003) ("If there is doubt as to whether federal jurisdiction exists, remand is appropriate.").

and Mr. Simpson argue further that the "status of the State [Court Proceeding] after more than 7 months of litigation" indicates that Justice Cohen "will be unable to timely adjudicate the removed Sate [Court Proceeding] in a manner that is not [] disruptive to this [bankruptcy]." *Id.* at p. 22. The Court addresses each argument in turn.

### i. Core Jurisdiction

Federal courts have "original but not exclusive [subject matter] jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." *See* 28 U.S.C. § 1334(b).[11]  Proceedings "aris[e] under" title 11 where a party "clearly invoke[s] substantive

---

[11]  Relatedly, Section 1334(e) provides "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction [] of all the property, wherever located, of the debtor as of the commencement of [a title 11] case, and of property of the estate . . . ." *See* 28 U.S.C. § 1334(e).  The Remand Objection claims that Section 1334(e) provides this Court with "exclusive jurisdiction over the State [Court Proceeding] because it involves and directly affects the property of the estate," in particular the Debtor's membership interest in AREH. *See* [Doc. 20, pp. 16, 20] ("[T]he removed State [Court Proceeding] seeks to effectively determine control over the Debtor and the identity of the Debtor-in-possession, to determine the nature of and the control over one of the Debtor's most valuable assets – its rights in and with respect to AREH – and involves numerous derivative actions that themselves constitute property of the Debtor's estate.").  To a degree, Mr. Simpson and the Debtor are correct—the claims asserted by the Debtor in the State Court Proceeding, as well as those relating Debtor's membership interests in AREH and other subsidiaries, constitute "property of the estate" under the Bankruptcy Code. *See* 11 U.S.C. § 541(a)(1) (property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case"); *see also In re McCaffrey*, 2023 WL 5612742, at *6 (Bankr. N.D.N.Y. Aug. 30, 2023) ("There is no dispute that Debtor's 100% membership interests in the limited liability companies are property of the estate under section 541.").

Section 1334(e) is, however, a grant of *in rem* jurisdiction. *See In re Lehman Brothers Holdings Inc.,* 544 B.R. 16, 41 (Bankr. S.D.N.Y., 2015) ("In other contexts, a court may only exercise *in rem* jurisdiction over property physically within the court's jurisdiction . . . [but] in the bankruptcy context, Congress explicitly gave bankruptcy courts global reach over the debtor's property via section 541(a) of the Bankruptcy Code and section 1334(e) . . . .") (internal citations omitted); *see also in rem*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An action *in rem* is one in which the judgment of the court determines the *title to property* . . . not merely as between [the parties], but also as against all persons at any time dealing with them or with the property upon which the court had adjudicated.") (citing R.H. Graveson, *Conflict of Laws* 98 (7th ed. 1974) (emphasis added)).  For this reason, Section 1334(e)'s jurisdictional grant extends only to actions relating to the legal *disposition* of the estate, rather than claims against the debtor, or claims by the debtor against a third party, both of which are properly considered actions *in personam*. *See in personam*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Involving or determining the personal rights and obligations of the parties . . . (Of a legal action) brought against a person rather than property."); *see also Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 312 (1950) ("Distinctions between actions in rem and those in personam are ancient and originally expressed in procedural terms what seems really to have been a distinction in the substantive law of property under a system quite unlike our own."); *Valley Historic Ltd. P'ship v. Bank of New York,* 486 F.3d 831, 837 (4th Cir. 2007) ("The Debtor is viewing two conceptually distinct jurisdictional grants as if they are the same . . . [Section] 1334(b) invests district courts with original but not exclusive jurisdiction over 'civil proceedings.'  In contrast, § 1334(e) is a broad grant of exclusive jurisdiction over a debtor's property; it does not invest [federal] courts with jurisdiction to conduct civil proceedings."); *cf. Leopard Marine & Trading, Ltd. v. Easy*

rights created by federal bankruptcy law." *Panthers Cap., LLC v. Jar 259 Food Corp*, 2023 WL 4823942, at \*2 (E.D.N.Y. Mar. 6, 2023) (citing *In re Robert Plan Corp.*, 777 F.3d 594, 596 (2d Cir. 2015)). Proceedings "arise in" a title 11 case where a party asserts "claims that are not based on any right expressly created by [the Bankruptcy Code], but nevertheless, would [not exist] outside of the bankruptcy." *Id.* (citing *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010)); *see also In re Grupo Aeromexico,* 2023 WL 6206093, at \*11 (Bankr. S.D.N.Y. Sept. 22, 2023) ("While the State Law Action does not directly implicate rights under title 11, the claims sold to Plaintiffs would not exist except for Debtors' bankruptcy case."). If a proceeding does not "arise under" title 11 or "arise in" a title 11 case, that proceeding may nevertheless "relate to" a case under title 11 if "th[at] action's outcome might have any conceivable effect on the bankrupt estate." *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333, 339–340 (2d Cir. 2018).

When a proceeding "arises in" or "arises under" the Bankruptcy Code, that proceeding is considered "core." *See In re AOG Ent., Inc.,* 569 B.R. 563, 573 (Bankr. S.D.N.Y. 2017) (citing *Stern v. Marshall,* 564 U.S. 462, 476 (2011) and 28 U.S.C. § 157(b)). It is well-established that "[b]ankruptcy courts retain comprehensive power to resolve claims and enter [final] orders or judgements in core proceedings . . . ." *In re Relativity Fashion*, *LLC*, 696 F. App'x 26, at \*28 (2d Cir. 2017); *see also Stern*, 564 U.S. at 474–75 ("Parties may appeal final judgments of a bankruptcy court in core proceedings to the district court, which reviews them under traditional

---

*St. Ltd.,* 896 F.3d 174, 193 (2d Cir. 2018) ("Courts of appeals invariably . . . stat[e] [] broadly the principle that one court's exercise of jurisdiction in rem does not prevent other courts from declaring rights in the res within an in personam action."); *In re Ames Dep't Stores, Inc.,* 542 B.R. 121, 153 (Bankr. S.D.N.Y. 2015) ("Because the First Assuming Jurisdiction Doctrine applies only to claims that are *in rem* or *quasi in rem*, it does not apply to *in personam* actions. Thus it does not apply to Ames' causes of action for breach of contract, breach of good faith and fair dealing, and unjust enrichment, *each of which seeks money or property not yet in the in rem jurisdiction of the Court*, if it ever will be.") (emphasis added).

Section 1334(e) therefore does not apply to the State Court Proceeding.

appellate standards.").  If a matter is a non-core—that is, if a matter merely "relate[s] to" a title 11 proceeding—a bankruptcy court must instead "submit proposed findings of fact and conclusions of law to the district court" for review.  *See* 28 U.S.C. § 157(c)(1).  Section 1334(c)(2), quoted *supra*, applies exclusively to non-core proceedings.  *In re George Washington Bridge Bus Station Dev. Venture LLC*, 2022 WL 1714176, at *5 (Bankr. S.D.N.Y. May 25, 2022).

