GREAT AMERICAN INSURANCE GROUP
301 E. Fourth Street, Cincinnati, OH 45202

# Asset Management Liability Solution
# DECLARATIONS

**THIS IS A CLAIMS MADE POLICY, READ IT CAREFULLY**

Insurance is afforded by the company indicated below: (Each a capital stock corporation)

☒ Great American Insurance Company ☐ Great American Insurance Company of New York

☐ Other

Note: The Insurance Company selected above shall herein be referred to as the **Insurer**.

Policy Number: PEPE246619 Policy Form Number: D18100-F

---

Note: This is a claims made policy, please read it carefully. Amounts incurred as **Costs of Defense** shall reduce the Limit of Liability available to pay judgments or settlements and shall also be applied against the retention. This Policy does not provide for any duty by the **Insurer** to defend those insured under the Policy.

---

Item 1. **Named Insured**: ARCH REAL ESTATE HOLDINGS, LLC

Mailing Address: 88 UNIVERSITY PLACE, 2ND FLOOR
NEW YORK, NY 10003

Attention:

Item 2. **Policy Period**: From: 4/18/2023 (*Month, Day, Year*) To: 4/18/2024 (*Month, Day, Year*)
(Both dates at 12:01 a.m. Standard Time at the address of the **Corporation** as stated in Item 1)

Item 3. Limit of Liability (Inclusive of **Costs of Defense**):

$3,000,000 Aggregate Limit of Liability for the **Policy Period**

Item 4. Retentions:

| | | |
|---|---|---|
| Insuring Agreement A: | Each **Claim**: | $0 |
| Insuring Agreements B: | Each **Claim** other than an **Employment Practices Claim**: | $150,000 |
| | Each **Employment Practices Claim**: | $150,000 |
| Insuring Agreement C: | Each **Claim**: | $0 |

Item 5. Premium: (Prepaid) $41,820

Item 6. Endorsements Attached

D18408NY D18712 (6) D18712 (22) D18712 (50) D18712NY (15 D18716 DTCOV
IL7324

Item 7. Prior and Pending Date 12/31/2018

Item 8. **Discovery Period**

(A) Additional Premium $41,820

(B) Additional Period 365 Days

Item 9. Notices: **Notice of Claim or Wrongful Act(s)** shall be addressed to:
Great American Insurance Companies,
Attn: Claims Department
1450 American Lane, 8th Floor
Schaumburg, IL 60173

All other notice shall be addressed to:
Great American Insurance Companies,
Executive Liability Division,
P.O. Box 66943
Chicago, IL 60666

These Declarations, along with the completed and signed Proposal Form and the ***Private Equity Liability Insurance Policy***, shall constitute the contract between the **Insured** and the **Insurer**.

Countersignature
Not Required

(Authorized Representative) (Countersignature Date)

NOTE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

**New York Declarations Page**
**Attachment**

Notice: Except to such extent as may be provided herein, the coverage provided by this policy is limited to liability for only those claims that are first made against the insureds during the Policy Period and reported in writing to the Insurer pursuant to the terms herein. Please read the policy carefully and discuss the coverage thereunder with your agent or broker.

Notice: The Limit of Liability available to pay judgments or settlements may be reduced by amounts incurred by the Insured for legal defenses pursuant to Section V.C.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# AMENDMENT TO DECLARATIONS PAGE

It is understood and agreed that Item 4. of the Declarations is hereby amended to read as follows::

Item 4. Retentions:

Insuring Agreement A:

| | |
|---|---|
| Each **Insured Person**, **Claim**: | $ 5,000 |
| But in no event exceeding:<br>for all Insured Persons, each Claim | $ 50,000 |

Insuring Agreement B:

| | |
|---|---|
| Each **Claim** other than an **Employment Practices Claim**: | $ 150,000 |
| Each **Employment Practices Claim**: | $ 150,000 |

Insuring Agreement C:

| | |
|---|---|
| Each **Claim:** | $ 0 |

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# PRE-CLAIM EXPENSES ENDORSEMENT

It is understood and agreed that the Policy is amended as follows:

1. Section III.B. is amended by the addition of the following:

   If, pursuant to Section VIII.B. of the Policy, notice is provided by an **Insured** and accepted in writing by the **Insurer** ("Noticed Matter"), then, with respect to any covered **Claim** arising out of such Noticed Matter, **Costs of Defense** shall also mean reasonable and customary legal fees, costs and expenses incurred from the date such Noticed Matter is accepted by the **Insurer** until the date such Noticed Matter develops into a covered **Claim** ("Pre-Claim Expenses"). However, this coverage is available only to **Insureds** who:

   (i) are in material compliance with all terms and conditions of the Policy;
   (ii) agree to provide the **Insurer** with the same rights to associate with the **Insureds** as afforded for any **Claim** as set forth in Section VII.B. of the Policy; and
   (iii) obtain the **Insurer's** prior written consent to incur such Pre-Claim Expenses.

2. For purposes of coverage extended by this endorsement, Section IV.H. is deleted and replaced with the following:

   **H.** based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of 12/31/2018, or any fact, circumstance or situation underlying or alleged in such proceeding;

3. For purposes of coverage extended by this endorsement, Section VII.A. is deleted and replaced with the following:

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# PRE-CLAIM EXPENSES ENDORSEMENT

**A.** No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed. The **Insurer** shall not be liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# COST OF CORRECTIONS WITH SEPARATE RETENTION

It is understood and agreed that the following changes are made to the Policy:

## AMENDMENT TO INSURING AGREEMENT

1. Section I. is amended by the addition of the following:

   Subject to the terms and conditions this Policy, the **Insurer** shall reimburse the **Insured** for amounts paid by the **Insured** in connection with a **Claim** for **Costs of Correction** but only if:

   (1) the **Insurer** is notified in writing within fifteen (15) business days of the discovery of the **Trade Error** and such notification is received as soon as practicable from the date during the **Policy Period** that the **Trade Error** occurred but in no event later than thirty (30) days after the expiration date of this Policy;

   (2) such **Trade Error** arose in the ordinary course of the **Insured's** operations and occurred during the **Policy Period**;

   (3) if not corrected, the **Trade Error** would reasonably be the basis for a **Claim** against the **Insureds** for quantifiable **Loss** which would be payable and not otherwise excluded under this Policy;

   (4) the **Insured** reasonably establishes that a **Trade Error** has in fact taken place and that payments constituting **Costs of Correction** were paid and in what amount they were paid.

## AMENDMENT TO DEFINITIONS

1. Solely with respect to coverage afforded under this endorsement, Section III. A. is amended by the addition of the following:

   **Claim** means a request by the **Insured** for approval to incur any **Costs of Correction**.

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

# COST OF CORRECTIONS WITH SEPARATE RETENTION

2. Solely with respect to coverage afforded under this endorsement, Section III. is amended by the addition of the following:

"**Alteration**" means any act done upon an instrument, document or security by which its meaning, legal effect, rights or obligations attendant to it, or interests in it are changed.

"**Costs of Correction**" means any payments made to an **Investment Fund** or **Separately Managed Account** for the benefit of an investor(s) in such **Investment Fund** or **Separately Managed Account** provided such payments were made to avoid or reduce financial loss to such investor(s) resulting from any **Trade Error**.

"**Forgery**" means the signing of another person's name, by either mechanical, electronic or handwritten means, with the intent to deceive.

"**Theft**" means:

(1) The wrongful taking of money or other property; or

(2) Dishonest or fraudulent acts committed by or on behalf of an **Insured** acting alone or in collusion with others with the intent (a) to cause a financial loss to an **Insured** or **Insured's** customer, or (b) to obtain a financial benefit for any person or entity.

"**Trade Error**" means any trades performed by an **Insured**: (1) that were incorrectly executed: (a) in the wrong security; (b) on the wrong side of the market; (c) for a quantity different than specified in the instructions; or (d) duplicating a prior execution of the same original order; or (2) where the **Insured** failed to execute a written order that was executable when rendered.

"**Separately Managed Account**" means any **Organization** that is an investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization** for the purpose of making investments pursuant to a written investment mandate or agreement and where the capital of such **Organization** was contributed solely by an unaffiliated investor.

## AMENDMENT TO EXCLUSIONS

Solely with respect to coverage afforded under this endorsement, Section IV. is amended by the addition of the following:

based upon, arising from, or in any way related to diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value, unless such diminution in value or damages are established to have been caused by a **Trade Error**;

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# COST OF CORRECTIONS WITH SEPARATE RETENTION

for any contractual obligation to a customer or client of the **Insured** guaranteeing any rate of return or the fulfillment of any minimum performance standards;

for any act committed within the scope of any **Insured's** discretionary authority for which the **Insured** would not be held legally liable;

for which no coverage would have been afforded under the Policy had the **Trade Error** resulted in a **Claim**;

for any **Trade Error** of which the **Insured** had knowledge or information prior to the inception date of this Policy or the first policy in an uninterrupted series of policies issued by the **Insurer**, or any insurance company controlling, controlled by, or under common control with the **Insurer**, of which this policy is a direct or indirect renewal or replacement;

based upon, arising from, or in any way related to wire or electronic transfer of funds not directly related to an order or trade;

based upon, arising from, or in any way related to unauthorized access, use or operation of the **Insured's** computer or other electronic systems;

based upon, arising from, or in any way related to loss of physical possession of money, securities or other property in the care, custody or control of the **Insured**; or

based upon, arising from, or in any way related to **Theft**, **Forgery** or **Alteration**.

