kbr
KAUFMAN BORGEEST & RYAN LLP
200 SUMMIT LAKE DRIVE, VALHALLA, NY 10595
TEL: 914.449.1000 FAX: 914.449.1100 WWW.KBRLAW.COM

November 22, 2023

SCOTT A. SCHECHTER
DIRECT: 914.449.1055
SSCHECHTER@KBRLAW.COM

JOSHUA DILENA
DIRECT: 914.449.1119
JDILENA@KBRLAW.COM

VIA EMAIL & CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Alan R. Lyons
Herrick, Feinstein LLP
Two Park Avenue
New York, NY 10016
*ALyons@herrick.com*

| | | | |
|---|---|---|---|
| Re: | Insured | : | Arch Real Estate Holdings, LLC |
| | Policy No. | : | PEPE246619 |
| | Claim No. | : | A0057227 |
| | Policy Type | : | Asset Management Liability |
| | Company | : | Great American Insurance Company |
| | Matter | : | 608941 NJ, Inc.; Jared Chassen |
| | Our File No. | : | 772.075 |

Dear Mr. Lyons:

As you are aware, our firm has been retained to represent the interests of Great American Insurance Company ("Great American"), which issued its Asset Management Liability Solution Policy No. PEPE246619 (the "Policy") to Arch Real Estate Holdings, LLC ("AREH"). On behalf of Jeffrey Simpson, you submitted the following for coverage under the Policy: (1) the civil proceeding styled *608941 NJ Inc. v. Jeffrey Simpson*, pending in the United States District Court for the Southern District of New York (the "*Oak* SDNY Action"); (2) the civil proceeding styled *608941 NJ Inc. v. Jeffrey Simpson, et al.*, initially filed in the Supreme Court of the State of New York, County of New York (the "*Oak* NY Action"); (3) the Counterclaim filed by Jared Chassen (the "*Chassen* Counterclaim") in the civil proceeding styled J*effrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC and JJ Arch LLC, v. Jared Chassen, et al.*, pending in the Supreme Court of the State of New York, County of New York (the "*Simpson* Action"); and (4) the Complaint filed by 608941 NJ Inc. ("Oak") within the *Simpson* Action (the "*Oak* Complaint").

We are directing this letter to your attention in your capacity as the designated representative of all Insureds with respect to insurance coverage matters. If you are not acting on behalf of the Insureds, please direct a copy of this letter to the appropriate party and advise us immediately of that party's identity. Please direct to the undersigned – on behalf of Great American – all future communications with respect to insurance coverage matters.

## INTRODUCTION

For the reasons set forth below, Great American acknowledges potential coverage for the *Oak* Complaint and the *Chassen* Counterclaim under the Policy. (We understand Simpson has not received service of process in connection with the *Oak* SDNY Action, and it generally appears that Plaintiff there is eschewing that proceeding in lieu of pursuing the same or similar claims in the *Oak* Complaint; and the *Oak* NY Action was voluntarily dismissed prior to the time Great American received notice of the matters. Accordingly, we focus below on the pending matter(s); but reserve the right to supplement this letter if an to the extent (1) Oak (defined below) chooses to proceed with the *Oak* SDNY Action or (2) refiles/reactivates the *Oak* NY Action).

Please be advised that nothing said or unsaid in this letter, nor any additional communications with you or any other party, should be considered a waiver or concession that coverage exists under the Policy. All rights of Great American under the Policy, at law and in equity should be considered fully and specifically reserved at all times.

## THE POLICY

The above-mentioned Policy is effective on a "Claims Made" basis for the Policy Period of April 18, 2023 to April 18, 2024. The limit of the Policy is $3 million, subject to a $150,000 Retention for each Claim first made during the Policy Period under Insuring Agreement B.(2); and a nil Retention for each Claim first made during the Policy Period under Insuring Agreements A. and C.

