**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
In re:

JEFFREY SOLOMON SIMPSON,

Debtor.

Chapter 11

Case No. 26-10359 (LGB)

---------------------------------------------------------------------x
608941 NJ INC.,

Plaintiff,

against

JEFFREY SOLOMON SIMPSON,

Defendant.

Adversary Proceeding

Case No. 26-01046 (LGB)

---------------------------------------------------------------------x

## AMENDED COMPLAINT

608941 NJ Inc. ("Oak," or "Plaintiff"), by its attorneys, Binder & Schwartz LLP, alleges as follows:

## PRELIMINARY STATEMENT

1. This is an adversary proceeding by Oak seeking a declaration that certain obligations owed by Jeffrey Solomon Simpson ("Debtor" or "Mr. Simpson") to Oak are not dischargeable pursuant to section 523(c)(1) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 4007.

2. Litigation between Mr. Simpson and Oak has been pending before the New York County Supreme Court, Commercial Division, Index No. 158055/2023 (the "State Court Action") for more than three years. Oak's claims against Mr. Simpson involve fraudulent, willful, and malicious acts by Mr. Simpson, including acts performed while acting in a fiduciary capacity. Accordingly, whether adjudicated in the State Court Action or before this Court, any

damages awarded on the basis of the fraud and misappropriation claims set forth herein are not dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4).

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

4. Venue is proper in this District under 28 U.S.C. § 1409(a). This adversary proceeding is related to a bankruptcy case under Chapter 11 that is pending in this District (Case No. 26-10359 (LGB)).

5. This adversary proceeding is commenced pursuant to section 523(c) of the Bankruptcy Code and Bankruptcy Rules 4007 and 7001(f).

6. Oak does not consent to entry of a final order or judgment by the Bankruptcy Court in this matter.

## PARTIES

7. Oak is a corporation duly organized and existing under, and by virtue of, the laws of the State of New Jersey, with its principal place of business in Toronto, Canada.

8. Mr. Simpson is the Debtor in the above-captioned case and, upon information and belief, is a resident of the State of New York, domiciled at 1055 Park Avenue Unit 4, New York, New York 10028.

## FACTUAL BACKGROUND

### A. The Corporate Structure

9. Oak and its affiliated companies are a family business focused on, among other things, the management of its real estate portfolio, which includes retail, office, and storage facilities, primarily located in Ontario and Florida.

10. In 2017, Oak sought to expand its U.S. real estate holdings and entered into the December 11, 2017 Limited Liability Company Operating Agreement (the "AREH LLC Agreement") that governs the operations of Arch Real Estate Holdings LLC ("AREH").

11. Pursuant to the AREH LLC Agreement, AREH has two members: Oak is the "investor member" and JJ Arch LLC ("JJ Arch") is the "managing member" responsible for the management and operations of real property holdings in which Oak has invested significant sums of money.

12. Section 7.1.1 of the AREH LLC Agreement provides that the managing member, JJ Arch, has "full, exclusive and complete discretion" with respect to the business, affairs and assets of AREH and, with limited exceptions, has the "unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [AREH] has the authority to perform . . . ."

13. Section 7.1.2 of the AREH LLC Agreement further provides that, with limited exceptions, the investor member "shall not participate in the management or control of [AREH] or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of [AREH]."

14. The Limited Liability Company Operating Agreement of JJ Arch, dated December 11, 2017 (the "JJ Arch LLC Agreement") governs the operations and management of JJ Arch, as the managing member of AREH.

15. The members of JJ Arch are Mr. Simpson and Jared Chassen ("Mr. Chassen"). Mr. Simpson holds the majority of membership interest in JJ Arch and was formerly the managing member of JJ Arch with management and operational responsibility. Mr. Chassen holds a minority interest in JJ Arch.

16. Section 3.1 of the JJ Arch LLC Agreement provides that prior to the fourth anniversary of the JJ Arch LLC Agreement (i.e., until December 11, 2021), with limited exceptions, "the business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Simpson who shall have . . . full, exclusive and complete discretion with respect thereto."

