# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ ARCH LLC,

*Plaintiff*,

- against -

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants.*

Index No.: 158055/2023

**COMPLAINT**

608941 NJ INC.,

*Plaintiff*,

- against -

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL ESTATE HOLDINGS LLC,

*Defendants*,

and

ARCH REAL ESTATE HOLDINGS LLC,

*Nominal Defendant*.

608941 NJ INC. ("Oak" or "Investor Member") brings the following Complaint,[1] individually and derivatively on behalf of ARCH REAL ESTATE HOLDINGS LLC ("AREH"), against JEFFREY SIMPSON ("Simpson") and JJ ARCH LLC ("JJ Arch," together with Simpson, Oak, and AREH, the "Parties"), by and through its undersigned counsel Haynes and Boone, LLP,

[1] Pursuant to CPLR 6401(a), Oak is a party to this proceeding, but Oak is not currently the subject of any claims in this matter. Accordingly, this pleading is styled as a "Complaint" rather than a Counterclaim.

alleges, upon knowledge as to itself and upon information and belief as to all other matters, as follows:

**NATURE OF THE PROCEEDINGS**

1. Plaintiff 608941 NJ INC. ("Oak" or "Investor Member") and JJ Arch LLC ("JJ Arch") are parties to a December 11, 2017 Limited Liability Company Operating Agreement (the "AREH LLC Agreement") that governs the operations of AREH. Together, Oak and JJ Arch are the two members of AREH.

2. Oak is the "money partner" in approximately ten large-scale projects that Simpson and entities controlled by him (namely, JJ Arch, AREH, and certain subsidiary entities of AREH) manage. Oak has at least $50 million dollars invested in Simpson-managed properties, and has guaranteed loans on some of the projects, either directly or through affiliates, totaling more than $350 million dollars. JJ Arch, in turn, is denominated the Managing Member of AREH, pursuant to the AREH LLC Agreement. However, and as described more fully below, JJ Arch was removed as AREH's Managing Member by way of an October 31, 2023 Cause Notice (the "Removal Notice"). *See* Exhibit C to the November 3, 2023 Emergency Affirmation of Leslie C. Thorne ("Thorne Aff.").

3. Simpson's status at JJ Arch is the subject of the above-captioned proceeding (the "JJ Arch Proceeding"). Pursuant to a series of interim orders in the JJ Arch Proceeding, Simpson has been acting as the managing member of JJ Arch.

4. However, Oak has sought a change in management at JJ Arch. Namely, on October 17, 2023, Oak joined this matter as a party and brought a motion by order to show cause for the appointment of a temporary receiver of JJ Arch (the "Receiver Motion," NYSCEF Doc. No 225 (Mot. Seq. No. 4)). During a hearing on Oak's Receiver Motion, the Court suggested that as an

alternative to the appointment of a receiver, Oak may instead seek to remove the Managing Member and appoint an individual or entity with more familiarity with AREH's business, such as Oak, "whose been involved in the business and knowledgeable about real estate." (Transcript of October 19, 2023 hearing before Hon. Joel Cohen ("Hearing Tr.") at 12:20-22.)

5. Therefore, by this action and for the reasons detailed herein, Plaintiff Oak brings claims against Defendants Simpson and JJ Arch for breach of fiduciary duty, breach of contract, and declaratory judgment. Plaintiff Oak also brings derivative claims on behalf of AREH for breach of fiduciary duty against Defendants Simpson and JJ Arch. Plaintiff Oak brings claims for tortious interference with contract, tortious interference with prospective economic advantage, defamation, fraud against Simpson individually. Finally, Oak seeks an equitable accounting against Defendants JJ Arch and AREH.

6. In addition to the foregoing relief, pursuant to its concurrently filed Emergency Order to Show Cause for Temporary Restraining Order and Preliminary Injunction to Enforce JJ Arch's Removal (the "PI OSC") Oak seeks a temporary restraining order restraining Simpson and/or JJ Arch from acting as Managing Member of AREH, following Oak's removal of JJ Arch on October 31, 2023 and either of the alternatives: (i) appointment of a temporary receiver as set forth in the Receiver Motion; or, (ii) appointment of Oak as the Managing Member of JJ Arch in place of Simpson for the duration of the JJ Arch Proceeding, as elaborated in the PI OSC.

## THE PARTIES

7. Oak is a corporation duly organized and existing under, and by virtue of, the laws of the State of New Jersey, with its principal place of business in Toronto, Canada.

8. AREH is a limited liability company organized under the laws of New York. Its members are Oak, a New Jersey corporation, and JJ Arch, a New York limited liability company with New York resident members.

9. Upon information and belief, Simpson is a resident of the State of New York, domiciled at 1055 Park Avenue Unit 4, New York, New York 10028.

10. Upon information and belief, JJ Arch is a limited liability company organized under the laws of New York. Its members are Simpson and Jared Chassen ("Chassen"), both residents of the State of New York.

## JURISDICTION, VENUE, AND GOVERNING LAW

11. This Court has personal jurisdiction upon appropriate service of process over Simpson and JJ ARCH as they reside and conduct business in the State of New York, County of New York and since they commenced this action in this court.

12. Venue is proper in the Supreme Court of the State of New York, County of New York, pursuant to CPLR 503(a) as Simpson and JJ ARCH reside and conduct business in New York County. Venue is further proper in the Supreme Court of the State of New York, County of New York, pursuant to CPLR 507.

