SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| ARCH REAL ESTATE HOLDINGS LLC, ARCH ASSET MANAGEMENT LLC, and ARCH PROPERTY MANAGEMENT LLC,<br><br>Plaintiffs<br><br>-against-<br><br>YJ SIMCO LLC, 1055 PARK AVE 1 LLC, 1055 PARK AVE PH LLC, 1055 PARK AVE ST LLC, 1055 PARK AVE 4 LLC, 266 WMTR LLC, YAEL SIMPSON, BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI, LLP, and JANE DOES #1 – 10,<br><br>Defendants. | Index No. 653216/2026<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiffs **ARCH REAL ESTATE HOLDINGS LLC, ARCH ASSET MANAGEMENT LLC AND ARCH PROPERTY MANAGEMENT LLC** (collectively, "Plaintiff" or "AREH"), by and through their attorneys, Olshan Frome Wolosky LLP, as and for its First Amended Complaint against (i) **YJ SIMCO LLC** ("YJ Simco"), (ii) **1055 PARK AVE 1 LLC** ("Park 1"), **1055 PARK AVE PH LLC** ("Park PH"), **1055 PARK AVE ST LLC** ("Park ST"), **1055 PARK AVE 4 LLC** ("Park 4"), **266 WMTR LLC** ("WMTR" and together with Park 1, Park PH, Park ST, and Park 4, the "SPV Defendants," and collectively with YJ Simco, the "Contract Defendants"), and (iii) **YAEL SIMPSON** ("Y. Simpson"), **BECKER, GLYNN, MUFFLY, CHASSIN & HOSINSKI, LLP** ("Becker Glynn"), and **JANE DOE #1 – 10** (collectively, the "Transfer Defendants" and together with the Contract Defendants, the "Defendants"), allege as follows:

## INTRODUCTION

1. This action arises from a breach of the Contract Defendants' obligations to AREH and the voidable transfers of certain of the Contract Defendants' assets to the Transfer

Defendants in a calculated scheme to divert and encumber assets away from Contract Defendants' present and future creditors.

2. Each SPV Defendant owns a unique residential condominium unit located on 1055 Park Avenue, New York, New York except for WMTR, which owns a single-family residential home located in Watermill, New York.

3. Plaintiff provided extensive property, asset, and bookkeeping management services to Contract Defendants over a multi-year period—services tied to real estate assets worth approximately $10 million—yet Contract Defendants never paid the agreed-upon market-rate compensation required under Plaintiff's Operating Agreement. Rather, Jeffrey Simpson ("J. Simpson"), a non-defendant currently in chapter 11 bankruptcy who is married to Defendant Y. Simpson, exercised complete dominion and control over the Contract Defendants to orchestrate a series of insider transactions designed to shield assets or otherwise make them available for use for improper purposes. These transfers included the improper transfer of YJ Simco's membership interests in Park ST and Park 4 to his wife Y. Simpson, and for Y. Simpson to, in turn, cause Park ST to encumber its assets in favor of Becker Glynn, in order that Becker Glynn would agree to represent J. Simpson in his bankruptcy case.

4. The foregoing transactions were undertaken without reasonably equivalent value and in furtherance of a scheme to delay, defraud, and harm creditors of the Contract Defendants.

5. Through this fraudulent shell game, J. Simpson conspired with his wife Defendant Y. Simpson to either (i) orchestrate the transfer of YJ Simco's 100% ownership of membership interests in Park ST and in Park 4 to Y. Simpson or (ii) otherwise claim Y. Simpson owns 100% in Park ST's and Park 4's membership interests, and in the case of Park ST, to ostensibly satisfy Becker Glynn that Y. Simpson was the owner of Park ST.

6. Ostensibly satisfied that Y. Simpson was the 100% owner of Park ST's membership interests, Y. Simpson caused Park ST to deliver a mortgage and guaranty to Becker Glynn, which Becker Glynn accepted as collateral to fund its representation of J. Simpson through his bankruptcy case. Becker Glynn accepted this mortgage and guaranty notwithstanding actual knowledge of Plaintiff's claims and supporting documents demonstrating that YJ Simco is the rightful owner of Park ST's membership interests and Plaintiff's claims against YJ Simco.

7. Neither Park ST nor Y. Simpson received value for the creation of the mortgage and guaranty. Moreover, even were it the case that Y. Simpson was the rightful owner of Park ST's membership interests, Park ST is a Contract Defendant that received no value from Becker Glynn for Y. Simpson causing it to encumber its assets. Plaintiff seeks to avoid or otherwise declare a nullity all transfers of Park ST's and Park 4's membership interests away from YJ Simco, the creation of the mortgage and guaranty in favor of Becker Glynn, and to further avoid all other transfers away from the Contract Defendants that are yet to be discovered.

