**BINDER & SCHWARTZ LLP**
Eric B. Fisher
Lindsay A. Bush
140 East 45th Street, 26th Floor
New York, New York 10017
Telephone: (212) 510-7008
Facsimile: (212) 510-7299
Email: efisher@binderschwartz.com
Email: lbush@binderschwartz.com

*Counsel for 608941 NJ Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

In re:

JEFFREY SOLOMON SIMPSON,

Debtor.

---------------------------------------------------------------------x

Chapter 11

Case No. 26-10359 (LGB)

**608941 NJ INC.'S MOTION FOR AN ORDER (I) CONVERTING THIS CHAPTER 11 CASE TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE, OR (II) IN THE ALTERNATIVE, DISMISSING THIS CHAPTER 11 CASE, OR (III) IN THE FURTHER ALTERNATIVE, DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

JURISDICTION & VENUE ........ 3

BACKGROUND ........ 4

- A. The State Court Action and Mr. Simpson's Three Prior Attempts to Remove the State Court Action to Federal Court ........ 4
- B. Procedural History of this Case ........ 6
- C. The Debtor's Financial Condition ........ 8
- D. Controlled Non-Debtor Entities ........ 11
- E. Unexplained Cash Withdrawals and Personal Spending ........ 14
- F. Claims Analysis ........ 16
- G. The Debtor's Conduct Toward the State Court and This Court ........ 17

ARGUMENT ........ 21

I. THE COURT SHOULD CONVERT OR DISMISS THIS CASE FOR CAUSE UNDER SECTION 1112(B) ........ 21

- A. The Estate Is Suffering Continuing Diminution with No Reasonable Likelihood of Rehabilitation ........ 23
- B. The Debtor Has Engaged in Gross Mismanagement and Has Violated His Obligations Under the Bankruptcy Code ........ 25
- C. The Debtor Has Been Found in Contempt of Court Orders ........ 28
- D. The Debtor Filed this Bankruptcy in Bad Faith and Cannot Serve as a Fiduciary for Creditors ........ 28

II. THE DEBTOR CANNOT DEMONSTRATE UNUSUAL CIRCUMSTANCES UNDER SECTION 1112(B)(2) ........ 32

III. CONVERSION TO CHAPTER 7 OR DISMISSAL IS IN THE BEST INTERESTS OF CREDITORS AND THE ESTATE ........ 34

IV. IN THE ALTERNATIVE, THE COURT SHOULD DIRECT THE APPOINTMENT OF A CHAPTER 11 TRUSTEE ........ 35

CONCLUSION ........ 38

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Ashley River Consulting, LLC*,
No. 14-13406, 2015 WL 1540941 (Bankr. S.D.N.Y. Mar. 31, 2015) ....30, 36

*In re Babayoff*,
445 B.R. 64 (Bankr. E.D.N.Y. 2011) ....25, 26, 35

*In re JJ Arch LLC*,
663 B.R. 258 (Bankr. S.D.N.Y. 2024), *aff'd*, No. 24-CV-08649, 2026 WL 1622865 (S.D.N.Y. June 5, 2026) .... *passim*

*In re JJ Arch LLC*,
No. 24-10381, 2024 WL 2933427 (Bankr. S.D.N.Y. June 10, 2024) ....4, 5

*In re JJ Arch LLC*,
No. 24-CV-08649, 2026 WL 1622865 (S.D.N.Y. June 5, 2026) ....21, 22, 23

*In re Sillerman*,
605 B.R. 631 (Bankr. S.D.N.Y. 2019) ....36, 37

*Simpson v. Chassen*,
No. 25-cv-4004, 2025 WL 1784931 (S.D.N.Y. June 27, 2025) ....6, 28

*In re Weiss Multi-Strategy Advisers LLC*,
No. 24-10743, 2024 WL 2767893 (Bankr. S.D.N.Y. May 29, 2024) ....23

**Statutes**

11 U.S.C. § 523(a)(2), (a)(4), (a)(6) ....17

11 U.S.C. §§ 544, 547, 548, 550 ....34

11 U.S.C. § 1104(a) ....1, 3, 21, 35

11 U.S.C. § 1112(b) ....1, 3, 21, 32

§ 1112(b)(1) ....21, 34

§ 1112(b)(2) ....22, 32

§ 1112(b)(4)(A) ....22, 23

§ 1112(b)(4)(B) ....22

§ 1112(b)(4)(E) ....22, 28

§ 1112(b)(4)(F) ....22, 26

11 U.S.C. §§ 1115(a), 363(c)(1) ....................15

11 U.S.C. § 1123(a)(8) ....................33

11 U.S.C. § 1129(a)(9) ....................17, 33

§ 1129(a)(9)(A) ....................33

§ 1129(a)(11) ....................33

§ 1129(a)(15) ....................33

28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(O) ....................3

28 U.S.C. § 1334 ....................3

28 U.S.C. § 1409 ....................3

**Other Authorities**

28 C.F.R. § 58.8(e) ....................25

Fed. R. Bankr. P. 2015.3 ....................2, 11, 14

608941 NJ Inc. ("Oak"), a creditor of Jeffrey Solomon Simpson (the "Debtor"), respectfully submits this motion (the "Motion") pursuant to sections 1112(b) and 1104(a) of title 11 of the United States Code (the "Bankruptcy Code") seeking an order: (1) converting this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (2) in the alternative, dismissing this Chapter 11 case; or (3) in the further alternative, directing the appointment of a Chapter 11 trustee.

## PRELIMINARY STATEMENT

1. It has become increasingly clear that this is a Chapter 11 filing that serves no legitimate reorganization purpose. The estate is administratively insolvent and there is no realistic prospect of rehabilitation. Worse, the Debtor has overstated his assets, understated his debts, misrepresented his financial condition, and repeatedly defied this Court's orders.

2. The numbers confirm that reorganization is impossible. The Debtor's schedules report supposed assets of $3,818,843.96, while creditors have filed twenty-eight claims totaling approximately $175 million, a claims-to-assets ratio of approximately 46 to 1. The Debtor's monthly operating reports ("MOR") for February through June 2026 reveal an estate in steady decline: over the five-month period, total receipts were $156,451 and total disbursements were $143,509, with the estate swinging from nominal positive cash flow in March and April to a net loss of $870 by June 2026, when it had only $8,805 in cash on hand. Unpaid administrative expenses, including professional fees alone, totaled $500,503 as of June 30, 2026, and have since grown far beyond that amount. The estate cannot pay the administrative expenses it has already incurred, let alone fund a plan.

3. The Debtor's MORs materially misrepresent the estate's liabilities. Although the Debtor's own schedules report $61,729,000 in unsecured liabilities, every MOR from March

through June reported $0 across all prepetition debt categories, notwithstanding over $175 million in filed claims. These are not rounding errors; they erase the Debtor's liabilities from the very reports on which creditors and this Court depend.

4. In addition, the Debtor's DIP bank statements reveal a systematic pattern of unexplained cash withdrawals from March through June described simply as "DEBIT." These withdrawals total $42,658, approximately 29.7% of total estate disbursements over the five-month period. The same bank statements reflect a pattern of peer-to-peer transfers through Venmo, Apple Cash, and Zelle to unidentified payees, which totaled approximately $24,335.63 across the five-month period and increased in frequency and amount over time.

5. The Debtor has also failed to satisfy his most basic reporting obligation as a debtor-in-possession: filing timely MORs. He filed his May and June MORs late, on August 26, 2026, and August 28, 2026, respectively. He has yet to file MORs for July or August, both of which are overdue.

6. The Debtor filed a Bankruptcy Rule 2015.3 Periodic Report that presents a misleading picture, claiming indirect interests in three properties, but omitting that he had already conveyed two of those properties to his related entity, YJ Simco LLC ("YJ Simco"), and that all three had been scheduled for foreclosure sales prior to this bankruptcy filing that will extinguish any interest held by him or his related entities. This Court has already determined that two of the properties are not property of the estate.

7. Even after this Court has twice held him in contempt, the Debtor continues to violate court orders and to attack creditors, their counsel and others—and, most recently, this Court itself. He has now turned on his own lawyers as well: days after announcing in open court that he is "not paying Mr. Ostrow another dollar" and "can't get a plan done," the Debtor

discharged his bankruptcy counsel, who has advised the Court of "an irreparable breakdown in the attorney-client relationship" and his intent to withdraw. Casting himself as a victim does not entitle the Debtor to relitigate settled state court rulings, to pursue personal grievances that drain the already minimal estate assets, or to waste the time of this Court and creditors.

8. Looking at the broader sweep of Mr. Simpson's activities, it is clear that this case is the fourth episode in Mr. Simpson's multi-year campaign to use the federal courts to obstruct the state court action that has been pending before Justice Cohen since 2023, to evade that court's orders, and to relitigate issues that remain pending there.

9. Every day this case remains in Chapter 11, the estate loses value and creditors lose ground. Cause plainly exists under section 1112(b) of the Bankruptcy Code to convert this case to Chapter 7, where an independent trustee can investigate the Debtor's financial affairs and maximize recoveries for the benefit of all creditors, or to dismiss it. Should the Court decline to convert or dismiss, it should, in the alternative, appoint a Chapter 11 trustee under section 1104(a).