Here, the record developed before Justice Cohen indicates that the State Court Proceeding neither "invoke[s] substantive rights created by federal bankruptcy law" nor encompasses claims that "would [not exist] outside of the bankruptcy." *Panthers Cap., LLC v. Jar 259 Food Corp*, 2023 WL 4823942, at *2 (E.D.N.Y. Mar. 6, 2023).  Nonetheless, the Remand Objection insists that the State Court Proceeding "fits squarely within th[e] understanding of a core proceeding . . . [because] proceedings dealing with [the] control of a debtor have been found to be core" given the "significant impact such decisions have on the administration of the debtor's estate."  [Doc. 20, p. 17].  The cases cited by the Debtor and Mr. Simpson in support of this position are, however, distinguishable.[12]

---

[12] The Remand Objection also argues that the State Court Proceeding is "core" because it falls within various provisions of Section 157(b)(2). *See* [Doc. 20, pp. 16–17].  It is, however, well-established that a bankruptcy court does not have the constitutional authority to enter final judgments on certain types of claims that are nonetheless designated as "core" by title 28. *See* 2 COLLIER ON BANKRUPTCY ¶ 3.02 [3] (noting that, in *Stern v. Marshall*, 564 U.S. 462 (2011), the Supreme Court "held, at a minimum, that Section 157(b)(2)(C) . . . has unconstitutionally assigned, for at least some proceedings, the 'judicial Power of the United States' to the non-Article III bankruptcy judges . . . [but] [i]t should generally be clear . . . that most of the matters included as core [in Section 157] can still be finally determined by the bankruptcy court"); *see also In re Purdue Pharma, L.P.,* 635 B.R. 26, 80 (S.D.N.Y. 2021), *rev'd and remanded sub nom. In Re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023) ("*Stern* itself illustrates that not every issue that is litigated under the [statutory] umbrella of a core proceeding is, to use [the bankruptcy court's] phrase, 'constitutionally core.'").

*Stern* held that a bankruptcy court's constitutional "core" authority extends to claims that either "stem from the bankruptcy itself or [that] would necessarily be resolved in the claims allowance process." *See* 564 U.S. 462, 499 (2011); *see also id.* at 484 ("When a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,' and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts.") (internal citations omitted).  As discussed *infra*, Part III(a)(i), there has been one claim asserted against the Debtor's estate in this bankruptcy case, and that claim is not part of the State Court Proceeding. *See* Claim no. 1-1 (filed by the Internal Revenue Service seeking $2982.33).

In *In re Johns-Manville Corp.*, 801 F.2d 60 (2d Cir. 1986), the Second Circuit considered whether a post-petition action brought in state court constituted a "core" proceeding under Section 157(b)(2)(A). There, in the midst of a "long-running Chapter 11 reorganization," the debtor (acting through its board of directors) proposed a confirmable plan that: (i) received the blessing of the relevant creditor committees; but (ii) contemplated the dilution of 90% of the debtor's equity. *Id.* at 61–63. After objecting to the plan, the committee representing the debtor's shareholders commenced an action in state court that sought to "compel [the debtor] to hold a shareholders' meeting" and thereafter "replace [the debtor's] directors, so that new directors might reconsider [] the proposed plan." *Id.* at 63. The Second Circuit deemed that state proceeding "core" given that "rehabilitation, the *very purpose for the bankruptcy proceedings*, might be undone by th[at] action." *Id.* (emphasis added).

Likewise, in *In re WP Realty Acquisition III LLC*, 626 B.R. 154 (Bankr. S.D.N.Y. 2021), another bankruptcy court in this district considered whether a state proceeding involving claims against the debtor constituted a "core" proceeding under Section 157(b). There, prior to the bankruptcy, the debtor was "formed [] as an investment manager for [its principal's] future real estate investments," an endeavor funded primarily by a loan from a third-party investor. *Id.* at 157. The parties' loan relationship was governed by a contract providing that—in the event of default—the investor could replace the principal as the managing member of the debtor. *Id.* at 158. Noting that the debtor's prepetition management was "in the advanced stages of forming a deal" that would have greatly increased the capital available to the estate, the court found "core" jurisdiction because the timing of the proceeding was such that "changes in control of the Debtor

---

The fact that some of the parties' claims fall within the statutory sweep of Section 157(b) does not, without more, convert the State Court Proceeding into a "core" proceeding.

would have a direct impact on th[is] bankruptcy . . . ." *See id.* at 160–61 (noting further that a "change in management now could endanger financing as lenders could lose confidence in the [d]ebtor and refuse to finance the deal").

In short, the cases relied upon by the Remand Objection found "core" jurisdiction where a state court proceeding either: (i) was brought *post-petition*, and posed a grave risk to the confirmation of a plan; or (ii) predated the bankruptcy, but nevertheless related to a core bankruptcy function (e.g., the adjudication of a pre-petition default, or the facilitation of a post-petition loan between the debtor and a third party).[13] *See In re WP Realty Acquisition III LLC*, 626 B.R. 154, 159 (Bankr. S.D.N.Y. 2021) (noting that core jurisdiction depends upon whether a "contract is antecedent to the [] petition" and whether the proceeding is "unique to or uniquely affected by the bankruptcy" or "affect[s] a core bankruptcy function"); *see also N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982) ("[T]he restructuring of the debtor-creditor relationship [] is at the core of the federal bankruptcy power."); *In re Cnty. Seat Stores, Inc.*, 2002 WL 141875, at *5 (S.D.N.Y. Jan. 31, 2002) (core bankruptcy functions include "the orderly and equitable distribution of the estate's assets"); *Armouth Intl., Inc. v. Fallas*, 2021 WL 795448, at *3 (S.D.N.Y. Mar. 1, 2021) (when determining core status, the "determinative issue is whether claims that appear to be based in state law are really an extension of the proceedings *already before the bankruptcy court*") (emphasis added).

---

[13]     To the extent the Remand Objection relies upon out-of-circuit authority, the Court finds those cases distinguishable for these same reasons. *See Bank of Am., NT&SA v. Nickele,* 1998 WL 181827 (E.D. Pa. Apr. 16, 1998) (denying a motion to remand where, hours prior to the filing of a chapter 11 petition, third-party lender sued in state court to "obtain immediate control over the voting rights that attached to all [of the debtor's] outstanding common stock"); *Matter of SCK Corp.*, 54 B.R. 165, 167 (Bankr. D.N.J. 1984) (denying a motion to remand where there was a pre-petition default on the part of the debtor's former president and shareholder, and where the state proceeding was initiated post-petition).