AMENDMENT TO DECLARATIONS

1. Solely for the purposes of any **Claim** for **Costs of Correction** to which this endorsement may in whole or in part apply, Item 3. of the Declarations is amended to read as follows:

   $ 3,000,000 in the aggregate each **Policy Period**, including **Costs of Defense**

   The extension of coverage afforded by this endorsement shall in no way serve to increase the **Insurer's** maximum aggregate Limit of Liability as shown under Item 3. of the Declarations. Such Limit of Liability is part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# COST OF CORRECTIONS WITH SEPARATE RETENTION

2. Solely for the purposes of any **Claim** to which this endorsement may in whole or in part apply Item 4. of the Declarations is amended to read as follows:

Each **Claim** for **Costs of Correction**: $ 500,000

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# EXCESS ADDITIONAL LIMIT OF LIABILITY FOR CHIEF COMPLIANCE OFFICER

Solely with respect to **Claims** by any **Regulatory Authority** against a **Chief Compliance Officer** for a **Regulatory Violation**, it is understood and agreed that the Policy is amended as follows:

1. Section III.is amended by the addition of the following:

   "**Chief Compliance Officer**" means any **Insured Person** appointed pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940, Rule 38a-1 of the Investment Company Act of 1940 and/or Section 4s(k) of the Commodities Exchange Act as the chief compliance officer of the **Insured Entity**, or the functional equivalent to the foregoing in any foreign jurisdiction.

   "**Regulatory Authority**" means:

   (1) any federal, state, local or foreign law enforcement authority or other governmental Investigation authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general); or

   (2) the enforcement unit of any securities or commodities exchange or other **Self-Regulatory Organization**.

   **"Regulatory Violation**" means an actual or alleged violation of:

   (1) the Investment Advisor Act of 1940;

   (2) the Investment Company Act of 1940; or

   (3) the Securities Act of 1933 or the Securities Exchange Act of 1934;

   regarding the adoption and implementation of written policies and procedures to prevent violation of law pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940, Rule 38a-1 of the Investment Company Act of 1940 and/or Section 4s(k) of the Commodities Exchange Act, or any similar law, including, without limitation, any equivalent law in any foreign jurisdiction.

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# EXCESS ADDITIONAL LIMIT OF LIABILITY FOR CHIEF COMPLIANCE OFFICER

2. Section III.Y. is amended by the addition of the following:

   With respect to a **Chief Compliance Officer**, a **Wrongful Act** shall also include a **Regulatory Violation**.

3. Section V.C. is amended by the addition of the following:

   provided, however:

   (1) An Additional Limit of Liability in an amount not to exceed $ 150,000 is available solely for **Loss** resulting from any **Claim** made against **Chief Compliance Officer** and which is otherwise covered under Insuring Agreement I.A. This Additional Limit of Liability is in addition to and not part of the Limit of Liability set forth in Item 3. of the Declarations.

   (2) This Additional Limit of Liability shall be excess of any insurance available that is specifically excess of this Policy. Such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment under this Additional Limit of Liability.

   (3) Any **Loss** covered under Insuring Agreement I.A. shall first be paid under the Limit of Liability set forth in Item 3. of the Declarations, and only when such Limit of Liability is completely exhausted by payment of **Loss** under any Insuring Agreements shall **Loss** be paid under this Additional Limit of Liability.

4. Section VI. is amended by the addition of the following:

   Any **Claims** subject to this additional Limit of Liability shall not be shall not be subject to any Retention.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# RT ELITE REAL ESTATE ENDORSEMENT

It is understood and agreed that the following changes are made to the Policy:

Amendment to Insuring Agreements

Section I. is deleted and replaced with the following:

**Section I. Insuring Agreements**

A. Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

B. The **Insurer** will pay on behalf of the **Insured Organization**:

(1) **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

(2) **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim**;

provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**C.** Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**;

**D.** The **Insurer** shall pay on behalf of the **Insured Organization** all **Investigative Costs** resulting from any **Shareholder Derivative Demand** first made during the **Policy Period** or the **Discovery Period** for any actual or alleged **Wrongful Act** of an **Insured Person**.

Amendment to Declarations

Item 3. of the Declarations is amended by the addition of the following:

$ 3,000,000 Aggregate Sub-Limit of Liability for **Investigative Costs** for any **Shareholder Derivative Demand** for the **Policy Period.** This sub-limit is part of and not in addition to the Limit of Liability stated in Item 3.(a).

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

Amendment to Discovery Period

Section II.B. is deleted and replaced with the following:

**B**. As a condition precedent to the right to purchase the **Discovery Period**, the total premium for this Policy must have been paid, and a written request together with payment of the appropriate premium for the **Discovery Period** must be provided to the **Insurer** no later than sixty (60) days after the **Termination of Coverage**.

Amendment to Definitions

1. Section III. is amended by adding the following:

"**Business Practices Wrongful Act**" shall mean any actual or alleged act of discrimination, sexual harassment or the violation of any individual's civil rights related to such discrimination or sexual harassment.

"**Controlling Person**" shall have the same meaning as set forth in Section 15 of the Securities Act of 1933 or Section 20 (a) of the Securities Exchange Act of 1934, as amended, or under the common law or under any other applicable statute, rule, regulation or law or any foreign equivalent thereof.

"**Extradition**" shall mean any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

"**Foreign Jurisdiction**" means any jurisdiction, other than the United States of America or any of its territories or possessions.

"**Insured Capacity**" shall mean the position or capacity of an **Insured Person** that causes him or her to meet the definition of **Insured Person** under the Policy, but does not include any position or capacity held by such **Insured Person** in any entity other than the **Insured Organization** or **Portfolio Company**, even if directed or requested by the **Insured Organization**.

"**Investigative Costs**" shall mean reasonable and necessary costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the **Directors, Officers**, or employees of the **Insured Organization**) incurred by the **Insured Organization** (including its Board of Directors or similar management body or any committee thereof) in connection with the investigation or evaluation of any **Shareholder Derivative Demand**.

"**Investigation**" shall mean any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local, foreign or offshore government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after receipt or service of a formal order of investigation or matter under inquiry, subpoena, grand-jury subpoena, receipt of a Wells Notice, receipt of a target letter (within the meaning of Title 9-11.151 of the United States Attorney's Manual), civil investigative demand, search warrant or similar document; provided, however, that the foregoing shall not include a routine examination, inspection, or industry sweep of a type periodically conducted by any administrative or regulatory authority that appears to be unrelated to any **Wrongful Act** of an **Insured**.

# RT ELITE REAL ESTATE ENDORSEMENT

"**Inquiry**" means:

(1) a request or demand for an **Insured Person** either to appear at a meeting, deposition or interview or to produce documents relating to the business of the **Insured Organization** or such **Insured Person's** capacity with the **Insured Organization**, where such request or demand is:

(a) by any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including but not limited to the U.S. Securities and Exchange Commission, U.S. Department of Justice or any attorney general);

(b) by the enforcement organization of any securities or commodities exchange or other self-regulatory entity;

(c) by or on behalf of the **Insured Organization**, the **Insured Organization's** Board of Directors (or similar management body) or a committee thereof: (i) arising out of a request or demand set forth in subparagraphs (a) or (b) above; or (ii) which is part of the **Insured Organization's** investigation and evaluation of a **Shareholder Derivative Demand**; or

(2) the arrest or confinement of an **Insured Person**, whether residential or custodial, by a law enforcement authority, relating to the business of the **Insured Organization** or the **Insured Person's** capacity with the **Insured Organization**.

**Inquiry** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in the normal review or compliance process of the **Insured Organization** by a law enforcement authority, governmental investigative authority or enforcement organization of a securities or commodities exchange or other self-regulatory entity.

Coverage, subject to all other terms and conditions of the Policy, will be extended for an **Inquiry** whether or not a **Wrongful Act** is alleged.

"**Pollutants**" shall mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, asbestos, chemicals or waste of any kind, including any materials to be recycled, reconditioned or reclaimed.

# RT ELITE REAL ESTATE ENDORSEMENT

"**Securities Claim**" shall mean any **Claim** (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an **Insured** alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1) brought by any person or entity alleging, arising out of , based upon or attributable to, in part or in whole, the: (a) purchase or sale of, or (b) offer or solicitation of an offer to purchase or sell, any securities of an **Insured Organization** or **Portfolio Company**; or

(2) brought by a security holder of an **Insured Organization** or **Portfolio Company**, arising solely with respect to such security holder's interest in such securities of the **Insured Organization** or **Portfolio Company**, whether directly, by class action, or derivatively on behalf of the **Insured Organization** or **Portfolio Company**.

"**Shareholder Derivative Demand**" shall mean a written demand by one or more shareholders of the **Insured Organization**, upon the Board of Directors (or similar management body or any committee thereof) of the **Insured Organization** to initiate a civil proceeding in a court of law against any individual **Insured Person**.

"**SOX 304/Dodd-Frank 954 Costs**" shall mean the reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond) consented to by the **Insurer** and incurred by any **Insured Person** solely to facilitate the return of amounts required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; provided, however, **SOX 304/Dodd-Frank 954 Costs** shall not include any payment, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

"**Third Party Claim**" shall mean any **Claim** brought by a customer, client, supplier, distributor, or independent contractor of the **Insured Organization**, or any other individual or group of individuals for any **Business Practices Wrongful Act**.

"**Whistleblower Conduct**" shall mean any of the activity set forth in 18 U.S.C. 1514A (a), engaged in by a whistleblower with any federal regulatory or law enforcement agency, member of the Congress or any committee of the Congress, or persons with supervisory authority over the employee, or an enforcement action by the whistleblower set forth in 18 U.S.C. 1514A (b) or any similar 'whistleblower' protection provision of any applicable federal, state, local or foreign securities law.

2. Section III.A. is deleted and replaced with the following:

**A.** "**Claim**" means:

(1) A written demand, other than a **Shareholder Derivative Demand**, for monetary, non-monetary or injunctive relief against an **Insured** commenced by such **Insured's** receipt of such demand;

# RT ELITE REAL ESTATE ENDORSEMENT

(2) an administrative, regulatory, arbitration, or other alternative dispute resolution proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, mediation or other alternative dispute resolution proceeding, notice of charges, formal investigative order or similar document, including the foreign equivalent thereof;

(3) a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading, or information or similar document including the foreign equivalent thereof;

(4) a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

(5) any **Investigation**;

(6) an **Employment Practices Claim**;

(7) a **Third Party Claim**;

(8) any **Securities Claim**; or

(9) an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

(10) an **Inquiry**, if reported to the **Insurer** pursuant to Section VIII. of the Policy.