## BACKGROUND[1]

By way of general background, AREH is a real estate investment management, construction management, property management and development company. AREH has two Members, Managing Member JJ Arch, LLC and Investor Member 608941 NJ Inc. ("Oak"). JJ Arch also has two Members, Managing Member Simpson and non-managing Member Jared Chassen. We understand that AREH, through a number of single purpose limited liability companies, held a portfolio of real estate investments; and in addition to its status as the Investor Member in AREH, Oak purportedly invested $50 million in such properties/projects, and has issued guarantees on loans related to certain of the aforementioned projects totaling $350 million. In addition to the property entities, AREH had a number of subsidiaries which, generally, provided services in connection with the underlying properties depending on the stage of the project, *e.g.*, Arch Property Management provided services in connection with completed residential rental properties, Arch Developers and/or Arch Construction Services & Solutions provided services in connection with the development and construction of projects.

[1] We lend no credence to the allegations set forth in the Noticed Matters and mention them only for purposes of identifying the matters that have been submitted for coverage.

There does not appear to be a dispute that AREH and certain underlying properties have been facing financial difficulties. Generally, however, disputes have arisen regarding the cause of such financial difficulties; and as a corollary, the party that should be put in charge of managing AREH. For their part and as discussed in further detail below, Oak and Chassen have accused Simpson of mismanaging AREH and its property portfolio, including through purported breaches of fiduciary duty, which Oak has alleged warrant removal of JJ Arch as Managing Member of AREH and Chassen has alleged warrant Simpson's forced resignation from JJ Arch. Both Oak and Chassen now also seek monetary relief for the alleged harm to those parties directly, or to AREH and JJ Arch on a derivative basis, purportedly caused by Simpson's misconduct. (For the sake of even-handedness, we understand that it is Simpson's position that AREH's business has been negatively impacted by external factors, including rising interest rates, which were exacerbated by Oak's principals' decision not to continue funding AREH and the underlying property projects via funding capital calls.)

In early August, Simpson and Chassen issued competing correspondence purporting to force the resignation of the other as Members of JJ Arch based upon the alleged commission of Cause Events, as defined in the JJ Arch LLC Agreement. Chassen, however, took additional steps to take control of JJ Arch (and thus AREH), and essentially locked Mr. Simpson out of the companies, removing Simpson's access to bank accounts, email and company documents. Simpson commenced the *Simpson* Action on August 15th essentially seeking to be restored to his position as Managing Member.

The same day Chassen issued his letter purporting to remove Simpson from JJ Arch (August 6th), Oak issued a similar letter alleging that JJ Arch had committed Cause Events as defined in the AREH LLC Agreement; and Oak reserved its rights to remove JJ Arch as Managing Member of AREH. Four days later, Oak commenced the *Oak* SDNY Action, asserting claims against Simpson for breach of fiduciary duties, defamation and tortious interference with prospective business advantage. Oak has not yet served Simpson with the summons/complaint in this matter; and it appears that Oak is alternatively pursuing its claims against Simpson as intervening Plaintiff in the *Simpson* Action (as discussed below).

Following its commencement, the *Simpson* Action proceeded apace. The Court issued an interim order effectively restoring Simpson to his position as Managing Member of JJ Arch (and, indirectly, AREH), while directing Simpson and Chassen to work together cooperatively. A series of additional disputes arose thereafter, with Simpson accusing Chassen of failing to timely and appropriately restore Simpson's access to bank accounts and company systems, and Chassen accusing Simpson of sidelining Chassen and ultimately attempting to re-terminate him. Oak first appeared in the *Simpson* Action on October 17th by Order to Show Cause, seeking the appointment of a Receiver over JJ Arch. We understand that the Court expressed skepticism regarding the propriety of the appointment of a Receiver (who would know nothing about JJ Arch's and AREH's business); and Oak responded by seeking a temporary restraining order and preliminary injunctive relief such that Oak would be designated to serve as Managing Member of JJ Arch (with JJ Arch being swapped into the role of Investment Member). By Order dated November 3rd, the Court directed that Oak would serve as Managing Member of AREH pending the hearing on Oak's request for the preliminary injunction; and it appears that at the hearing on November 20th, the Court ultimately granted the preliminary injunction such that Oak will serve as the Managing Member of AREH pending the resolution of the *Simpson* Action.