17. On May 22, 2021, Section 3.1 of the JJ Arch LLC Agreement was amended to provide Mr. Simpson with exclusive discretion over JJ Arch indefinitely.

18. As Mr. Simpson has stated under oath in August 2023, "[t]hrough JJ Arch, the managing member of [AREH], I have run all of [AREH's] businesses since the inception." Jeffrey Simpson Affidavit in Support, State Court Action, NYSCEF Doc. No. 11 ¶ 19.

19. Mr. Simpson further stated under oath that, while Mr. Chassen as the other member of JJ Arch has certain "negative controls," Mr. Chassen did not "limit or restrict a single decision of [Mr. Simpson's] in the 6 years of JJ Arch and [AREH]." Reply Affidavit of Jeffrey Simpson in Further Support, State Court Action, NYSCEF Doc. No. 134 ¶ 9.

20. Thus, Mr. Simpson acknowledges that "[t]hrough JJ Arch LLC, [he is] the sole Managing Member of [AREH]," and Mr. Simpson has managed all of AREH's businesses since the beginning. *Id.* ¶ 11.

21. Since AREH's inception, Oak has invested at least $3 million directly into AREH to fund its overhead and operations, and over $50 million in ten large-scale real estate projects that were developed, managed and/or controlled by AREH or JJ Arch.

**B. The State Court Action**

22. On August 14, 2023, Mr. Simpson, individually and allegedly derivatively on behalf of JJ Arch and AREH, commenced the State Court Action against Mr. Chassen and First Republic Bank. The State Court Action largely concerns corporate governance disputes between

Messrs. Simpson and Chassen following their respective efforts to force the other to resign, and claims concerning the alleged mismanagement of JJ Arch and AREH.

23. In October 2024, Oak filed a motion seeking the appointment of a receiver for JJ Arch and was joined as a party to the State Court Action pursuant to Section 6401(a) of the CPLR.

24. In November 2023, the State Court entered a series of interim orders concerning the governance rights of JJ Arch and AREH. The crux of these orders provided that: (i) Oak would act as the sole managing member of AREH; (ii) the August 2023 purported resignation instruments of both Chassen and Simpson were "void and of no force or effect"; (iii) either Simpson or Chassen could unilaterally consent to a Major Decision of AREH; and (iv) any "Company Major Decision" under JJ Arch's operating agreement required the prior written consent of Chassen. *In re JJ Arch LLC*, 663 B.R. 258, 265 (Bankr. S.D.N.Y. 2024), *motion for relief from judgment denied*, No. 24-10381, 2025 WL 3465625 (Bankr. S.D.N.Y. Dec. 2, 2025).

25. Thus, until November 2023, when Oak was ordered to act as the sole Managing Member of AREH, Mr. Simpson, through his exclusive control over JJ Arch, had acted as the sole Managing Member of AREH since its formation.

**C. Oak Asserts Claims Against Mr. Simpson In Its Intervenor Complaint**

26. On November 3, 2023, Oak filed an intervenor complaint (the "Intervenor Complaint"), a copy of which is attached hereto as Exhibit A. Oak asserted direct and derivative claims against Mr. Simpson and JJ Arch, alleging that Mr. Simpson engaged in prohibited and unlawful acts individually and on behalf of JJ Arch and AREH that devastated all stakeholders in the real estate portfolio, including Oak.

27. These alleged acts of fraud and mismanagement by Mr. Simpson include, for example, failing to comply with requirements of the Internal Revenue Code to obtain promised

tax benefits, failing to make debt servicing payments causing properties to go into default, engaging in financial mismanagement and other misconduct with respect to JJ Arch and AREH, making fraudulent misrepresentations to Oak, and knowingly concealing material facts from Oak.