## FACTUAL BACKGROUND

### A. Oak's History

13. Oak is a subsidiary of 35 Oak Holdings Ltd. ("Oak Guarantor"), a Canadian entity owned and controlled by members of the Wiener family.

14. Oak Guarantor is a holding company and family office. While it is today focused on investments and real estate, the family business was first created by the family patriarch, David Wiener.

15. David Wiener started Wiener Electric, a company that would later become Visioneering Corp. Visioneering pioneered the use of a lightweight frame housing for fluorescent lighting. Under the leadership of David, and later David's son, Bill Wiener, Visioneering would become the largest independent manufacturer of lighting in Canada.

16. David was always a believer that land was the safest possible store of value, because it is finite and satisfies a basic need. Accordingly, the Wiener family began using the proceeds from Visioneering's success to invest in real estate, always adopting a conservative approach to its investment. The strategy was to choose a parcel in an area that believed to have long-term development potential and revenue streams that could cover its operating expenses, purchase the land in cash without any leverage, and hold onto the land as long as it took for its value to be realized before selling it.

17. Members of the Wiener family put together a property management company called Bilnia Investments Ltd ("Bilnia"). Bilnia sits under 35 Oak and is an affiliate of Oak. Bilnia continues to manage 35 Oak's real estate portfolio, which includes retail, office and storage facilities, primarily in Ontario and Florida.

18. AREH was formed in 2017 when Oak sought to expand its U.S. real estate holdings. Since AREH's inception, Oak has invested at least $3 million directly into AREH to fund its overhead and operations, and over $50 million in the properties developed, managed and/or controlled by AREH or JJ Arch. Oak has made the vast majority of its equity investments in the properties developed, managed and/or controlled by AREH or JJ Arch through Arch-affiliated entities and is entitled to distributions from those entities in respect of such investments in accordance with the governing documents of those entities.

19. As described more fully below, the unjustified and contractually prohibited acts and omissions of Simpson, acting on behalf of JJ Arch and AREH, have already harmed and stand to further threaten the stability of the Oak, Oak Guarantor and the Wiener family legacy.

**B. The AREH LLC Agreement**

20. Defendant AREH is governed by the AREH LLC Agreement. Pursuant to the Preamble and Section 13.1.1 of the AREH LLC Agreement, Oak is denominated the "Investor

Member" of AREH LLC and JJ Arch the "Managing Member." *See* Doc. No. 2 (AREH LLC Agreement). Currently, pursuant to the AREH LLC Agreement, JJ Arch is responsible for the management and operations of real property holdings valued in excess of $1 billion as of 2022, and in which Oak has far and away the most funds of any party.

21. Under the AREH LLC Agreement, "The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member"—referring to JJ Arch—subject to Oak's Major Decision rights, which are enumerated in Section 7 of the AREH LLC Agreement. Doc. No. 2 at §§ 7.1.1, 7.1.3.

22. The Managing Member, JJ Arch, must provide Oak with "all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property[,]" pursuant to Section 11.5.2 of the AREH LLC Agreement. Oak has inconsistently received required financial reports and AREH has failed to substantially fulfill its obligations under Section 11.5.

23. Oak has repeatedly made prior requests for the financial reporting required to be provided to Oak under the AREH LLC Agreement, which requests have been rebuffed, refused, or granted only subject to unreasonable and unjustified conditions.

24. On or around October 19, 2023, following the hearing on Oak's Receiver Motion, AREH began to comply with the books and records demands for AREH and all subsidiary entities to whom Oak has contributed capital or that are directly or indirectly managed by AREH (the "Applicable Entities"). However, the records and documents that have been shared to date do not satisfy the requests Oak has made, and are so incomplete that Oak still does not have access to such basic information as the balance sheets for AREH and the Applicable Entities.

### C. General Mismanagement of AREH and Misconduct by Simpson and JJ Arch Leading to Unforeseen Tax Liabilities, Defaults, and Foreclosure

25. In recent months, including through the filings in the JJ Arch Proceeding, Oak has come to learn of the serious mismanagement that has occurred and still occurring at AREH. Such events include the following:

26. With respect to certain properties under development, AREH purposely failed to comply with the requirements under Section 1031 of the Internal Revenue Code (the "1031 Exchange") to obtain tax benefits, the receipt of which was essential to the commercial success of the project and was the basis on which investment was sought and obtained. Indeed, when seeking commitments to the 1031 Exchange, AREH characterized the opportunity as presenting essentially no risk because, according to a communication from AREH Investor Relations "If a satisfactory re-investment opportunity cannot be identified, funds shall be returned to investors." *See* Doc. No. 236. As we now know, apparently the 1031 Exchange was a failure, and investors did not receive a return of their funds. While members of AREH's staff, and Mr. Simpson himself, were aware of the failure to obtain these benefits, they delayed revealing this information to investors with certain investors (including Oak) never receiving any formal notice of the issue. As a result, investors in the project now face unexpected and significant tax liabilities that eclipse any possible return that could have been obtained on the property. *See* Doc. No. 258.

27. The circumstances surrounding AREH's abandonment of the 1031 Exchange have yet to be fully disclosed, while startling information in Chassen's October 6, 2023 affidavit in the JJ Arch Proceeding indicates that Simpson himself had minimal funds on the line, and therefore was uniquely insulated from the failure. *See* Doc. No. 162 at ¶ 24. This circumstance is particularly egregious because Simpson induced Oak's investment by representing that AREH was participating in the 1031 Exchange, which was not the case in fact. *See* Doc. No. 236.