8. Plaintiff therefore commences this action seeking recourse.

## THE PARTIES

The Plaintiff:

9. Arch Real Estate Holdings LLC is a New York limited liability company with its principal place of business at 348 W. 57th Street, Suite 172, New York, NY 10019. Arch Real Estate Holdings LLC is the sole member of Arch Asset Management LLC, a Delaware limited liability company principal place of business at 348 W. 57th Street, Suite 172, New York, NY 10019. Arch Asset Management LLC is the sole owner of Arch Property Management LLC, a Delaware limited liability company with principal place of business at 348 W. 57th Street, Suite 172, New York, NY 10019.

Contract Defendants:

10. Contract Defendants consist of six entities, (i) YJ Simco, a New York limited liability company located at 266 Water Mill Town Rd, Water Mill, NY 11976; and (ii) five (5) affiliated special purpose vehicles— Park 1, Park PH, Park ST, Park 4, WMTR, (collectively the "SPV Defendants").

11. The membership interests in YJ Simco are 50% held by J. Simpson and 50% held by Y. Simpson.

Transfer Defendants:

12. Y. Simpson is the wife of J. Simpson, and an alleged recipient of YJ Simco's interest in Park ST.

13. Becker, Glynn, Muffly, Chassin, & Hosinski, LLP ("Becker Glynn"), is a law firm located at 299 Park Avenue, New York, New York 10171.

14. Becker Glynn represented Simpson in his personal bankruptcy filing. Becker Glynn is also the recipient of Y. Simpson's purported interest in Park ST.

15. Jane Does # 1 – 10 are unknown defendants who may have received voidable transfers from any other Defendant.[1]

## STATEMENT OF FACTS

### A. Plaintiff Provided its Management Services to Contract Defendants

16. Plaintiff and its subsidiaries are in the business of managing certain real properties. Plaintiff's services include property management, asset management, construction management and bookkeeping.

[1] For the avoidance of doubt, J. Simpson is not a defendant in this action and is not a Jane Doe hereunder, regardless of whether he is a recipient of any voidable transfer from any other Defendant.

17. Until November 3, 2023, at the direction of J. Simpson, each Contract Defendant used AREH's resources including bookkeeping. J. Simpson acted as AREH's managing member until that date, when this Court entered a series of interim orders in the case captioned *Simpson v. Chassen et al.,* Index No. 158055/2023 (Sup. Ct. N.Y. Cty.) (Cohen, J.). The Court granted sole management rights over Plaintiff to 608941 NJ, Inc., subject only to certain "Major Decisions" which must be submitted jointly to both Jeffrey Simpson and Jared Chassen, and which either can unilaterally approve. These interim orders remain in effect.

18. Under Section 7.1.3(x) of AREH's Operating Agreement, attached as **Exhibit A** hereto, each Contract Defendant is an "Affiliate" that was required to pay a "market rate" for Plaintiff's management services. Plaintiff, however, was not paid for its services. Plaintiff seeks a minimum of $550,000, amounting to 2% fee per annum as a "market rate" for fees for its management services under the Operating Agreement. Alternatively, Plaintiff seeks to be made whole by each Contract Defendant under a theory of unjust enrichment.

19. For years, at the behest of J. Simpson, Plaintiff provided these aforementioned services to each Contract Defendant, for which Plaintiff has not received compensation, despite providing services for approximately $10,000,000 worth of real property on behalf of Contract Defendants. Examples of Plaintiff providing the aforementioned services to the Contract Defendants include: (1) emails between YJ Simco employees coordinating said services at J. Simpson's direction; (2) emails between YJ Simco employees with record of multiple transfers covering various debt services and booking notes for related entities; (3) financial statements for YJ Simco, and related entities detailing rental income, expenses, and net income concerning the Contract Defendants; and (4) emails between YJ Simco employees regarding an April 2023 rent invoice reflecting the specific SPV Defendant entity rather than YJ Simco.

20. Prior to October 31, 2021, the membership interests in the SPV Defendants had been owned by either J. Simpson or his wife Transfer Defendant Y. Simpson. On or about October 31, 2021 J. Simpson and Y. Simpson each transferred their interests (in each case, aggregating to 100% of the membership interests in each SPV Defendant) to Defendant YJ Simco (the foregoing transfers of the membership interests in the SPV Defendants are collectively the "October 2021 Transfers").