## JURISDICTION & VENUE

10. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(O). Venue is proper in this District pursuant to 28 U.S.C. § 1409.

11. The statutory predicates for the relief sought herein are sections 1112(b) and 1104(a) of the Bankruptcy Code. Section 1112(b) authorizes the Court to convert or dismiss a Chapter 11 case for cause. Section 1104(a) authorizes the Court to direct the appointment of a Chapter 11 trustee for cause or if such appointment is in the interests of creditors, equity security holders, and other interests of the estate.

## BACKGROUND

### A. The State Court Action and Mr. Simpson's Three Prior Attempts to Remove the State Court Action to Federal Court

12. On August 15, 2023, after Mr. Simpson and Jared Chassen had each attempted to remove the other from their shared company, JJ Arch LLC ("JJ Arch"), Mr. Simpson commenced an action in the New York County Supreme Court, Commercial Division, Index No. 158055/2023, against Mr. Chassen and First Republic Bank (the "State Court Action"). State Court Action, NYSCEF Doc. No. 1. Mr. Simpson sued both individually and purportedly derivatively on behalf of JJ Arch and Arch Real Estate Holdings LLC ("AREH"), the entity of which JJ Arch is the managing member. The State Court Judge issued a series of interim orders barring Messrs. Simpson and Chassen from terminating one another without the court's permission and banned Mr. Simpson from acting alone on behalf of JJ Arch without Mr. Chassen's consent. Displeased with how his case was proceeding in state court, Mr. Simpson made three unsuccessful attempts to remove the State Court Action to federal court.

13. *First attempt: The 2024 JJ Arch bankruptcy filing*. In March 2024, Mr. Simpson ignored the State Court's directive not to act without Mr. Chassen's consent and filed a bankruptcy petition for JJ Arch, calling himself its "sole equity holder." *In re JJ Arch LLC*, No. 24-10381, 2024 WL 2933427, at *4 (Bankr. S.D.N.Y. June 10, 2024). In April 2024, Mr. Simpson relied on that bankruptcy filing to remove the State Court Action and have it referred to the Bankruptcy Court. Judge Mastando determined that the removal was improper "forum shopping" and allowed the State Court Action to proceed, noting that Justice Cohen already knew the action well and it had little to do with the bankruptcy. *Id.* at *15-20. In October 2024, Judge Mastando dismissed the bankruptcy entirely, citing Mr. Simpson's bad faith in filing it and

his serious mismanagement of the company. *In re JJ Arch LLC*, 663 B.R. 258, 261, 280-88 (Bankr. S.D.N.Y. 2024), *aff'd*, No. 24-CV-08649, 2026 WL 1622865 (S.D.N.Y. June 5, 2026). On June 5, 2026, the district court affirmed the dismissal. *Id.* On October 1, 2026, the Second Circuit dismissed the appeal.

14. *Second attempt: the March 2025 removal*. Once the case was back before the state court, Justice Cohen held a two-day hearing and, on March 11, 2025, appointed a temporary receiver (the "Receiver") to take control of the properties managed by JJ Arch. State Court Action, NYSCEF Doc. No. 1360. The evidence showed that Mr. Simpson had not paid taxes since 2022, had let the properties fall into default or foreclosure, and had taken company money for himself. A hearing on whether to hold Mr. Simpson in contempt was set for March 27, 2025. On March 25, 2025, two days before that hearing, Mr. Simpson again tried to remove the case to federal court, claiming it involved federal law. State Court Action, NYSCEF Doc. No. 1408. He did this through his own state court electronic filing account, even though he was represented at the time. *Id.* On March 25, 2025, Justice Cohen posted a notice advising Mr. Simpson and the other parties that the state court's earlier orders, including the Receiver appointment, remained in effect. State Court Action, NYSCEF Doc. No. 1409. Even so, Mr. Simpson used the "removal" to ignore the Receiver, and informed Justice Cohen that he would not communicate with the state court again, that he had expelled the receiver from the business, and that he had told a lender that Justice Cohen and the Receiver were "on the take." State Court Action, NYSCEF Doc. No. 1445. On April 24, 2025, the federal court sent the case back to state court because Mr. Simpson never paid the required filing fee, even after he was given 30 days to do so. State Court Action, NYSCEF Doc. No. 1411. The federal court's written decision is dated April 25, 2025. *Id.* Mr. Simpson's appeal of the remand was later dismissed.

15. *Third attempt: the May 2025 "pro se" removal*. After the case returned to state court once again, the Receiver and Mr. Chassen asked the state court to enforce the receiver order and to hold Mr. Simpson in contempt. A hearing was held on May 12, 2025. State Court Action, NYSCEF Doc. No. 1636. On May 15, 2025, Mr. Simpson emailed screen shots to the Court using his own NYSCEF account credentials showing that he had filed a new removal case "pro se," even though he was represented. State Court Action, NYSCEF Doc. Nos. 1517-18. On May 29, 2025, U.S. District Judge Furman granted a fast-tracked return of the case to state court. State Court Action, NYSCEF Doc. No. 1535. On June 27, 2025, the court sanctioned Mr. Simpson and barred him from removing the case to federal court again without the court's prior permission. *Simpson v. Chassen*, No. 25-cv-4004, 2025 WL 1784931, at *2 (S.D.N.Y. June 27, 2025). Judge Furman noted Mr. Simpson's "vexatious history of litigation" and his "repeated and frivolous efforts to delay state court proceedings." *Id.*

**B. Procedural History of this Case**

16. In the wake of his three prior removal attempts, on February 19, 2026, the Debtor filed an individual voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court, commencing the above-captioned case, Case No. 26-10359 (LGB). The Debtor resides at 1055 Park Avenue, New York, New York 10028, and operates a business restoring classic automobiles.

17. In addition to the JJ Arch bankruptcy, discussed above, YJ Simco, which the Debtor co-owns with his spouse, Yael Simpson, also previously filed its own Chapter 11 petition in this District, Case No. 25-10437 (LGB). About a month after the YJ Simco bankruptcy was filed, the United States Trustee filed a motion to convert the case from a Chapter 11 case to a case under Chapter 7 or, in the alternative, to dismiss the case. The United States Trustee stated

that "[t]his Debtor is a poster child example of a debtor that does not abide by its fiduciary duties as a debtor-in-possession" and "demonstrate[ed] gross mismanagement" by, *inter alia*, failing to timely file schedules and financial information, and failing to provide necessary information to the United States Trustee. Mem. of L. in Supp. of Tr.'s Mot. to Convert, *In re YJ Simco LLC*, No. 25-10437 (Bankr. S.D.N.Y. Apr. 14, 2025), ECF No. 7 at 6, 8. On May 14, 2025, the Court "found cause existing" for the conversion and entered an Order converting the case to a case under Chapter 7. Order Converting Ch. 11 Case to Case Under Ch. 7, *In re YJ Simco*, ECF No. 18 at 1. On January 15, 2026, the Chapter 7 Trustee filed a motion to dismiss the YJ Simco bankruptcy, explaining that:

> The multitude of filings by Simpson in this Court and the State Court evidence that there is no bankruptcy justification or proper bankruptcy purpose to the continuation of this Debtor's Chapter 7 case. Simpson is attempting to use this Court to circumvent the prior rulings of the State Court, and what he perceives to be as injustices against him personally.

Tr.'s Mot. to Dismiss, *In re YJ Simco*, ECF No. 98 at 12. On March 24, 2026, the Court ruled that "the legal and factual bases set forth in the Motion establish just cause for the relief," and dismissed the YJ Simco bankruptcy. Order Dismissing the Debtor's Ch. 7 Case, *In re YJ Simco*, ECF No. 148 at 1.

18. Lead counsel for the Debtor, Becker, Glynn, Muffly, Chassin & Hosinski LLP ("Becker Glynn"), was retained pursuant to an order of this Court dated May 8, 2026. ECF No. 61.

19. The Court established July 31, 2026, as the deadline to file proofs of claim (the "Bar Date"). ECF No. 93. The Bar Date has now passed. There are twenty-eight filed proofs of claim that remain pending, totaling approximately $175 million in claims, described in more detail below.

20. The Debtor has filed MORs through June 2026. The May and June MORs were not filed until the end of August 2026, and the Debtor has not filed MORs for July or August. Thus, for the past few months, there has been no visibility into the Debtor's financial affairs.

21. The Debtor has violated orders of this Court on at least two separate occasions, resulting in the Debtor being held in contempt of Court. ECF Nos. 152, 167. At the September 18, 2026 contempt hearing, the Debtor stated in open court that he has no intention of abiding by the Court's cease and desist orders, claiming that if "provoke[ed]," he is excused from compliance with the Court's orders. Declaration of E. Fisher in Support of Motion to Convert ("Fisher Decl.") Ex. C (Sept. 18, 2026 Tr.) at 68:19-69:20. In fact, the Debtor continued to violate the Court's cease and desist orders even following the September 18, 2026 contempt hearing. Letter from M. Bunin to Judge Beckerman (Sept. 24, 2026), Adv. Pro. No. 26-01013, ECF No. 95. This pattern of willful noncompliance with judicial directives is an independent ground for conversion or dismissal.