Neither circumstance exists here. The State Court Proceeding predates the Debtor's petition by a full seven months, and the progress of the Debtor's bankruptcy has been minimal at best—the record contains neither a plan nor a disclosure statement, Debtor's counsel has not been retained,[14] and there has been precisely one claim filed against the Debtor's estate. *See* Claim no. 1-1 (filed by the Internal Revenue Service seeking $2982.33). The State Court Proceeding is thus divorced from any "core bankruptcy function," and otherwise involves claims that arise under state law and concern issues relating almost exclusively to the internal composition of the Debtor and its foremost subsidiary. *See generally* [Doc. 2-1]. For these reasons, the Court finds that the State Court Proceeding is merely "related to" the Debtor's bankruptcy and therefore non-core.[15]

---

[14] On April l5, 2024, the Debtor filed an *Application for Entry of an Order Pursuant to Sections 327(a) and 329 of the Bankruptcy Code, Bankruptcy Rules 2014, and 2016, and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Debtor to Employ and Retain Griffin LLP, as General Bankruptcy Counsel, Nunc Pro Tunc to the Petition Date. See* [Ch. 11 Dkt., Doc. 73]. That motion is presently opposed by both AREH and the United States Trustee. *See* [Ch. 11 Dkt., Doc. 88, p. 4] ("[T]he questions relating to the potential conflict involved in Griffin representing the Debtor after having represented AREH, as well as to the source of funds to compensate the Debtor's professionals . . . appear to favor a deferral of the consideration of the Application until the governance issues have been resolved."); [Ch. 11 Dkt., Doc. 91, p. 6] ("Griffin now resurfaces in this Chapter 11 Case as proposed counsel for the Debtor, in complete disregard of its central role in litigating the State Court Action, which involves claims that Simpson (its former client), acting through the Debtor (its former, now once-again client), breached fiduciary duties to and substantially harmed AREH (its former client) and AREH's other member, [Oak].").

Griffin LLP later filed a *Motion to Withdraw as Proposed General Bankruptcy Counsel for Debtor JJ Arch LLC* on June 3, 2024. *See generally* [Ch. 11 Dkt., Doc. 120]. Wiggin and Dana LLP, proposed co-counsel to the Debtor, also recently filed a *Motion to Withdraw. See* [Ch. 11 Dkt., Doc. 118]. Counsel for Mr. Simpson in his individual capacity likewise filed a *Motion for Entry of an Order Authorizing Offit Kurmna, P.A. to Withdraw as Counsel of Record to Jeffrey Simpson. See* [Ch. 11 Dkt., Doc. 119].

[15] The Remand Motion questions whether this Court even has "related to" jurisdiction over the State Court Proceeding. *See* [Doc. 2, pp. 20–21] ("[T]he Debtor . . . has not presented a scenario where controlling a 'Major Decision' of AREH—the Debtor's principal business—would result in any economic impact upon the estate."). However, a proceeding "relates to" a case under title 11 where "[its] outcome might have *any conceivable effect* on the [] estate . . . ." *See SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339–340 (2d Cir. 2018) (emphasis added).

The State Court Proceeding includes several claims that may ultimately precipitate judgments against property of the Debtor's estate. *See, e.g.*, [Doc. 2-1, p. 4] (noting that Oak has asserted claims directly against the Debtor for breach of fiduciary duty and breach of contract); *see also* [Doc. 25, p. 22] ("[T]o the extent AREH and Oak and Mr. Chassen are successful in their claims against the [D]ebtor and Mr. Simpson, [] unrelated assets [of the Debtor] are exposed to any liability that arises from the AREH related claims."). Additionally, although many of the claims asserted in the State Court Proceeding technically involve claims between non-Debtor third parties, the resolution of those claims will either determine or influence the post-petition control of both the Debtor and its main subsidiary. *See generally id.* (identifying a litany of derivative claims asserted on behalf of both AREH and the Debtor); *see*

### ii.     *Timely Adjudication in State Court*

Section 1334(c)(2) also requires that a given proceeding can be "timely adjudicated" in a state forum.  A state court's ability to timely adjudicate a proceeding is a two-pronged inquiry that asks: (i) the speed at which a state court could resolve the proceeding; and (ii) whether that speed is adequate as a matter of law.  *See Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.,* 639 F.3d 572, 580 (2d Cir. 2011).  Several factors are relevant in making this determination, including:

> (1) the backlog of the state court's calendar relative to the federal court's calendar; (2) the complexity of the issues presented and the respective expertise of each forum; (3) the status of the title 11 bankruptcy proceeding to which the state law claims are related; and (4) whether the state court proceeding would prolong the administration or liquidation of the estate.

*Id*.  Consistent with principles of federalism and comity, a court must ultimately "presume that a state court will operate efficiently and effectively."  *In re AOG Ent., Inc*., 569 B.R. 563, 573 (Bankr. S.D.N.Y. 2017).

In this case, Mr. Simpson and the Debtor assert that several aspects of the record indicate that Justice Cohen simply "cannot be expected to timely adjudicate" the State Court Proceeding:

(i)      the "nascent stage of discovery" of the State Court Proceeding at the time of the Debtor's bankruptcy filing;

(ii)     the fact that, at the time of removal, the first evidentiary hearing in the State Court Proceeding was set for June of this year; and

---

*also In re Grupo Aeromexico,* 2023 WL 6206093, at \*9 (Bankr. S.D.N.Y. Sept. 22, 2023) ("[T]he Supreme Court found that the choice of language in 11 U.S.C. § 1334 'suggests some breadth' to the scope of 'related to' jurisdiction."); *SPV Osus Ltd. v. UBS AG,* 882 F.3d 333, 339–340 (2d Cir. 2018) ("While 'related to' jurisdiction is not 'limitless,' it is fairly capacious, and includes 'suits between third parties which have an effect on the bankruptcy estate.'") (internal citations omitted).  As such, the Court finds that the State Court Proceeding properly falls within this Court's "related to" jurisdiction.  *See In re Nat'l Events Holdings, LLC,* 2023 WL 4771901, at \*5 (Bankr. S.D.N.Y. July 26, 2023) ("An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.") (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.5 (1995)).

(iii)      the delays caused by Mr. Chassen's, AREH's and Oak's "continuing efforts to frustrate the discovery process" during the course of the State Court Proceeding.[16]

[Doc. 20, pp. 21–22]. The Remand Objection therefore argues that, taken together, the circumstances are such that Justice Cohen "will be unable to timely adjudicate the removed State [Court Proceeding] in a manner that is not incredibly disruptive to this Chapter 11 case." *Id.* at p. 22.

The Court is unpersuaded. As a threshold matter, the Remand Objection has not identified a "backlog" in Justice Cohen's calendar indicating that this Court could resolve the State Proceeding more expeditiously. *See generally id.* Indeed, a review of the data published by the New York State Unified Court System indicates that the Commercial Division has—consistently, since at least 2019—disposed of more cases than were filed year-by-year. *See State-Paid Trial*

---

[16]     This is an argument Mr. Simpson has urged both before this Court and before Justice Cohen. *See, e.g.*, [Ch. 11 Dkt., Doc. 4-5, pp. 48–50] (the transcript from a hearing held before Justice Cohen on February 2, 2024); *see also* [Ch. 11 Dkt., Doc. 4-6, p. 3] (where, in an email sent to the Honorable Deborah A. Kaplan, Mr. Simpson takes issue with the fact that Justice Cohen's Interim Orders were issued without "cross examination, trial, or an evidentiary hearing"); [Ch. 11 Dkt., Doc. 62, p. 12] ("Mr. Chassen has refused to respond to discovery requests, and has not produced documents in both the State Court Action and this bankruptcy case . . . [and] only Oak, a non-party to this [] matter, has provided minimal documents, without a privilege log, and without providing any of the key agreements and communications between Oak and Chassen."); [Doc. 16, p. 16] (where the Debtor takes issue with the fact that "[Mr.] Chassen, AREH and Oak refused to proceed with the Motions to Dismiss or to participate in discovery with respect to the Motions to Dismiss or the Remand Filings").