3. Section III.B. is deleted and replaced with the following:

**B.** "**Costs of Defense**" means reasonable legal fees, costs and expenses (including but not limited to attorneys, experts, consultants, mediator and arbitrator fees, costs and expenses, document production fees and expenses) incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

Solely with respect to any **Extradition**, **Costs of Defense** shall also mean reasonable fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

(a) opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

(b) appealing any order or other grant of **Extradition** of that **Insured Person**.

# RT ELITE REAL ESTATE ENDORSEMENT

If, pursuant to Section VIII.B. of the Policy, notice is provided by an **Insured** and accepted in writing by the **Insurer** ("Noticed Matter"), then, with respect to any covered **Claim** arising out of such Noticed Matter, **Costs of Defense** shall also mean reasonable and customary legal fees, costs and expenses incurred from the date such Noticed Matter is accepted by the **Insurer** until the date such Noticed Matter develops into a covered **Claim** ("Pre-Claim Expenses"). However, this coverage is available only to **Insureds** who:

(1) are in material compliance with all terms and conditions of the Policy;

(2) agree to provide the **Insurer** with the same rights to associate with the **Insureds** as afforded for any **Claim** as set forth in Section VII.B. of the Policy; and

(3) obtain the **Insurer's** prior written consent to incur such Pre-Claim Expenses, such consent to not be unreasonably withheld.

4. Section III.D. is deleted and replaced with the following:

**D.** "**Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

5. Section III.E. is amended by the addition of the following:

(13) wrongful demotion;

(14) negligent reassignment;

(15) violation of any federal, state or local civil rights laws;

(16) negligent hiring;

(17) negligent supervision;

(18) negligent training;

(19) negligent retention; or

(20) acts described in (1) through (19) above, arising from the use of the **Insured Organization's** internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to such use of the **Insured Organization's** internet, e-mail, telecommunication or similar systems.

(21) with respect to any of the foregoing items (1) through (19) of this definition: infliction of emotional distress and failure to provide or enforce adequate or consistent corporate policies.

6. Section III.F. is deleted and replaced with the following:

**F.** **"Executive Officer"** means the functional equivalent of a chief financial officer or in-house general counsel, regardless of the actual title or position.

# RT ELITE REAL ESTATE ENDORSEMENT

7. Section III.J. is deleted and replaced with the following:

**J.** **“Insured Person(s)”** means:

(1) any natural person who was, is or shall become a director, officer, general partner, manager, managing member, member of the board of managers, management committee member, equivalent executive or employee (including any part-time, seasonal, temporary or leased employees) of an **Insured Organization**;

(2) any natural person who was, is or shall serve in equivalent positions to those noted in subsection (1) above in a foreign-domiciled **Insured Organization**;

(3) any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or other committee of an **Investment Fund**; or

(4) any natural person other than a director, officer, general partner, manager, equivalent executive or employee; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)**.

8. Section III.M. is deleted and replaced with the following:

**M.** “**Investment Fund**” means:

(1) any **Organization** that is a pooled investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization**; and

(2) any **Organization** which is created or established prior to or during the **Policy Period** for the purpose of monitoring, liquidating, dissolving or winding down an **Organization** identified in subsection (1) above or for the purpose of holding investments in connection with monitoring, liquidating, dissolving or winding down such an **Organization** identified in subsection (1) above.

9. Section III.N. is deleted and replaced with the following:

**N.** **“Loss**” means compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, **SOX 304/Dodd-Frank 954 Costs**, **Investigative Costs**, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense.**

**Loss** shall also include any reasonable fees and expenses of any attorney representing any party who has brought a **Claim** against any **Insured** where such fees and expenses are awarded pursuant to a covered judgment against an **Insured** or a covered settlement (consented to by the **Insurer**, which consent shall not be unreasonably withheld, delayed or denied) to which an **Insured** is a party.

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

# RT ELITE REAL ESTATE ENDORSEMENT

**Loss**, other than **Costs of Defense**, shall not include:

((1) taxes, criminal or civil fines or penalties imposed by law;

(2) amounts which may be deemed uninsurable under the law pursuant to which this Policy is construed;

(3) non-monetary relief;

(4) employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay;

(5) any portion of damages, settlements or judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities but solely with respect to coverage provided under Insuring Agreement I. B. (2) and solely to the extent such portion of damages, settlements or judgments, or settlements constitute an increase in consideration paid to the underlying claimant

(6) costs incurred in connection with cleaning up, removing, eliminating, abating, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**;

For clarification, this subsection (1), shall not in itself exclude from the definition of **Loss** any damages, settlements or judgments incurred by an **Insured** that are calculated based upon, or that flow directly from, any taxes, fines or penalties imposed upon a client where such taxes, fines or penalties result from a **Wrongful Act** of an **Insured**.

Notwithstanding sub-paragraph (2) above, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the **Insurer** shall not assert the portion of any amounts incurred by any **Insureds** attributable to such violations constitutes uninsurable loss and shall treat that portion of all settlements, judgments and **Costs of Defense** as constituting **Loss** under the Policy.

Further, notwithstanding subparagraphs (1) and (2) above and solely with respect to coverage provided by Insuring Agreement I.A., "**Loss**" shall also mean civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B).

10. Section III.Q. is deleted and replaced with the following:

**Q.** **"Operating Entity"** means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insureds** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1) ownership of greater than 50% voting securities in such **Organization**;

# RT ELITE REAL ESTATE ENDORSEMENT

(2) right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3) rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall include any entity (including, but not limited to, any holding company, special purpose vehicle or other acquisition vehicle) formed to hold a direct or indirect interest in a **Portfolio Company**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

11. Section III.R. is deleted and replaced with the following:

**R.** "**Organization**" means any corporation, trust (including any grantor trust), limited liability company, limited liability partnership, limited partnership, general partnership or joint venture. **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust (including any grantor trust), limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

12. Section III.S. is deleted and replaced with the following:

**S.** "**Outside Position**" means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board, shareholder representative or other equivalent executive or management position in any:

(1) **Portfolio Company**;

(2) **Non-Profit Entity**; or

(3) other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

**Outside Position** shall also include service by an **Insured Person** in any other capacity with a **Portfolio Company** other than the capacities listed above, provided such service entitles the **Insured Person** to the same rights of indemnification and advancement afforded individuals in the capacities listed above.

13. Section III.U. is deleted and replaced with the following:

**U.** "**Portfolio Company**" means any entity, including without limitation any pooled investment vehicle sponsored, established and managed by an unaffiliated entity, in which an **Investment Fund** directly or indirectly maintains, maintained or may maintain a debt, equity or other investment interest and any direct or indirect majority-owned subsidiaries of such entity(ies).

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

14. Section III.V. is deleted and replaced with the following:

**V.** **"Professional Services"** means:

(1) any financial, economic, investment advice, investment management, advisory, asset allocation services, portfolio management, or any other management services (including the hiring and supervision of third party vendors), administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2) the formation, creation, distribution or sale of securities in, or the management, administration or investment decision or potential investment decision (including but not limited to any decisions based upon an **Insured's** due diligence of, investment in, or disposition of any **Portfolio Company**) of any **Investment Fund**;

(3) any advisory, management, administrative or other services performed by an **Insured** for or on behalf of any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, purchase or sale of assets, merger or acquisitions, stock issuance, contemplated financing or capitalization, internal controls, legal or regulatory compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters;

(4) identification of property and arranging of financing for, the purchase or sale of, or investment in, real properties or any potential properties on behalf of an **Insured Organization**;

(5) legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**; or

(6) the publication of written material, whether in tangible or electronic format, in connection with any of the activities identified in (1) through (5) above;

**Professional Services** also means the direction of, control of, management of or influence over a **Portfolio Company**, directly or indirectly, by an **Insured** in his, her or its capacity as a **Controlling Person** of such **Portfolio Company**, including, without limitation, the exercising of actual or alleged control over funding or management of, being a fiduciary of, or controlling, any pension, employee benefit or welfare plan established by a **Portfolio Company** and regulated by ERISA or any regulation promulgated thereunder or any similar, federal, state or local law or regulation.

# RT ELITE REAL ESTATE ENDORSEMENT

**Professional Services** shall also mean:

(1) an agreement or refusal to grant or extend any loan, lease or extension of credit or the granting or extension of any loan, lease or extension of credit (including but not limited to the administration of any loan, lease or extension of credit);

(2) declaring an event of default, accelerating any loan, lease or extension of credit or foreclosing on any collateral or asset or pursuing any of these remedies (including but not limited to any debt collection activities, taking possession of or assignment of, or the subordination of any collateral or asset), with respect to any loan, lease or extension of credit;

(3) the termination, cancellation, acceleration, withdrawal or failure to advance funds in connection with any loan, lease or extension of credit or the releasing of or failure to release any information in connection with any loan, lease or extension of credit;

(4) the imposition of financial, business or management controls or requirements upon any customer of an **Insured** to whom any loan, lease or extension of credit has been granted;

(5) servicing, monitoring and administration of any loan, lease or extension of credit including (including but not limited to, the selection and oversight of a third party that performs such services pursuant to a written contract or agreement, record keeping, billing or disbursement of principal or interest, receipt or payment of insurance premiums or taxes, credit reporting or amount of property value, restructuring, monitoring and maintaining the attachment and perfection of security interests and other functions relating to collateral, and the termination, transfer, repossession, or foreclosure of the subject loans and related collateral); or

(6) due diligence services performed in any of the foregoing.

15. Section III.Z. is deleted and replaced with the following:

**Z.** "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act**, any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1) by the **Insured Persons** in their capacity as such or solely because of their status as such;

(2) with respect to Insuring Agreement (B)(2), by the **Insured Organization**;

# RT ELITE REAL ESTATE ENDORSEMENT

(3) with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**;

(4) by an **Insured** solely by reason of their status as a **Controlling Person** or as a selling shareholder; or

(5) With respect to (1) and (2) above, **Wrongful Act** shall also include any **Business Practices Wrongful Act**.