The foregoing is largely prologue. In short, to date, the *Simpson* Action has largely focused on the parties' competition for who should be placed in charge of AREH. Going forward, however, the matter will presumably focus on the substantive claims asserted by Chassen and Oak in the *Chassen* Counterclaim (initially filed on October 14th, and with an amended version filed on November 17th) and the *Oak* Complaint (first filed on November 3rd). At a high level, the *Chassen* Counterclaim and the *Oak* Complaint include a number of parallel allegations; and, again at a high level, allege that Simpson's conduct which amounted to Cause Events purportedly warranting the removal of JJ Arch and/or Simpson also amounted to breaches of fiduciary duty or other misconduct that resulted in compensable harm to Oak, Chassen, AREH and JJ Arch.

With respect to the *Oak* Complaint, Oak alleges that JJ Arch and Simpson (collectively, "Defendants") generally mismanaged AREH, which purportedly led to unforeseen tax liabilities, loan defaults and property foreclosures. In this regard, Oak alleges:

- Following the sale of certain properties, Defendants proposed and Oak agreed to participate in a 1031 exchange to defer/avoid tax liability on its portion of the sale proceedings. Oak alleges that the 1031 exchange failed, exposing it to unexpected tax liability; and Defendants failed to timely disclose the foregoing to Oak.

- Defendants purportedly failed to have AREH making unspecified debt servicing payments which resulted in the issuance of default notices related to seven properties, a foreclosure sale on one property and potential additional foreclosure auctions in the near term.

- Quoting from an affidavit filed by Chassen on September 14th, Oak asserts that Simpson: directed AREH team members to make misrepresentations to induce investments or contribute additional capital; provided insufficient reporting to investors; directed AREH attorneys to stop work on a time sensitive matter to leverage Oak to contribute additional capital; generally failed to supervise projects; and made unnecessary staffing and expense cuts which negatively impacted AREH's ability to manage projects.

Oak further alleges that Defendants committed misconduct in connection with spending, budgeting and capital calls. Among other things, Oak alleges that Simpson directed capital calls to Oak with the representation that similar capital calls had been to other project-level investors, which Oak contends was false. Oak also alleges that capital calls issued on behalf of AREH – to Oak as the Investor Member therein – were not done in accordance with the procedures set forth in the AREH LLC Agreement, and without adequate information for Oak to assess the need for and proposed use of the called capital. Oak further alleges that it had met its funding cap under the AREH LLC Agreement of $3 million, such that further capital calls were not proper. In this regard, Oak accuses Simpson of improperly recharacterizing a $650,000 contribution made by Oak to AREH (which would have placed it over the AREH funding cap) towards a particular project expense. Oak also alleges that Simpson – based upon accusations raised by Chassen – misappropriated funds from AREH to pay personal expenses and non-AREH related business expenses.

Oak concludes with another list of purported misconduct/breaches of fiduciary duty, which include the failure to provide adequate information to Oak and otherwise taking steps to impede Oak form obtaining such information from other sources.

Oak asserts the following causes of action in the *Oak* Complaint: (1) Breach of Fiduciary Duty, against JJ Arch and Simpson; (2) Breach of Contract, against JJ Arch; (3) Tortious Interference with Contract, against Simpson; (4) Tortious Interference with Prospective Business Advantage, against Simpson; (5) Breach of Fiduciary Duty, against JJ Arch and Simpson (brought derivatively on behalf of AREH); (6) Defamation, against Simpson; (7) Fraud, against Simpson; (8) Declaratory Judgment, against Simpson and JJ Arch; and (9) Equitable Accounting, against JJ Arch and AREH.

With respect to the *Chassen* Counterclaim, Chassen, individually and derivatively on behalf of JJ Arch, asserts claims against Simpson and YJ Simco LLC (an entity owned by Simpson and his wife).

Initially, Chassen essentially seeks to invalidate a May 22, 2021 amendment to JJ Arch's LLC Agreement (the "Amendment"). Under the terms of the initial LLC Agreement – effective in 2017 – Chassen was a minority member, but beginning on December 11, 2021, Chassen would obtain equal rights and authority with Simpson to manage JJ Arch, with each entitled to 50% of the distributions. Pursuant to the Amendment, Simpson and Chassen would receive 50.1% and 49.9% of distributions. While not alleged in the Counterclaim, our understanding is that Chassen's primary objection is likely the removal of Chassen's abilities to manage JJ Arch on a co-equal basis, with Simpson remaining managing member and Chassen's consent only required for certain significant decisions. Chassen ultimately alleges that the Amendment was unconscionable and the result of Simpson's abuse of trust and pressure.