28. The claims asserted in the Intervenor Complaint against Simpson individually include, among others: (i) breach of fiduciary duties to Oak, as the managing member of JJ Arch (Count I); (ii) breach of fiduciary duty against Simpson, derivatively on behalf of AREH (Count V); and; (iii) fraud resulting from Simpson's material misrepresentation of fact to Oak regarding promised tax benefits, and the return of funds in the event that a satisfactory re-investment opportunity could not be identified (Count VII).

**1. Mr. Simpson's Fraudulent Acts**

29. Mr. Simpson engaged in fraudulent acts in connection with the management and operations of real property holdings and projects in which Oak invested significant sums of money.

30. As set forth above Mr. Simpson had exclusive authority to operate and manage JJ Arch and thus Mr. Simpson had exclusive management authority over AREH and over the various property-owning special-purpose entities that AREH controlled and in which Oak invested.

31. By his own acknowledgment, Mr. Simpson functionally operated as the sole managing member of AREH and its subsidiaries and, as such, owed fiduciary duties to Oak, AREH's investor member, including but not limited to the duty of care, the duty of loyalty, and the duty of disclosure.

32. The duty of disclosure required Mr. Simpson to make full disclosure to Oak of all material facts concerning its investments.

33. As set forth below, Mr. Simpson consistently made material misrepresentations to Oak and/or knowingly concealed material information from Oak that Mr. Simpson had a fiduciary duty to disclose and did so with knowledge that he was making false statements or omitting material facts with the intention of inducing Oak to provide capital to fund AREH's projects.

*i. Prior to the Closing on the Myrtle Point Investment, Mr. Simpson Misrepresented the Scope of the Guarantee Provided by Oak*

34. Between late 2020 and early 2021, Oak invested approximately $14.8 million to fund AREH's recapitalization and refinancing of Myrtle Point, a mixed-use development project in Ridgewood, Queens ("Myrtle Point") that was being developed by Ridgewood Tower LLC ("Ridgewood Tower"), a company previously controlled by Meir Babaev ("Mr. Babaev").

35. Prior to the closing on the refinance, in addition to Oak's capital contribution, Mr. Simpson required that Oak (through one or more of its affiliated companies), provide a "bad boy" guarantee to the lender.

36. A "bad boy" guarantee provides the lender with recourse in the event the borrower commits intentional or fraudulent "bad acts."

37. In June 2020, Mr. Simpson caused AREH to enter into a letter of intent with Mr. Babaev to outline the terms under which AREH would recapitalize and develop Myrtle Point. This letter of intent provided that in any refinance of the project, AREH's affiliates would provide customary "bad boy" guarantees while Mr. Babaev would be responsible for the completion guarantee for the project, which is a significant undertaking that guarantees to the lender that the project will be finished on time and within budget, even if the developer or borrower runs out of money or defaults.

38. For the Myrtle Point project, the completion guarantee represented a potential liability of approximately $100 million.

39. At Mr. Simpson's direction, AREH provided a copy of the letter of intent to Oak in July 2020 in order to induce Oak to consent to, and invest in, the Myrtle Point recapitalization.

40. After Oak took over as the managing member of AREH in November 2023, Oak learned that in September 2020, Mr. Simpson negotiated a forbearance and term sheet with Madison Realty Capital ("Madison"), the secured lender for the Myrtle Point project. This term sheet provided that the existing financing of the project would be replaced by a substantially larger construction loan issued by Madison. It also provided that an affiliate of Oak would sign not merely a "bad boy" guarantee, but also be subject to the completion guarantee as well as a carry guarantee that could subject Oak's affiliate to up to $24 million a year in interest. Mr. Simpson did not provide this term sheet to Oak or otherwise advise Oak that the revised deal terms required that Oak would be subject to a completion guarantee.

41. On September 18, 2020, the same day this term sheet was signed by Mr. Babaev on behalf of Ridgewood Tower and sent to Mr. Simpson, Mr. Simpson caused an AREH employee to send to Oak (copied to Mr. Simpson) an email with the subject "Arch Deal Updates." This email advised Oak that AREH was "in the process of securing construction financing of approximately $106.0mm in total proceeds" but failed to disclose that such financing was dependent on Oak signing highly risky carry and completion guarantees. The email attached a 29-page investment summary of the Myrtle Point project that also failed to disclose that Mr. Simpson had caused AREH to change the intended financing structure to require carry and completion guarantees from Oak.