Nevertheless, Oak has yet to receive an explanation as to why it now, as the largest investor in the failed 1031 Exchange, faces millions in tax liabilities.

28. AREH, through the acts and omissions of Simpson, has failed to make debt servicing payments as required, causing the affected properties to go into default. As of the date of this filing, Oak has received default notices regarding at least seven properties, which number is expected to expand based on Oak's understanding that formal notices have not been sent in all applicable cases. Similarly, one property was the subject of a foreclosure auction on October 19, 2023, and two more are scheduled for foreclosure auctions in near future.

29. In one instance that led to a formal notice of default being issued, email correspondence reflects that despite repeated notices of the shortfall and the need to immediately remedy it, Mr. Simpson did not even respond to the debt servicer until after the initial date for payment had passed. Mr. Simpson then failed to notify Oak until the eve of the default, which is non-remedial, in addition to having never made a capital call for the property. *See* Exhibit 9 to the Nov. 2 Wiener Aff.

30. A September 14, 2023 affidavit of Chassen, also filed in the JJ Arch Proceeding, similarly contains numerous statements that Simpson mismanaged AREH and the Applicable Entities, made misrepresentations to investors, and provided them with inadequate reporting, including:

a. "The operation of the Arch Entities did well initially, but it went downhill over the past two years." Doc. No. 62 ¶ 16.

b. "Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch grossly under budgeted projects and promised unrealistic returns

on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks." *Id.* ¶ 19.

c. "Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else." *Id.* ¶ 19

d. "Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss." *Id.* ¶ 20

e. "Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses." *Id.* ¶ 21.

f. "[A]s cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson

started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures." *Id.* ¶ 22.

31. Accordingly, a picture emerges of a company in serious disarray and headed for imminent collapse. While Simpson has repeatedly referenced a potential need to pursue bankruptcy, apparently retained bankruptcy counsel for AREH, and strenuously opposed Oak's efforts to safeguard its consent rights under the AREH LLC Agreement in respect of any bankruptcy filing, at no point has Oak actually been presented with a bankruptcy proposal or any semblance of one either for a property or on a global basis. These circumstances raise serious questions as to the financial reality of AREH and the Applicable Entities, and as to Simpson's observance of his fiduciary and other duties.

**D. Major Misconduct Related to Spending, Budgeting and Capital Calls**

32. In addition to the foregoing misconduct, Simpson, acting on behalf of JJ Arch and AREH, has engaged in serious misconduct with respect to the financial affairs of JJ Arch and AREH. As is described more particularly below, the serious mismanagement of the businesses has led to a purported "liquidity crisis," culminating in Simpson's communication to AREH's staff furloughing them. *See* Exhibit B to the Thorne Aff. Some representative instances of such misconduct include the following:

33. Simpson failed to present a budget for Oak's approval for 2023, and when this significant lapse in protocol was brought to his attention, insisted that regardless of Oak's approval, Simpson could proceed with the prior year's budget as if approved for 2023 if he desired, in violation of the terms of the AREH LLC Agreement. *See* Exhibit 10 to the Nov. 2 Wiener Aff.

34. On numerous occasions, Simpson has falsely advised Oak that certain capital calls have been made to other investors. As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute.

35. Related to the above, Simpson has repeatedly demanded capital contributions from Oak without following the contractual procedures elaborated in the AREH LLC Agreement requiring the formal issuance of capital calls and regular financial reporting. Oak has acceded to these demands from time to time under the threat from Simpson that such capital needs were urgent and that ruinous events would ensue absent an immediate contribution of capital. Doc. No. 254,[2] a September 24, 2023 email with the subject line, "Emergency funds - URGENT reply required" is typical of the extortive demands for capital Oak has received, which flout all proper procedure for capital calls and lack virtually any explanation for the necessity of the funds.

36. In a similar instance where Simpson made demands for capital that was purportedly urgently needed, he refused to provide a breakdown of how much money he was asking for or whether such funds were being contributed to AREH or to one of the properties subject to AREH's management. When Oak refused, Simpson proposed "borrowing" money from the properties, regardless of whether he had consent from the investors in those properties to do so, demonstrating an exceptionally troubling attitude towards his obligations to investors, the properties, and to sound accounting practices. *See* Doc. No. 227 (K. Wiener Aff.) ¶ 48; Doc. No. 234.

37. Most recently, late in the evening of October 25, 2023, AREH sent a purported capital call seeking approximately $300,000 on an emergency basis to meet AREH's claimed

[2] Certain redactions are applied regarding settlement, pursuant to Federal Rule of Evidence 408.

payroll needs, which AREH's purported counsel communicated was due within three business—the following Monday. Although Oak has already met its $3 million funding cap for AREH's overhead, and therefore has no obligation to make any further contributions to AREH for its payroll or any other operational expenses, Oak nevertheless entertained the request subject to certain conditions, which primarily consisted of receiving further information about the capital needs. Specifically, Oak reiterated its need for books and records—which AREH had already conceded it was under a court order to provide—and requested specific information as to which employees would be paid, in what amounts, and when the next payroll date would occur. Oak similarly sought assurances that any capital it provided in response to this request would not be used to pay certain lawyers, Simpson himself, or JJ Arch, among certain other commitments. In subsequent correspondence through counsel, Oak made clear that "[i]f there's a condition Mr. Simpson finds objectionable and there is a good reason why, we're happy to consider." *See* Exhibit B to the Thorne Aff.