21. The October 2021 Transfers were made pursuant to an October 31, 2021 contribution agreement executed by Jeffrey Simpson in favor of YJ Simco attached as **Exhibit B** (the "J. Simpson Contribution Agreement"), and a contribution agreement executed by Yael Simpson (the "Y. Simpson Contribution Agreement" and together with the J. Simpson Contribution Agreement, the "Contribution Agreements") attached as **Exhibit C**.

22. A subsequent course of dealing evidences the occurrence of the October 2021 Transfers. This course of dealing includes: representations made by J. Simpson to a lender that the October 2021 Transfers occurred and that YJ Simco was the owner of the SPV Defendants, the transmission of rent statements to tenants of the SPV Defendants on YJ Simco letterhead, and financial statements prepared at J. Simpson's direction by Plaintiff's employees that treat the SPV Defendants as wholly owned by Defendant YJ Simco.

**B. <u>YJ Simco's Bankruptcy Case</u>**

23. On March 9, 2025, YJ Simco filed for chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On May 14, 2025, the Bankruptcy Court entered an order converting YJ Simco's chapter 11 case to a chapter 7 case and a trustee was appointed (the "Simco Trustee"). On October 9, 2025 AREH filed a proof of claim against YJ Simco, alleging breach of contract against it for the claims asserted herein. On November 4, 2025 AREH filed a letter with the

Bankruptcy Court containing the supporting documentation evidencing the October 2021 Transfers and the subsequent course of dealing evidencing their occurrence. J. Simpson was on record denying that the October 2021 Transfers occurred. In the wake of evidence presented that YJ Simco owned the SPV Defendants, J. Simpson instead represented to the Bankruptcy Court that no such transfer occurred.

24. AREH, however, was on record in the YJ Simco bankruptcy case in trying to persuade the Simco Trustee to bring claims to enforce the Contribution Agreements and the October 2021 Transfers on YJ Simco's behalf. The Simco Trustee conducted his own investigation and on December 15, 2025, the Simco Trustee docketed a status report in the YJ Simco bankruptcy case (the "Trustee Report") that included his initial investigation of AREH's claims concerning the October 2021 Transfers.

25. The Trustee Report demonstrates that he found merit to AREH's claims concerning the Contribution Agreement and the occurrence of the October 2021 Transfers. After conducting a costs and benefits analysis taking into account concerns of YJ Simco's insolvency and lack of resources to pursue the claims, however, the Trustee Report indicated that the Simco Trustee was not inclined to pursue claims on YJ Simco's behalf, notwithstanding the existence of the Contribution Agreements and other supporting evidence.

26. On January 15, 2026, the YJ Simco Trustee filed a motion to dismiss the YJ Simco chapter 11 case, arguing:

> 35. It is certain that there would be protracted and highly contested litigation, along with its attendant delay, cost, and risk of an unfavorable outcome for the Debtor's estate should the Trustee pursue a sale of 1055 Park Ave 4 LLC, 1055 Park Ave ST LLC, and 266 WMTR LLC. Assuming the Trustee prevailed, the administrative fees and expenses would likely exceed the amount of the filed claims (which total $540,000.00) and a distribution to creditors is unlikely. Equally important, assuming the claims of Chassen and AREH/Oak were

> disallowed, then such a sale would essentially be for the benefit of equity, i.e., Simpson and Yael Simpson who oppose the sale of the membership interests.
>
> 36. To summarize, the potential assets for the Trustee to administer are disputed claims, the administration of those claims would be highly contentious, the administrative fees and expenses to administer those claims would exceed the claims against the Debtor, and, if Simpson is right and Chassen and/or AREH/Oak have no claims against the Debtor, the only parties who may benefit from the administration of those claims would be Simpson and Yael Simpson. In short, no bankruptcy purpose is served by the continuation of this Chapter 7 case.

27. On March 24, 2026, the Bankruptcy Court entered an order granting the YJ Simco Trustee's motion and dismissed the YJ Simco bankruptcy case. AREH's claims against YJ Simco and issues concerning YJ Simco's rights to the membership interests in each of the SPV Defendants under the Contribution Agreements remained unresolved.

### C. <u>Park ST's Purported Transfer and the Execution of a Mortgage and Guaranty for Becker Glynn</u>

28. On February 19, 2026, through Becker Glynn as counsel, J. Simpson filed for personal bankruptcy protection in the Bankruptcy Court under chapter 11.

29. Notwithstanding the Contribution Agreements, J. Simpson's 2026 bankruptcy schedules filed under oath claim that Y. Simpson is the 100% owner of Park ST.