**C. The Debtor's Financial Condition**

22. The Debtor's sole source of income is self-employment income from restoring classic automobiles. MOR, June 2026, pt. 8, ECF No. 158. The MORs report zero wages, zero salary, and zero income from any source other than the automobile restoration business. *Id.* The MORs report that the business has no employees other than the Debtor himself. MOR, Feb.-June 2026, ECF Nos. 38, 67, 90, 155, 158 (each at 1).

23. Over the first five months of the case (February through June 2026), the Debtor's cumulative gross income totaled $156,451, and cumulative disbursements totaled $143,509, yielding cumulative net income of just $12,942. MOR, June 2026, pt. 1, ECF No. 158. Indeed, the Debtor's most recent operating report for the month of June 2026 reflects a *net operating loss*

of $870, with monthly total expenses of $48,646 exceeding total income of $47,776. *Id.*, pts. 4, 8. Thus, the business is now losing money.

24. Cash balances have remained perilously low throughout the case: $5,872 at the beginning of February 2026, declining to $2,880 at the end of February, and fluctuating between approximately $8,000 and $11,000 in subsequent months before settling at $8,805 as of June 30, 2026. MOR, Feb.-June 2026, pt. 1, ECF Nos. 38, 67, 90, 155, 158.

25. The Debtor's Schedule J reports monthly expenses of $33,680.32. ECF No. 19. Based on even the limited financial information made available to date, it is apparent that the Debtor cannot meet his monthly living expenses from his monthly income, let alone provide for any distribution to creditors, suggesting that his living expenses are being paid from undisclosed sources.

26. The Debtor's Summary of Assets and Liabilities, filed on March 5, 2026, reports total assets of $3,818,843.96, total secured liabilities of $0, and total unsecured liabilities of $61,729,000. ECF No. 20. Notably, Schedule E/F lists a total of more than 170 unsecured creditors, and the approximately $61 million in claim amounts account for only 12 of the listed creditors. ECF Nos. 19, 20.

27. The estate is administratively insolvent. As of June 30, 2026, unpaid professional fees alone total $500,503—more than fifty times the estate's available cash. MOR, June 2026, pt. 5, ECF No. 158. More than three months later, professional fees are now likely well in excess of that figure, but the Debtor's lack of timely financial reporting provides no visibility.

28. Critically, the Debtor's MORs are inconsistent and unreliable for the entire five-month period for which reports are available. The February 2026 MOR reported $61,729,000 in prepetition unsecured debt, the same figure reported in the Debtor's Summary of Assets and

Liabilities. ECF No. 20. Beginning with the March 2026 MOR, however, the Debtor changed all prepetition debt fields to $0—secured, priority, and unsecured claims—and that $0 figure persisted in all subsequent MORs, even as claims totaling approximately $175 million were filed with the Court and even though the Debtor's initial filing listed its 20 largest creditors as holding claims of $65,485,000. ECF No. 2. Professional fees were left blank in every MOR ($0 approved, $0 paid) despite Becker Glynn's accrual of $500,503 in approved fees. MOR, Feb.-June 2026, pt. 5, ECF Nos. 38, 67, 90, 155, 158. These misrepresentations and errors raise serious questions about the Debtor's good faith and the reliability of his financial disclosures to this Court and creditors.

29. The Debtor's expenses have been increasing without explanation. Selling expenses rose from $0 in February through April 2026 to $7,512 in May 2026 and $21,500 in June 2026, with no explanation for the increase. MOR, Feb.-June 2026, pt. 4, ECF Nos. 38, 67, 90, 155, 158. Other expenses reached $12,696 in June 2026. MOR, June 2026, pt. 4, ECF No. 158. These escalating expenses, during a period when the business posted a net loss, further undermine any prospect of recovery for creditors.

30. Additionally, the $25,000 retainer for the Debtor's bankruptcy counsel was paid by the Debtor's mother and aunt on February 18, 2026, one day before the petition was filed. Disclosure of Compensation of Attorney for Debtor, ECF No. 24. The Debtor's spouse also signed a mortgage on property purportedly owned by her own LLC to fund the Debtor's legal services. *Id.* These facts suggest that the Debtor is relying on the financial resources of family members to sustain a Chapter 11 case that he cannot fund on his own.

**D. Controlled Non-Debtor Entities**

31. The Debtor's Periodic Report Regarding Value, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest (the "Periodic Report"), as required by Bankruptcy Rule 2015.3 and filed on March 17, 2026, identifies three controlled non-debtor entities, each of which is a real estate holding company. ECF No. 27.

32. The Debtor lists on the Periodic Report his purported 100% interest in 1055 Park Ave PH LLC, which the Debtor represents to be the owner of a condominium valued at $4.5 million. ECF No. 27, at 5-6. According to the Debtor's Periodic Report, 1055 Park Ave PH LLC's net equity value in the property declined from $927,500 as of December 31, 2025, to $840,000 as of February 28, 2026. *Id*. According to the Debtor, the entity reported a net loss of $453,250 for 2025. *Id.* at 12. The Debtor also lists on the Periodic Report his purported 100% interest in 1055 Park Ave 1 LLC, which the Debtor represents to be the owner of a second condominium valued at $5 million. *Id.* at 7. According to the Debtor, the net equity value in that second property declined from $717,500 to $605,000 over the same period. *Id.* at 7-8. The entity reported a net loss of $416,500 for 2025. *Id.* at 14. Rental income was generated from a lease at $23,500 per month, although the tenant vacated and surrendered the lease at the end of 2025. *Id*.

33. Glaringly absent from the Debtor's disclosure (or any subsequent disclosure) is any mention that, as of the date the disclosure was filed, 1055 Park Ave PH LLC and Park Ave 1 LLC (the "Park Ave LLCs") no longer owned the two condominiums (the "Park Ave Properties"). Specifically, in connection with the YJ Simco bankruptcy, the Chapter 7 Trustee, after consulting with a real estate broker and counsel, determined that the properties owned by the Park Ave LLCs "likely did not have equity or sufficient equity to satisfy the known liens

against the properties and the costs of sale such that funds would flow to the Debtor, i.e., the equity holder in the non-debtor entities that owned the Park Ave Properties." Tr.'s Mot. to Dismiss, *In re YJ Simco*, ECF No. 98 ¶ 17. Accordingly, "on August 26, 2025, the Trustee filed a notice of proposed abandonment of the estate's interests in the Park Ave Properties," and, "[b]y operation of law, the Park Ave Properties were deemed abandoned as of September 11, 2025." *Id.* ¶¶ 18, 20.

34. Thereafter, a UCC sale of 100% of the membership interests in the Park Ave LLCs took place at an auction held on January 7, 2026. New York 555 LLC was the highest bidder for both membership interests. New York 555 LLC became the sole member of the Park Ave LLCs and thereafter executed deeds transferring both properties to Park 2 Ave 1055 LLC. The deeds were recorded in the Office of the City Register of the City of New York, New York County on February 11, 2026 (Unit 1) and March 3, 2026 (PH). Fisher Decl. Ex. F (Bargain and Sale Deed from 1055 Park Ave 1 LLC to Park 2 Ave 1055 LLC (Jan. 27, 2026), recorded Feb. 11, 2026, CRFN 2026000043009, Office of the City Register, N.Y.C. Dep't of Fin. (N.Y. Cnty.)); Fisher Decl. Ex. G (Bargain and Sale Deed from 1055 Park Ave PH LLC to Park 2 Ave 1055 LLC (Jan. 27, 2026), recorded Mar. 3, 2026, CRFN 2026000061621, Office of the City Register, N.Y.C. Dep't of Fin. (N.Y. Cnty)).

35. Notwithstanding these events, the Debtor sought a "do-over" before this Court by filing a motion seeking to consolidate the Debtor's purported interest in the net assets of the Park Ave LLCs. ECF No. 72. New York 555 LLC and Park 2 Ave 1055 LLC opposed the motion on the basis that, *inter alia*, the Debtor had no interest in the properties based on the fact that: (1) the Debtor had executed a contribution agreement on October 31, 2021, transferring the Debtor's 100% interest in the Park Ave LLCs to YJ Simco; (2) YJ Simco abandoned its interest in the

properties; (3) UCC Sales of the membership interests took place and Park 2 Ave 1055 LLC now owns the properties. ECF No. 95. On July 1, 2026, this Court denied the Debtor's consolidation motion. ECF No. 109.

36. On July 23, 2026, this Court entered an Order finding that: "as of the date that the Debtor filed this Petition on February 19, 2026, [the membership interests in the Park Ave LLCs and the Park Ave Properties were] not property of the Debtor's bankruptcy estate . . . ." ECF No. 131 at 2.