The Court is aware of the argument for discovery in this case—indeed, the pending Motions to Dismiss raise "complicated issues," the resolution of which will likely require an evidentiary record. *See* [Ch. 11 Dkt., Doc. 64, p. 48] ("The Court does think there are a number of complicated issues that the parties have raised and discovery does make sense on these issues."). However, discovery is unnecessary to the resolution of the instant Motion, and the Court does not believe that discovery as to the ultimate issues raised by the State Court Proceeding would proceed any more expeditiously here than it would before Justice Cohen. *See* [Ch. 11 Dkt., Doc. 50, p. 1] (where Mr. Chassen, AREH *and the Debtor* "agree[] to adjourn the Motion to Dismiss pending the Court's determination of the Stay Relief Motions, so that the Court and all parties may collectively preserve resources that would otherwise be expended in a *contentious discovery process* . . . .") (emphasis added).

In any event, to the extent that Mr. Simpson and the Debtor believe that the Remand Motion "indicate[s] a need for expedited discovery to enable a fair and reasonable resolution of the issues raised [there]," the record indicates that the parties to this action have already had an ample opportunity to conduct discovery prior to the filing of this bankruptcy. *See* [Doc. 16, pp. 7–9, 21] (making a request for an order "compelling expedited discovery"); *but see* [Ch. 11 Dkt., Doc. 14-1, p. 34] (where, on a hearing held November 20, 2023, Justice Cohen states, "Just to be clear, everyone had an opportunity to take discovery. If you all wanted a preliminary injunction with [an] evidentiary hearing, I certainly didn't turn that down. *Nobody asked for it*.") (emphasis added).

*Court Caseload Trends Dashboard*, NEW YORK STATE UNIFIED COURT SYSTEM, https://ww2.nycourts.gov/caseload-trends-36966 (last visited May 6, 2024) (logging "counts from 2019 of cases filed, disposed, end of period pending, and the number of trials commenced for all state-paid trial courts, updated monthly").  Given this data, and given the pace at which the State Court Proceeding had been advancing prior to removal, the Court does not believe that it would resolve the claims asserted before Justice Cohen any more quickly than Justice Cohen himself. *See In re AOG Ent.,* 569 B.R. 563 at 579 ("Timeliness . . . is a case- and situation-specific inquiry that requires a comparison of the time in which the respective state and federal forums can reasonably be expected to adjudicate the matter."); *see also* [Doc. 1-2, pp. 334–363] (the docket from the Commercial Division, which contains over 600 docket entries logged between August and the date of removal); [Doc. 3, pp. 5, 7, 10, 13–14] (cataloging instances where Justice Cohen resolved *every emergency motion filed* in the State Court Proceeding within 10 days of filing).

The Court likewise believes that the State Court Proceeding presents questions that are best decided in the Commercial Division.[17]  Although the claims asserted by the parties are not particularly complex, they are numerous, arise exclusively under New York law, do not raise issues unique to bankruptcy, and rest upon factual allegations that are hotly contested.  *See generally* [Doc. 2-1]; *see also* [Doc. 20-2, p. 66] (where, at a hearing held February 6, 2024, Justice Cohen notes that Mr. Chassen and Mr. Simpson "couldn't agree on the day of the week").  Resolving those claims would thus require the Court to, *inter alia*, decide facts that have already been alleged

---

[17]     This is particularly true where, as here, the propriety of the Debtor's bankruptcy depends at least in part upon an interpretation of Justice Cohen's Interim Orders.  *See* [Ch. 11 Dkt., Doc. 4, p. 2] (where the Motion to Dismiss argues that this bankruptcy "should be dismissed as unauthorized in bad-faith because Jeffrey Simpson never sought or obtained the consent of . . . Mr. Chassen, as required by the [Debtor's] Operating Agreement" and by the Interim Orders) (abbreviations omitted); *see also* Part (III)(b) n.20 (where the Court explains why "the Interim Orders bear directly upon the Debtor's reorganization—including the threshold issue of whether Mr. Simpson possessed the authority to file a petition for relief on behalf of the Debtor").

repeatedly before Justice Cohen. This exercise would be, in the Court's view, unnecessarily redundant and inefficient. *See In re AOG Ent.,* 569 B.R. 563 at 580 ("[W]hen the facts in a case are especially complex, the forum with greater familiarity with the record may [] be expected to adjudicate the matter more quickly.") (citing *Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp.,* 639 F.3d 572, 580–81 (2d Cir. 2011)); *In re Maa-Sharda, Inc.,* 2015 WL 1598075, at *7 (Bankr. W.D.N.Y. Apr. 9, 2015) ("In light of [the state court's] specific knowledge and experience with respect to both the fiercely litigated foreclosure action and the follow-on civil action between the same parties, there is simply no credible evidence to even hint that the State Court will not promptly hear the fraud case.").

Finally, the Court notes again that the Debtor's bankruptcy is underdeveloped at this time. *See supra*, Part (III)(a)(i). In contrast, the State Court Proceeding record was robust at the time of this bankruptcy, and Justice Cohen was otherwise poised to answer an "ultimate issue:" the party properly in control of the Debtor. *See* [Doc. 20-2, pp. 63–64]; [Ch. 11 Dkt., Doc. 4-5, pp. 42, 63]; [Ch. 11 Dkt., 41-19]; *see also In re Maa-Sharda, Inc.,* 2015 WL 1598075, at *7 ("In fact, the defendants' motions to dismiss the fraud action were scheduled to be heard by [the state court] on March 26, 2015—a date that has now passed due to [the debtor's] own litigation tactic in removing the action to federal court."). In any event—and although remand may impact the Debtor's reorganization—the Court considers any potential delay in the bankruptcy unavoidable given the posture of this case. *See* [Ch. 11, Doc. 95, p. 2] (where the Subchapter V Trustee recommends that "issues of governance and control should be completely resolved" before the bankruptcy proceeds); *see also* [Doc. 25, p. 30] (where, at the hearing held May 2, 2024, proposed Debtor's counsel agrees that reorganization "will be virtually impossible because [the Debtor] can't move

forward with anything until the questions that the state court action need[s] to resolve are dealt with").

In summary, the Court finds that: (i) under Section 1334(b), this Court merely has "related to" jurisdiction over the State Court Proceeding; (ii) because "related to" jurisdiction is the only basis for subject matter jurisdiction, the State Court Proceeding is "non-core" within the meaning of Section 157(b); and (iii) the State Court Proceeding can be "timely adjudicated" before Justice Cohen. For these reasons, the Court concludes that Section 1334(c)(2) mandates abstention.

### b. **Permissive Abstention & Equitable Remand**

Alternatively, the Court finds that the State Court Proceeding presents a case where permissive abstention and equitable remand are also appropriate.