Amendments to Exclusions

1. Section IV.A. is deleted and replaced with the following:

**A.** for any actual or alleged:

(1) bodily injury, sickness, disease, or death of any person;

(2) damage to or destruction of any tangible property, including the loss of use thereof; or

(3) mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any:

(a) **Employment Practices Claim**; or

(b) **Third Party Claim**;

provided, however, that this exclusion shall not apply to any **Securities Claim** or to any **Claim** arising from the performance of or failure to perform **Professional Services**;

2. Section IV.C. is deleted and replaced with the following:

**C.** by or on behalf of an **Insured Organization** provided, however, this exclusion shall not apply to any **Claim** against any **Insured Person** if such **Claim**:

(1) is brought solely and entirely in a jurisdiction other than the United States of America, its territories and possessions;

(2) is in the event of **Financial Insolvency**;

(3) is brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

(4) is against any **Insured Person** who is no longer acting in an **Insured Capacity**; or

# RT ELITE REAL ESTATE ENDORSEMENT

(5) is brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**;

For the purposes of Section IV.C.(3), where one or more security holders allege, certify or affirm there is likely support for their **Claim** by referring to any of the following actions taken by an **Insured Person**, such allegations, certification or affirmation shall not, in itself, demonstrate such security holder is not "acting totally independent of, and without solicitation, assistance, active participation or intervention of any **Insured**":

(a) providing information to, causing information to be provided to, or otherwise assisting in an investigation conducted by a federal regulatory agency, a federal law enforcement agency, or any member or committee of the United States Congress regarding the possible violation by an **Insured** of the laws, rules, and regulations listed in 18 U.S.C. 1514A(a)(2);

(b) filing, causing to be filed, testifying, participating in, or otherwise assisting in a proceeding relating to the possible violation by an Insured of law, rules, or regulations listed in 18 U.S.C. 1514A(a)(2);

(c) filing a complaint with the United States Secretary of Labor, as authorized by 18 U.S.C. 1514A(b)(1)(A); or

(d) a bringing an action at law or equity to the extent that such action seeks relief pursuant to 18 U.S.C. 1514A(b)(1)(B).

3. Section IV.D. is deleted and replaced with the following:

**D.** brought about or contributed to by:

(1) any **Insureds** gaining any personal profit, financial advantage or remuneration to which they were not legally entitled; or

(2) the deliberately fraudulent or deliberately criminal acts of any **Insureds**;

provided, however: (a) this exclusion shall only apply if it is established by any final, non-appealable adjudication in the underlying proceeding that such conduct in fact occurred, provided, further, that this exclusion shall not apply to any **Costs of Defense** occurring prior to such final non-appealable adjudication; (b) this exclusion shall not apply to coverage provided under Insuring Agreement I.B.(1); and (c) with respect to subsection (2) above, for acts or omissions which are considered a criminal violation in a **Foreign Jurisdiction** that are not considered a criminal violation in the United States of America, the imposition of a criminal fine or criminal sanction in such **Foreign Jurisdiction** will not trigger this exclusion.

# RT ELITE REAL ESTATE ENDORSEMENT

4. Section IV.E. is deleted in its entirety.

5. Section IV.G. is deleted and replaced with the following:

   **G.** for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization**; provided, however, solely with respect to an **Employment Practices Claim**, this Exclusion **G**. shall not apply to any **Claim** based upon, arising out of, relating to, or directly or indirectly resulting from any actual or alleged retaliation including but not limited to any **Claim** for an actual or alleged violation of Section 510 of the Employee Retirement Income Security Act (ERISA).

6. Section IV.H. is deleted and replaced with the following:

   **H.** based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding against any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

7. Section IV.J. is deleted and replaced with the following:

   **J**. solely with respect to the **Insured Organization**, for any actual or alleged breach of a written contract or agreement; provided, however, this exclusion shall not apply to:

   (1) liability for **Loss** which would have attached even in the absence of such contract or agreement;

   (2) any actual or alleged breach of any contract describing or calling for **Professional Services**;

   (3) any indemnification obligation between an **Insured Organization** and an **Insured Person**;

   (4) any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture, limited partnership agreement, operating agreement, or similar organizational or constituting document; or

   (5) **Costs of Defense**;

8. Section IV.L. is deleted in its entirety.

9. Section IV.M. is deleted and replaced with the following:

   **M.** for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or Fair Labor Standards Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

10. The last paragraph of Section IV. is deleted and replaced with the following:

Note: It is agreed that the acts of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the above stated exclusions.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

## Amendments to Retention

Section VI. is amended by the addition of the following:

**D**. With respect to a **Claim** against an **Insured Person** for a **Wrongful Act** while serving in an **Outside Position**, no Retention shall apply to such **Claim**.

**E.** Coverage for **Investigative Costs** shall not be subject to any Retention;

## Amendments to Costs of Defense and Settlements

Section VII. A. of the Policy is deleted and replaced with the following:

**A.** No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed. The **Insurer** shall not be liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

## Amendment to Notice of Claim

Section VIII. A. of the Policy is deleted and replaced with the following:

**A.**

(1) The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim**, other than an **Inquiry,** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable; or

(2) If, during the **Policy Period**, the **Insureds** first become aware of an **Inquiry**, and if the **Insureds** give written notice to the **Insurer** as soon as practicable from the date the Chief Financial Officer or General Counsel first becomes aware of the **Inquiry**, but in no event later than ninety (90) days after the end of the **Policy Period** of:

(i) the entity conducting the **Inquiry**;

(ii) the circumstances by which the **Insureds** first became aware of the **Inquiry**; and

(iii) the particulars as to dates and persons involved;

then the **Inquiry** shall be treated as a **Claim** under this Policy and the reasonable and necessary costs, charges, fees and expenses incurred by an **Insured Person** solely in connection with his or her preparation for and response to the **Inquiry** shall be covered, subject to all terms, conditions and limitations of this Policy. Any other **Claim** which arises out of such **Inquiry** shall be deemed to have been first made at the time such written notice of the **Inquiry** was received by the **Insurer**. However, if the **Insureds** elect not to report an **Inquiry**, then any subsequent **Claim** which arises out of the **Inquiry** shall be subject to the reporting requirements set forth in subparagraph A. (1) above, and coverage for such subsequent **Claim** will not be denied because of the **Insureds'** failure to report the **Inquiry** pursuant to this section of the Policy.

# RT ELITE REAL ESTATE ENDORSEMENT

Addition to General Conditions

Section IX. is amended by the addition of the following:

**Supplemental Coverage for UK Corporate Manslaughter Act Investigation Costs**
The **Insurer** shall, subject to prior written consent, pay on behalf of or reimburse an **Insured Person** for reasonable costs and expenses that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against the **Insured Organization** for any actual or alleged violations of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction, provided, however, such costs and expenses shall not include any salary, wages, overhead or benefit expenses associated with such **Insured Person.** Any payment pursuant to this supplemental coverage shall be considered **Loss** for purposes of the exhaustion of the Limit of Liability and shall be subject to the Retention applicable to " each **Claim** other than an **Employment Practices Claim**" as stated for Insuring Agreement B in Item 4. of the Declarations. In the event the **Insured Person** is not indemnified by the **Insured Organization** for any reason, the **Insurer** shall advance payment hereunder without requiring payment of the Retention.

**Other Insurance Provisions**
This Policy shall apply only as excess over, and shall not contribute with, any other valid and collectible policy or policies (except with respect to: (1) any excess beyond the amount or amounts of coverage under such other policy or policies; and (2) any personal umbrella liability policy, independent directors' liability or other personal liability policy providing coverage to **Insured Persons** and only to the extent coverage is otherwise provided to such **Insured Persons** under this Policy whether such other policy or policies are stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is specifically written as excess insurance over the Limit of Liability provided by this Policy.

Notwithstanding the foregoing, such insurance as is provided by this Policy shall apply as primary to any contractual right of indemnification that an **Insured Organization** has from any **Portfolio Company**, **Non-Profit Entity**, or any other entity in which an **Insured Person** serves in an **Outside Position** (collectively, "**Outside Entity**").

In the event of a **Claim** covered under Insuring Agreement I.C. that is made against an **Insured Person** for a **Wrongful Act**, coverage provided under this Policy shall be specifically excess of: (a) any indemnification provided by an **Outside Entity**; and (b) any valid and collectible insurance coverage afforded to an **Outside Entity** or its executives applicable to such **Claim**. Notwithstanding the foregoing sentence, and without prejudice to the Insurer's excess position, if:

(a) for any reason (including but not limited to **Financial Insolvency**) an **Outside Entity** fails or refuses to advance, pay or indemnify **Loss** from a **Claim** made against an **Insured Person**; or

(b) **Loss** from such **Claim** is not actually paid to, or on behalf of, the **Insured Person** by insurance afforded to an **Outside Entity** or its executives;

then this Policy will respond as if it were primary with no Retention being applicable, but subject to all its other terms, conditions and limitations including the **Insurer's** subrogation rights under Section IX.J.

Advancement, payment or indemnification of an **Insured Person** by an **Outside Entity** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Outside Entity** within sixty (60) days of such request; and advancement, payment or indemnification by an **Outside Entity** is deemed "refused" if such **Outside Entity** gives a written notice of the refusal to the **Insured Person**.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

## Amendments to General Conditions

1. Section IX.D.(1) is deleted and replaced with the following:

   (1) This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**. In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, Standard & Poor's or Moody's, the **Insurer** shall retain the customary short rate premium. However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-] by A.M. Best or [BBB] by Standard & Poor's Ratings Services, the **Insurer** shall refund any unearned premium on a pro rata basis. Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

2. Section IX.G. is deleted and replaced with the following:

   **G. Merger or Acquisition**

   If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed fifty percent (50%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request. Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

3. Section IX.H.(3) is deleted and replaced with the following:

   (3) Sale of **Portfolio Company**

   If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** to such **Portfolio Company** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

   An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

4. Sections IX.I.(2) and IX.I.(3) are deleted and replaced with the following:

   (2) Worldwide Provision

   The coverage provided under this Policy shall apply worldwide.