Next, Chassen generally faults Simpson for the financial difficulties facing AREH. In this regard, Chassen alleges that Simpson engage in aggressive/hostile activities with respect to internal personnel, which led to the departure of key employees leading to understaffing issues. Chassen also alleges that Simpson "forced the team" to make misrepresentations regarding the financial prospects of AREH's underlying real estate projects to induce investments or satisfaction of capital calls. Chassen also contends that Simpson prioritized his personal gains over the success of AREH's projects; failed to appropriately supervise and manage projects; failed to address staffing issues; improperly devoted time to separate business ventures; and improperly attempted to remove Chassen from his role with AREH (by attempting to remove him from Arch). Chassen also alleges that Simpson failed to disclose the failed 1031 exchange to investors.

After Simpson commenced the *Simpson* Action and obtained an interim order from the Court restoring his status as managing member of JJ Arch, Chassen alleges that Simpson continued to breach his fiduciary duties by, among other things: preventing Chassen from working on behalf of JJ Arch and AREH; again seeking to terminate Chassen in purported defiance of the interim order; undertaking various actions which purportedly required Chassen's consent with obtaining such consent.

As noted above, JJ Arch has investments and/or business dealings separate and distinct from AREH. Chassen also alleges that Simpson engaged in misconduct in connection therewith.

Chassen asserts the following causes of action in the *Chassen* Counterclaim: (1) Breach of Fiduciary Duty (Derivatively on Behalf of JJ Arch); (2) Breach of Fiduciary Duty (Derivatively on Behalf of AREH); (3) Breach of Fiduciary Duty (Directly by Chassen); (4) Declaratory Judgment (Directly by Chassen); (5) Declaratory Judgment (Directly by Chassen); (6) Permanent Injunction (Directly by Chassen); (7) Permanent Injunction (Derivatively on Behalf of JJ Arch); (8) Breach of Contract (Directly by Chassen); (9) Specific Performance (Directly by Chassen); (10) Declaratory Judgment (Directly by Chassen); (11) Declaratory Judgment (Directly by Chassen); (12) Declaratory Judgment (Directly by Chassen); (13) Declaratory Judgment (Directly by Chassen); (13) Declaratory Judgment (Derivatively on Behalf of JJ Arch); (14) Breach of Contract (Directly by Chassen); (15) Declaratory Judgment (Directly by Chassen); (16) Declaratory Judgment (Derivatively on Behalf of JJ Arch); (17) Accounting (Directly by Chassen); and (18) Books & Records (Directly by Chassen).

**COVERAGE EVALUATION[2]**

Initially, we direct you to the following pertinent Policy provisions.

The term **Insured(s)** is defined to mean "the **Insured Persons** and the **Insured Organization**." **Insured Organization** is defined to include the **Named Insured** and any **Operating Entity**, where **Operating Entity** is defined in Section III.Q. of the Policy, as amended by Endorsement No. 5, as follows:

> **"Operating Entity"** means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insureds** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:
>
> (1) ownership of greater than 50% voting securities in such **Organization**;
>
> (2) right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or
>
> (3) rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.
>
> **Operating Entity** shall include any entity (including, but not limited to, any holding company, special purpose vehicle or other acquisition vehicle) formed to hold a direct or indirect interest in a **Portfolio Company**.
>
> **Operating Entity** shall not include any **Organization** created or acquired by an any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

---

[2] We quote from certain portions of the Policy below. The terms in bold type are the subject of definitions in the Policy. Our reference to these portions of the Policy does not mean that these are the only provisions relevant to this matter. We refer you to the entire Policy for a full listing of all Policy provisions.

The term **Insured Person(s)** is defined in Section III.J. of the Policy, as amended by Endorsement No. 5, to mean:

(1) any natural person who was, is or shall become a director, officer, general partner, manager, managing member, member of the board of managers, management committee member, equivalent executive or employee (including any part-time, seasonal, temporary or leased employees) of an **Insured Organization**;

* * *

(4) any natural person other than a director, officer, general partner, manager, equivalent executive or employee; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)**.