42. Mr. Simpson was copied on this email and knew that it omitted material information of critical importance to Oak about the term sheet he was negotiating the very same day. Nonetheless, Mr. Simpson failed to correct or supplement the investment summary provided to Oak and otherwise failed to advise Oak about this material change to the refinancing structure.

43. Based on these misrepresentations and omissions, Oak consented to AREH purchasing an equity interest in Myrtle Point and funded millions of dollars into the project, anticipating that the refinance AREH was in the middle of negotiating would not require any guarantee from Oak beyond the "bad boy" guarantee, as provided in the letter of intent.

44. Oak would not have consented to the equity purchase in Ridgewood Tower, and would not have funded millions of dollars into the project had it known that the deal was dependent on Oak's affiliate signing carry and completion guarantees that it had not been advised about, that it had never agreed to, and that would expose Oak and its parent to substantially more risk in the project than it had intended to take on.

45. Later, in January 2021, when the refinance with Madison was about to close, Oak was provided with guarantee signature pages and a corporate consent to enter into the refinancing, but was not given drafts of the loan documents. Oak directed its affiliate to execute the guarantee and to consent to the refinance based on its understanding that the loan corresponded to the terms in the letter of intent, with Mr. Babaev guaranteeing completion and Oak's affiliate providing a "bad boy" guarantee only.

46. Oak (through its affiliate) would not have signed the guarantee had it known that, in addition to the "bad boy" guarantee, it was also responsible for the completion and carry

guaranties, which increased its potential exposure by $100 million in completion costs and up to $24 million a year in carrying costs.

*ii. Mr. Simpson Concealed that He Constructed the Project in Violation of the Ground Lease for the Development*

47. The Myrtle Point development project consisted of an assemblage of five land parcels: four of which were owned by Ridgewood Tower;[1] and an adjacent parcel that was owned by 5421 Myrtle Avenue Associated, LLC ("Myrtle Associates").

48. In December 2015, the initial developer for the Myrtle Point project, Ridgewood Tower, had negotiated a 48-year ground lease (the "Ground Lease") for the adjacent parcel with Myrtle Associates that leased the adjacent parcel to Ridgewood Towers to allow the parcels to be assembled as part of the development project.

49. The development project was intended to be a self-sufficient and independent mixed-use structure suitable for conversion to the condominium form of ownership consisting of (i) residential units; (ii) a retail unit that met certain specific construction requirements that, at the end of the project, would be deeded to Myrtle Associates (the "Myrtle Retail Unit") in exchange for cancellation of the lease; and (iii) additional retail units that were to be separate and apart from the Myrtle Retail Unit.

50. The terms of the Ground Lease set out the specifications for the construction of the Myrtle Retail Unit, including among many other requirements, that it be a self-sufficient and independent structure.

[1] Subsequent to AREH taking control of, and Oak recapitalizing Ridgewood Tower, another investor was brought into the project through a 1031 exchange. As part of this exchange, two tenancy-in-common interests in these parcels were transferred to Ridgewood Tower II LLC and Ridgewood Tower III LLC, which were both owned by the 1031 investor but managed by AREH.

51. The Ground Lease also provided that the failure to complete certain construction milestones of the project by December 3, 2023, was a default under the lease.

52. In October 2020, AREH invested in the project, and an affiliated company of AREH created a joint venture with Ridgewood Tower pursuant to which management of the project was transferred to AREH along with a percentage of Ridgewood Tower's beneficial ownership interests.

53. After AREH's investment, to quote Mr. Simpson, AREH, directed by Mr. Simpson, was "at the helm" of the project. Affidavit of Jeffrey Simpson in Opposition to Plaintiff's Order to Show Cause, *5421 Myrtle Ave. Assocs., LLC v. Ridgewood Tower LLC,* Index No. 652183/2023 (Sup. Ct., N.Y. Cnty. June 20, 2023), NYSCEF Doc. No. 19 ¶ 1.