38. In the intervening period between the purported capital call and communications between counsel regarding the conditions on which Oak would fund payroll, this Court entered the Interim Order Regarding Measures During the Pendency of the Order to Show Cause Regarding the Appointment of Receiver for JJ Arch (the "Interim Measures Order," NYSCEF Doc. No. 292). The Interim Measures Order ordered compliance with the AREH LLC Agreement, including the Section 7.1.3, regarding Major Decisions, reinforced Oak's entitlement to information, including through the provision of books and records, spend against the AREH budget, and generally promoted greater transparency to Oak.

39. Nevertheless, rather than providing the requested information or objecting to any of Oak's conditions for funding the payroll, and in complete disregard of the spirit of the Interim

Measures Order, purported counsel for AREH communicated that it treated Oak's conditions as a "refusal to honor any portion of the recent Capital Call" and that "AREH was required to furlough employees." Attached to this communication was a letter from Simpson informing AREH staff that, effective as of October 27, 2023, they were furloughed and should cease working immediately. *See* Exhibit B to the Thorne Aff.

40. Counsel's incorrect characterization that Oak had "refus[ed] to honor any portion of the recent Capital Call" was further improper because (1) it failed to conform to the AREH LLC Agreement's requirements; (2) Oak had already met its funding cap; (3) and Oak was entitled to five business days to contribute capital in response to any valid capital call under Section 3.2.2 of the AREH LLC Agreement. Indeed, the purported capital call was made with fewer than five business days' notice even though AREH's payroll obligations occur on a predictable schedule, known in advance. The fact that Simpson in any event instructed all AREH employees to cease working immediately before Oak could elect to provide the requested funds, and that he did so after the Interim Measures Order was entered, indicates that Simpson has no regard for his duties to Oak, the other investors, or this Court's authority.

41. As Simpson is aware, a furlough has immediate and irreparable consequences for AREH and the properties it manages. Indeed, with no employees carrying out the business of managing the properties, the entire business would collapse in a matter of days to weeks—wiping out Oak's investments, other investors' investments, and triggering potentially massive liabilities on Oak's and Oak Guarantor's guaranties. Since the furlough, Oak has received reports of widespread panic from property management teams around the country.

42. While Oak remains unaware of the exact financial condition of AREH and the properties because of Simpson's obstructive and dilatory conduct in providing the necessary

information to Oak, Oak understands in the lead up to the purported "liquidity crisis" that prompted Simpson to furlough all employees, Simpson has authorized six-figure payments to counsel in recent weeks, apparently prioritizing the legal battles he has initiated (and his individual interests thereby implicated) over the functioning of the underlying business.

43. Both members of JJ Arch have accused the other of misappropriating company funds. For instance, in his September 14, 2023 affidavit (the "Chassen Affidavit"), Mr. Chassen attests as follows: "The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds." *See* Doc. No. 62 at ¶ 30.

44. The Chassen Affidavit also contains numerous statements that Simpson mismanaged AREH and the Applicable Entities, made misrepresentations to investors, and provided them with inadequate reporting, including:

a. "The operation of the Arch Entities did well initially, but it went downhill over the past two years." *Id.* ¶ 16.

b. "Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks." *Id.* ¶ 19.

c. "Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept

funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else." *Id.* ¶ 19

d. "Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss." *Id.* ¶ 20

e. "Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses." *Id.* ¶ 21.

f. "[A]s cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures." *Id.* ¶ 22.

45. Indeed, Simpson readily admitted to improper use of company funds, explaining that an employee of his automobile business, Rêver Motors, which is completely separate from AREH, is on the AREH payroll. *See* Doc. No. 160 (October 2, 2023 Affidavit of Jeffrey Simpson) at ¶ 21.

46. Discussions with Rebecca Tokarczyk, an AREH accountant, confirm the irregularities, misuse, and misappropriation of AREH funds by Simpson. Ms. Tokarczyk has described that, among other things, AREH's accounting department was severely understaffed and the lack of personnel inhibited proper recordkeeping. Compounding the understaffing, accounting staff was directed to "borrow" money from the various accounts under AREH's control for other entities' use, even over protestation. Since June 2023, Simpson directed Ms. Tokarczyk to come up with creative ways to pass money through the organizations, labeling the transfers as "distributions" to AREH, but then not handling them as distributions in fact. On at least one occasion where Ms. Tokarczyk voiced concern with these practices, Simpson declared "I'm the Managing Member and can take money from where I want." Ms. Tokarczyk reports that AREH's funds were used to cover non-AREH expenses, including her own salary, despite the fact that she exclusively performed work for JJ Arch and its principals. Likewise, AREH was billing properties for accountant work, but not actually paying outside accountants.

47. Reinforcing the statements of Ms. Tokarczyk, Jason Paul, a member of the AREH team responsible for asset management, recounted in an August 9, 2023 email Simpson's plans to redirect the budget for Arch Property Management, a subsidiary of AREH, to AREH in order to cover payroll expenses of AREH, notwithstanding the "recognize[d] underperformance of property operations" at properties managed by Arch Property Management. Paul expressed his belief that "[t]he recent actions he has taken with respect to the company restructure have crossed

the line of our fiduciary responsibilities, as the interest of our investors was no longer being made the primary objective. Ensuring that he and others would continue to receive a salary became the goal, even if this was to be at the expense of the properties and the investors." *See* Doc. No. 190.