30. Park ST owns a condominium (the "Unit Suite") located at 1055 Park Avenue, New York, New York.

31. On or about March 12, 2026 Park ST executed a guaranty in favor of Becker Glynn to guarantee up to $500,000 of legal fees, costs, and expenses to be incurred by J. Simpson during Becker Glynn's representation of him in his 2026 individual bankruptcy filing (the "Guaranty"). A copy of the Guaranty is attached as **Exhibit D** hereto. As security for the Guaranty, on March 12, 2026, Park ST granted a mortgage to Becker Glynn upon the Unit Suite

in the amount of $250,000 (the "Mortgage"). A copy of the Mortgage is attached as **Exhibit E** hereto.

32. The Mortgage and Guaranty were executed by Transfer Defendant Y. Simpson as an "Authorized Signatory." However, Y. Simpson's purported 100% ownership interest in Park ST is belied by the October 2021 Transfers which demonstrate that YJ Simco is the 100 percent owner of Park ST.

33. If at any point YJ Simco assigned its membership interests in Park ST to Y. Simpson, such assignment is a voidable transaction under the New York Debtor and Creditor Law.

34. On March 20, 2026, J. Simpson signed an application seeking Bankruptcy Court approval for Becker Glynn to be engaged as counsel to J. Simpson as debtor in possession (the "Retention Application"). The Retention Application was countersigned as being "Prepared by" Alec P. Ostrow of Becker Glynn.

35. The Retention Application disclosed that Becker Glynn's compensation included a nonrecourse guaranty from Park ST for its fees and obtained a mortgage in the amount of $250,000 against the Unit Suite from Park ST. [Application at 6-7]. According to the application, "The documentation was signed by [J. Simpson's] wife, Yael Simpson, on behalf of [Park ST]. *Id.* at 7.

36. The application demonstrates Becker Glynn's awareness of claims that Park ST belongs to Simco:

> The Debtor and the Debtor's wife signed documentation that contributed their respective interests in certain entities to YJ Simco LLC, which is a debtor in a case pending in this Court, Case No. 25-10437 (LGB). YJ Simco LLC is owned by the Debtor and his wife. The Debtor's position is that this documentation was never implemented and its existence only became known through an improper seizure and

> disclosure of the Debtor's personal records. The chapter 7 trustee of YJ Simco LLC is aware of the documentation, has not expressed an interest in exercising control of ST LLC, and has moved to dismiss the YJ Simco LLC chapter 7 case. That motion is scheduled to be heard on March 24, 2026

Retention Application at 6 n.2.

37. Upon information and belief, YJ Simco never transferred any interest in Park ST to Y. Simpson.

38. However, to the extent YJ Simco did transfer any membership interests in Park ST to Y. Simpson, such transfer is voidable as it was (i) a transfer made to an insider with actual intent to hinder, delay, or defraud YJ Simco's present and future creditors which includes Plaintiff; (ii) a transfer in which YJ Simco did not receive reasonably equivalent value in exchange for the transfer and YJ Simco was either insolvent at the time of the transfer, or became insolvent shortly thereafter as a result of the transfer.

39. Transfer Defendant Y. Simpson lacked the corporate authority to grant a mortgage. Becker Glynn's filings in Jeffrey Simpson's bankruptcy case make it clear that Becker Glynn knew of a dispute between Plaintiff and J. Simpson concerning YJ Simco's ownership of Park ST and was aware that AREH filed multiple documents on the public record in YJ Simco's bankruptcy case asserting that YJ Simco owned Park ST.

40. Becker Glynn knew or should have known that YJ Simco and not Y. Simpson was the owner of Park ST's membership interests and that Y. Simpson did not have authority to grant either the Mortgage or the Guaranty on Park ST's behalf.

41. To the extent the Mortgage and Guaranty are not void ab initio, the creation of the Mortgage and Guaranty are each voidable because (i) a transfer made when Park ST was insolvent/unreasonably small (ii) a transfer made with actual intent to hinder, delay, or defraud Park ST's present and future creditors including Plaintiff, and (iii) a transfer in which Park ST

did not receive "reasonably equivalent value in exchange for the transfer" and was either insolvent at the time of the transfer, or became insolvent shortly thereafter as a result of the transfer.

42. These transfers were intended to delay, defraud, and harm YJ Simco and Park ST's present and future creditors as there was no consideration to YJ Simco for its transfer or to Park ST for creation of the Mortgage and Guaranty in favor of Becker Glynn, because the orchestrators of the conveyances, J. Simpson and Y. Simpson continued to benefit from the conveyances by virtue of (i) their ability to frustrate creditors including Plaintiff all while retaining their control of the Contract Defendants; (ii) create a mechanism for Park ST to help fund J. Simpson's bankruptcy through the Mortgage and Guaranty in a manner intended to shield Park ST's assets from YJ Simco's and Park ST's creditors.