37. In the July 23, 2026 Order, this Court also confirmed that there was never an automatic stay in effect with respect to the interests in the Park Ave LLCs or the Park Ave Properties, *id.*, thereby allowing continuation of the lawsuits that had been commenced by Park 2 Ave 1055 LLC in the Supreme Court of the State of New York, County of New York, against Park Ave LLC and YJ Simco, and the Debtor, among others, seeking a declaration that (1) title to the Park Ave Properties is vested in Park 2 Ave 1055 LLC; and (2) the defendants and every person or entity is barred from all claims to an estate or interest in the Park Ave Properties. *Park 2 Ave 1055 LLC v. 1055 Park Ave PH LLC*, Index No. 158617/2026 (N.Y. Sup. Ct. N.Y. Cnty. filed July 10, 2026); *Park 2 Ave 1055 LLC v. 1055 Park Ave 1 LLC*, Index No. 158620/2026 (N.Y. Sup. Ct. N.Y. Cnty. filed July 10, 2026). On September 30, 2026, Park 2 Ave 1055 LLC filed motions in both actions seeking default judgments. Index No. 158620/2026, NYSCEF Doc. 33; Index No. 158617/2026, NYSCEF Doc. 33.

38. According to the Periodic Report, 266 WMTR LLC is 50% owned by the Debtor and holds the property at 266 Water Mill Towd Road, which the Debtor valued at $3.25 million, subject to a mortgage with a balance of approximately $1.8 million. The Debtor failed to mention in his disclosure that in September 2024, JP Morgan Chase Bank, National Association

("JPMorgan"), the lender on the 266 WMTR property, commenced a Complaint for Mortgage Foreclosure (the "WMTR Foreclosure Action") in the Supreme Court of the State of New York, Suffolk County, Index No. 623340/2024. In the WMTR Foreclosure Action, on September 29, 2025, the State Court issued an Order that rendered a judgment against Jeffrey Simpson and his wife in the amount of $1,858,461.19, and ordered the referee to conduct a foreclosure sale of the property. WMTR Foreclosure Action, NYSCEF No. 68. The Order further states that following the foreclosure sale, the Debtor and his wife "are barred and foreclosed of all right, claim, lien, title, and interest in the property after the sale of the mortgaged property." *Id.* at 8. A Notice of Sale set a public auction sale for December 15, 2025. WMTR Foreclosure Action, NYSCEF No. 71. The sale was initially stayed as a result of the YJ Simco bankruptcy, and remains stayed as a result of this proceeding.

39. As explained above, contrary to the Periodic Report, two of the alleged controlled entities no longer have an interest in the underlying properties. And the third entity owns a property that is subject to a foreclosure sale that will result in the Debtor having no interest in the property.

40. The Debtor failed to file a Periodic Report concerning the alleged financial condition of the controlled non-debtor entities by the end of September, as required by Bankruptcy Rule 2015.3.

**E. Unexplained Cash Withdrawals and Personal Spending**

41. An examination of the Debtor's bank statements across all five MOR periods reveals a pattern of unexplained cash withdrawals. In March 2026, after the Debtor opened the TD Bank DIP account, the TD Bank Statement lists $4,250 in "Other Withdrawals" with the description "DEBIT," with no payee or explanation. ECF No. 67, at 28. The pattern continued

in the following months: in April 2026, four unexplained DEBIT withdrawals totaling $12,400 appeared ($3,700 on April 7, $4,000 on April 13, $3,700 on April 20, and $1,000 on April 29). ECF No. 90, at 23. In May 2026, three DEBIT withdrawals totaling $6,508 appeared ($1,508 and $1,500 on May 19, and $3,500 on May 26). ECF No. 155, at 24. By June 2026, the withdrawals escalated to five transactions totaling $19,500 ($4,500 on June 1, $3,500 on June 8, $3,800 on June 15, $3,500 on June 22, and $4,200 on June 30). ECF No. 158, at 25. The cumulative total for March through June is $42,658 in unexplained withdrawals, representing approximately 29.7% of total estate disbursements over the five-month period.

42. In addition to these unexplained cash withdrawals, the Debtor's bank statements reflect peer-to-peer transfers through Venmo, Apple Cash, and Zelle to unidentified payees: in February, Zelle payments totaling approximately $855 went to recipients including "Ray Quaranto" ($400) and "D.S." ($200) (ECF No. 38, at 21-27); in March, Venmo payments totaled $1,831.50, including payments of $549.50, multiple $105 payments, and $475 (ECF No. 67, at 16-24, 29-32); in April, Venmo and Apple Cash transfers totaled $4,325, including transfers of $800, $500, $425, $300, $1,500, and $250, plus Apple Cash transfers of $250 and $300 (ECF No. 90, at 18-23); in May Venmo and Apple Cash transfers totaled $5,374.13 (ECF No. 155, at 17-24); in June Venmo and Apple Cash transfers totaled $11,950 (ECF No. 158, at 17-25). The total peer-to-peer transfers through Venmo, Apple Cash, and Zelle across the months for which the Debtor has provided financial information total $24,335.63.

43. Under sections 1115(a) and 363(c)(1) of the Bankruptcy Code, the Debtor's post-petition earnings and property are property of the estate, and the Debtor may use such property only in the ordinary course. Approximately $28,420 in disbursements across the February through April period fell into spending categories that were entirely unbudgeted on the Debtor's

Form 122B or Schedule J, including unexplained DEBIT withdrawals, peer-to-peer transfers to unidentified recipients, luxury grocery purchases, pet services, and similar items. The Debtor's Form 122B projected gross monthly business receipts of $27,955.85 and net business income of $10,100.13, ECF No. 23, while Schedule J projected monthly expenses of $33,680.32, ECF No. 19. The actual spending patterns bear no resemblance to these projections. The divergence between the Debtor's budgeted and actual spending further demonstrates that the Debtor has no viable path to a confirmable plan and that estate funds are being dissipated to the detriment of creditors.

**F. Claims Analysis**

44. As noted above, twenty-eight proofs of claim have been filed in this case, totaling approximately $175 million. The magnitude and composition of these claims make any meaningful distribution to creditors through a Chapter 11 plan impossible.

45. Fannie Mae has filed a claim for $8,899,252.87. Claims Register, Claim 22. JPMorgan Chase has filed four claims totaling $4,913,558.67. Claims Register, Claims 8, 9, 10, 13. Aron Weber has asserted a claim of $571,647.00, and Marco Scaba has asserted a claim of $1,668,838.83. Claims Register, Claims 17, 26.

46. Four claims filed by creditors represented by Jacobs P.C. assert fraud-based damages based on claims asserted in a state court litigation as follows: Claim No. 27 ($13,321,094 on behalf of 435 Central Condo Development Holdings LLC); Claim No. 28 ($17,963,196 on behalf of Bushwick 1010 Holdings, LLC); Claim No. 29 ($21,524,553 on behalf of 1351 Dekalb Condo Development Holdings LLC); and Claim No. 30 ($52,808,843 on behalf of Carpe Diem Stock Trading LLC). In total, these four fraud-based claims amount to $105,617,686. Additionally, Claim No. 25, filed by Oak, asserts $50,000,000 in damages and is

accompanied by a timely adversary complaint seeking a determination of nondischargeability under sections 523(a)(2), (a)(4), and (a)(6) of the Bankruptcy Code. Adv. Pro. No. 26-01046, ECF No. 1.

47. Priority tax claims filed by the Internal Revenue Service and the New York State Department of Taxation and Finance total approximately $219,000. To be confirmable, the Debtor's plan must provide for these claims to be paid in full pursuant to section 1129(a)(9) of the Bankruptcy Code. Secured and mortgage-related claims exceed $16 million—more than four times the Debtor's total reported assets of $3,818,843.96.

**G. The Debtor's Conduct Toward the State Court and This Court**

48. Mr. Simpson's prepetition forum shopping is documented at length in *Simpson v. Chassen*, No. 25-cv-04004 (JAV) (S.D.N.Y.), ECF Nos. 7-8, 12, 77-79. When he filed this bankruptcy case, Mr. Simpson faced a fully submitted contempt motion in the State Court Action that followed four days of evidentiary hearings held between May and October 2025. State Court Action, NYSCEF Doc. Nos. 2000, 2050-52 (hearing transcripts); *see also id.*, NYSCEF Doc. No. 2072 (post-hearing memorandum documenting Mr. Simpson's contempt of the orders appointing the Receiver). Rather than defend himself, Mr. Simpson informed the state court that he would not attend the final day of the hearing: "I am not participating in anything regarding a court hearing with you as it's [sic] adjudicator, not happening." *Id.*, NYSCEF Doc. No. 2126 at 2 (Oct. 8, 2025 email); *see also id.*, NYSCEF Doc. No. 2127 (Oct. 9, 2025 email).