Section 1334(c)(1) of title 28 provides:

> Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

28 U.S.C. § 1334(c)(1). Title 28 thus provides a means by which a federal court may abstain from hearing a case, regardless of whether that case is core or non-core, so long as that abstention is motivated by a "respect for State law," or otherwise serves the interests of justice or comity. [18] *Id.*

Courts consider several factors when considering whether permissive abstention is appropriate. These factors include:

---

[18]  Additionally, Section 1452 of title 28 provides that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." 28 U.S.C. § 1452(b). Because the factors relevant to the Section 1452(b) analysis are "essentially the same" as the permissive abstention factors, courts in this district typically address equitable remand and permissive abstention together. *See Empery Tax Efficient, LP v. MusclePharm Corp.*, 2023 WL 2580006, at *6 (S.D.N.Y. Mar. 21, 2023); *Little Rest Twelve, Inc. v. Visan*, 458 B.R. 44, 60 (S.D.N.Y. 2011).

(1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden [on] the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*In re WP Realty Acq. III LLC*, 626 B.R. 154, 162 (Bankr. S.D.N.Y. 2021) (citing *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 332 (S.D.N.Y. 2003)). An examination of these factors need not be a "mechanical or mathematical exercise," and a court need not "plod through a discussion of each factor" before rendering a decision. *In re All Year Holdings Ltd.*, 2024 WL 1460157, at *5 (Bankr. S.D.N.Y. Apr. 3, 2024). Rather, the Section 1334(c)(1) analysis involves a "thoughtful, complex assessment of what makes good sense in the totality of the circumstances." *Id.* (citing *In re Janssen*, 396 B.R. 624, 636 (Bankr. E.D. Pa. 2008)). The party moving under Section 1334(c)(1) bears the burden of establishing that permissive abstention is warranted. *Id.*

The Court believes that factors four, seven, and nine are either neutral or irrelevant to the instant proceeding, and with the exception of factor ten, the Court believes the remaining factors can be addressed summarily.[19]

---

[19] Factor four (the presence of a related state court proceeding) is inapplicable to this case, as it appears the State Court Proceeding is the sole proceeding involving the Debtor. [Doc. 2, p. 27]; *see generally* [Doc. 20].

Factor seven (the "substance rather than form of an asserted core proceeding") is likewise inapplicable because, as discussed at length *supra*, the State Court Proceeding is not a core proceeding.

Finally, with respect to factor nine, no party has persuasively identified a burden on either the docket of either this Court or the Commercial Division that would either weigh in favor or against remand. *See generally* [Doc. 2]; [Doc. 20]; *see also supra,* Part III(a)(ii).

As a threshold matter, the fifth factor—the existence of a non-1334 basis for jurisdiction—clearly favors abstention. The parties have not identified (and the Court has not found) a basis for jurisdiction other than that provided by Section 1334(b). *See generally* [Doc. 2]; [Doc. 20]; [Doc. 23]. With respect to factor eleven (the right to a jury trial), the parties seem to agree that this factor weighs in favor of remand. *See* [Doc. 2, p. 27] ("The right to a jury trial [supports] remand [], as the litigants continue to have preserved their right to a jury trial."); [Doc. 20, p. 29] ("Factor eleven . . . weighs in favor of remand where a litigant [] has a right to a jury trial.").

The first, second and third factors—the efficient administration of the estate, the predominance of state law issues, and the unsettled nature of applicable state law—further favor abstention. Two bodies of state law permeate the State Court Proceeding: (i) the law of the state of New York, which will ultimately decide the governance of the Debtor; and (ii) the Interim Orders, which direct the operation of both AREH and the Debtor until issue (i) is decided.[20]

---

[20]    Mr. Simpson and the Debtor have emphasized—repeatedly—the fact that the Interim Orders are "interim" and therefore non-final. *See, e.g.*, [Doc. 21, p. 8] ("The only orders entered in the State Court Action are those for preliminary, injunctive relief, which do not constitute the law of the case, res judicata or collateral estoppel, and [are], therefore, *not binding on this Court*.") (emphasis added); [Doc. 25, p. 35] ("There hasn't been a final order entered by the state court."); *id.* at p. 37 ("[T]here have been no final decisions, even though [other parties] have referenced final, and perhaps that's why [other parties used] quotes in their briefing. Nothing is final."); [Ch. 11 Dkt., Doc. 62, p. 3] ("Tellingly, approximately 8 months have elapsed since the State Court Action was filed, no final orders have been entered . . . ."); [Ch. 11 Dkt., Doc. 60, p. 4] ("[T]he State Court has entered a series of interim, non-final orders that prevented Simpson's or Chassen's notices from being deemed effective . . . [and] [s]ince the entry of such interim orders, Oak and Chassen have treated such non-final orders as *carte blanche* to restructure the Arch Companies over Simpson's objections and for Oak's benefit."); [Ch. 11 Dkt., Doc. 64, p. 28] ("[T]here's been nothing that's been established [as] final here . . . We're dealing with orders that are interim orders."); *but see* [Ch. 11 Dkt., Doc. 77, p. 16] (where proposed counsel for the Debtor states " I don't think we've ever contested whether or not the state court orders are effective"). These statements seem to suggest that that the nature of the Interim Orders' non-finality undercuts the effect those Orders have on this bankruptcy.

Bankruptcy Rule 9027 provides that "[a]ny injunction or order issued . . . before [] removal remains in effect until dissolved or modified . . . ." *See* Bankruptcy Rules 9027(i); *see also* 28 U.S.C. § 1450 (Bankruptcy Rule 9027(i)'s non-bankruptcy parallel); *see also In re Ramirez,* 2010 WL 1904270, at *5–7 (Bankr. S.D. Tex. May 11, 2010) (noting that the text of Bankruptcy Rule 9027(i) is identical to the language contained in Section 1450 and therefore has the same effect); *accord*, *In re Cattell*, 2021 WL 1100068, at *4 (Bankr. D. Or. Mar. 22, 2021). Bankruptcy Rule 9027(i) embodies the principle that, after removal, "[a] bankruptcy court is bound to respect State court orders and judgments," even when those orders and judgments are interlocutory. *In re Briarpatch Film Corp*., 281 B.R. 820, 830 (Bankr. S.D.N.Y. 2002); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.,* 415 U.S. 423, 435–36 (1974) ("Judicial economy is promoted . . . [when] proceedings had in state court [] have force and effect in federal court . . . [and when] interlocutory orders entered by the state court to

Although the parties dispute the precise effect of these authorities, all parties seem to agree that questions relating to the Debtor's governance (particularly in light of the Interim Orders) logically precede any administration of the Debtor's estate. *See, e.g.*, [Doc. 25, p. 30] (where proposed Debtor's counsel agrees that reorganization "will be virtually impossible because [the Debtor] can't move forward with anything until the questions that the state court action [raises] are dealt with"); *id.* at p. 54 (where counsel for Mr. Chassen describes the State Court Proceeding as "a case that's not yet ripe" for bankruptcy relief); [Ch. 11 Dkt., Doc. 38, pp. 20–21] (where AREH argues that determining the "long-litigated issue of the Debtor's, and AREH's, governance issues" would "swiftly, and with judicial economy" allow the Debtor's bankruptcy to proceed). Put differently, until questions relating to the Debtor's governance are answered under New York law, this bankruptcy cannot proceed. The same would be true regardless of whether those questions were resolved by this Court or by Justice Cohen, the latter of whom already possesses an intimate familiarity with the State Court Proceeding and the Interim Orders issued therein.