   (3) Estates and Legal Representatives

   The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives assigns, or any trust (including but not limited to any grantor trust, irrevocable trust, revocable trust, bypass trust, GST trust, marital trust) or any entity (including but not limited to any corporation, partnership, limited liability company) used for estate planning purposes or any other estate planning or wealth management devices, maintained by or for the benefit of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of such **Insured Persons**.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

## Amendment to Subrogation

Section IX.J. is deleted and replaced with the following:

**J. Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all the **Insureds'** rights of recovery. The **Insured Organization** and **Insured Persons** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**. In no event, however, shall the **Insurer** exercise its rights to subrogation against an **Insured Person** under this Policy unless, such **Insured Person**:

(1) has been convicted of a deliberate criminal act; or

(2) has been determined by a final adjudication adverse to the **Insured Person** to have committed a deliberate fraudulent act, or to have obtained any personal profit, financial advantage or remuneration to which such **Insured Person** was not legally entitled.

In the event the **Insurer** shall for any reason pay indemnifiable **Loss** on behalf of an **Insured Person**, the **Insurer** shall have the contractual right hereunder to recover from the **Insured Organization** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Insured Organization** and shall be subrogated to rights of the **Insured Persons** hereunder.

## Amendment to Representations and Severability

Section IX.Q. is deleted and replaced with the following:

**Q. Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy. It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations. In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy:

(1) There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2) There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. For purposes of this paragraph (2), knowledge of any Insured shall not be imputed to any other **Insured Person**;

(3) There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**; for purposes of this paragraph (3), knowledge of any **Insured** other than an **Executive Officer** of the **Named Insured** shall not be imputed to any **Insured Organization**;

(4) There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

(5) The **Policy** shall not be rescinded by the **Insurer**.

Amendment to Insured Capacity

It is understood and agreed that the **Insurer** shall not be liable to make any payment for that portion of **Loss** for any **Claim** made against an **Insured Organization** for the rendering or failure to render services in its capacity as a(n):

(1) Property Manager;
(2) General Contractor;
(3) Real Estate Developer;
(4) Architect or Engineer;
(5) Insurance Broker or Agent;
(6) Real Estate Broker or Agent;
(7) Securities Broker or Dealer (provided, however, subpart (7) of this exclusion shall not apply to transactions sponsored by the **Insured Organization**);

Notwithstanding the foregoing, this exclusion shall not apply to any **Employment Practices Claim** or any **Claim** brought by a security holder of an **Investment Fund** relating to the diminution of value of real property owned by an **Investment Fund** as a result of an **Insured Organization's** negligent rendering or failing to render professional services in any of the above scheduled capacities.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

GREAT AMERICAN INSURANCE GROUP

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# MOCK REGULATORY COMPLIANCE EXAMINATION RENEWAL PREMIUM CREDIT

If, during the **Policy Period**, the **Insured** undergoes a mock regulatory compliance examination conducted by a qualified consulting firm, then the **Insurer** will offer a premium credit toward the renewal of this Policy. The premium credit may be up to: (1) fifty percent (50%) of the cost of such examination; or (2) ten percent (10%) of the annualized premium for such renewal; whichever is less. However, in no event shall the premium credit exceed $25,000. The **Insured** will be not be eligible for another premium credit attributable to any future mock regulatory compliance examination until the **Policy Period** following the expiration of the second renewal of this Policy.

Notwithstanding the foregoing, the premium credit is subject to the following conditions:

(1) any such examination shall not be conducted without the prior written consent of the **Insurer** (such consent not to be unreasonably withheld); and

(2) receipt and review of a copy of the consultant's statement for such work and letter of findings and recommendations or similar documents.

This endorsement should not be construed to guarantee an offer to renew coverage with the **Insurer**.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

GREAT AMERICAN INSURANCE GROUP

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# TERRORISM COVERAGE ENDORSEMENT
# CAP ON LOSS FROM CERTIFIED ACTS

Subject to all terms and conditions of this Policy, including any follow-form provisions, this Policy is amended by the addition of the following:

**CERTIFIED ACTS OF TERRORISM COVERAGE**

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of Homeland Security and the Attorney General of the United States, to be an act pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "Certified Act of Terrorism" include the following:

1. the act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

If the aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year in the aggregate and the Insurer has met its deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rate allocation in accordance with procedures established by the Secretary of the Treasury.

It is understood and agreed that the Premium section of the Declarations is amended by the addition of the following:

Terrorism Premium: $ 0.00

The Policyholder Disclosure Offer of Terrorism Coverage is attached to and is to be considered as incorporated in and constituting a part of this Policy.

*This coverage shall not apply to any commercial crime or errors & omissions coverages that may be included in this policy.*

This endorsement does not extend any additional coverage or otherwise change the terms and conditions of any coverage under this Policy.

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration | Policy Number: PEPE246619

Countersigned by: ______________________ | Endorsement Effective Date: 4/18/2023
*Authorized Representative*

GREAT AMERICAN INSURANCE GROUP

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# ECONOMIC AND TRADE SANCTIONS CLAUSE

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

Insured: ARCH REAL ESTATE HOLDINGS, LLC

Policy Period: 4/18/2023 to Policy Expiration

Policy Number: PEPE246619

Countersigned by: ______________________________
*Authorized Representative*

Endorsement Effective Date: 4/18/2023

GREAT AMERICAN INSURANCE GROUP

# POLICYHOLDER DISCLOSURE
# OFFER OF TERRORISM COVERAGE

The Terrorism Risk Insurance Act establishes a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals as part of an effort to coerce the government or population of the United States.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% beginning on January 1, 2020, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

In accordance with the Terrorism Risk Insurance Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism. The policy's other provisions will still apply to such an act.

*This coverage shall not apply to any commercial crime coverage that may be included in this policy.*

**Terrorism coverage** for acts of terrorism that are certified under the federal program as an act of terrorism is included for no additional premium. Nonetheless, if you would like to reject such Terrorism coverage, please provide Great American written confirmation of such, and an exclusion will be attached to your policy.

*This coverage shall not apply to any commercial crime or errors & omissions coverages that may be included in this policy.*

GREAT AMERICAN®
INSURANCE GROUP

**THIS IS A CLAIMS MADE POLICY. UPON TERMINATION OF COVERAGE FOR ANY REASON, A SIXTY (60) DAY AUTOMATIC DISCOVERY PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM AN ADDITIONAL THREE YEAR DISCOVERY PERIOD CAN BE PURCHASED. EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD, THE AUTOMATIC DISCOVERY PERIOD, ANY APPLICABLE DISCOVERY PERIOD OR ANY RENEWAL. HOWEVER, MORE THAN ONE CLAIM INVOLVING THE SAME WRONGFUL ACT OR RELATED WRONGFUL ACTS OF ONE OR MORE INSUREDS SHALL BE CONSIDERED A SINGLE CLAIM, AND ONLY ONE RETENTION SHALL BE APPLICABLE TO SUCH SINGLE CLAIM. ALL SUCH CLAIMS, CONSTITUTING A SINGLE CLAIM SHALL BE DEEMED TO HAVE BEEN MADE ON THE EARLIER OF THE FOLLOWING DATES (1) THE EARLIEST DATE ON WHICH ANY SUCH CLAIM WAS FIRST MADE; OR (2) THE EARLIEST DATE ON WHICH ANY SUCH WRONGFUL ACT OR RELATED WRONGFUL ACT WAS REPORTED UNDER THIS POLICY OR ANY OTHER POLICY PROVIDING SIMILAR COVERAGE.**

**THERE IS NO COVERGE FOR INCIDENTS THAT TOOK PLACE PRIOR TO THE RETROACTIVE DATE. NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE AUTOMATIC DISCOVERY PERIOD, OR IF PURCHASED, THE ADDITIONAL DISCOVERY PERIOD, WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT PROVIDED BY ANOTHER INSURER. DURING THE FIRST SEVERAL YEARS OF A CLAIMS MADE RELATIONSHIP, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES, UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.**

# Asset Management Liability Solution

**Asset Management Liability Solution**

Great American Insurance Company - Executive Liability Division
Headquarters: 301 E. Fourth Street, Cincinnati, Ohio 45202

# Table of Contents


I. Insuring Agreement.................................................................. Page 1
II. Discovery Period........................................................................ Page 2
III. Definitions................................................................................ Page 3
IV. Exclusions................................................................................ Page 7
V. Limit of Liability........................................................................ Page 10
VI. Retention................................................................................. Page 10
VII. Costs of Defense and Settlements............................................ Page 10
VIII. Notice of Claim....................................................................... Page 12
IX. General Conditions.................................................................... Page 13
- (A) Payment of Judgment.......................................................... Page 13
- (B) Bankruptcy/Insolvency ........................................................ Page 13
- (C) Claim Information................................................................ Page 13
- (D) Cancellation....................................................................... Page 13
- (E) Nonrenewal........................................................................ Page 14
- (F) Action Against the Insurer.................................................... Page 15
- (G) Merger or Acquisition.......................................................... Page 15
- (H) Run-Off Coverage................................................................ Page 15
- (I) Coverage Extensions............................................................ Page 16
- (J) Subrogation........................................................................ Page 17
- (K) Assignment........................................................................ Page 17
- (L) Conformity of Statute.......................................................... Page 17
- (M) Entire Agreement................................................................ Page 17
- (N) Named Insured Represents Insured........................................ Page 17
- (O) Representative of the Insured............................................... Page 17
- (P) Order of Payments.............................................................. Page 17
- (Q) Representations and Severability.......................................... Page 18

# GREAT AMERICAN INSURANCE COMPANIES®

Headquarters: 301 E. Fourth Street, Cincinnati, Ohio 45202

## THIS IS A CLAIMS MADE POLICY. READ IT CAREFULLY

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (a stock insurance company, hereinafter called the **Insurer**), including the statements made in the **Proposal Form** and subject to all terms, conditions and limitations of this Policy, the **Insured** and the **Insurer** agree:

## Section I. Insuring Agreements

**A.** Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**B.** The **Insurer** will pay on behalf of the **Insured Organization**:

(1) **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

(2) **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim** first made against the **Insured Organization**;

provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**C.** Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**; provided, however, that such coverage shall be specifically excess of any indemnity and/or valid and collectible insurance available from or provided by the entity in which the **Insured Person** serves in such **Outside Position**.