As a threshold matter, we understand that the Noticed Matters have been submitted on behalf of Mr. Simpson. Mr. Simpson is the Managing Member of JJ Arch (which, in turn, is the managing member of AREH). JJ Arch, however, is not the **Named Insured** and otherwise does not constitute an **Operating Entity** as defined in the Policy. Specifically, an **Insured** does not maintain an ownership interest in JJ Arch; rather, JJ Arch maintains an ownership interest in the **Named Insured**, AREH. Accordingly, JJ Arch is not an **Insured** under the Policy.

With that in mind, as Managing Member of JJ Arch, Mr. Simpson does not satisfy the definition of **Insured Person**, since again, JJ Arch is not an **Insured Organization**. That being said, Great American recognizes that Mr. Simpson was acting as the *de facto* managing member of AREH; and that Mr. Simpson signed the application for the Policy as “managing member” of AREH. With the foregoing in mind, Great American acknowledges that Mr. Simpson constitutes an **Insured Person** and thus an **Insured** under the Policy; but only with respect to acts, errors, omissions or **Wrongful Acts** committed in his capacity as the *de facto* managing member of AREH. As noted above, Chassen has asserted various claims against Simpson based upon JJ Arch investment activities outside of the AREH structure; and such claims are not subject to coverage under the Policy.

Next, we direct your attention to Insuring Agreements A. and B.(1), as amended by Endorsement No. 5, which provide as follows:

A. Except for **Loss** which the **Insurer** pays pursuant to Section I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

B. The **Insurer** will pay on behalf of the **Insured Organization**:

(1) **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

*          *          *

> provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**Wrongful Act** is defined in Section III.Z. of the Policy, as amended by Endorsement No. 5, in pertinent part as follows:

> **"Wrongful Act"** means any actual or alleged **Employment Practices Wrongful Act**, any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:
>
> (1) by the **Insured Person** in their capacity as such or solely because of their status as such;

*          *          *

**Professional Services** is defined in Section III.V., as amended by Endorsement No. 5, in pertinent part to mean:

> (1) any financial, economic, investment advice, investment management, advisory, asset allocation services, portfolio management, or any other management services (including the hiring and supervision of third party vendors), administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

*          *          *

> (4) identification of property and arranging of financing for, the purchase or sale of, or investment in, real properties or any potential properties on behalf of an **Insured Organization**;

*          *          *

In the *Oak* Complaint and the *Chassen* Counterclaim, Oak and Chassen accuse Simpson of committing various acts, errors, omissions or breaches of duties, including in the performance of **Professional Services**, *e.g.*, failure to appropriately manage the underlying property investments, portfolio management services. Accordingly, the foregoing **Claims** are brought against an **Insured Person** for **Wrongful Acts**, such that coverage is potentially implicated under Insuring Agreement A. and/or Insuring Agreement B.(1).

With the foregoing in mind, we direct your attention to Section VI.A. of the Policy, which provides as follows:

> One Retention shall apply to each and every **Claim**. The **Insured Organization** shall be responsible for, and shall hold the **Insurer** harmless from, any amount

> within the Retention. With respect to Insuring Agreement B.(1), if the **Insured Organization** is permitted or required by the **Insured Organization** agreement, by-laws, certificate of incorporation, or similar document to indemnify the **Insured Persons** for **Loss**, or to advance **Costs of Defense** on their behalf, and does not in fact do so other than for reasons of **Financial Insolvency**, then the **Insurer** shall pay all such **Loss** on behalf of such **Insured Persons** subject to the Retention applicable to Insuring Agreement B.(1) and all terms and conditions of this Policy. For purposes of this paragraph, any partnership agreement, operating agreement, shareholder and/or board of director's resolutions of an **Insured Organization** shall be deemed to provide indemnification and advancement for such **Loss** to the fullest extent permitted or required by the law.

We understand that Simpson would be entitled to indemnification from AREH pursuant to the terms of that entity's LLC Agreement. While AREH may wrongfully refuse to provide such indemnification – given that it is now apparently under the control of Simpson's litigation adversary, Oak – we do not understand Oak to be in a state of **Financial Insolvency**.[3] Accordingly, the coverage that may be available here is subject to a $150,000 Retention.