54. To solicit Oak's investment in the project, Simpson concealed material facts already known to him related to the purported development plan for the property.

55. First, Simpson concealed from Oak, before it made its investment and caused its affiliate to provide a guarantee, that the Ground Lease contained specific provisions outlining the construction requirements for the Myrtle Retail Unit, including that the unit was required to be separate from the rest of the development project.

56. Second, Simpson failed to disclose to Oak that the Ground Lease provided that certain construction requirements had to be met by December 2023, and that failure to meet that deadline constituted a default under the ground lease.

57. Third, by the time Oak made its investment in the project and caused its affiliate to provide a guarantee, it was already clear to Simpson that the project would be unable to meet the deadlines in the ground lease. Accordingly, at the time he solicited Oak's investment for the

project, Simpson knew that the development plan he presented to Oak was not feasible under the current Ground Lease.

58. At the time Oak made its investment and caused its affiliate to provide a guarantee, Simpson knew that the success of the project was contingent on his ability to negotiate an amended ground lease with Myrtle Associates. Simpson did not disclose this contingency to Oak.

*iii. Mr. Simpson Continued to Conceal Material Information in Connection with Oak's Additional Capital Contributions to the Myrtle Point Development*

59. After Oak made its initial investment in the project, it continued to make a series of additional capital investments in the project.

60. Prior to each additional capital contribution to the project, Mr. Simpson knowingly concealed material information about the development project from Oak thereby successfully inducing Oak to continue investing millions of dollars of additional funds into a development project that was on the road to failure.

61. For example, Mr. Simpson concealed from Oak that since the time of AREH's initial involvement in the project, Mr. Simpson had been unsuccessful in negotiating a new lease with Myrtle Associates that provided for a 99-year ground lease as well as modifications to the construction requirements in the existing Ground Lease that were consistent with Mr. Simpson's development plans for the project. In fact, nothing in the investment summary provided to Oak on September 18, 2020, mentioned the risks associated with the Ground Lease, merely mentioning that one of the lots required a ground rent payment of $490,000 per year.

62. In actual fact, by the time Oak started investing serious funds into the project in fall 2020, Mr. Simpson already knew that the project would not be viable without renegotiating

the Ground Lease. The economics of the development were based on leases Mr. Babaev had negotiated with two anchor tenants: Target and Burlington Coat Factory. But these leases required the development to provide certain exclusivity covenants that were inconsistent with Myrtle Associates' rights to have full and unfettered control over their retail unit at the conclusion of the project. This meant that it would be impossible for Ridgewood Tower to comply with both the Ground Lease and its anchor tenant leases, but both were required for the development to be viable.

63. The entire success of the project therefore depended on the speculative proposition that Mr. Simpson could somehow convince Myrtle Associates to give up their rights under the existing Ground Lease and sign a new 99-year Ground Lease.

64. These facts and risks were all known to Mr. Simpson and were withheld from Oak by Mr. Simpson. Oak would not have consented to the Myrtle Point acquisition or invested funds in the project had these material facts, risks and contingencies been properly disclosed.

65. Following Mr. Simpson's failure to negotiate a new lease with Myrtle Point and knowing the construction requirements set forth in the existing Ground Lease required a separate retail space on Myrtle Point parcel, Mr. Simpson proceeded to construct the project in clear breach of the Ground Lease.

66. Mr. Simpson engaged in a building strategy that violated the Ground Lease with the hope that by making the construction a *fait accompli*, he would force Myrtle Point to agree to the construction changes that they had refused to agree to for years.

67. Mr. Simpson concealed from Oak that the development was being built in clear violation of the Ground Lease while continuing to solicit additional capital contributions from Oak throughout 2023 and 2024.