48. All the while, Simpson has engaged in a campaign of misinformation to investors, attempting to pin the blame on Oak the current state of affairs without naming it as such. *See* Doc. No. 241 (M. Wiener Aff.) ¶ 44; Doc. No. 256 (Exhibit 15 to M. Wiener Aff.) (in a communication to investors, offering a seriously misleading account of the state of the project by asserting, "our investment partner has indicated they are in a position where they either unwilling or unable to contribute additional funds. This recent change has caused work to stop at the site until additional funds are infused into the project."). *See also* Doc. No. 227 (K. Wiener Aff.) ¶ 61.

**a. Misrepresentations about Oak's Capital Contributions**

49. Simpson's failure to formally raise capital calls and prepare appropriate paperwork evidencing the basis and terms on which capital has been contributed by Oak appears to serve Simpson's modus operandi of recanting or denying the statements on which Oak's investment of further capital was predicated.

50. October 25, 2023, Simpson sent concurrent capitals calls for AREH and the stalled Myrtle Point project. In his AREH capital call, Simpson claims that $650,000 Oak had contributed in June 2023 to cover overhead expenses instead "should have been credited" to Myrtle Point, and then used by that project to pay its payables to AREH. Simpson therefore issued a capital call for Myrtle Point, which he has purported to pay with the equity Oak had already contributed to AREH. Needless to say, there is no provision in any of the relevant operating agreements that would allow Simpson to capital call Oak through one LLC and fund it by removing and reallocating Oak's already-contributed equity from another LLC.

51. It is unclear whether Simpson always intended to reclassify Oak's equity contribution, or if he only decided to after the money was contributed. If it is the former, then Simpson induced Oak's contribution by fraud. Oak has no obligation to provide additional equity to the Myrtle Point project. Any equity contributed to Myrtle Point gets immediately subordinated behind another investor, earns virtually no economics, and is at significant risk of loss given the present state of that project. Moreover, that LLC owes millions of dollars to various vendors and subcontractors. To the extent that Oak would wish to contribute additional funds to that project, it would be to cover invoices from subcontractors that could secure additional work from those subcontractors, so that further progress is made on the project. It would not be so that AREH could give itself a preference over all the other creditors.

52. It was Oak's clear understanding at the time the $650,000 was contributed in June that it was being contributed under the AREH operating agreement. Oak was legally obligated to contribute funds to AREH and most of the costs being covered had nothing to do with Myrtle Point. Indeed, the email seeking the funds in June 2023 had the subject line "Corporate Cash Needs" and referred to a separate email that would be coming out later in the day for "property cash needs." While the "Corporate Cash Needs" email did refer to outstanding receivables from Myrtle Point, we merely understood that to mean that much of the $650,000 would be repaid to us when AREH's receivables were paid (whether that was through additional equity being contributed to Myrtle Point down the line or by further advances on the project's construction loan).

53. In other words, Simpson uses a combination of fraud and accounting chicanery to try turn a clear $3-million cap into an unlimited line of capital. First, Simpson capital calls funds from Oak at the AREH level where Oak has a legal obligation to fund. Then, after Oak has already

funded, say that the capital "should have" been funded at the property level (where there is no obligation to fund), reclassify the funding in AREH's books and records as property-level equity, and reduce Oak's funding at the AREH level back under the cap so the entire process can begin again at the next payroll cycle. In fact, the very email from Simpson purporting to reclassify Oak's equity sets himself up to pull the same trick in the future, by including a chart stating that most of the payroll funding requested will be "reimbursable at the property level," notwithstanding that they were capital called at the AREH level.

54. In part to avoid this unending cycle of fraudulent capital calls at the AREH level that are later reclassified to property-level funding, Oak demanded that Simpson withdraw his meritless Myrtle Point equity reclassification capital call, so that any payroll funding is property recognized as an above-cap capital contribution that cannot be reallocated into any other LLC without Oak's consent. Simpson has refused to do so, and Oak is unable to contribute further capital at the AREH level while there remains outstanding a fraudulent attempt to reclassify Oak's previously-contributed capital.

55. As AREH has begun to release certain records to Oak pursuant to the Interim Measures Order requiring the provision of books of records, Oak has identified serious discrepancies in the records (notwithstanding that such productions have been seriously deficient, and Oak is owed substantially more documentation). Select but representative discrepancies identified to date include:

a. Unexplained reductions of Oak's equity. For example, for the Bushwick project, financial statements in August 2023 reflected Oak had an interest of $1.726 million, which current statements now report as only $1.150, despite no intervening events occurring that would explain this change.

b. Failure to account for Oak's contributions. Entire amounts advanced by Oak are simply not recorded in the tables provided, as is the case for Center Point ($5 million unaccounted for) and 16th Street ($40,070 unaccounted for).

c. Internally inconsistent tables. For example, tables provided for Center Point appear to indicate Oak holds a 28% interest when the various tiers of percentages are summed. But Oak's interest as a percentage of the total capitalization (as reported in the table) indicates a different percentage interest, and the tables inaccurately state Oak's member loans.