43. Y. Simpson did not receive the transfer of Park ST's membership interests in good faith because she is an insider who actively participated in and personally benefited from the scheme to delay, defraud, and harm the Contract Defendants' creditors.

44. Becker Glynn did not receive either the Mortgage or Guaranty in good faith because, (i) as demonstrated by its bankruptcy engagement application, it had actual notice of the cloud of title concerning Park ST's membership interests as of the creation of the Mortgage and Guaranty; and (ii) it was on inquiry notice, and given its agreement to represent J. Simpson, should have known of the cloud of title concerning Park ST's membership interests as of the creation of the Mortgage and Guaranty due to the public record available concerning same in the YJ Simco bankruptcy case.

45. The fraudulent intent of the various transfers described in this Complaint are further bolstered by the inconsistent positions taken by J. Simpson under penalty of perjury concerning different assets.

46. As set forth in the Trustee Report, in a JJ Arch's 2024 bankruptcy case filed with J Simpson acting in de facto control of JJ Arch, J. Simpson made representations under oath as follows:

> [J. Simpson] testified, inter alia, that JJ Arch "is the majority owner of [AREH]. [AREH] has a variety of companies that are directly owned, indirectly involved in." Id. at p. 7. When asked about the [YJ Simco] Simpson testified: "It is an entity that's controlled by me and my wife. It has nothing to do with this." Id. at p. 54, lines 18:21. Simpson further testified "[YJ Simco] has no involvement. It's not related. It's not related." Id. at p. 55, lines 8:17. When questioned whether JJ Arch assigned all its membership interests in certain entities to [YJ Simco], Simpson testified: "It assigned any distributions, if there was money to go to it, it could go upstream to an entity that would be controlled by YJ Simco, or I could have changed it." Id. at p. 86, lines 4:13

Trustee Report ¶ 59 (citing June 20, 2024 Section 341 Meeting Transcript).

47. J. Simpson's testimony at the June 20, 2024 341 Meeting tracked what J. Simpson swore under penalty of perjury on behalf of JJ Arch.

48. But in the later filed YJ Simco bankruptcy case, in seeking certain relief, J. Simpson pressed the position that certain assets (but not the Defendant SPVs) belonged to YJ Simco, notwithstanding his prior sworn testimony that they did not, such that the Bankruptcy Judge presiding over the proceeding warned that if J. Simpson continued to press his position, she would have to report a bankruptcy crime. Meanwhile, Simpson represented to the Bankruptcy Court that YJ Simco did not own the membership interests in any of the SPV Defendants despite J. Simpson having represented to lenders that YJ Simco did in fact own the membership interests in the SPV Defendants.

49. Moreover, in the YJ Simco bankruptcy case, the Chief Restructuring Officer hand-picked by J. Simpson, David Goldwasser, stated in an affidavit after having been relieved "that Simpson requested that Goldwasser file essentially the same schedules of assets that were filed in [JJ Arch's 2024 bankruptcy case" in [YJ Simco's bankruptcy case], but Goldwasser disagreed with that request." Trustee Report ¶ 67.

50. J. Simpson and Y. Simpson have also reported to the Internal Revenue Service that they owned the SPV Defendants, while telling lenders that YJ Simco owned the SPV Defendants, telling the JJ Arch bankruptcy court that JJ Arch had nothing to do with YJ Simco, and telling the YJ Simco bankruptcy court that YJ Simco was the owner of JJ Arch.

51. J. Simpson's conflicting representations under oath in the JJ Arch and YJ Simco bankruptcy cases and to the Internal Revenue Service, and to its lenders, further demonstrate J. Simpson's propensity to move assets and take conflicting positions concerning the precise ownership of various assets under his dominion or control in a manner intended to delay, defraud, or harm the present and future creditors of the entities he controls.

52. Additionally, in his current bankruptcy case, J. Simpson has filed papers under oath purporting that in 2025, he caused $270,000 of rental income from Defendant 1055 PH to fund the condominium association expenses of other SPV Defendants, including one of which that owns the condominium where J. Simpson maintains his Manhattan residence further bolstering that J. Simpson's various transfers, including those that are the subject of this Complaint are part of an elaborate shell game in furtherance of J. Simpson's fraudulent intent.

**D. <u>Park 4's Purported Transfer to Y. Simpson</u>**

53. Notwithstanding the Contribution Agreements, J. Simpson's 2026 bankruptcy schedules filed under oath claim that Y. Simpson is the 100% owner of Park 4.

54. Park 4 owns a condominium on Park Avenue in Manhattan. According to the Trustee Report, Park 4's condominium is worth over $4.5 million and its equity value exceeds $2 million after taking into account the debt.