49. Beginning in or about October 2025, Mr. Simpson repeatedly emailed the state court to announce that he was boycotting its proceedings. *See, e.g.*, *Great Am. Ins. Co. v. Arch Real Estate Holdings, LLC*, Index No. 653208/2024 (N.Y. Sup. Ct. N.Y. Cnty. filed June 26, 2024) (the "Interpleader Action"), NYSCEF Doc. Nos. 296, 297, 299, 300, 315, 316; State Court

Action, NYSCEF Doc. Nos. 1860-1897, 1909-1911, 1923-1983, 2126-2134, 2150, 2152-2153, 2176, 2179-2185, 2239-2248. He refused to participate in discovery, and, by the eve of the bankruptcy filing, motions for discovery sanctions and default judgments against him had been fully briefed. *Id.*, NYSCEF Doc. Nos. 2230-2255, 2258-2264.

50. Before this Court held him in contempt, the state court sanctioned Mr. Simpson four times for sending *ex parte* and substantive emails to the court in violation of its rules. State Court Action, NYSCEF Doc. No. 1847 (Sept. 24, 2025 Order) ($500 sanction); *id.*, NYSCEF Doc. No. 1851 (Sept. 29, 2025 Order) ($1,000 sanction); *id.*, NYSCEF Doc. No. 1998 (Oct. 8, 2025 Order) ($1,500 sanction); *id.*, NYSCEF Doc. No. 2157 (Dec. 5, 2025 Order) ($2,000 sanction). The state court warned him that his pleadings could be stricken if he persisted. He persisted anyway. *Id.*, NYSCEF Doc. Nos. 2239, 2248, 2280-2288, 2346, 2349. Since the petition date, he has continued to send harassing emails to the state court. *See* ECF Nos. 125, 133-134, 136, 142-144, 150, 152, 159-160; Adv. Pro. No. 26-01013, ECF Nos. 30, 61, 63-64, 67, 69, 74, 78-79, 83-84, 86-89.

51. Roughly a month before filing this bankruptcy case, Mr. Simpson commenced three civil rights lawsuits against the state court and Justice Cohen, and a fourth against the Receiver and his counsel. *Simpson v. N.Y. State Unified Ct. Sys.*, No. 1:26-cv-00110 (LTS) (S.D.N.Y. filed Jan. 3, 2026); *Simpson v. Cohen*, No. 1:26-cv-00193 (LTS) (S.D.N.Y. filed Jan. 8, 2026); *Simpson v. Cohen*, No. 1:26-cv-00130 (LTS) (S.D.N.Y. filed Jan. 5, 2026); *Simpson v. Wilson*, No. 2:26-cv-00125 (SJB) (ARL) (E.D.N.Y. filed Jan. 9, 2026). He then informed Justice Cohen that a scheduled status conference would not go forward: "There will NOT be a conference this week (or ever ), on my case (in front of Cohen), that I called for until justice is served and we get clarity from people who are not biased and prejudicial. If you, Cohen,

proceed you're doing at your own risk." State Court Action, NYSCEF Doc. No. 2281; *see also* *id.*, NYSCEF Doc. Nos. 2285 (Jan. 16, 2026 email), 2287 (Jan. 17, 2026 email). Days before the petition date, after Justice Cohen held the conference notwithstanding Mr. Simpson's threat to file for bankruptcy, Mr. Simpson wrote that Justice Cohen would not be deciding anything "in my case" and that nothing further would happen "in front of a completely absurd thing that calls itself a court." *Id.*, NYSCEF Doc. No. 2346 (Feb. 11, 2026 email).

52. Since the petition date, Mr. Simpson has refused to allow any matter to proceed in state court, even after this Court remanded matters on mandatory abstention grounds. This Court explained to Mr. Simpson that permitting the Interpleader Action to proceed in state court would allow a prompt determination of who is entitled to the disputed insurance proceeds and would benefit the estate. Mr. Simpson nevertheless refused to proceed before Justice Cohen. Aug. 17, 2026 Conf. Tr. 44:9-47:2, ECF No. 153. Days later, he commenced a new adversary proceeding seeking to relitigate the interpleader dispute in this Court. *See Simpson v. Great Am. Ins. Co.*, Adv. Pro. No. 26-01079.

53. Mr. Simpson also pressed a multi-day evidentiary hearing in this Court to recover items that he himself described as worth less than the legal fees spent to recover them. *See* Fisher Decl. Ex. D (Adv. Pro. No. 26-01013, June 10, 2026 Hr'g Tr.) at 192:6-12 ("[E]conomically, no, it's not worth spending $20,000, $30,000, $40,000, $50,000 on legal, the Court's time and everything else for things here . . . ."); *id.* at 157:15-16; *id.* at 165:2-5 ("[T]he total value here is valuable to me and nobody else."); *id.* at 203:4-8 ("This is all a waste of time. It just frankly is. The amount of legal we keep spending. Hundreds and hundreds of thousands . . . ."); Fisher Decl. Ex. E (Simpson Dep. Tr.) at 472:2-16 ("The dollars were talking about these legal bills are way, way larger than what you will collect . . . .").

54. Most recently, on October 18, 2026, Mr. Simpson sent an email to this Court's chambers, Justice Cohen, the United States Trustee, the Department of Justice, the Manhattan District Attorney, and dozens of counsel. Fisher Decl. Ex. A (Email from J. Simpson (Oct. 18, 2026, 8:09 PM)). He again explained why he filed this case—"I had to file a personal bankruptcy because of you [Justice Cohen]"—and then turned to this Court:

> And yes judge Beckerman - everything we have going on in the bankruptcy has to deal with what [Justice Cohen] did to my livelihood so you can keep ignoring it and you could keep playing the game saying it's not your problem but it is your problem if you're the last stop on the train. . . . So the question is as I've said judge Beckerman are you ready to face reality of what this case is? Or are you going to play like Joel cohen did. So far you haven't shown any courage to stand up for what New York State did to me.

*Id.* The email goes on to declare that the bankruptcy court is "scared of its own shadow" and "doesn't have the courage," and closes with Mr. Simpson's demand for a confrontation "[t]omorrow - where and when and I will be there- me against all of you." *Id.*

55. The next day, at an October 19, 2026 discovery conference in the Debtor's adversary proceeding against AREH, Mr. Simpson, although he is represented and the Court had reminded him that the conference was "lawyer talk," delivered a lengthy, profane tirade aimed at the Court, opposing counsel, and Justice Cohen. Fisher Decl. Ex. B (Adv. Pro. No. 26-01097, Oct. 19, 2026 Hr'g Tr. 32:2-50:21). Along the way, he conceded, "No, I can't get a plan done. I can't pay for a lawyer," *id.* at 43:9-10; announced that he is "not paying Mr. Ostrow another dollar," *id.* at 41:1; and told the Court, "You don't want to convert it? You go find someone to convert it to." *Id.* at 44:2-3. His own counsel acknowledged that he has "less authority to control this than Your Honor does." *Id.* at 53:9-10. The Court observed that the tirade was evidence that "Mr. Simpson can't control himself." *Id.* at 53:22-54:1.

56. Two days later, on October 21, 2026, the Debtor's lead counsel, Alec P. Ostrow of Becker Glynn, informed the Court that, based on an email from the Debtor "as well as other separate communications from him," he believes he has been discharged as the Debtor's counsel, and that he will promptly move for leave to withdraw from this case and all pending adversary proceedings. Letter from A. Ostrow to Judge Beckerman (Oct. 21, 2026), ECF No. 179. Mr. Ostrow further advised that, "[e]ven if I have technically not been discharged, the attached email and other public statements from the debtor make clear that there is now an irreparable breakdown in the attorney-client relationship." *Id.* Mr. Ostrow's forthcoming motion will seek a stay of pending matters and deadlines or, in the alternative, relief permitting the Debtor "provisionally to act as his own counsel." *Id.*

## ARGUMENT

### I. THE COURT SHOULD CONVERT OR DISMISS THIS CASE FOR CAUSE UNDER SECTION 1112(b)

57. Section 1112(b)(1) of the Bankruptcy Code provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1). "A court must convert or dismiss a bankruptcy where 'cause' exists so long as [conversion or dismissal] is in the best interest of both the creditors and the estate." *In re JJ Arch LLC*, 663 B.R. 258, 275 (Bankr. S.D.N.Y. 2024) (citation omitted), *motion for relief from judgment denied*, 676 B.R. 675 (Bankr. S.D.N.Y. 2025), *aff'd*, No. 24-CV-08649, 2026 WL 1622865 (S.D.N.Y. June 5, 2026).

58. Section 1112(b)(4) sets forth a nonexclusive list of grounds constituting "cause" for conversion or dismissal, including, *inter alia*: (1) "substantial or continuing loss to or

diminution of the estate and the absence of a reasonable likelihood of rehabilitation"; (2) "gross mismanagement of the estate" (3) "failure to comply with an order of the court"; and (4) "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." 11 U.S.C. § 1112(b)(4)(A), (B), (E), (F).

59. The statutory list of causes is not exhaustive, and courts are free to consider other factors. *In re JJ Arch LLC*, 663 B.R. at 275. "Courts in this circuit and elsewhere have thus concluded that . . . a bankruptcy court may dismiss or convert a case upon a finding of bad faith." *Id.* at 280. Bad faith involves "finding an intent to abuse the judicial process, and the purpose of the reorganization process." *Id.* (citation omitted).