The sixth, eighth and twelfth factors—the relatedness of the proceeding to the bankruptcy, the feasibility of severing that proceeding from the bankruptcy, and the presence of non-Debtors— likewise favor remand. While the State Court Proceeding involves claims that will impact the course of the Debtor's bankruptcy, those claims are (as discussed above, *see supra*, Part III(a)(i)) attenuated from a core bankruptcy function or purpose. The remaining claims are between non-Debtor third parties, most of which exist separate and apart from both the Debtor's reorganization and the administration of its estate. *See generally* [Doc. 2-1].

---

protect various rights of the parties [do] not lapse upon removal."). Thus, to the extent Mr. Simpson and the Debtor believe the Interim Orders have a minimal effect on the questions presented during the Debtor's bankruptcy, the Court disagrees. The Court finds instead that the Interim Orders bear directly upon the Debtor's reorganization— including the threshold issue of whether Mr. Simpson possessed the authority file a petition for relief on behalf of the Debtor.

### i.  *Factor Ten: Forum Shopping*

An application of the above factors indicates, independently, that permissive abstention is appropriate under Section 1334(c)(1).  In addition, given the tenor of the record, the present posture of this case, and the history of both the State Court Proceeding and this bankruptcy, the Court will address the tenth factor—forum shopping—separately.  To that end, a re-examination of the record is necessary.

The August Exchange occurred during the weekend of August 5, 2023.  Mr. Simpson thereafter commenced the State Proceeding on August 15, 2023.  *See generally* [Doc. 1].  Mr. Simpson's state court complaint made several requests for relief, most (if not all) of which required a determination of the membership rights of Mr. Simpson and Mr. Chassen vis-à-vis the Debtor.  *See, e.g.*, [Doc. 1-2, p. 31] ("Chassen materially breached the 'Resignation' provision of § 1.1 of the [Debtor's] Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of [the Debtor], and thus had no authority to do so . . . ."); *id.* at p. 23 ("On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the [Debtor's] Operating Agreement, Chassen ceased to be a member of [the Debtor].").

Justice Cohen did not immediately rule on the merits of Mr. Simpson's claims, and instead set a hearing on Mr. Simpson's request for a preliminary injunction on September 29, 2023.  *See* [Ch. 11 Dkt., Doc. 4-7, p. 2].  Additionally, on August 21, 2023, Justice Cohen issued an Interim Order providing*, inter alia*, that the August Exchange was "hereby void and of no force or effect," and that "Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the [Debtor]'s Operating

"Agreement" pending a determination of their membership interests in the Debtor.[21]  [Ch. 11 Dkt., Doc. 4-2, p. 317].

Mr. Simpson attempted to resign Mr. Chassen again on September 1, 2023, apparently while Justice Cohen was on vacation.  [Doc. 1-2, p. 98]; [Doc. 3-8, pp. 8, 13–14, 24].  At a hearing held September 11, 2023, Justice Cohen told the parties:

> I'm just astonished . . . [and] I'm very skeptical about the unilateral termination that happened under the shadow of the last order I signed . . . [but] Mr. Chassen and Mr. Simpson have a business to run.  [The parties] still have a preliminary injunction hearing to get ready for.  This seems to be counterproductive . . . My preference would be to take this [case] off the Court's radar and get it back on to counselors and business people operating a business that doesn't look as chaotic as frankly [] it looks to me right now . . . [a]nd if you can't work it out and I see a risk to the assets of th[e] [Debtor], and somebody asks for a receiver, which is not what anybody wants I imagine, I will take it seriously.  So work this out.  I am imploring you to do that.

[Doc. 3-8, pp. 7, 24–25, 38, 40, 48].  Three days later, Mr. Chassen filed his own request for a preliminary injunction "compelling [] Simpson to comply with [Justice Cohen's] August 21, 2023 Interim Order . . . [and] holding Simpson in contempt of [that] Interim Order . . . ."  [Ch. 11 Dkt., Doc. 4-3, p. 3].

On September 29, 2023, however, Justice Cohen held a hearing on Mr. Simpson's initial request for preliminary injunctive relief.  [Ch. 11 Dkt., Doc. 4-7, pp. 7–8].  There, then-counsel for Mr. Simpson argued that Mr. Chassen was not a member of the Debtor for several reasons, including because Mr. Chassen failed to "devot[e] substantially all of his business time" for the benefit of the Debtor:

> [T]here is a provision in the agreements that requires, without getting into every detail, you know, there is a provision in the agreements that requires Jared Chassen to give his full time and his full loyalty and his full his full work fulltime for JJ

---

[21]     Justice Cohen described his August 21, 2023 order as an attempt to "steady the ship, [] put the [Debtor] back in sort of normal working order . . . [and] get the business at least operating on the basis of the existing [operating] agreement . . . ."  [Doc. 3-8, p. 6] (transcript from the hearing held September 11, 2023).

> Arch. That is his requirement . . . [meaning] he cannot work for [] Oak and he violated that. . . .

*See* [Ch. 11 Dkt., Doc. 4-7, pp. 7–8] (describing Oak's alleged hiring of Mr. Chassen); *see also id.* at pp. 12–15 ("Mr. Chassen is not coming to work . . . [he's] calling in sick all the time and he doesn't show up to work hardly ever."); *id.* at pp. 16–17 ("[Section] 3.3 of [the Debtor's] operating agreement requires that [] Mr. Chassen devote substantially all his business time to the company. Instead . . . he's not showing up to work.").[22]

Notwithstanding these arguments, Justice Cohen found that the "record now does not justify any changes to the existing orders" entered on August 21, 2023, reasoning:

> Even if the plaintiff was able to demonstrate more of a likelihood of success on all of their claims as well as irreparable injury, the balance of equities does not favor [Mr. Simpson] here. The actions I've observed over the past several weeks don't give me confidence to alter the status quo from the interim orders. Instead, from my perspective, [Mr. Simpson] has demonstrated the inclination to take every opportunity possible to either get around court orders or further inflame the situation at every turn . . . And so, in my view [Mr. Simpson] does not come today with clean hands to seek additional injunctive relief.

*See* [Ch 11 Dkt., Doc. 4-7, pp. 49–60]. Justice Cohen reiterated that the terms of his August 21, 2023 Orders were "intended to permit the [Debtor] to go back to normal operating procedure," and urged the parties to "try to figure out a way to run this business and put some of this vendetta mindset to the side." *Id.* at p. 54.