## Section II. Discovery Period

**A**. If either the **Named Insured** or the **Insurer** cancels or does not renew this Policy, or if the **Insurer** offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, or any change in coverage less favorable to the **Insured**, the **Named Insured** shall be entitled to acquire an additional reporting period for **Claims** first made against an **Insured** as set forth below, but only with respect to **Wrongful Acts** committed prior to the end of the **Policy Period**. This additional reporting period shall be referred to as the **Discovery Period.**

**B**. If either the **Named Insured** or the **Insurer** cancels or does not renew this Policy, or if the **Insurer** offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, or any change in coverage less favorable to the **Insured**, even if such change is requested by the **Insured**, it is understood and agreed that the **Discovery Period** shall be the period of sixty (60) days from the end of the **Policy Period**, and there shall be no additional charge. This sixty (60) day period shall be referred to as the **Automatic Discovery Period.** If prior to the end of the **Automatic Discovery Period** the **Named Insured** pays the **Insurer** an additional amount equal to one hundred fifty percent (150%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional thirty-six (36) months from the end of the **Automatic Discovery Period**.

**C**. The **Insurer** will provide written notice to the **Named Insured** of the **Automatic Discovery Period** and the availability of, the premium for, and the importance of purchasing, the **Discovery Period** within thirty (30) days after the **Termination of Coverage**. This provision shall not apply where the claims-made relationship has continued for less than one (1) year and the **Insurer** is canceling the Policy for non-payment of premium.

**D**. The right to purchase the **Discovery Period** will terminate unless written notice is given to the **Insurer** within sixty (60) days from the **Termination of Coverage**, or within thirty (30) days after the mailing or delivery of the notice provided by the **Insurer** under Section C, above, whichever is greater, together with full payment of the premium for the **Discovery Period**. If such notice and premium payment are not so given to the **Insurer,** the **Named Insured** will not be able to exercise the right to purchase the **Discovery Period**. The premium charged for the **Discovery Period** shall be based upon the rates in effect on the date this Policy was issued or last renewed.

In the event the **Named Insured** is in liquidation or bankruptcy, or permanently ceases operation, and if the **Named Insured** or its designated trustee, although entitled to, does not purchase the **Discovery Period**, any **Insured Persons** who request the **Discovery Period** within one hundred twenty (120) days of the **Termination of Coverage** may purchase the **Discovery Period**, as provided in Section B, above.

**E**. **Insured Persons** employed or otherwise affiliated with the **Named Insured** and covered by this Policy during such affiliation shall continue to be covered under this Policy and any **Discovery Period** after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

**F**. Upon **Termination of Coverage**, any return premium due the **Named Insured** shall be applied to the premium for the **Discovery Period** if the **Insured** elects to purchase such coverage. Where the premium is due to the **Insurer**, any payment received by the **Insurer** from the **Named Insured** as payment for the **Discovery Period** shall be first applied to any premium due for the Policy.

**G**. In the event similar insurance to that provided by this Policy is in force during the **Discovery Period**, the coverage afforded during the **Discovery Period** shall be excess over any such valid and collectible insurance.

**H.** Where a claims-made relationship has continued for at least three (3) years, the Policy's annual aggregate Limit of Liability for the Discovery Period, shall be equal to one hundred percent (100%) of the Policy's annual aggregate Limit of Liability.

Where a claims-made relationship has continued for less than three (3) years, the Policy's annual Limit of Liability for the Discovery Period, shall be at least equal to the greater of:
(1) the amount of coverage remaining in the Policy's annual aggregate Limit of Liability; or
(2) fifty percent (50%) of the Policy's annual aggregate Limit of Liability.

## Section III. Definitions

**A.** "**Claim**" means:

(1) a written demand for monetary or non-monetary relief against an **Insured** commenced by such **Insured's** receipt of such demand;

(2) an administrative, regulatory, or arbitration proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, notice of charges, formal investigative order or similar document;

(3) a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading or similar document;

(4) a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

(5) any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local or foreign government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after service of a subpoena, receipt of a Wells Notice, receipt of a target letter or receipt of a formal order of investigation; or

(6) an **Employment Practices Claim**.

**B.** "**Costs of Defense**" means reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

**C.** **"Domestic Partner"** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

**D.** **"Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

E. "**Employment Practices Wrongful Act**" means:

(1) wrongful dismissal, discharge or termination of employment, whether actual or constructive;

(2) employment related misrepresentation;

(3) sexual or workplace harassment of any kind;

(4) discrimination;

(5) wrongful failure to employ or promote;

(6) wrongful discipline;

(7) wrongful deprivation of career opportunity, including defamatory statements made in connection with an employee reference;

(8) failure to grant tenure;

(9) negligent evaluation;

(10) failure to provide adequate workplace or employment policies and procedures;

(11) wrongful retaliation; or

(12) employment related libel, slander, defamation, or invasion of privacy.

Coverage is provide only if the actual or alleged **Employment Practices Wrongful Act** is based on disparate impact or actual or alleged vicarious liability.

F. **"Executive Officer"** means the functional equivalent of a chief executive officer, chief financial officer, or in-house general counsel, regardless of the actual title or position.

G. "**Financial Insolvency**" means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Insured Organization**, or the **Insured Organization** becoming a debtor in possession.

H. **"General Partner(s)"** means any natural person or organization identified as such in the limited partnership agreement of an **Operating Entity** formed as a limited partnership.

I. "**Insured Organization**" means the **Named Insured** and any **Operating Entity**. **Insured Organization** shall not include any **Portfolio Company**.

J. "**Insured Person(s)**" means:

(1) any natural person who was, is or shall become a director, officer, general partner, manager, equivalent executive or employee of an **Insured Organization**;

(2) any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or committee of an **Investment Fund**; or

(3) any natural person other than a director, officer, general partner, manager, equivalent executive or employee while serving in an **Outside Position**; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)** while serving in such **Outside Position**.

K. **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**.

L. "**Interrelated Wrongful Acts**" means **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision.

M. **"Investment Fund"** means an **Organization** which is created or established prior to or during the **Policy Period** by an **Insured Organization** consisting of a sum of money whose principal is invested pursuant to the objectives set forth in such **Organization's** private placement, prospectus, or similar document.

N. **"Loss"** means compensatory damages, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense**. Loss shall also mean punitive or exemplary damages and the multiple portion of any multiplied damage if allowed by law.

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

"**Loss**" shall not include:

(1) taxes, fines or penalties, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2) non-monetary relief;

(3) employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay; or

(4) any portion of damages, judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities.

O. **"Named Insured"** means the entity named in Item 1 of the Declarations.

P. **"Non-Profit Entity"** means any non-profit and/or eleemosynary organizations.

Q. **"Operating Entity"** means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insured's** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1) ownership of greater than 50% voting securities in such **Organization**;

(2) right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3) rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

R. **"Organization"** means any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture. **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

S. **"Outside Position"** means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position in any:

(1) **Portfolio Company**;

(2) **Non-Profit Entity**; or

(3) other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

T. "**Policy Period**" means the period set forth in Item 2 of the Declarations or any shorter period that may occur as a result of a cancellation or termination of this Policy.

U. "**Portfolio Company**" means any entity in which any **Investment Fund** has or had or proposes to have a financial interest pursuant to the investment objectives set forth in any private placement memorandum, prospectus or similar document issued by an **Insured Organization**. **Portfolio Company** shall also mean any entity in which an **Insured Organization** other than an **Investment Fund** has or had or proposes to have a financial interest provided that such financial interest was acquired in connection with an investment in such entity by an **Investment Fund**.

V. **"Professional Services"** means:

(1) any advisory, management, administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2) the formation, creation, distribution or sale of securities in, or the management, administration or investment decision of any **Investment Fund**;

(3) any advisory or other consultative services performed by an **Insured** for any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, sale of assets, stock issuance, contemplated financing or capitalization, internal controls, legal compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters; or

(4) legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**.

W. "**Proposal Form**" means the application for this Policy, any attachments to such application, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy.

**X.** "**Self-Regulatory Organization**" means any association of investment advisors or securities dealers registered under state or federal securities laws or any national securities exchange registered with the Securities Exchange Commission under the Securities and Exchange Act of 1934, as amended, or any similar Canadian or other national or international exchange or commission.

**Y.** **"Termination of Coverage"** means, whether made by the **Insurer** or the **Insured** at any time: (1) cancellation or nonrenewal of the Policy; or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change less favorable to the **Insured.**

**Z.** "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act** or any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1) by the **Insured Persons**, in their capacity as such;

(2) with respect to Insuring Agreement (B)(2), by the **Insured Organization**; or

(3) with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**.

## Section IV. Exclusions

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

**A.** for any actual or alleged:

(1) bodily injury, sickness, disease, or death of any person;

(2) damage to or destruction of any tangible property, including the loss of use thereof; or

(3) mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any **Employment Practices Claim**;

**B.** based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts**, or any fact, circumstance or situation which has been the subject of any notice or **Claim** given under any other policy of which this Policy is a renewal or replacement;

**C.** brought or maintained by or on behalf of any **Insured**, provided, however, this exclusion shall not apply to:

(1) any **Claim** brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

(2) any **Employment Practices Claim**;

(3) any **Claim** brought by any **Insured Person** where such **Claim** is in the form of a cross-claim or third party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

(4) any **Claim** brought by the bankruptcy trustee or examiner of an **Insured Organization** or any assignee of such bankruptcy trustee or examiner, or any receiver, conservator, rehabilitator, or liquidator or comparable authority of an **Insured Organization**;

(5) any **Claim** brought by any **Insured Person** who is no longer employed, contractually or otherwise, by an **Insured Organization**; provided, however, that when such **Claim** is made and maintained, such natural person is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

(6) any **Claim** made in a jurisdiction outside of the United States of America, Canada or Australia by an **Insured Person** of an **Insured Organization** created in such jurisdiction;

(7) any **Claim** brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**; or

(8) any **Claim** brought by an **Insured Person** serving as a member of an **Investment Fund's** advisory board, advisory committee or any similar board or committee; provided, however, that such **Insured Person** is serving in such capacity at the request and direction of a security holder of an **Investment Fund**.