We next direct your attention to the definition of **Loss** in Section III.N. of the Policy, as amended by Endorsement No. 5, which provides as follows:

> **"Loss"** means compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, **SOX 304/Dodd-Frank 954 Costs, Investigative Costs**, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense**.
>
> **Loss** shall also include any reasonable fees and expenses of any attorney representing any party who has brought a **Claim** against any **Insured** where such fees and expenses are awarded pursuant to a covered judgment against an **Insured** or a covered settlement (consented to by the **Insurer**, which consent shall not be unreasonably withheld, delayed or denied) to which an **Insured** is a party.
>
> It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.
>
> **Loss**, other than **Costs of Defense**, shall not include:
>
> (1) taxes, criminal or civil fines or penalties imposed by law;
>
> (2) amounts which may be deemed uninsurable under the law pursuant to which this Policy is construed;

[3] **Financial Insolvency** is defined to mean "the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Insured Organization**, or the **Insured Organization** becoming a debtor in possession."

(3) non-monetary relief;

(4) employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay;

(5) any portion of damages, settlements or judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities but solely with respect to coverage provided under Insuring Agreement. B.(2) and solely to the extent such portion of damages, settlements or judgments, or settlements constitute an increase in consideration paid to the underlying claimant

(6) costs incurred in connection with cleaning up, removing, eliminating, abating, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring, **Pollutants**;

For clarification, this subsection (1), shall not in itself exclude form the definition of **Loss** any damages, settlements or judgments incurred by an **Insured** that are calculated based upon, or that flow directly from, any taxes, fines or penalties imposed upon a client where such taxes, fines or penalties result form a **Wrongful Act** of an **Insured**.

Notwithstanding sub-paragraph (2) above, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the **Insurer** shall not assert the portion of any amounts incurred by an **Insureds** attributable to such violations constitutes uninsurable loss and shall treat that portion of all settlements, judgments and **Costs of Defense** as constituting **Loss** under the Policy.

Further, notwithstanding subparagraphs (1) and (2) above and solely with respect to coverage provided by Insuring Agreement I.A., "**Loss**" shall also mean civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B).

Great American reserves its right to deny coverage to the extent Oak or Chassen seek relief which may not be included in the definition of **Loss**. Any disgorgement or restitution of any wrongfully obtained gains, or any settlement that encompasses damages for unentitled gains may not constitute **Loss**, and Great American reserves its right to deny coverage for any settlement or judgment constituting such amounts. In addition, to the extent that the alleged conduct of any **Insureds** entails inherently improper or intentionally wrongful conduct, the loss arising therefrom may be uninsurable. Furthermore, any fines or penalties imposed on any **Insureds** and any amount for which any **Insureds** are not legally responsible do not constitute covered **Loss**. Finally, any non-monetary relief sought in this matter, including injunctive or declaratory relief, will likewise not constitute covered **Loss**.

We next direct your attention to Exclusion J., as amended by Endorsement No. 5, which provides that Great American "shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**":

solely with respect to the **Insured Organization**, for any actual or alleged breach of a written contract or agreement; provided, however, this exclusion shall not apply to:

(1) liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2) any actual or alleged breach of any contract describing or call for **Professional Services**;

(3) any indemnification obligation between an **Insured Organization** and an **Insured Person**;

(4) any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture, limited partnership agreement, operating agreement, or similar organizational or constituting document; or

(5) **Costs of Defense**;

Great American reserves its rights to rely upon the foregoing Exclusion.

We also direct your attention to Exclusion D., as amended by Endorsement No. 5, which provides that Great American "shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**":

brought about or contributed to by:

(1) any **Insureds** gaining any personal profit, financial advantage or remuneration to which they were not legally entitled; or

(2) the deliberately fraudulent or deliberately criminal act of any **Insureds**;

provided, however: (a) this exclusion shall only apply if it is established by any final, non-appealable adjudication in the underlying proceeding that such conduct in fact occurred, provided, further, that this exclusion shall not apply to any **Costs of Defense** occurring prior to such final non-appealable adjudication; (b) this exclusion shall not apply to coverage under Insuring Agreement I.B.(1); and (c) with respect to subsection (2) above, for acts or omissions which are considered a criminal violation in a **Foreign Jurisdiction** that are not considered a criminal violation in the United States of America, the imposition of a criminal fine or criminal sanction in such **Foreign Jurisdiction** will not trigger this exclusion.