68. After Oak became acting managing member of AREH, and through AREH the Myrtle Point project, Oak entered into negotiations with Madison for a forbearance of the loan, which had gone into default and accrued several million dollars in default interest Oak's affiliate was liable for under the carry guarantee. These negotiations resulted in a forbearance agreement signed at the beginning of 2024 that required Oak to inject additional capital into the project, while Madison in turn agreed to resume financing the project from the construction loan. The forbearance allowed the project time to try to find a new lender to take Madison out of the project.

69. Once Oak began marketing the project, it became clear that there was no economical way to finish the project and that the market value of the project was worth significantly less than Madison's loan. Oak was unsuccessful in finding a new lender or equity partner, in large part due to the uncertainty around whether Myrtle Associates would agree to a revised Ground Lease and what the costs would be of such an agreement. These were risks that Mr. Simpson knew of and concealed from Oak.

70. At the expiry of the forbearance period, Madison became entitled to a deed in lieu of foreclosure. Madison ultimately exercised its rights in September 2026, at which point Oak lost its entire investment in the Myrtle Point project.

*iv. IRS Section 1031*

71. Holding certain assets in a vehicle under Section 1031 of the Internal Revenue Code (the "1031 Exchange") can be an advantageous investment strategy because it defers the recognition of otherwise taxable gains and allows for continuous reinvestment by rolling proceeds from a sold property directly into a new property.

72. A 1031 vehicle enables real estate portfolios to upgrade assets without incurring tax liabilities, optimizing the portfolio value over time.

73. In 2022, AREH sold three property portfolios – Midtown Oaks, Camelot and North Carolina-South Carolina ("NCSC") – at a significant taxable gain. To allow investors to defer this gain, AREH intended to structure a 1031 exchange for each portfolio into new properties. However, this plan was not viable without Oak participating in the 1031 Exchange, as Oak had invested most of the capital in the three portfolios.

74. Oak had to elect whether to participate in the 1031 vehicle prior to the sale of each property portfolio. In a 1031 exchange, if partners disagree about whether to complete a 1031 exchange, the partnership interests must be divided before the exchange so that partners who want to exit can sell their interest for cash, while the participating investors' interests are rolled into a 1031 exchange.

75. Because, at the time of the sale re-investment assets had not been identified, Oak was told by investor relations that Oak needed to "rely on [AREH's] expertise to reinvest the proceeds" and that AREH "operates with specific investment criteria and believes it can successfully reinvest all or a portion of the capital into one of [AREH's] strategic acquisitions." (Order to Show Cause Exhibit I, State Court Action, NYSCEF Doc. No. 236.)

76. AREH's investor relations team, at the direction of Mr. Simpson, also represented to Oak that "[i]f a satisfactory re-investment opportunity cannot be identified, funds shall be returned to investors." (*Id.*)

77. Finally, Mr. Simpson's investor relations team also told Oak that Mr. Simpson would be participating in the 1031 vehicle alongside Oak so their "interests are fully aligned in achieving a successful outcome." (*Id.*)

78. Mr. Simpson knew these representations were false when made, and made them with the intent to induce Oak's reliance.

79. Oak reasonably and justifiably relied on the misrepresentations when it made its investment decisions.

80. Once new investment projects were identified, Oak, as the Investor Member of AREH, had consent rights over whether the new acquisitions could proceed. If Oak refused to consent, the 1031 exchange window would time out and the funds would need to be returned to investors.

81. While Mr. Simpson identified acquisition targets for the 1031 Exchange, he was aware that some of these acquisitions would not allow for a successful tax deferral.

82. For example, if the proposed acquisitions went ahead, investors in the Camelot portfolio would receive a significant "boot" (i.e., cash or debt relief that is not invested in the new property) that would subject them to immediate taxes without access to the capital that triggered the tax.

83. The investment target for the NCSC exchange was wholly unsuitable and would not lead to a 1031 deferral at all, and investors would be fully taxed on the 2022 disposition despite having no proceeds to pay the taxes with.