**E. Simpson's Past Record of Misconduct and Breaches of Fiduciary Duty**

56. Other conduct that Simpson has engaged while serving as JJ Arch's Managing Member include the following:

a. Holding hostage the sale proceeds of an Oak affiliate's interest in a property on Biscayne Blvd in Miami—in which Simpson and entities controlled by him had no ownership interest at all—by demanding Oak agree to pay him approximately $60,000 in pre-development fees to which he had no legitimate claim. In order to ensure that it will have access to the sale proceeds, Oak had little choice but to give into Simpson's demands, notwithstanding his utter lack of entitlement to the fees. Simpson has since intimated that he will withhold the entire proceeds of the sale to use as leverage in his broader dispute with Oak even if the fees are paid, notwithstanding that AREH has no possible economic interest in the sale proceeds outside of the $60,000 in dispute. *See* Doc. No. 227 (K. Wiener Aff.) ¶¶ 30-37.

b. Refusing to provide basic information despite clear obligations to provide such information. For instance, regarding the flagging Myrtle development,

Simpson refused to provide any meaningful information as to the financial needs to complete the project and secure the much-needed anchor tenants, which is the only reasonable path forward to prevent a complete loss on the project. (*See* Doc. No. 249 (Exhibit 8 to M. Wiener Aff.); Oct. 6 Chassen Aff. ¶ 6). When asked to confirm the accuracy of the proposed budget to secure the anchor tenants—which Oak would contribute—Simpson set off on a tirade about the lack of funds, despite the fact that the solution under consideration was further investment from Oak: "As I previously indicated there's 200,000 to finish. . . By tomorrow, the site is getting locked down without any workers. There is no money to pay for anyone. You can't try to call the shots on this stuff when there's no money to pay for anything. It doesn't work. If you actually care about the assets and the needs that are required, that's a real dialogue." Doc. No. 249.

c. Forbidding Oak from communicating with third parties such as lender and other investors, even threatening legal action in such event. *See*, *e.g.*, Doc. No. 249 (threatening, "This is the last notice to you. You are not to reach out to anyone without my consent. If you continue, it's at your own risk and immediate legal action will be taken."). *See also* Doc. No. 227 (K. Wiener Aff.) ¶¶ 61-63 (describing Simpson's efforts to stymie the flow of information to facilitate his misdeeds and double-speak).

d. Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor (as guarantor of certain loan obligations with respect to the Arch Portfolio) to stop work on critical, time sensitive work as a means of leverage to force Oak

to take certain actions. *See, e.g.*, Doc. No. 243 (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted due to privilege concerns but available for *in camera* review). On information and belief, Simpson continues to interfere in the representation of AREH, certain of its subsidiaries, Oak and Oak Guarantor in these time-sensitive matters, advising counsel to halt work following his removal from JJ Arch and AREH.

e. Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor to not speak to Oak or Oak Guarantor, such counsel's own client. Again, Simpson's purpose was to exert leverage over Oak and Oak Guarantor. *See, e.g.*, Doc. No. 244 (August 1, 2023 5:36 PM email from J. Simpson re Nostrand).

f. Making misrepresentations to Oak concerning capital. For instance, regarding the 550 Metropolitan Avenue development in which Oak is a General Partner, it came to Oak's attention that although the relevant member loan provisions in the underlying agreements allow Oak to fund shortfalls and accrue an 18% interest rate, AREH at Simpson's direction had made a commitment to other investors that such loans would accrue at only 12%. AREH and Simpson made this commitment without Oak's knowledge, authorization, notification, or any amendment to the underlying agreements. *See* Doc. No. 245 at Section 3.2.2 (Amended and Restated Limited Liability Company Operating Agreement of 550 Metropolitan Ave Holdings LLC); Doc No. 246 (550 Member Loan Distribution Records, reflecting interest rate of 12%). Oak challenged this immediately, and Simpson attempted to justify his unauthorized and

unwarranted conduct by suggesting that family and friends would be unduly penalized under the contractually agreed 18% rate. The 550 Metropolitan Avenue development is not the only instance in which Simpson unilaterally, without Oak's knowledge, authorization, notification, or any amendment to the underlying agreements, lowered the interest rate accruing to Oak.

g. Advising Oak that certain capital calls to other investors had been made, which was not the case in fact. As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute. In fact, Oak had no such right to priority payments or interest, as no capital calls had occurred. *See, e.g.*, Doc No. 243 (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted for privilege); Doc. No. 247 (July 31, 2023 8:01 PM email from T. Last re: Myrtle).

h. Threatening to fire all AREH employees and cease operations if Oak does not accede to demands for money, despite no capital calls having been made. *See, e.g.*, Doc. No. 248 (July 11, 2023 11:39 PM email from J. Simpson re: Meeting Recap).

i. Engaging in conduct constituting a "Major Decision" under the AREH LLC Agreement, which requires the consent of Oak, without providing Oak any notice of such conduct nor seeking Oak's required approval. Simpson likewise attempted to circumvent his obligations to obtain Oak's consent to make a

Major Decision, which is defined as, among other things, a decision to "enter into any agreement requiring the expenditure of more than $50,000 per annum" by amending an agreement to facially appear to fall below the $50,000 threshold, when in fact, the contingent liabilities under said agreement well exceeded that amount.

j. Making misrepresentations to induce Oak's investment in various properties in the Arch Portfolio; generally creating a hostile business atmosphere because of his ego that is damaging critical relationships with lenders, contractors, tenants, etc.; and making defamatory statements to third parties. *See, e.g.*, Doc. No. 249.

**F. Simpson Refuses to Heed JJ Arch's Removal as AREH's Managing Member**

57. As noted previously, on October 31, 2023, in reaction to Simpson's furlough decision (among his various other misconduct) and to preserve any semblance of Oak's investment, Oak took action to remove JJ Arch as the managing member of AREH pursuant to its clear contractual rights under the AREH LLC Agreement and duly delivered the Removal Notice. *See* Exhibit C to the Thorne Aff.