55. Upon information and belief, YJ Simco never transferred any interest in Park 4 to Y. Simpson.

56. However, to the extent YJ Simco did transfer any membership interests in Park 4 to Y. Simpson, such transfer is voidable as it was (i) a transfer made to an insider with actual intent to hinder, delay, or defraud YJ Simco's present and future creditors which includes Plaintiff; (ii) a transfer in which YJ Simco did not receive reasonably equivalent value in exchange for the transfer and YJ Simco was either insolvent at the time of the transfer, or became insolvent shortly thereafter as a result of the transfer.

57. Y. Simpson did not receive the transfer of Park 4's membership interests in good faith because she is an insider who actively participated in and personally benefited from the scheme to delay, defraud, and harm the Contract Defendants' creditors.

**E. <u>YJ Simco and Park ST were Insolvent or Had Unreasonably Small Capital at the Time of the Fraudulent Transfers.</u>**

<u>YJ Simco</u>

58. In December 2025, the Simco Trustee found that: "[a]s set forth above, and as confirmed by the IRS's proof of claim, no tax returns have been filed by YJ Simco since its Formation Date [May 4, 2021]. The only tax return provided to the Simco Trustee for J. Simpson and Y. Simpson is their 2021 tax return, which is also being provided to the Court for in camera review." Trustee Report ¶ 23. The Simco Trustee further found that "there are no funds in the YJ Simco's estate, and it is not known whether the Trustee will collect any funds." *Id.* ¶ 14.

59. YJ Simco's lack of tax returns since 2021 and lack of funds available for distribution demonstrate that YJ Simco was insolvent and had unreasonably small capital at all relevant times.

Park ST was insolvent or rendered insolvent on account of the Creation of the Mortgage and of the Guaranty

60. The Trustee Report found:

> According to the NYC Department of Finance, Office of the City Register ("OCR"), [Park ST] took title to the real property located at 1055 Park Avenue, Unit Suite, New York, New York 10028 ("Park Ave Suite") by deed dated September 1, 2021 and recorded on September 16, 2021.
>
> Upon information and belief, the current fair market value of Park Ave Suite is not less than $200,000.00

61. Park ST's only asset is its equity value in the Unit Suite after taking into account encumbrances, which equity is believed to be valued at approximately $200,000. By entering into the Mortgage and Guaranty, for which Park ST received no value, Park ST was rendered insolvent to the extent it was not already insolvent. Additionally, because it has no cash, it had unreasonably small capital at the time of the Mortgage and Guaranty.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT AGAINST CONTRACT DEFENDANTS

62. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 61 of this complaint.

63. Under Section 7.1.3(x) of Plaintiff's Operating Agreement, each Contract Defendant is an "Affiliate" required to pay a "market rate" for Plaintiff's management services.

64. Plaintiff and each Contract Defendant were in a legally binding agreement as Plaintiff's Operating Agreement bound each Contract Defendant as an Affiliate under the

Operating Agreement to pay for Plaintiff's management services concerning the real property owned by each of the Contract Defendants.

65. Plaintiff dutifully provided each Contract Defendant management services, including bookkeeping from approximately October 31, 2021 – November 3, 2023. Plaintiff provided these services to Contract Defendants' properties believed to have been worth $10 million at the time.

66. The Contract Defendants, however, have breached the Operating Agreement by failing to pay Plaintiff. Thus, as of the filing of this complaint, Plaintiff has not been compensated for its services.

67. As the direct result of Contract Defendants' breach of contract, Plaintiff has suffered significant harm. Plaintiff therefore seeks damages in amounts exceeding $550,000 amounting to a 2% fee per annum as a "market rate" for management services fees under the Operating Agreement. Plaintiff also seeks interest and costs. All such amounts will be determined at trial.

**SECOND CAUSE OF ACTION**
**IN THE ALTERNATIVE - UNJUST ENRICHMENT AGAINST CONTRACT DEFENDANTS**

68. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 67 of this complaint.

69. Alternatively, Plaintiff brings unjust enrichment claims against Contract Defendants.

70. From approximately October 31, 2021 – November 3, 2023, Contract Defendants knowingly enjoyed Plaintiff's management services including its bookkeeping services.

71. Benefiting from Plaintiff's unpaid services, Contract Defendants benefited by virtue of receiving management and bookkeeping services.

72. In providing management services, Plaintiff incurred several expenses in addition to the cost of its services.

73. It would be against the principles of equity and good conscience to allow Contract Defendants to retain the benefit of these services to Plaintiff's detriment.

74. Accordingly, Plaintiff seeks damages in amounts exceeding $550,000 amounting to a 2% fee per annum as a "market rate" for management services fees under the Operating Agreement. Plaintiff also seeks interest and costs. All such amounts will be determined at trial.