60. Where cause is established, the bankruptcy court "has no choice, and no discretion, and must dismiss or convert the Chapter 11 case" unless the debtor can demonstrate "unusual circumstances" under section 1112(b)(2). *In re JJ Arch LLC*, No. 24-CV-08649, 2026 WL 1622865, at *3 (S.D.N.Y. June 5, 2026) (citation omitted).

61. In order to establish "unusual circumstances," the court must find (1) "there is a reasonable likelihood of plan confirmation within a specified or reasonable period of time," and (2) "there exists a reasonable justification for [the debtor's] acts or omissions," and any such acts or omissions "will be cured within a reasonable period." *In re JJ Arch LLC*, 2026 WL 1622865, at *3 (quoting 11 U.S.C. § 1112(b)(2)(A)-(B)(ii)).

62. Although "the fundamental purpose of Chapter 11 proceedings [is] to rehabilitate economically distressed businesses, this goal must be compromised where the operations of the debtor in possession continually erode the interests of creditors without a bright picture for reversing these losses in the future." *Id.*, at *4 (citation omitted).

### A. The Estate Is Suffering Continuing Diminution with No Reasonable Likelihood of Rehabilitation

63. Section 1112(b)(4)(A) identifies "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" as cause for conversion or dismissal. 11 U.S.C. § 1112(b)(4)(A). "In determining whether a substantial or continuing loss to, or diminution of, the estate exists, a court must make a full evaluation of the present condition of the estate, not merely look at the Debtor's financial statements." *In re Weiss Multi-Strategy Advisers LLC*, No. 24-10743, 2024 WL 2767893, at *10 (Bankr. S.D.N.Y. May 29, 2024) (citation omitted). "Persistent losses during the course of a bankruptcy case 'come[ ] at the expense of creditors' and 'would weigh in favor of conversion or dismissal of the case.'" *Id.* (citation omitted). With respect to the second prong, "rehabilitation means to put back in good condition and reestablish on a sound basis [and] ... signifies that the debtor will be reestablished on a secure financial basis ... impl[ying] establishing a cash flow from which its current obligations have been met." *Id.*.

64. In 2024, in connection with a bankruptcy filing initiated by Mr. Simpson on behalf of JJ Arch, Judge Mastando granted the motion to dismiss the bankruptcy, finding, *inter alia*, that there was "[s]ubstantial or continuing loss to or diminution of the estate" and an "absence of a reasonable likelihood of rehabilitation," *In re JJ Arch LLC*, 663 B.R. at 275-76 (quoting 11 U.S.C § 1112(b)(4)(A)), because (1) "the Debtor is not actively generating revenue," and (2) the Debtor had incurred expenses at an "exceptional rate.") This decision was affirmed by the District Court. *In re JJ Arch LLC*, 2026 WL 1622865, at *4.

65. Every financial indicator in this case points in the same direction as the JJ Arch bankruptcy: the estate is not generating meaningful revenue and is losing value with each passing month; and there is no prospect of rehabilitation.

66. The Debtor's five-month MOR record reveals an estate in financial decline. After nominal positive cash flow in March and April, the estate eked out a marginal profit of just $1,474 in May before recording a net loss of $870 in June, ending the month with only $8,805 in cash on hand. Even the five-month cumulative net positive cash flow of $12,942 drastically understates the estate's true financial distress: of the $143,509 in total disbursements, $42,658 (29.7%) were unexplained withdrawals and approximately $24,335 fell into peer-to-peer transfers via Venmo, Apple Cash, and Zelle.

67. Unpaid administrative expenses total $500,503 as of June 30, 2026, and are well in excess of that figure as of the date of this filing, representing an administrative expense obligation that is more than fifty times the estate's available cash as of the end of June 2026. Selling expenses, which were $0 in every month from February through April, suddenly were reported at $7,512 in May and tripled to $21,500 in June, with no explanation.

68. The portion of the Debtor's personal estate that he ties to interests in non-debtor entities has no basis in reality. As discussed above, the Periodic Report falsely claims millions of dollars of equity in properties that this Court found are not property of the estate or are the subject of a foreclosure action that will wipe out the Debtor's interest in the property. Thus, the Debtor has $0 in equity as a result of property interests once held by non-debtor entities.

69. The claims-to-assets ratio in this case is overwhelming. Twenty-eight claims totaling approximately $175 million have been filed against an estate with reported assets of $3,818,843.96, approximately 2% of the claim amounts. The Debtor's income barely covers his operating costs, and it is indisputable that, even if a substantial portion of the $175 million in filed claims are reduced in amount, the Debtor cannot meaningfully provide for distributions to creditors from his monthly business income.

70. There is no conceivable basis upon which this Debtor could reasonably propose, let alone confirm, a plan that provides any meaningful distribution to creditors. Thus, there is an "absence of a reasonable likelihood of rehabilitation."

**B. The Debtor Has Engaged in Gross Mismanagement and Has Violated His Obligations Under the Bankruptcy Code**

71. The record in this case reveals a pattern of mismanagement, misrepresentation, and disregard for the Debtor's fiduciary obligations as a debtor in possession.

72. *First*, the Debtor's reporting of liabilities has been materially inaccurate across every reporting period. The February MOR reported $61,729,000 in prepetition unsecured debt, and every MOR from March through June has reported $0 in total prepetition liabilities—secured, priority, and unsecured—despite the fact that creditors have filed more than $175 million in claims against the estate. Professional fees have been left blank in every MOR despite Becker Glynn's accrual of $500,503 in approved fees. These are not minor discrepancies or inadvertent errors; they are material misstatements and omissions that render the MORs unreliable as a tool for monitoring the estate's financial condition.

73. *Second*, the Debtor has yet to file MORs for July or August, notwithstanding that MORs are required to be filed "no later than the 21st day of the month immediately following the reporting period covered by the MOR." 28 C.F.R. § 58.8(e).

74. "Monthly operating reports provide necessary information to the Court, creditors, and other parties in interest about the progress and prospects of a debtor's reorganization efforts." *In re Babayoff*, 445 B.R. 64, 81 (Bankr. E.D.N.Y. 2011). "The requirement to file these reports on a timely basis, no later than twenty days following the reporting period, assures that current information is regularly and easily available to anyone with an interest in monitoring the progress of a case toward confirmation." *Id.*

75. Section 1112(b)(4)(F) of the Bankruptcy Code recognizes the "unexcused failure to satisfy timely any filing or reporting requirement" as cause for conversion or dismissal, and the filing of a materially misleading MOR is no less objectionable than the failure to file one at all. *See Babayoff*, 445 B.R. at 81 (failure to file MORs is cause for conversion).

76. *Third*, the Debtor's bank statements reveal $42,658 in unexplained cash withdrawals from March through June ($4,250 in March, $12,400 in April, $6,508 in May, and $19,500 in June), representing approximately 29.7% of total five-month disbursements. These withdrawals, each labeled merely "DEBIT," are accompanied by no payee information, no narrative description, and no supporting documentation. A debtor in possession who engages in substantial undocumented cash transactions is acting in a manner fundamentally inconsistent with his fiduciary obligations to the estate and its creditors.

77. *Fourth*, the Debtor's bank statements across all five months reflect unexplained and unbudgeted personal spending from estate accounts, including over $24,000 in peer-to-peer transfers through Venmo, Apple Cash, and Zelle to unidentified payees. In addition, numerous disbursements fell into spending categories entirely unbudgeted on the Debtor's Form 122B or Schedule J, such as private school tuition payments of $1,027.94 at Heschel.org.

78. *Fifth*, the Debtor reported $0 in income for 2024, yet was somehow able to continue operating a business, maintain a residence at 1055 Park Avenue in Manhattan, and file for bankruptcy protection. The SOFA reflects income of only $15,000 in 2026 (through the filing date) and $40,000 in all of 2025. ECF No. 22. These figures are irreconcilable with the Debtor's lifestyle and spending patterns and suggest either that substantial income has gone unreported or that the Debtor has been living off undisclosed sources of funds.

79. *Sixth*, the Debtor has used this Chapter 11 case and estate resources to relitigate settled state court rulings and pursue personal grievances, not to reorganize. For example, one day after filing, the Debtor commenced an adversary proceeding against the Receiver and moved to enjoin a scheduled sale of receivership property. Adv. Pro. No. 26-01013, ECF No. 1. The Debtor later filed an Amended Complaint adding additional claims focused on terminating the Receiver's role over the JJ Arch-controlled entities. *Id.* ECF No. 33. As another example, and as discussed above, the Debtor filed a motion to consolidate his purported interest in the net assets of the Park Ave LLCs, notwithstanding that he conveyed his interests in the properties to YJ Simco well before this bankruptcy was filed. ECF No. 72. In addition, the Debtor has knowingly violated this Court's orders, resulting in two hearings before this Court.