Oak intervened in the State Court Proceeding on October 17, 2023. [Ch. 11 Dkt., Doc. 41-13, p. 4]. As a part of that intervention, Oak sought the temporary appointment of a receiver to oversee the operations of the Debtor, and further requested "a preliminary injunction making Oak

---

[22] Mr. Chassen also filed an answer to Mr. Simpson's complaint on October 13, 2023, that generally denied Mr. Simpson's allegations and sought, *inter alia*, a declaration that Mr. Chassen "lawfully terminated Simpson, that Simpson may be terminated, and that Simpson is no longer a member of [the Debtor]." *See* [Doc. 1-2, p. 106].

the managing member [of AREH] during the pendency of th[e] litigation." *Id*; [Ch. 11 Dkt., Doc 14-1, p. 31].

Justice Cohen heard Mr. Chassen and Oak's motions for preliminary injunctive relief on November 20, 2023. *See generally* [Ch. 11 Dkt., Doc 14-1] (the hearing transcript). Both motions were granted to some degree during that hearing, and those rulings were memorialized in two Interim Orders issued on November 28, 2023. [Ch. 11 Dkt., Doc. 38-3, pp. 2–3]; [Ch. 11 Dkt., Doc. 38-3, pp. 3–4].

With respect to Oak's motion, Justice Cohen chose not to appoint a receiver to oversee the operations of the Debtor, and instead made Oak the managing member of AREH.[23] *See* [Ch. 11 Dkt., Doc. 38-3]. The AREH Interim Order thus enjoined Mr. Chassen and Mr. Simpson from:

> [a]cting as (or holding themselves out to third parties to be) managing members of [AREH], and . . . [d]enying prompt consent to any Major Decision proposed by Oak as Managing Member . . . unless *both* JJ Arch members (Jeffrey Simpson and Jared Chassen) jointly agree to deny such consent . . . . [and] [o]therwise interfering with Oak's ability to exercise its responsibility as Managing Member of AREH.

*Id.* (emphasis in original). Notably, the AREH Interim Order also enjoined Mr. Simpson from "entering the offices of AREH except with and upon the terms stated in an advance written consent provided by Oak . . . ." *Id.* at p. 3.

Mr. Simpson made three attempts to nullify Justice Cohen's rulings in the months preceding this bankruptcy. The first of these occurred on January 29, 2024, when Mr. Simpson

---

[23] Justice Cohen based the AREH Interim Order on two concerns: (i) the fact that AREH was "in a fairly critical phase . . . [with] a morass of accounting and tax issues that need to be sorted out very, very quickly" by a party with operational knowledge of both AREH and the Debtor; and (ii) the fact that Oak's replacement of the Debtor was something expressly contemplated by AREH's operating agreement. *See, e.g.* [Ch. 11 Dkt., Doc 14-1, p. 43] ("[U]nder the agreement there are situations where Oak can take over . . . if things went south in a way that was culpable, it would not be a receiver or bankruptcy trustee that would take over, it would be Oak."); *id.* at p. 57–58; *id.* at p. 64 ("So, at the moment my goal is for Oak to have a relatively free hand to right the ship . . . I want first and foremost for Oak to continue what it has been doing. I think it's positive. I think it's really the only pathway here to keep the ship afloat.").

filed a motion to stay the AREH Interim Order. [Doc. 1-2, p. 358]; *see also* [Ch. 11 Dkt., Doc. 4-5, pp. 106–107] (Mr. Simpson's proposed order to show cause). That motion sought: (i) authorization to terminate Mr. Chassen from the Debtor; and (ii) the reinstatement of the Debtor as managing member of AREH. [Ch. 11 Dkt., Doc. 4-5, pp. 106–107].

After oral argument held February 2, 2024, Mr. Simpson's request for stay was denied. Recognizing that granting Mr. Simpson's motion would "effectively give Mr. Simpson the sole consent rights" over the Debtor, Justice Cohen reasoned:

> [T]he changing of roles of making Oak managing member . . . it has a contractual basis to it; and it was, in my view, justified by what I consider overwhelming evidence of just some outrageous conduct [by Mr. Simpson] . . . Look, I don't really throw around orders like that in cases very often. It's the last thing I want to do is get involved in this, but the -- the animus that I observed was clearly hurting [he Debtor] and all the other third parties that depend on [the Debtor]; and it got to the point where it was so dysfunctional that I didn't feel like there was any other choice and I didn't see anything in the papers I've read in connection with this motion which causes me to even for a moment change my mind on that.

*Id.* at pp. 47, 51–53. Justice Cohen thereafter set an evidentiary hearing for June 7, 2024, to decide the "ultimate issue" of Mr. Simpson and Mr. Chassen's respective rights vis-à-vis the Debtor. *Id.* at pp. 42, 63; [Ch. 11 Dkt., Doc. 41-19].

Less than two weeks later, Mr. Simpson emailed the chambers of the Honorable Deborah A. Kaplan, Deputy Chief Administrative Judge of the New York City Courts. [Ch. 11 Dkt., Doc. 4-6, pp. 2–3]. That email read in its entirety:

> Attn Hon Deborah Kaplan,
>
> I am writing to you about my case in front of Hon. Joel Cohen, 158055/2023, Simpson and JJ Arch LLC vs. Chassen.
>
> In early August 2023, my junior/ non-controlling partner of JJ Arch LLC, Jared Chassen (with very limited rights) colluded with our exclusive/ passive investment partner, Oak from Canada, so that they can oust me from a business that I built, all for the purposes of self dealing and ultimately gaining the power as managing member of a $1Bn real estate business. My partner, Chassen, did illegal things like

steal my intellectual property, take improper distributions, misguide major banking institutions, etc. Judge Cohen ultimately gave a Pl in my favor but after many twists and turns of attempting to rewrite the agreements and maintain "status quo" for a business that was struggling due to the economic times in commercial real estate (it already had over $10M of defaulted unpaid debts, now over $20M where Oak had the obligation to fund contractually). Oak had motive to hurt me and my business since July, and we tried to tell Judge Cohen this, but it got sidelined for the greater good of the "motion practice". Months later, I continue to get hurt, Oak has hired countless attorneys that Cohen is impressed with (large firms that I cannot equally afford given the circumstances) and that is the guiding force of the Court process rather than the merits. We have tried to tell Cohen that the company has over $20M of unpaid defaulted obligations - he has blocked bankruptcy, stripped me of my rights by changing agreements without the right to do that (I am told that Courts should not rewrite agreements). These shifts in control, guided by the Court, have resulted in major loan events of default that are not curable, all which I gently advised Cohen that this would happen in August and he acknowledged. Many of the law firms working on the case have worked in conflict of interest without pursuing a conflict waiver from me, this has not be acknowledged either. There has not been a way to defend myself properly and it seems that Cohen has unfairly (or improperly) rendered a decision about my character and business without cross examination, trial, or an evidentiary hearing with actual witnesses speaking under oath.

The bottom line is that the parties are spending millions of legal dollars surrounding Court generated contract changes that are not on the four corners of the page of the agreements. We are going to proceed with the appeal process but candidly it is not fair what has happened here. I have not been able to defend myself, I have been wiped out of my liquidity, my business, and reputation, all on the hunch of a judge rather than proper evidence and merits. This process continues to erode $100M of other investors funds simultaneously, without any defense there as well.