**D.** brought about or contributed to by:

(1) any **Insureds** gaining any profit, advantage or remuneration to which they were not legally entitled; or

(2) the deliberately fraudulent or criminal acts of any **Insureds**;

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred; and this exclusion shall not apply to coverage provided under Insuring Agreement I.B(1);

**E.** for: (1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or (2) any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste;

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**F.** for, based upon, arising from, or in any way related to any **Wrongful Act** of any **Insured Person** serving as a director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position of any entity other than the **Insured Organization** even if such service is at the direction or request of the **Insured Organization**, provided, however, this exclusion does not apply to any **Claim** for any **Wrongful Act** of an **Insured Person** while serving in an **Outside Position**;

**G.** for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization** or a **Portfolio Company**;

**H.** based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

**I.** for any **Wrongful Act** of any **Operating Entity** or the **Insured Persons** of such **Operating Entity** occurring:

(1) prior to the date such entity became an **Operating Entity**;

(2) subsequent to the date such entity became an **Operating Entity** or was merged with an **Insured Organization** which, together with a **Wrongful Act** occurring prior to the date such entity became an **Operating Entity** or was merged with an **Insured Organization**, would constitute **Interrelated Wrongful Acts**; or

(3) subsequent to the date an **Insured** ceased to possess, directly or indirectly, the power to control, manage or direct such **Operating Entity**;

**J.** solely with respect to the **Insured Organization**, for, based upon, arising from, or in any way related to any actual or alleged breach of contract or agreement, whether written or oral; provided, however, this exclusion shall not apply to:

(1) liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2) any actual or alleged breach of any contract describing or calling for **Professional Services**;

(3) any indemnification obligation between an **Insured Organization** and an **Insured Person**; or

(4) any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture or similar organizational or constituting document;

**K.** for, based upon, arising from, or in any way related to any public offering of securities of an **Insured Organization** or the purchase or sale of such securities subsequent to such public offering; provided, however, that this exclusion shall not apply to the offering of securities of an **Insured Organization** that is exempt from registration under the Securities Act of 1933;

**L.** which is insured in whole or in part by another valid and collectible policy or policies (except with respect to any excess beyond the amount or amounts of coverage under such other policy or policies), whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise;

**M.** for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

NOTE: For the purpose of determining the applicability of the aforementioned Exclusion D., it is understood and agreed that:

(1) the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**; and

(2) only the **Wrongful Acts** of any past, present or future **Executive Officer** shall be imputed to the **Insured Organization**.

## Section V. Limit of Liability

**A.** The **Insurer** shall be liable to pay one hundred percent (100%) of **Loss** in excess of the applicable Retention amount stated in Item 4 of the Declarations and subject to applicable retention amount stated in Section VII.F. of the policy, up to the Limit of Liability stated in Item 3 of the Declarations.

**B.** **Costs of Defense** shall be part of, and not in addition to, the Limit of Liability stated in Item 3 of the Declarations, and such **Costs of Defense** shall serve to reduce the Limit of Liability.

**C.** The **Insurer's** liability for all **Loss** shall be the amount shown in Item 3 of the Declarations which shall be the maximum aggregate Limit of Liability of the **Insurer** for the **Policy Period**, regardless of the time of payment or the number of **Claims**.

## Section VI. Retention

**A.** One Retention shall apply to each and every **Claim**. The **Insured Organization** shall be responsible for, and shall hold the **Insurer** harmless from, any amount within the Retention. With respect to Insuring Agreement B.(1), if the **Insured Organization** is permitted or required by the **Insured Organization** agreement, by-laws, certificate of incorporation, or similar document to indemnify the **Insured Persons** for **Loss**, or to advance **Costs of Defense** on their behalf, and does not in fact do so other than for reasons of **Financial Insolvency**, then the **Insurer** shall pay all such **Loss** on behalf of such **Insured Persons** subject to the Retention applicable to Insuring Agreement B.(1) and all terms and conditions of this Policy. For purposes of this paragraph, any partnership agreement, operating agreement, shareholder and/or board of director's resolutions of an **Insured Organization** shall be deemed to provide indemnification and advancement for such **Loss** to the fullest extent permitted or required by the law.

**B.** More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more **Insureds** shall be considered a single **Claim**, and only one Retention shall be applicable to such single **Claim**. All such **Claims** constituting a single **Claim** shall be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such **Claim** was first made; or (2) the earliest date on which any such **Wrongful Act** or **Interrelated Wrongful Acts** was reported under this Policy or any other policy providing similar coverage.

**C.** In the event **Loss** arising from a single **Claim** is subject to more than one Retention, the largest Retention amount set forth in Item 4 of the Declarations shall be the maximum Retention applicable to such **Claim**.

## Section VII. Costs of Defense and Settlements

**A.** No **Costs of Defense** shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld. The **Insurer** shall not be liable for any **Costs of Defense**, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

**B.** The **Insurer** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Policy. The **Insurer** may make any investigation it deems appropriate. However, it shall be the duty of the **Insureds**, not the **Insurer**, to defend any **Claim** provided that the **Insureds** shall only retain counsel as is mutually agreed upon with the **Insurer**.

**C.** The **Insurer** shall advance on behalf of the **Insureds**, excess of any applicable Retention, covered **Costs of Defense** which the **Insureds** have incurred in connection with covered **Claims** made against them prior to disposition of such **Claims** and within ninety (90) days of receipt and review of the invoices containing such **Insured's Costs of Defense**, provided that to the extent it is finally established that any such **Costs of Defense** are not covered under this Policy, the **Insureds**, severally according to their relative interests, agree to repay the **Insurer** such non-covered **Costs of Defense**. Any amounts advanced by the **Insurer** shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid.

**D.** The **Insureds** shall as a condition precedent to their rights under this Policy, give to the **Insurer** all information and cooperation as the **Insurer** may reasonably require and shall do nothing that may hinder the **Insurer's** position or its potential or actual rights of recovery.

**E.** **(1)** If the **Insurer** concludes that, based on **Claims** which have been reported to the **Insurer** and to which this Policy may apply, the Policy's Limit of Liability is likely to be exhausted by the payment of **Loss**, the **Insurer** will notify the **Named Insured**, in writing, to that effect.

**(2)** When the Limit of Liability set forth in Item 3. of the Declarations has actually been exhausted by the payment of **Loss**:

**(a)** The **Insurer** will notify the **Named Insured**, in writing, as soon as practicable, that:

**(i)** The Limit of Liability has actually been exhausted; and

**(ii)** The **Insurer's** duty to pay on behalf of the **Insured(s)** all **Loss** which the **Insured(s)** shall be legally obligated to pay as a result of **Claims** has ceased.

**(b)** The **Insurer** will initiate and cooperate in the transfer of control to any appropriate **Insured** all **Claims** subject to that Limit of Liability and which were reported to the **Insurer** prior to the exhaustion of the Limit of Liability. The **Insured** must cooperate in the transfer of control of these **Claims**.

The **Insurer** agrees to take such steps as it deems appropriate to avoid a default in, or to continue the defense of, such **Claims** until the transfer is completed, provided the appropriate **Insured** is cooperating in completing such transfer.

The **Insurer** will take no action whatsoever with respect to any **Claim** that would have been subject to the Limit of Liability had it not been exhausted, if the **Claim** is reported to the **Insurer** after the Limit of Liability is exhausted.

**(c)** The **Named Insured** and any other **Insured** involved in a **Claim** subject to the Limit of Liability, must arrange for the defense of any **Claim** within such time period as agreed to between the **Insurer** and the **Insured**. Absent such agreement, arrangements for the defense of such **Claim** must be made as soon as practicable.

**(3)** The **Insured** will reimburse the **Insurer** for expenses the **Insurer** incurs in taking those steps deemed appropriate by the **Insurer** in accordance with Section E. (2)(b) above.

The duty of the **Insured** to reimburse the **Insurer** will begin on:

**(a)** The date the applicable Limit of Liability is exhausted, if the **Insurer** sent notice in accordance with Section E**.** (1) above; or

**(b)** The date the **Insurer** sent notice in accordance with Section E.(2)(a) above, if the **Insurer** did not send notice in accordance with Section E. (1) above

**(4)** The exhaustion of the Limit of Liability by the payment of **Loss**, and the resulting end of the **Insurer's** duty to pay on behalf of the **Insureds,** will not be affected by the **Insurer's** failure to comply with any of the provisions of this Policy.

**F.** It is agreed that to the extent that this policy of insurance could result in indemnifying the **Insured Persons** in instances where they may not otherwise be indemnified by the **Insured Organization** under the provisions of the Business Corporation Law of the State of New York: (a) an individual retention amount as set forth in Item 4. of the Declarations will apply to each such **Insured Person,** and (b) the first $1,000,000 of the Limit of Liability afforded by this Policy shall only apply to 99.5% of **Loss** if the Insured Organization has assets greater than $20,000,000; 99.6% of Loss if the **Insured Organization** has assets greater than $10,000,000 but less than $20,000,000; 99.7% of Loss if the **Insured Organization** has assets greater than $5,000,000 but less than $10,000,000; and 99.8% of Loss if the **Insured Organization** has assets less than $5,000,000. The remaining percentage shall be uninsured and borne by such **Insured Persons**.

## Section VIII. Notice of Claim

**A.** The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable. Provided, however, that failure by the **Insureds** to give notice will not invalidate any coverage that would otherwise have been available if the **Insureds** show that (1) it was not reasonably possible to do so and (2) notice was given as soon as reasonably possible.

**B.** If during the **Policy Period** or **Discovery Period** any **Insureds** become aware of a specific **Wrongful Act** that may reasonably be expected to give rise to a **Claim** against any **Insureds**, and, if such **Wrongful Act** is reported to the **Insurer** during the **Policy Period** or **Discovery Period** in writing with particulars as to the reasons for anticipating such a **Claim**, the nature and dates of the alleged **Wrongful Act**, the alleged injuries or damages sustained, the names of potential claimants, any **Insureds** involved in the alleged **Wrongful Act** and the manner in which the **Insureds** first became aware of the specific **Wrongful Act**, then any **Claim** subsequently arising from such specific **Wrongful Act** duly reported in accordance with this paragraph shall be deemed under this Policy to be a **Claim** made during the **Policy Period** or **Discovery Period.**

**C.** All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or by email, properly addressed to the appropriate party. Notice to the **Insured(s)** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations. Notice to the **Insurer** of any **Claim** or **Wrongful Act(s)** shall be given to the **Insurer** at the following address:

GREAT AMERICAN INSURANCE COMPANIES
EXECUTIVE LIABILITY DIVISION
CLAIMS DEPARTMENT
P.O. Box 66943
Chicago, IL 60666

or

By Email: ELDClaims@gaig.com
Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

**D.** Written notice given by or on behalf of the **Insureds** or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the **Insurer** in this State shall be deemed notice to the **Insurer**.

## Section IX. General Conditions

**A. Payment of Judgment**

If the **Insurer** does not pay any judgment covered by the terms of this Policy within thirty (30) days after the serving of notice of entry of judgment upon the **Insureds** or their attorney and upon the **Insurer,** then, except during a stay or limited stay of execution against the **Insured** on such judgment, an action may be maintained against the **Insurer** under the Policy for the amount of such judgment not exceeding this applicable Limit of Liability under the Policy. Nothing in this paragraph is intended, however, nor shall it be construed, to obligate the **Insurer** to make any payment it would not otherwise be obligated to make under the terms, conditions, limitations and endorsements of this Policy, or to pay any **Loss** in excess of the then available Limit of Liability under this Policy.

**B. Bankruptcy/Insolvency**

The insolvency or bankruptcy of the **Insureds**, or the insolvency of their estates, shall not release the **Insurer** from the payment of damages for injury sustained or **Loss** or **Costs of Defense** occasioned during the life of and within the coverage of this Policy.

**C. Claim Information**

Upon written request by the **Named Insured** or such **Insured's** authorized agent or broker, the **Insurer** shall mail or deliver the following information for the time the Policy was in effect within twenty (20) days of such request:

**(1)** information on closed **Claims**, including the date and description of the **Claim,** and any payments;

**(2)** information on open **Claims**, including date and description of the **Claim**, and amounts of any payments; and

**(3)** information on notice of any **Wrongful Acts**, including date and description of such notice.

**D. Cancellation**

**(1)** This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**. In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, the **Insurer** shall retain the customary short rate premium. However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-], the **Insurer** shall refund any unearned premium on a pro rata basis. Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

**(2)** During the first sixty (60) days this Policy is initially in effect, except for the reasons for cancellation set forth in paragraph (2) of this section, no cancellation shall become effective until twenty (20) days after written notice is mailed or delivered to the **Named Insured** at the mailing address shown in the Policy and to its authorized agent or broker.

**(3)** After this Policy has been in effect for sixty (60) days or on or after the effective date if such Policy is a renewal, no notice of cancellation shall become effective until sixty (60) days, or fifteen (15) days for non payment of premium, after written notice is mailed or delivered to the **Named Insured** and to its authorized agent or broker, and such cancellation is based on one or more of the following reasons:

**(a)** non payment of premium; Notice of Non-payment shall include amounts Past Due.

**(b)** conviction of a crime arising out of acts increasing the hazard insured against;

**(c)** discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a **Claim** thereunder;

**(d)** after issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period.**

**(e)** a determination by the New York Superintendent of Insurance that continuation of the present premium volume of the insurer would jeopardize that insurers solvency or be hazardous to the interests of policyholders of the **Insurer**, its creditors or the public; or

**(f)** a determination by the New York Superintendent that continuation of this Policy would violate, or would place the **Insurer** in violation of, any provision of the New York Insurance Code.

After this Policy has been in effect for sixty (60) days or on or after the effective date if the Policy is a renewal, no premium increase for the term of the Policy shall be made to become effective unless due to and commensurate with insured value added, subsequent to issuance or the last renewal date, pursuant to the Policy or at the **Insured's** request or, in lieu of cancellation, where such increase is based upon Section (3) (d) of Section D. Cancellation.

**E. Nonrenewal**

**(1)** If the **Insurer** elects not to renew this Policy, or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of ten percent (10%), then the **Insurer** shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Named Insured** at the mailing address shown on the Policy and to the **Named Insured's** authorized agent at least sixty (60) days but not more than one hundred and twenty (120) days in advance of the Policy's expiration date. The notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the **Insurer** does not provide notice of nonrenewal or conditional renewal as provided in the paragraph above, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered, unless the **Named Insured**, during this sixty (60) day period, has replaced the coverage or elects to cancel. The Limit of Liability of the expiring Policy will be increased in proportion to the Policy extension provided for in this provision.

**(2)** If the **Insurer** provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another **Policy Period**, at the lower of the current rates or the prior period's rates, unless the **Named Insured**, during the additional **Policy Period**, has replaced the coverage or elects to cancel.

**(3)** The **Insurer** will not send the **Named Insured** notice of nonrenewal or conditional renewal if the **Named Insured**, the **Insured Persons**, their authorized agent or another insurer of the **Insureds** mails or delivers notice that the Policy has been replaced or is no longer desired.

**(4)** If the **Insureds** elect to accept the terms, conditions and rates of the conditional renewal notice, a new aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the New York Superintendent of Insurance.

**F. Action Against the Insurer**

**(1)** No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the **Insured's** obligation to pay shall have been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.

**(2)** No person or organization shall have any right under this Policy to join the **Insurer** as a party to any **Claim** against the **Insureds** nor shall the **Insurer** be impleaded by any **Insured** or their legal representative in any such **Claim**.

**G. Merger or Acquisition**

If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed twenty-five percent (25%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request. Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

**H. Run-Off Coverage**

**(1)** Acquisition of **Named Insured**

If, during the **Policy Period**, a transaction occurs wherein another entity gains control of the **Named Insured** through the ownership of more than fifty percent (50%) of the voting stock of the **Named Insured**, or the **Named Insured** merges into another entity or consolidates with another entity such that the **Named Insured** is not the surviving entity, then:

**(a)** the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary;

**(b)** this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction; and

**(c)** the entire premium for this Policy shall be deemed earned as of the date of such transaction;

provided, however, this condition shall not apply if the transaction is a reorganization or restructuring of security ownership of the **Named Insured** among **Insured Persons**.

**(2)** Withdrawal, Resignation, Replacement or Substitution of **General Partner**

If, during the **Policy Period,** the **General Partner** of an **Investment Fund** withdraws, resigns, is replaced or is substituted with another entity that is not an **Operating Entity,** then:

**(a)** the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary; and

**(b)** with respect to coverage for such **Investment Fund**, this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction.

**(3)** Sale of **Portfolio Company**

If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

**I. Coverage Extensions**

**(1)** Spousal/Domestic Partner Provision

In the event a **Claim** made against an **Insured Person**, which is otherwise within the coverage afforded by this Policy, also includes a **Claim** against such **Insured Person's** lawful spouse or **Domestic Partner** solely by reason of (a) such spousal or **Domestic Partner** status, or (b) such spouse or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, then any and all **Loss** for which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Insured Person** of the spouse or **Domestic Partner** becomes legally obligated to pay as a result of the **Claim** made against such **Insured Person**.

All terms and conditions of this Policy, including the Retention, applicable to **Loss** sustained by such **Insured Person** in the **Claim** shall also apply to loss sustained by such spouse or **Domestic Partner**. The extension of coverage afforded by this Section IX.E. shall only apply to the extent the **Claim** arises out of any actual or alleged **Wrongful Act** of an **Insured Person**.

**(2)** Worldwide Provision

The coverage provided under this Policy shall apply worldwide. The term **Insured Persons** is deemed to include individuals who serve in equivalent positions in foreign **Operating Entities**.

**(3)** Estates and Legal Representatives

The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives or assigns of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of any **Insured Persons**.

**J. Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the **Insureds**' rights of recovery and the **Insured Organization** and **Insured Persons** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.

**K. Assignment**

Assignment of interest under this Policy shall not bind the **Insurer** until its consent is endorsed hereon.

**L. Conformity to Statute**

To the extent that any of the terms, conditions or limitations of this Policy, including any endorsement, may be inconsistent with applicable New York law or regulations, the provisions of New York law will prevail.

**M. Entire Agreement**

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the Declarations, **Proposal Forms** submitted to the **Insurer** and any information provided therewith) and any written endorsements attached hereto constitute the entire agreement between the parties. The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

**N. Named Insured Represents Insured**

By acceptance of this Policy, the **Named Insured** shall be designated to act on behalf of the **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

**O. Representative of the Insurer**

Great American Insurance Companies, Executive Liability Division, P.O. Box 66943, Chicago, Illinois 60666 shall act on behalf of the **Insurer** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, provided, however, notice of **Claims** shall be given pursuant to Section VIII. of the Policy.

**P. Order of Payments**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Policy, then the **Insurer** shall in all events:

**(1)** first, pay **Loss** for which coverage is provided under Insuring Agreement A of this Policy; then

**(2)** only after payment of **Loss** has been made pursuant to Insuring Agreement A of this Policy, with respect to whatever remaining amount of the Limit of Liability is available after such payment, the **Insurer** shall pay such other **Loss** for which coverage is provided under any other applicable Insuring Agreements in Section I of this Policy.

The **Financial Insolvency** of any **Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this Policy.

**Q. Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy. It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations. In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate:

**(1)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;

**(2)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form,** whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**. For purposes of this paragraph (2), knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**;

**(3)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**;

**(4)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

**(5)** Solely with respect to Insuring Agreement A, under no circumstances shall the **Insurer** be entitled to rescind such coverage.

In witness whereof the **Insurer** has caused this Policy to be signed by its President and Secretary and countersigned, if required, on the Declarations page by a duly authorized agent of the **Insurer**.

**GREAT AMERICAN INSURANCE COMPANIES®**



*President*



*Secretary*