Great American reserves its rights to rely upon the foregoing Exclusion.

As per Section VII ("**Costs of Defense and Settlement**"), as amended by Endorsement No. 5, please note that:

**A.** No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted

with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed. The **Insurer** shall not e liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, the then the **Insurer's** consent shall not be required for such disposition.

**B.** The **Insurer** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Policy. The **Insurer** may make an investigation it deems appropriate. However, it shall be the duty of the **Insureds**, not the **Insurer**, to defend any **Claim** provided that the **Insureds** shall only retain counsel as is mutually agreed upon with the **Insurer**.

**C.** The **Insurer** shall advance on behalf of the **Insureds**, excess of any applicable Retention, covered **Costs of Defense** which the **Insureds** have incurred in connection with covered **Claims** made against them prior to disposition of such **Claims** and within ninety (90) days of receipt and review of the invoices containing such **Insured's Costs of Defense**, provided that to the extent it is finally established that any such **Costs of Defense** are not covered under this Policy, the **Insureds**, severally according to their relative interests, agree to repay the **Insurer** such non-covered **Costs of Defense**. Any amounts advanced by the **Insurer** shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid.

**D.** The **Insureds** shall as a condition precedent to their rights under this Policy, give to the **Insurer** all information and cooperation as the **Insurer** may reasonably require and shall do nothing that may hinder the **Insurer's** position or its potential or actual rights of recovery.

*  *  *

We understand that Mr. Simpson is being represented by Sam P. Israel of the law firm Sam P. Israel P.C. Great American consents to the retention of Mr. Israel and his firm, subject to an agreement on hourly rates and staffing. <u>In this regard, please provide the identity of any other attorney at the foregoing firm that may provide services in connection with this matter, along with their and Mr. Israel's respective hourly rates</u>.

<u>In addition, we also ask that the Insured or its chosen defense counsel provide us with a written status report concerning this matter</u>. The report (and going-forward reports) should include, if applicable: (1) the factual background of the case, including the relationship of the parties and chronology of events; (2) an assessment of liability; (3) an evaluation of damages; (4) the Insured's positions and defenses; (5) a synopsis of significant depositions and an evaluation of witnesses; (6) likelihood of settlement; (7) scheduling orders; (8) an estimate of defense costs up to and including trial; and (9) the setting of any trial dates.

Please note that under Section VII. of the Policy, and as a condition precedent to coverage, no settlement agreements or "**Costs of Defense**" may be incurred without the consent of Great American, and such consent shall not be unreasonably withheld. Therefore, we ask that the Insureds provide notice of any settlement communications from Oak and/or Chassen or their counsel, and please provide advance notice of any contemplated settlement offer. Please also provide immediate notification of any efforts to resolve this matter through mediation or arbitration. Great American reserves its rights accordingly.

We next note that the "**Other Insurance Provisions**," added to Section IX. of the Policy by Endorsement No. 5, states:

> This Policy shall apply only as excess over, and shall not contribute with, any other valid and collectible policy or policies (except with respect to: (1) any excess beyond the amount or amounts of coverage under such other policy or policies; and (2) any personal umbrella liability policy, independent directors' liability or other personal liability policy providing coverage to **Insured Persons** and only to the extent coverage is otherwise provided to such **Insured Persons** under this Policy whether such other policy or policies are stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is specifically written as excess insurance over the Limit of Liability provided by this Policy.

* * *

In this regard, Great American requests copies of all other potentially applicable policies and coverage positions, if any, issued by any other carrier to whom this matter has been reported. Great American reserves its rights in this regard.

Finally, because there is limited information available to Great American at this time, this letter is not intended to be an exhaustive recitation of all potentially applicable terms, conditions, endorsements or exclusions of the Policy. Nothing in this letter is intended to, or does waive any of Great American's rights, privileges or defense sunder the Policy, at law or in equity, all of which are expressly reserved. Great American reserves the right to alter, supplement and modify this statement of its coverage position as other and additional information may become available.

If you have any questions concerning anything set forth in this letter, please do not hesitate to contact us.

Very truly yours,

KAUFMAN BORGEEST & RYAN LLP

Scott A. Schechter
Joshua DiLena

cc: Thomas Mundt, Great American: tmundt@gaig.com