84. Notwithstanding that Oak would have preferred a return of its capital from the initial investments, it participated in the 1031 Exchange to obtain the promised tax benefits. It then consented to the acquisition of the new properties, and Oak and its affiliates entered into lender guarantees to make the acquisitions possible. Oak did so at a time when Mr. Simpson knew that the 1031 Exchange would fail and that Oak would not receive the promised tax benefits. If Oak had been aware that the 1031 targets were not viable, it would not have

consented to the acquisition or provided the guarantees, and its sale proceeds would have instead been returned to it.

85. Ultimately the 1031 Exchanges were invested into heavily leveraged under-budgeted projects that all went into default within a year of acquisition. All the properties were foreclosed on between 2023 and 2025 and Oak's entire investment was lost.

86. Meanwhile, contrary to what was represented to Oak, Mr. Simpson had chosen not to participate in the 1031 Exchange and instead took his proceeds from the portfolio sales in cash. He therefore had minimal funds at risk, was not aligned in interest with Oak, and insulated himself from the financial consequences of the failed 1031 Exchange and subsequent foreclosures.

**2. Mr. Simpson's Misappropriation of Oak's Capital**

87. During the relevant time, Mr. Simpson was the managing member of JJ Arch, which, in turn, is the managing member of AREH.

88. As a result of this relationship, Mr. Simpson had exclusive control over the business affairs of AREH, including the power to "deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement." (AREH LLC Agreement § 7.1.1(vi).)

89. Mr. Simpson engaged in a continuous pattern of improperly paying out management fees and benefits in a manner at odds with the operating agreement and secretly using AREH resources for his personal benefit while telling Oak that the contributions Oak continued to make were for "corporate needs."

90. For example, the AREH LLC Agreement provides that JJ Arch is entitled to an annual guaranteed management fee, paid monthly, in the amount set forth in the budget approved

by Oak. If Oak does not approve the budget, then each budget line item is the lesser of the proposed budget and the approved budget from the prior year.

91. Historically, the budget included a separate line item for JJ Arch's guaranteed management fee. Starting in the 2020 budget, however, Mr. Simpson only included a consolidated line for "Payroll + GP", which masked the fact that Mr. Simpson unilaterally increased the guaranteed fee to JJ Arch. Thus, Oak's approval of the total payroll budget was not effective to increase the guaranteed payment to JJ Arch and such payment should have defaulted to the management fee paid to JJ Arch the previous year. Management fee increases were similarly hidden in the 2021 and 2022 budgets.

92. Thus, to the extent that Oak consented to a consolidated "Payroll + GP" budget line item in any given year, Mr. Simpson concealed from Oak that he was increasing JJ Arch's guaranteed payment year after year thereby enriching Mr. Simpson at Oak's expense.

93. For 2023, there was no budget provided or approved by Oak. However, Mr. Simpson, once again, unilaterally increased the management fee to JJ Arch without the necessary authorization to do so and misappropriated funds from AREH to pay his inflated "management fees."

94. Oak has a legal obligation to fund AREH, so Oak continued to meet its obligation to inject additional capital into AREH without knowing that Mr. Simpson was taking additional funds for his own benefit out of the "operating budget" without the requisite approval.

95. In addition to improper cash transfers Mr. Simpson made for his own benefit, he also misappropriated AREH assets by putting himself on the AREH benefits plan and by using AREH employees to provide services to JJ Arch and to Mr. Simpson and his companies, without authority to do so and often without any benefit or reimbursement to AREH.

96. Mr. Simpson put employees on AREH's payroll that were not performing work for AREH, but were working on construction on his other projects, working on cars at Mr. Simpson's separate company, Rever Motors, doing accounting and bookkeeping for Mr. Simpson's other companies, and doing taxes and other financial tasks for Mr. Simpson individually.

97. Mr. Simpson also caused third-party investors in one of JJ Arch's development projects, East 89th Street, to pay JJ Arch a construction management fee while all the actual construction and development work was done by AREH and its subsidiaries, reimbursing AREH at below-market rates or not at all for the work that was performed at AREH's expense.

98. Mr. Simpson would do so, upon information and belief, without any allocation for administration, overhead, or profit in breach of the AREH LLC Agreement, which prohibits self-dealing unless rates are paid at arm's length prices.

99. Mr. Simpson's misappropriation of Oak's funds has caused Oak to incur substantial damages.

## COUNT I

## NONDISCHARGEABILITY OF DEBT UNDER 11 U.S.C. § 523(a)(2)(A)

100. Oak incorporates and re-alleges the above allegations as if set out in full herein.

101. Section 523(a)(2)(A) provides, in pertinent part, that an individual debtor is not entitled to a discharge from any debt "for money . . . to the extent obtained by false pretenses, a false representation, or actual fraud . . . ."

102. Any damages on account of the fraud described above are non-dischargeable.

103. As the managing member of AREH, Mr. Simpson owed fiduciary duties to Oak, including but not limited to the duty of care, the duty of loyalty, and the duty of disclosure.

104. Mr. Simpson made material misrepresentations and concealed material facts concerning the advantaged position of other investors relative to Oak; and material misrepresentations about the viability of Myrtle Point, concealing that the project would require Oak to sign a carry and completion guarantee and concealing that the ongoing construction was in violation of the Ground Lease. Mr. Simpson also misrepresented critical information concerning the 1031 exchange aspect of Oak's investment in the Midtown Oaks, Camelot and NCSC portfolios.

105. Mr. Simpson made these material representations and omitted these material facts with knowledge of their falsity with the intent of deceiving Oak into making investments into AREH and the projects it controlled.

106. Oak reasonably relied on Mr. Simpson's false statements and intentional omissions and was damaged thereby.

107. The elements of common law fraud include: a false representation or omission of material fact, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury.

108. The common law fraud elements under New York law are consistent with fraud under bankruptcy law.

109. If there is a determination by the State Court or this Court that Mr. Simpson committed fraud and a resulting judgment or default judgment grounded in a finding of fraud, then the Court should find that the judgment is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

## COUNT II

## NONDISCHARGEABILITY OF DEBT UNDER 11 U.S.C. § 523(a)(4)

110. Oak incorporates and re-alleges the above allegations as if set out in full herein.

111. Section 523(a)(4) provides, in pertinent part, that an individual debtor is not entitled to a discharge from any debt based on embezzlement.

112. To successfully plead that a claim is non-dischargeable under section 523(a)(4) due to embezzlement, a creditor must prove: (1) that the creditor entrusted his property to the debtor; (2) that the debtor appropriated the property for a purpose other than that for which it was entrusted; and (3) the circumstances indicate that the debtor acted with fraudulent intent or deceit.

113. Any damages on account of Mr. Simpson's misappropriation of funds and resources described above are non-dischargeable.

114. As set forth more fully above, Mr. Simpson (through JJ Arch), as managing member of AREH was entrusted with Oak's capital to use in accordance with the AREH LLC Operating Agreement. Mr. Simpson allocated AREH's funds and resources provided by Oak for the benefit of himself and JJ Arch without Oak's authorization. Mr. Simpson did so knowing that what he was doing was in violation of his duties as the managing member of AREH. If these facts are substantiated by proceedings in the State Court or this Court, the Court should find that the resulting judgment or default judgment is nondischargeable under 11 U.S.C. § 523(a)(4).

WHEREFORE, Plaintiff respectfully requests a determination that any judgment entered against Mr. Simpson on account of fraud or misuse of Oak's are not dischargeable pursuant to section 523(a)(2)(A), and (a)(4) of the Bankruptcy Code, and for such other and further orders and relief as this Court deems just and proper.

Dated: September 15, 2026
New York, New York

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Lindsay A. Bush
140 E. 45th Street, Suite 26B
New York, New York 10017
Tel: (212) 510-7008
Email: efisher@binderschwartz.com
Email: lbush@binderschwartz.com

*Attorneys for Plaintiff Oak*