58. However, despite Oak asking for confirmation that Simpson and JJ Arch would honor the Removal Notice, Simpson has done the opposite. On November 2, Simpson provided a response letter, stating that the Removal Notice "must be deemed ineffective" and "is invalid." *See* Exhibit D to the Thorne Aff. In sum, Simpson and JJ Arch are not only refusing to carry out their duties as Managing Member by furloughing all AREH employees, but also refusing to comply with Oak's right to remove JJ Arch as the Managing Member of AREH. Their actions are paralyzing AREH.

59. In light of all the foregoing, Simpson and JJ Arch are acting in violation of their contractual and fiduciary duties to Oak and absent immediate relief, Oak will be irreparably harmed. Oak is also entitled relief for the causes of action in Counts I through IV, listed below.

**COUNT I**
**Breach of Fiduciary Duty Against JJ Arch and Simpson**

60. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

61. During the relevant times alleged herein, Simpson was the managing member of JJ Arch, which is the managing member of AREH. Oak and JJ Arch are co-members of AREH.

62. As a result of this relationship and Simpson's status as the controlling person of the JJ Arch, Simpson owed fiduciary duties to Oak.

63. As set forth above, Simpson knowingly breached his fiduciary duties to Oak.

64. Simpson's conduct has caused Oak to incur substantial damages, including tax liabilities, the loss of value of its investments in AREH and the related portfolio, the loss of its own time and investment in dealing with Simpson's improper conduct, and substantial legal fees.

**COUNT II**
**Breach of Contract Against JJ Arch**

65. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

66. The AREH LLC Agreement is a valid and binding agreement under New York law.

67. As discussed above, JJ Arch has breached its obligations under the AREH LLC Agreement, including its duty of good faith and fair dealing in carrying out its obligations under the AREH LLC Agreement.

68. By reason of the foregoing, Oak has suffered and continues to suffer substantial damages.

**COUNT III**
**Tortious Interference with Contract Against Simpson**

69. Oak repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

70. At the time of Simpson's wrongful acts discussed above and alleged herein, Oak and JJ Arch remained bound by the provisions of the AREH LLC Agreement.

71. As set forth above, Simpson caused JJ Arch to breach its obligations to Oak pursuant to the AREH LLC Agreement.

72. Simpson's acts were intended to frustrate JJ Arch's ability to meet its obligations pursuant to the AREH LLC Agreement and did procure a breach of the agreement.

73. Simpson's conduct in interfering with the AREH LLC Agreement was intentional, willful, and calculated to cause damage to Oak. As a result of Simpson's malicious and intentional conduct, Oak has been harmed and incurred substantial damages.

**COUNT IV**
**Tortious Interference with Prospective Business Advantage Against Simpson**

74. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

75. Through its investments in properties managed by AREH, Oak has investments valued in the range of $50 million.

76. AREH is responsible for the day-to-day management responsibilities of these properties.

77. As a result of his wrongful and unauthorized conduct, both before and after his removal from JJ Arch, Simpson has engaged in conduct that has caused losses to the value of Oak's investments in the properties.

78. For example, as a result of Simpson's unilateral and unauthorized conduct in lowering the interest rate accruing to Oak from co-investors, Oak accrued less than the contractual interest rate to which it was entitled.

79. Indeed, the tortious conduct that Simpson has already undertaken and as alleged herein has the ability to impair Oak's business interests to such a degree as to wipe out the entire equity value of all the properties the Arch Portfolio, costing Oak not only its initial investments in these properties, but the return on those investments it would have otherwise realized.

## COUNT V
**Breach of Fiduciary Duty Against JJ Arch and Simpson – Derivatively on behalf of AREH**

80. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

81. During the relevant times alleged herein, Simpson was the managing member of JJ Arch, which is the managing member of AREH. Oak and JJ Arch are co-members of AREH.

82. As a result of this relationship and Simpson's status as the controlling person of the JJ Arch, Simpson owed fiduciary duties to AREH.

83. As set forth above, Simpson knowingly breached his fiduciary duties to AREH.

84. A demand to AREH would be futile because Simpson is presently in control of AREH and cannot be expected to bring claims against himself.

85. Likewise, although AREH has purportedly retained counsel, this representation is directed by Simpson and AREH's purported counsel has been antagonistic to Oak and its interests. Accordingly, any demand to AREH's counsel to sue Simpson would also be futile.

86. Simpson's conduct has caused AREH to incur substantial damages, including prospective liability to investors in properties managed by AREH, tax liabilities, the loss of value

of AREH as a going concern, the loss of its own time and investment in dealing with Simpson's improper conduct, and substantial legal fees.

**COUNT VI**
**Defamation Against Simpson**

87. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

88. Simpson has made knowingly false statements of fact about Oak's business.

89. Simpson has made numerous statements that are defamatory per se, including statements that employees of Oak have and that prejudice Oak in its profession.

90. For instance, in an email communication in which numerous business associates of Oak were included, including Oak's counsel and employees of AREH, Simpson falsely stated, among other things, "Again, you were entered into a funding relationship without having the cash to support it so lets [*sic.*] understand the facts, you are illiquid and insolvent. Markets change, and your father entered this relationship with us as capital preservation / long-term, not fly by the seat of our pants because interest rates went up and you are out of money." *See* Doc. No. 232.

91. On information and belief, Simpson has also made false statements of fact regarding Oak's competency and capabilities in the business of real estate investment, with the purpose of damaging Oak's reputation in the industry both among potential business partners, lenders, and other business associates.

92. Simpson knew these statements were false at the time they were made, or else demonstrated reckless disregard for the truth or falsity.

93. Statements as to Oak's solvency and creditworthiness or ability to make payments when due prejudice Oak in its profession, including its ability to secure financing and co-investors in projects.

94. Moreover, statements regarding the insolvency of Oak Guarantor, to which Simpson's statements also reasonably apply, would constitute a default under various lending agreements related to the Arch Portfolio.

95. Likewise, statements as to Oak's competency prejudice Oak's ability to enter into future business relationships.

96. Accordingly, Oak is substantially damaged by Simpson's defamatory statements.

**COUNT VII**
**Fraud Against Simpson**

97. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

98. Simpson and those acting at his direction made material misrepresentations of fact. For instance, with regard to the 1031 Exchange, AREH Investor Relations represented to Oak that "Arch will be participating in the 1031 vehicle, so our interests are fully aligned in achieving a successful outcome." *See* Doc. No. 236. AREH Investor Relations also misrepresented that "If a satisfactory re-investment opportunity cannot be identified, funds shall be returned to investors." Simpson personally made similar representations to Oak. Neither of these statements were true in fact.

99. Simpson, as both the person who made or else authorized these statements to be made and the person with decision-making authority with regard to the 1031 Exchange, knew these misrepresentations were false.

100. Simpson, acting on behalf of JJ Arch and AREH, made these misrepresentations with the intent to induce Oak's reliance. Indeed, in addition to making a false assertion that there would be an alignment of interests, the communications from AREH Investor Relations

specifically stated, "you will need to rely on Arch's expertise to reinvest the proceeds at its discretion." *Id.*

101. Oak actually, reasonably, and justifiably relied on the misrepresentations.

102. Oak suffered damages as a result, including the loss of the funds in contributed to the failed 1031 Exchange and the tax liabilities incurred as a result of its failure.

103. The circumstances under which Oak contributed capital to AREH in June 2023, which Simpson later purported to treat and use a capital contribution to Myrtle likewise establish fraud. Specifically, Simpson sought and obtained capital from Oak through representations that the contributions would be treated as equity in AREH, when in fact, Simpson had no such intention. Simpson instead classified Oak's contribution as going to Myrtle, a subsidiary entity specific to a property, and then used those funds to pay AREH's receivables on behalf of Myrtle. This scheme was intended to wrongfully prevent Oak from realizing an equity interest in AREH, as intended. Given the distress of the Myrtle project, the entirety of the contribution (if treated as Simpson purports) will be lost.

## <u>COUNT VIII</u>
## Declaratory Judgment Against Simpson and JJ Arch

104. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

105. There is a justiciable controversy because Section 7.1.4 specifically authorizes Oak to remove JJ Arch as AREH's Managing Member. In accordance with this provision, Oak has duly notified JJ Arch of its removal as AREH's Managing Member by way of the Removal Notice, but Simpson (acting on behalf of JJ Arch) has refused to heed the Removal Notice.

106. Accordingly, Oak desires a declaration that as of no later than 12:01am on November 17, 2023, (1) JJ Arch is no longer AREH's Managing Member, and (2) Oak is AREH's Managing Member.

**COUNT IV**
**Equitable Accounting Against JJ Arch and AREH**

107. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

108. Defendant Mr. Simpson, (by virtue of his status as acting managing member of Defendant JJ Arch, which was, until the Removal Notice, the Managing Member of Defendant AREH), owes Oak (as Investor Member of AREH) a fiduciary duty or other trust-based duty with respect to the business and affairs of Defendant AREH.

109. As a result of this trust-based relationship between Defendant Mr. Simpson, and Oak, Oak is entitled to an accounting with respect to AREH.

110. Plaintiff has previously demanded such an accounting from Defendants.

111. Defendants have failed and/or refused to provide such accounting.

112. On information and belief, Defendants have failed and/or refused to provide such accounting so as to conceal defendants' wrongful acts in derogation of Oak's rights.

113. An accounting is necessary to determine Oak's monetary damages and/or in order to determine the true and full information about the financial affairs of the AREH.

114. The accounting is applicable to AREH for each annual year (or partial period) of its operation and its management by Defendants Simpson and JJ Arch.

## PRAYER FOR RELIEF

WHEREFORE, Oak respectfully requests that the Court issue judgment in its favor and in AREH's favor against Simpson and JJ Arch as follows:

(a) Awarding money damages to Oak and AREH in an amount to be determined at trial;

(b) Ordering Simpson to disgorge his ill-gotten gains as a result of his wrongful conduct;

(c) Awarding Oak its attorneys' fees incurred in connection with the conduct described herein and its prosecution of its claims;

(d) Enjoining Simpson and JJ Arch, and anyone acting on their behalf, from failing to meet their contractual and fiduciary obligations;

(e) Declaring that Simpson and JJ Arch have been removed as AREH's Managing Member effective no later than 12:01am on November 17, 2023;

(f) Ordering Simpson and JJ Arch to make an equitable accounting of AREH's assets; and

(g) For such other and further relief as this Court may deem just and proper.

Dated: November 3, 2023

Respectfully submitted,

HAYNES AND BOONE, LLP

By: /s/ Leslie C. Thorne
Leslie C. Thorne
Aishlinn Bottini
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
(212) 835-4848
leslie.thorne@haynesboone.com
aishlinn.bottini@haynesboone.com

Attorneys for 608941 NJ Inc.