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT AS AGAINST TRANSFER DEFENDANTS**

75. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 74 of this complaint.

76. Plaintiff seeks a declaratory judgment that YJ Simco owns all membership interests in Park ST and in Park 4 and that the transfer of membership interests in Park ST and Park 4 to Y. Simpson never occurred and that as such, Y. Simpson lacked authority to act on behalf of Park ST in creating the Mortgage and Guaranty, and as such, the Guaranty and Mortgage are each void ab initio.

77. There is a real and justiciable controversy between Plaintiff and Transfer Defendants regarding the ownership of the membership interests of Park ST.

78. Plaintiff and Transfer Defendants are adverse parties.

79. Plaintiff's claim is ripe for adjudication because Plaintiff has suffered an actual concrete injury as the result of the creation of the Mortgage and Guaranty.

80. As such, Plaintiff is entitled to a declaratory judgment pursuant to C.P.L.R. § 3001 having a ripe justiciable controversy against Transfer Defendants that: (1) a transfer of membership interests in Park ST and in Park 4 to Y. Simpson never occurred or is otherwise

voidable; and (2) the creation of the Mortgage and Guaranty are void ab initio or otherwise voidable.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK'S DCL § 273(A)(1) AGAINST TRANSFER DEFENDANTS**

81. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 80 of this complaint.

82. Plaintiff is a creditor of YJ Simco and of Park ST.

83. The transfer of any membership interest in Park ST and in Park 4 from YJ Simco to Y. Simpson were transfers from YJ Simco made with actual intent to hinder, delay, or defraud YJ Simco's creditors.

84. YJ Simco's conduct (at the control of J. Simpson or Y. Simpson) in connection with the transfers of Park ST's and Park 4's membership interests show "badges of fraud" under NY DCL §273(b) because (i) Y. Simpson is an insider of YJ Simco on account of her 50% ownership of its membership interests and otherwise, (ii) YJ Simco retained control because J. Simpson and Y. Simpson who control YJ Simco continued to make decisions concerning Park ST and Park 4 following the transfers and J. Simpson and Y. Simpson benefited from the transfer through maintaining that control and furthering their fraudulent scheme; (iii) the transfers were concealed; (iv) YJ Simco had been subject to a bankruptcy proceeding with claims pursued against it; (v) the equity value of the Unit Suite and Park 4's condominium represents substantially all of YJ Simco's assets; (vi) YJ Simco received no value for the transfers of the membership interests; (vii) YJ Simco was insolvent or became insolvent shortly after the transfers of the membership interests were made.

85. The creation of the Mortgage and the Guaranty by Y. Simpson purporting to act in control of Park ST, to the extent not void ab initio were transfers from Park ST made with actual intent to hinder, delay, or defraud both YJ Simco's creditors and Park ST's creditors.

86. Y.J. Simco and Park ST's conduct (in each case, at the control of J. Simpson or Y. Simpson) show "badges of fraud" under NY DCL §273(b) because (i) it was in furtherance of a fraudulent scheme that included the transfer of Park 4 and Park ST's membership interests to Y. Simpson, which are each actual fraudulent transfers, the latter of which allowed J. Simpson to reap the benefits of Park ST having provided the Mortgage and Guaranty on account of his engagement agreement with Becker Glynn; (ii) the creation of the Mortgage and Guaranty encumber substantially all of Park ST's otherwise unencumbered assets, (iii) Park ST received no value for the creation of the Mortgage or Guaranty; and (iv) Park ST is insolvent or became insolvent shortly after the Mortgage and Guaranty were made.

87. Becker Glynn knew or should have known that YJ Simco and not Y. Simpson was the owner of Park ST's membership interest, that Y. Simpson did not have authority to grant either the Mortgage or the Guaranty on Park ST's behalf, and that YJ Simco and Park ST were insolvent or rendered insolvent on account of the creation of the Mortgage and Guaranty.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF NEW YORK DCL § 273(A)(2) AGAINST TRANSFER DEFENDANTS**

88. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 87 of this complaint.

89. Plaintiff is a creditor of YJ Simco and of Park ST.

90. The transfer of any membership interest in Park ST and in Park 4 from YJ Simco to Y. Simpson was a transfer from the YJ Simco made without receiving reasonably equivalent value in exchange for such transfer and YJ Simco:

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of YJ Simco were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that YJ Simco would incur, debts beyond the debtor's ability to pay as they became due.

91. The creation of the Mortgage and the Guaranty to the extent not void ab initio were transfers from Park ST made without receiving reasonably equivalent value in exchange for such transfer and Park ST:

> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (ii) intended to incur, or believed or reasonably should have believed that Park ST would incur, debts beyond Park ST's ability to pay as they became due.

92. Becker Glynn knew or should have known that YJ Simco and not Y. Simpson was the owner of Park ST's membership interest, that Y. Simpson did not have authority to grant either the Mortgage or the Guaranty on Park ST's behalf, and that YJ Simco and Park ST were insolvent or rendered insolvent on account of the creation of the Mortgage and Guaranty, and that YJ Simco and Park ST were engaged in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction and further that Y.J. Simco and Park ST (as controlled by J. Simpson and Y. Simpson) intended to incur, or believed or reasonably should have believed that YJ Simco and Park ST would incur debts beyond their ability to pay as they became due.

## SIXTH CAUSE OF ACTION
## VIOLATION OF NEW YORK DCL § 274(a) AGAINST TRANSFER DEFENDANTS

93. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 92 of this complaint.

94. Plaintiff was a creditor of YJ Simco prior to YJ Simco's transfer of Park ST's and Park 4's membership interests to Y. Simpson and Plaintiff was a creditor of Park ST prior to the creation of the Mortgage and Guaranty.

95. The transfer of any membership interest in Park ST from YJ Simco to Y. Simpson was a transfer from the YJ Simco made without receiving reasonably equivalent value in exchange for the transfer and Y.J. Simco was insolvent at that time or became insolvent as a result of the transfer.

96. The creation of the Mortgage and the Guaranty to the extent not void ab initio were transfers from Park ST made without receiving reasonably equivalent value in exchange for the transfer and Y.J. Simco was insolvent at that time or became insolvent as a result of the transfer.

97. Becker Glynn knew or should have known that YJ Simco and not Y. Simpson was the owner of Park ST's membership interest, that Y. Simpson did not have authority to grant either the Mortgage or the Guaranty on Park ST's behalf, and that YJ Simco and Park ST were insolvent or rendered insolvent on account of the creation of the Mortgage and Guaranty.

## SEVENTH CAUSE OF ACTION
## ATTORNEY'S FEES UNDER NEW YORK DCL § 276-a AGAINST TRANSFER DEFENDANTS

98. Plaintiff repeats and incorporates the allegations contained in paragraphs 1 – 97 of this complaint.

99. Pursuant to New York DCL § 276-a Plaintiff is entitled to a judgment awarding reasonable attorney's fees and expenses it incurs against each Transfer Defendant in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

A. As to the First Cause of Action (Breach of Contract against Contract Defendants): compensatory and consequential damages in an amount to be determined at trial, including the reasonable value of all services rendered at the market rate required under Section 7.1.3(x) of the Operating Agreement, together with all costs and expenses incurred in connection therewith;

B. As to the Second Cause of Action (Unjust Enrichment against Contract Defendants), restitution and disgorgement of all benefits conferred upon Contract Defendants, including the value of services rendered and expenses saved, in an amount to be determined at trial;

C. As to the Third Cause of Action (Declaratory Judgment against Transfer Defendants), a declaratory judgment pursuant to C.P.L.R. § 3001 declaring that (i) YJ Simco is the owner of 100% of Park ST's membership interests and of Park 4's membership interests and that any purported transfer of such interests to Y. Simpson never occurred or is otherwise voidable; and (ii) the creation of the Mortgage and Guaranty are void ab initio.

D. As to the Fourth, Fifth, and Sixth Causes of Action (Fraudulent Transfer under New York Debtor and Creditor Law against Transfer Defendants), avoiding: (i) the transfer of Park ST's and Park 4's membership interests from YJ Simco to Y. Simpson; (ii) the Guaranty in favor of Becker Glynn; (iii) the Mortgage in favor of Becker Glynn; (iv) any amounts transferred to Becker Glynn on account of the Guaranty or the Mortgage; and any and all avoidable transfers that may be uncovered through discovery or otherwise against all Transfer Defendants.

E. As to the Seventh Cause of Action (Attorney's Fees under New York DCL § 276-a against Transfer Defendants) reasonable attorney's fees and costs against all Transfer Defendants.

F. As to All Causes of Action: Attorneys' fees, costs, and disbursements to the extent permitted by contract, statute, or applicable law, including N.Y. Debt. & Cred. Law § 276-a; and C.P.L.R. § 8101 et seq.; and such other and further relief as this Court deems just and proper.

Dated: New York, New York
June 5, 2026

Olshan Frome Wolosky LLP

By: *<u>/s/ Jonathan T. Koevary</u>*
Jonathan T. Koevary
Lisette Candia Diaz
1325 Avenue of the Americas
New York, New York 10019