80. In the JJ Arch bankruptcy, Judge Mastando found dismissal appropriate for, *inter alia*, "gross mismanagement of the estate," because of "lack of income and excessive accrual of expenses"; the debtor-in-possession's failure to keep the court and other parties apprised of the Debtor's business operations; and "the fact that the Debtor's proposed counsel (hired by Mr. Simpson) rehashed arguments before this Court that were already made before—and were set to be decided by—Justice Cohen in the context of the State Court Litigation prior to this bankruptcy." 663 B.R. at 278-79, 283.

81. Similarly, in the YJ Simco bankruptcy, the Court granted the U.S. Trustee's motion to convert the case to a case under Chapter 7 as a result of the U.S. Trustee's argument that there had been "demonstrate[ed] gross mismanagement" by, *inter alia*, the failure to timely file schedules and financial information, and the failure to provide necessary information to the United States Trustee. *In re YJ Simco*, ECF No. 7, at 10.

82. The same pattern that emerged in those two prior bankruptcy cases is repeating itself, yet again, in this case.

**C. The Debtor Has Been Found in Contempt of Court Orders**

83. Section 1112(b)(4)(E) provides that "failure to comply with an order of the court" constitutes cause for conversion or dismissal. 11 U.S.C. § 1112(b)(4)(E). The Debtor has been found in contempt of this Court's orders on two separate occasions, has admitted in court that he has no plans to comply with these same orders going forward, and, in fact, has continued to violate the Court's orders even after being found in contempt on a second occasion.

84. This amounts to a pattern of willful noncompliance, not an isolated incident, that provides an independent basis for conversion or dismissal. Indeed, before the petition date, the state court sanctioned Mr. Simpson four times for the same kind of improper email communications, and he continued even after being warned that his pleadings could be stricken. *See supra* Background § G.

**D. The Debtor Filed this Bankruptcy in Bad Faith and Cannot Serve as a Fiduciary for Creditors**

85. The timing of Mr. Simpson's prior removal attempts provides important context for Mr. Simpson's motivation in filing this proceeding. In each of the three prior removals, when faced with unfavorable rulings or a hearing to enforce the state court's orders, Mr. Simpson removed the state court action and treated the "removal" as carte blanche to disregard the state court's orders. Finally, in June 2025, the district court put an end to this gamesmanship and enjoined him from removing the state court action again without its prior permission. *Simpson*, 2025 WL 1784931, at *2.

86. Mr. Simpson then repeated the same tactic here. On January 24, 2026, faced with a July 2026 trial date, a fully submitted civil and criminal contempt motion, and unopposed

motions for a default judgment and discovery sanctions, Mr. Simpson wrote to Justice Cohen and announced his next move:

> Once again, SHAME ON YOU JUDGE JOEL COHEN, for what you have done and continue to do - all prejudicial, biased and with intentional harm to me, including your actions this week.
>
> If i must file for personal bankruptcy as a result to stop your absurdity, that i will do and your "unclean" hands will be investigated to the nth degree.
>
> I will once again go to all law enforcement agencies with your actions. I can only imagine where your immunity starts and stops as it relates to federal bankruptcy code crimes.

*Simpson v. Chassen*, No. 1:25-cv-04004 (JAV) (S.D.N.Y. Apr. 20, 2026), ECF No. 78-1.

87. Mr. Simpson made good on his threat. Less than four weeks later, on February 19, 2026, Mr. Simpson filed this Chapter 11 case. Three weeks after that, on March 12, 2026, he asked the district court for relief from its anti-removal injunction and for permission, once again, to remove the state court action. *Id.*, ECF No. 70.

88. On June 3, 2026, Judge Vargas denied the motion, finding that removal would be futile under mandatory and permissive abstention, and that rewarding the Debtor's "repeated baseless attempts to remove the State Court Action" and "his threats to file for personal bankruptcy to thwart state court jurisdiction, would make a mockery of the Court." *Id.*, ECF No. 84.

89. Since filing this proceeding, Mr. Simpson has left no doubt about his motivation for doing so. On June 5, 2026, under oath at a deposition, Mr. Simpson told Receiver's counsel that the "State court is full of s[**]t . . . That's why I filed bankruptcy, you moron." Fisher Decl. Ex. E (Simpson Dep. Tr.) at 563:12-16.

90. In the JJ Arch bankruptcy, Judge Mastando found, as evidence of bad faith justifying dismissal of the bankruptcy, that "the record overwhelmingly suggests that this bankruptcy was a means of removing the State Court Proceeding from the purview of Justice Cohen." 663 B.R. at 282. Thus, the Court found that "the Debtor's Petition was not filed in order to 'rehabilitat[e] or liquidat[e]' . . . and was instead an attempt by Mr. Simpson to avoid the resolution of the governance issues raised in the State Court Proceeding—a proceeding initiated by Mr. Simpson." *Id.* at 283.

91. Mr. Simpson's conduct both before and after the petition date confirms both his motive and his unfitness to act as a fiduciary for his creditors. A debtor in possession must preserve estate assets, cooperate with the courts that will adjudicate claims against the estate, and refrain from litigation that needlessly drains estate resources. *See In re Ashley River Consulting, LLC*, No. 14-13406, 2015 WL 1540941, at *8 (Bankr. S.D.N.Y. Mar. 31, 2015). Mr. Simpson has done the opposite. *See supra* Background § G.

92. *Refusal to participate.* Mr. Simpson refused to attend the final day of the state court contempt hearing, announced that he was boycotting the state court's proceedings, and refused to take part in discovery, leaving motions for sanctions and default judgments against him fully briefed on the eve of this filing. These are the same disputes that will determine what the estate owns and what it owes. A fiduciary for creditors must participate in court proceedings, as required, and demonstrate a willingness to comply with court directives.

93. *Pre-filing threats.* In the weeks before the petition date, Mr. Simpson sued the state court, Justice Cohen, and the Receiver, declared that there would be no conference before Justice Cohen "this week (or ever)," and, after his threat to file for bankruptcy went unheeded,

announced that nothing further would happen in that court. State Court Action, NYSCEF Doc. Nos. 2281, 2346. The filing of this bankruptcy case was the threat carried out.

94. *Refusal to let matters proceed.* Since filing, Mr. Simpson has refused to let any matter proceed before Justice Cohen, even where this Court explained that doing so would benefit the estate, and instead commenced a new adversary proceeding to relitigate the interpleader dispute here. A fiduciary would have taken the faster path that benefits creditors; Mr. Simpson instead put his personal grievances against the state court first.

95. *Admittedly wasteful litigation.* By his own account, Mr. Simpson is spending more on litigation in this Court than the property at issue is worth, for reasons personal to him. That is the antithesis of what a fiduciary for creditors must do.

96. *Attacks on this Court.* Mr. Simpson has now turned the same hostility on this Court. His October 18, 2026 email confirms, once again, that he filed this case because of Justice Cohen, and then accuses this Court of "playing the game," asks whether it will "play like Joel cohen did," and declares that it is "scared of its own shadow." Fisher Decl. Ex. A at 1-2. The next day, he told the Court directly that it was "allowing" what Justice Cohen had done, and the Court itself observed that Mr. Simpson "can't control himself." Fisher Decl. Ex. B (Oct. 19, 2026 Hr'g Tr.) at 43, 53; *see supra* Background § G.

97. *Discharge of his own counsel.* Mr. Simpson has now turned on his own lawyers. Having announced that he is "not paying Mr. Ostrow another dollar," Fisher Decl. Ex. B (Oct. 19, 2026 Hr'g Tr.) at 41:1, he discharged his bankruptcy counsel, who has reported "an irreparable breakdown in the attorney-client relationship" and will move to withdraw from this case and every pending adversary proceeding. ECF No. 179. Counsel was the one remaining check between Mr. Simpson and the estate—the professional who could tell him what the

Bankruptcy Code requires of a debtor in possession. Mr. Simpson's own counsel had already conceded that he has "less authority to control this than Your Honor does." Fisher Decl. Ex. B (Oct. 19, 2026 Hr'g Tr.) at 53:9-10. With counsel gone, there is no one left to try. A debtor who will not heed his own lawyers cannot be trusted to act as a fiduciary for creditors.

**98.** The pattern is unmistakable. Mr. Simpson removed the State Court Action three times when the state court ruled against him, filed this case to escape Justice Cohen, and now, having failed to obtain the result he wants here, attacks this Court in the same terms he has used against Justice Cohen for years. The bad-faith finding in *JJ Arch* applies with even greater force here, where Mr. Simpson has conceded that avoiding the State Court Action was his reason for filing this Chapter 11 case. This is not a debtor seeking to reorganize; it is a litigant using the bankruptcy process as one more forum in which to pursue a personal grievance. *See In re JJ Arch LLC*, 663 B.R. at 280, 282.

## II. THE DEBTOR CANNOT DEMONSTRATE UNUSUAL CIRCUMSTANCES UNDER SECTION 1112(b)(2)

99. Once cause is established under section 1112(b), conversion or dismissal is mandatory unless the debtor demonstrates "unusual circumstances" specifically identified by the court that "establish[] that converting or dismissing the case is not in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(2). The debtor must show both a "reasonable likelihood that a plan will be confirmed" within a reasonable time and a "reasonable justification for the act or omission" constituting cause. *Id.*

100. The Debtor cannot carry this burden. Indeed, he has admitted as much in open court: "No, I can't get a plan done." Fisher Decl. Ex. B (Oct. 19, 2026 Hr'g Tr.) at 43:9. And he has now discharged the only counsel who could have drafted, solicited, and prosecuted a plan on his behalf. ECF No. 179. Even if the Debtor were to file a plan tomorrow, confirmation

would be impossible. Section 1129(a)(9) of the Bankruptcy Code requires that priority claims be paid in full under a confirmable plan; the priority tax claims in this case total approximately $219,000, roughly twenty-five times the estate's available cash, and even if those claims were paid in installments over five years as section 1129(a)(9)(C) permits, the Debtor has insufficient income from which to fund them. Section 1129(a)(11) requires that the plan be feasible—that confirmation is "not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11). Where the Debtor's income cannot cover operating expenses, feasibility cannot be demonstrated.

101. Moreover, because the Debtor is an individual, any plan must "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan," 11 U.S.C. § 1123(a)(8), and, if any holder of an allowed unsecured claim objects, must either pay that claim in full or distribute the Debtor's projected disposable income over the longer of five years or the plan's payment period, 11 U.S.C. § 1129(a)(15). With no disposable income, the Debtor cannot satisfy either requirement.

102. Additionally, the $500,503 in unpaid administrative expenses constitutes an administrative priority claim that must be paid in full in cash on the effective date of any plan, 11 U.S.C. § 1129(a)(9)(A), and satisfied before any distribution to creditors.

103. The impossibility of confirming a plan is grounds standing alone for conversion or dismissal and undercuts any possibility that the Debtor will be able to prove the "unusual circumstances" required to prevent conversion or dismissal of this case.

## III. CONVERSION TO CHAPTER 7 OR DISMISSAL IS IN THE BEST INTERESTS OF CREDITORS AND THE ESTATE

104. Where cause for conversion or dismissal is established, the Court must determine "whichever is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).

105. Conversion to Chapter 7 is the appropriate remedy here for several reasons.

106. *First*, the appointment of a Chapter 7 trustee would provide an independent fiduciary empowered to conduct a thorough investigation of the Debtor's financial affairs, including the cumulative unexplained cash withdrawals over the five-month MOR period, and the material misrepresentations in the Debtor's MORs. A Chapter 7 trustee can, among other powers, compel the production of financial records through Rule 2004 examinations, and pursue litigation to recover assets for the benefit of the estate.

107. *Second*, a Chapter 7 trustee would be empowered to pursue avoidance actions under sections 544, 547, 548, and 550 of the Bankruptcy Code. The Debtor's prepetition transfers, including the consolidation of ownership interests under YJ Simco LLC, and the use of family members' funds to support the filing, warrant close scrutiny for potential preference or fraudulent transfer claims.

108. *Third*, a Chapter 7 trustee is better positioned than a debtor in possession (particularly one who has been found in contempt twice and who has failed to provide accurate financial disclosures) to investigate and, where appropriate, prosecute or settle claims for the benefit of the estate.

109. *Fourth*, conversion would enable an orderly liquidation and distribution of the estate's assets in accordance with the Bankruptcy Code's priority scheme. "[C]onversion supports the Bankruptcy Code policy of vigorous maximization of the value of the economic enterprise." *Babayoff*, 445 B.R. at 82 (citations omitted). "[V]alue also may be created where,

by converting the case, an orderly liquidation of the debtor's assets will occur and a prompt conclusion to the bankruptcy process may be anticipated." *Id.*

110. Dismissal is warranted and is an acceptable alternative to conversion on these facts. However, in the event of dismissal, creditors would not benefit from the comprehensive investigation of the Debtor's financial affairs that a Chapter 7 trustee would undertake.

111. Nor should the Debtor's discharge of his counsel delay this relief. Mr. Ostrow has indicated that his withdrawal motion will seek a stay of pending matters and deadlines. ECF No. 179. But the breakdown of the Debtor's relationship with his counsel is a problem of the Debtor's own making, and it is one more reason the estate needs an independent fiduciary now. A stay would only prolong the administrative insolvency of the estate, allow unpaid professional fees to keep accruing, and leave the estate in the hands of a debtor who has rejected the guidance of his own lawyers. Conversion would place the estate under the control of a Chapter 7 trustee with independent counsel, eliminating any need for delay.

## IV. IN THE ALTERNATIVE, THE COURT SHOULD DIRECT THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

112. Should the Court decline to convert or dismiss this case, Oak respectfully submits that, in the alternative, the Court should direct the appointment of a Chapter 11 trustee pursuant to section 1104(a) of the Bankruptcy Code.

113. Section 1104(a) of the Bankruptcy Code provides two independent bases for the appointment of a Chapter 11 trustee. Under section 1104(a)(1), the Court may appoint a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." Under section 1104(a)(2), the Court may appoint a trustee if "such appointment is in the interests of creditors, any equity security holders, and other interests

of the estate." These two provisions are "distinct and independent." *In re Sillerman*, 605 B.R. 631, 641 (Bankr. S.D.N.Y. 2019).

114. Courts retain wide discretion in determining whether the statutory standard has been met. *Id*. The examples of cause enumerated in section 1104(a)(1) are not exclusive; courts have also found cause based on "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence." *Ashley River*, 2015 WL 1540941, at *9. Both pre-petition and post-petition misconduct may be considered. *Id.* at *10.

115. "While there is a presumption that a debtor should be permitted to remain in possession of its business, that presumption is not absolute." *Sillerman*, 605 B.R. at 640. Courts have recognized that "the temptation for self-dealing may be heightened in the case of an individual debtor whose natural instinct is to protect his own self-interest." *Id.* at 647. The Debtor, as a debtor in possession, owes fiduciary duties to the estate and its creditors, including the duties to "protect and conserve property in [its] possession for the benefit of creditors" and to "refrain from acting in a manner which could damage the estate, or hinder a successful reorganization of the business." *Ashley River*, 2015 WL 1540941, at *8 (citation omitted).

116. Cause for the appointment of a trustee under section 1104(a)(1) is established by the Debtor's two contempt findings and his mismanagement of the estate (including the material misrepresentation in the MORs and the unexplained cash withdrawals across the five-month period). The serious fraud allegations underlying more than $105 million in filed claims further underscore the need for an independent fiduciary. The Debtor has demonstrated that he cannot be trusted to manage estate assets in the interests of creditors.

117. Appointment is also warranted under section 1104(a)(2) because it is in the interests of creditors and the estate based on the following considerations: (i) the Debtor's trustworthiness is severely compromised by the MOR misrepresentations, unexplained withdrawals, and contempt findings; (ii) the Debtor's past and present performance offers no prospect of rehabilitation—no pathway to a confirmable plan, administrative insolvency, and a 46-to-1 claims-to-assets ratio; (iii) creditors have no basis for confidence in present management, given the Debtor's inaccurate financial reporting, his repeated violations of this Court's orders, and the serious fraud allegations asserted against him; and (iv) the benefits of a trustee, including independent oversight, investigation, and fiduciary accountability, far outweigh the costs, particularly given the $175 million in claims at stake.

118. The concerns identified by the court in *Sillerman* regarding individual debtors apply with particular force here. "The temptation for self-dealing may be heightened in the case of an individual debtor whose natural instinct is to protect his own self-interest." 605 B.R. at 647. The Debtor's conflicts of interest are manifest: he operates his business from property owned by an affiliated entity (266 WMTR LLC); his spouse is involved in financing the case through a mortgage on her own LLC-owned property; he maintains multiple affiliated entities with complex, overlapping ownership structures; and his ownership interests have been consolidated under YJ Simco LLC, an entity co-owned with his spouse, ensuring that the Debtor retains effective control over assets nominally held by separate legal entities.

119. Under these circumstances, the Debtor has conclusively demonstrated that he will not (or cannot) discharge his fiduciary obligations as a debtor in possession. Having now discharged his own counsel, the Debtor would be left to administer a $175 million claims pool

without professional guidance. The appointment of an independent Chapter 11 trustee is necessary to protect the interests of creditors and the estate.

**CONCLUSION**

For the foregoing reasons, Oak respectfully requests the Court grant the Motion and issue an order: (1) converting this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code; or (2) in the alternative, dismissing this Chapter 11 case; or (3) in the further alternative, directing the appointment of a Chapter 11 trustee; and (4) granting such other relief as the Court deems just.

Dated: October 22, 2026
New York, New York

Respectfully submitted,

**BINDER & SCHWARTZ LLP**

/s/ Eric B. Fisher
Eric B. Fisher
Lindsay A. Bush
140 East 45th Street, 26th Floor
New York, New York 10017
Tel: (212) 510-7008
Email: efisher@binderschwartz.com
Email: lbush@binderschwartz.com

*Counsel for 608941 NJ Inc.*