Your help is greatly appreciated.

Best Regards,
Jeff Simpson
JJ Arch LLC, Managing Member (also prior MM of AREH or Arch Real Estate Holdings LLC)

*Id.* Special Counsel to Judge Kaplan responded to that email several days later and informed Mr. Simpson that "Judge Cohen is a judge of coordinate jurisdiction and Judge Kaplan [therefore] cannot interfere with his rulings." *Id.* at p. 5.

Mr. Simpson appealed Justice Cohen's February 2, 2024 ruling to the Appellate Division, First Department four days after contacting Judge Kaplan's chambers. *See* [Ch. 11 Dkt., Doc. 4-6, p. 40]. That appeal was denied without prejudice several days later. *Id.* at p. 41 (referring Mr. Simpson's motion "to full bench for disposition").

On March 6, 2024—exactly one day before putting the Debtor into bankruptcy—Mr. Simpson sent several emails to Kevin Wiener ("Mr. Wiener"), one of Oak's principals, regarding Oak's management of AREH. Mr. Simpson's final email to Mr. Wiener read:

> YOU DON'T KNOW ANYTHING, GO BACK TO CANADA AS YOU ARE PLANNING TO DO ANYWAY AFTER YOU ARE FINISHED RUINING THE BUSINESS THAT I BUILT. THE GROWN UPS WILL HANDLE IT. YOU WILL NEVER BE ALLOWED BACK IN THE US WHEN WE ARE DONE WITH THIS NONSENSE. DON'T SEND ME ANYTHING MORE, YOU WILL BE PROVEN GUILTY ON ALL RESPECTS – GOOD THAT YOU DUPED ONE JUDGE, YOU WON'T DUPE OTHERS.[24]

[Ch. 11 Dkt., Doc. 14-3, p. 2] (emphasis in original). Mr. Wiener responded, "Jeff I'm already in Canada." *Id.*

Mr. Simpson then unilaterally filed a petition for chapter 11 relief on behalf of the Debtor on March 7, 2024. *See generally* [Ch. 11 Dkt., Doc. 1]. The Debtor's petition states that Mr. Simpson became the Debtor's sole equity holder after "Mr. Chassen [] was deemed to have

---

[24]     Many of Mr. Simpson's emails indicate a certain displeasure for Mr. Chassen, Mr. Wiener and—perhaps most notably—Justice Cohen's Interim Orders. *See, e.g.*, [Ch. 11 Dkt., Doc. 14-3, p. 4] ("Be specific Kevin. You are a lying / cheating crook in all respects."); *id.* ("The grown ups figure out the real estate not the inexperienced crooks like you and your disgusting brother. The judge has no idea what is happening in front of him with your duping efforts."); *id.* ("AGAIN, LET'S MEET IN ANY PLACE OR JURISDICTION RIGHT NOW – LAWYERS OR NOT – PUT THE CARDS ON THE TABLE – YOU LOSE FOR BREAKING LAWS AND LYING, I HAVE ZERO TO HIDE.") (emphasis in original); *see also* [Ch. 11 Dkt., Doc. 43-1, p. 26] (where Mr. Simpson tells Mr. Chassen, "You have no authority to do anything, but if you actually think you are a member, why are you not sending any money to cover some costs Jared? . . . There is no question you are fully in breach of the agreement and /or an in contempt of court and should arguably be arrested."); *id.* at p. 8 ("Who do you work for Jared? Your signature to your email refers to you as something you are not. You certainly are not doing anything for me under JJ Arch."); *id.* at p. 1 ("If there is a consent required by Jared, I will get it when necessary. Until then he has no relevance as a passive non-managing member participant, other than when I ask him to do things which he has refused to acknowledge since you started the 'coup' process in July.").

resigned as a member of [the Debtor]" during the August Exchange. *Id.* at p. 12, n.1. This narrative was contradicted twelve days later when Mr. Simpson filed his 1007-2 affidavit, which provides that Mr. Chassen "voluntarily decided to cease providing substantially all of his business time for the benefit of the Debtor no later than January 2024 and, as a result, was deemed to have resigned from the Debtor under the under [sic] terms of the [Debtor's] Operating Agreement." *See* [Ch. 11 Dkt., Doc. 16, p. 11 n.14] ("Notably, although certain [Interim Orders] did enjoin the Debtor's Members from unilaterally seeking to terminate or force the resignation of the other without permission of the court, such orders did not prohibit Mr. Chassen from *voluntarily resigning* from the Debtor in th[is] manner . . . .") (emphasis added); *see also* [Ch. 11 Dkt., Doc. 4-7, pp. 7–8, 11–14, 16–17] (making a comparable argument before Justice Cohen); *but see* [Ch. 11 Dkt., Doc. 56, pp. 16–17] (where proposed counsel for the Debtor represents to this Court that "[w]e absolutely have an argument that we don't believe has been addressed by the state court, which is the -- you know, what we referred to as the voluntary resignation in our objection to the motion to shorten notice, which is whether or not Mr. Chassen's been devoting substantially all of his business time for the benefit of [the Debtor].") (emphasis in original).

It is well-established that "state-court losers complaining of injuries caused by state-court judgments" cannot use the federal judiciary as an appellate court. *See Hunter v. McMahon,* 75 F.4th 62, 65 (2d Cir. 2023) (discussing the *Rooker-Feldman* doctrine). *Rooker-Feldman*, of course, only applies where "the losing party in state court filed suit in federal court *after the state proceedings ended.*" *Hunter v. McMahon*, 75 F.4th 62, 65 (2d Cir. 2023) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)) (emphasis in original). The Court nonetheless finds that, in this case, the principle underlying *Rooker-Feldman* and its progeny support abstention under Section 1334(c)(1). *See* 28 § 1334(c)(1) ("[N]othing in this section

34

prevents a district court in the interest of justice, or in the *interest of comity* with State courts or *respect for State law*, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.") (emphasis added); *see also In re AOG Ent., Inc.,* 569 B.R. 563, 573 (Bankr. S.D.N.Y. 2017) ("Federal courts abstain out of deference to the paramount interests of another sovereign, and the concern is with principles of comity and federalism.") (citing *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 723 (1996)).

The Court believes that the record recited above establishes that the tenth factor—forum shopping—weighs in favor of abstention.

Based on the above analysis, the Court submits the following findings of fact and/or conclusions of law:

(i)    this Court only has "related to" jurisdiction over the State Court Proceeding under 28 U.S.C. § 1334(b);

(ii)   the State Court Proceeding is a "non-core" proceeding within the meaning of 28 U.S.C. § 157(b);

(iii)  the Commercial Division of the Supreme Court of the State of New York can "timely adjudicate" the State Court Proceeding;

(iv)   abstention is mandated under 28 U.S.C. § 1334(c)(2); and

(v)    alternatively, permissive abstention and equitable remand are warranted under 28 U.S.C. §§ 1334(c)(1) and 1452(b).

**IT IS SO ORDERED.**

Dated: June 10, 2024

New York, New York

/S/ John P. Mastando III
HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE