# Exhibit E

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFREY SOLOMON SIMPSON, as
Debtor and Debtor in Possession,
Plaintiff,
v. Case No.
ERIC HUEBSCHER, as Receiver of 26-10359
Certain Assets of JJ Arch,
Defendant.

---

DEPOSITION OF JEFFREY SIMPSON

DATE: Friday, June 5, 2026
TIME: 9:46 a.m.
LOCATION: Remote Proceeding
Water Mill, NY 11976
REPORTED BY: Douglass Breshin
JOB NO.: 8248653

APPEARANCES

ON BEHALF OF PLAINTIFF JEFFREY SOLOMON SIMPSON:

ALEC OSTROW, ESQUIRE (by videoconference)
Becker Glynn Muffly Chassin & Hosinski LLP
299 Park Avenue
New York, NY 10171
aostrow@beckerglynn.com
(212) 888-3033

ON BEHALF OF DEFENDANT ERIC HUEBSCHER:

MARTIN G. BUNIN, ESQUIRE (by videoconference)
Farrell Fritz PC
622 Third Avenue, Suite 37200
New York, NY 10017
mbunin@farrellfritz.com
(212) 687-1230

ON BEHALF OF DEFENDANT JARED CHASSEN:

ALLEN SCHWARTZ, ESQUIRE (by videoconference)
Schwartz Law
2635 Nostrand Avenue, 4E
Brooklyn, NY 11210
allen@allenschwartzlaw.com
(917) 720-5496



APPEARANCES (Cont'd)

ON BEHALF OF DEFENDANT JARED CHASSEN:

SEAN SOUTHARD, ESQUIRE (by videoconference)
Klestadt Winters Jureller Southard & Stevens LLP
200 West 41st Street, Floor 17
New York, NY 10036
southard@klestadt.com
(212) 972-3000

ALSO PRESENT:

Jared Chassen, Defendant (by videoconference)
Eric Huebscher, Defendant (by videoconference)
Judge Lisa Beckerman, Bankruptcy Judge (by videoconference)



INDEX


| EXAMINATION: | PAGE |
|---|---|
| By Mr. Schwartz | 10 |
| By Mr. Bunin | 468 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Defendant: | | |
| Exhibit A | Official Form 106-AB Schedule A/B Property | 16 |
| Exhibit A2 | Rever Motors Instagram | 395 |
| Exhibit A2 | Order Issued by Judge Cohen in December 2025 | 513 |
| Exhibit A3 | E-mail from Mr. Simpson to Mr. Schwartz and Others Dated 6/5/2026 | 112 |
| Exhibit A5 | Second E-mail from Mr. Simpson to Mr. Schwartz and Others Dated 6/5/2026 | 114 |
| Exhibit B | Form 107 Statement of Financial Affairs | 169 |
| Exhibit E | Reply to Amended Counterclaims | 89 |
| Exhibit F | Agreement Between Jeffrey Simpson, YJ Simco, and Jared Chassen, 8/1/23 | 94 |




EXHIBITS (Cont'd)


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Defendant: | | |
| Exhibit G | E-mail, 11/12/2023 | 211 |
| Exhibit I | List of Items | 439 |
| Exhibit N | Photograph of Mr. Simpson's House | 357 |
| Exhibit O | Photograph of Tow Truck | 361 |
| Exhibit R | Order Appointing Temporary Receiver | 257 |
| Exhibit S | Court Notice, 3/25/2025 | 291 |
| Exhibit T | Order Filed by Judge Cohen, Dated 5/16/2025 | 314 |
| Exhibit U | E-mail from Jeffrey Simpson to Jared Chassen and Barry Akrongold, Dated 3/28/2025 | 275 |
| Exhibit W | Citizens Account Overview | 298 |
| Exhibit Y | Form 201, Petition for JJ Arch LLC's Bankruptcy Filing | 174 |
| Exhibit Z | IRS Letters | 461 |


QUESTIONS INSTRUCTED NOT TO ANSWER


| PAGE | LINE |
|---|---|
| 432 | 11 |
| 562 | 25 |

Page 466

J. SIMPSON

he facilitated doing the bank accounts. Jared did the administrative work, yes, sir.

And just like the G Wagon, when it was time to paper it, guess what? He filled out the application for me. I signed it as owner, and he took his DMV for me. So he was a high paid administrative of assistant. That's the best person I could point to for this stuff.

So yeah, when things weren't paid in 2023, 2022, that's on him. He was the operations guy because he didn't close the damn thing. You know how to build the damn thing. He was highly overpaid for what he did.

You could ask people who used to work for Arch, what did Jared do? You know what they'll say? We don't know. If you were to say, "What does Jared do?"

But yeah. He was like an admin for a lot of his life besides trying to do other good things, which he sometimes did

Page 467

J. SIMPSON

sometimes to cause bad things to happen.

So he was responsible for these things, the payments, all these things. As he said the other day, it was his responsibility to do it. His. And he didn't do great at it. I don't do admin work. It's not what I do. I'm not good at that.

MR. SCHWARTZ: Mr. Simpson, let's take a short break.

MR. OSTROW: All right. Well how long?

THE WITNESS: Absolutely.

MR. OSTROW: When do we get back?

MR. SCHWARTZ: Five minutes.

THE REPORTER: I'll go off the record, everyone, at 6:19.

(Off the record.)

THE REPORTER: We're back on record at 6:24.

MR. SCHWARTZ: So I'm going to show -- I'm going to reserve my rights go to the judge in the next several minutes to compel an answer to the question

Page 468

J. SIMPSON

regarding the five former Rever Motors employees that are currently doing work for Mr. Simpson. I'm going to reserve my right to ask additional --

THE WITNESS: I didn't say five.

MR. SCHWARTZ: -- questions, but --

THE WITNESS: I didn't say five.

MR. SCHWARTZ: Whatever the number is.

THE WITNESS: You said five.

MR. SCHWARTZ: Whatever the number is.

THE WITNESS: Never said five.

MR. SCHWARTZ: Whatever the number.

THE WITNESS: That's fine. I never said five, but okay, okay, okay.

MR. SCHWARTZ: And to ask additional questions. But at this time, I'm going to let Mr. Bunin ask questions of Mr. Simpson.

MR. BUNIN: Thank you.

EXAMINATION

BY MR. BUNIN:

Q Good evening. Or I guess it's

Page 469

J. SIMPSON

good evening. Mr. Simpson, you testified Mr. Simpson, that many of the items on your property list were purchased for cash; correct?

A I said they could have been by cash and I also said some of them could have been purchased a very long time ago. I said I wasn't sure. It depends, and I'm not sure I know, it depending upon when things were purchased.

And it may not even purchased by me. It could have been purchased by my father or my grandfather or -- it depends on what it is. If it's an old tool or if it's a vehicle or parts of a vehicle. It depends. I might be able to clarify if you have a specific question.

Q So my question is in getting your property list together, did you look for any receipts for the purchase of any of the items on your property list?

A I certainly tried to -- to come to -- to gather materials. If you at the exhibit that Mr. Ostrow prepared, frankly

J. SIMPSON

again, I'm quite disappointed because you told the Court and didn't share anything with you and this information was shared with you a year ago.

So I shared with you bills of sales I shared with you, you know, certain documentation that I have. It's not -- a lot of it on some of the older vehicles. A lot of this is not vehicles. A lot of it is just sort of random parts.

So no. I just -- you know, I didn't keep track over the years. If I bought parts for, you know, one of my early MGBs, which cost $100 or $200 or if I bought a carburetor for something for $50.

And unfortunately a lot of this stuff's like that because I never imagined a million years we'd be having this dialogue with you all. Especially since there's no one else that's relevant in the economic position here. But here or there, we're here. So I just, I don't know. I don't know.



J. SIMPSON

As I mentioned, anything of significant value fell into buckets that are no longer relevant. Right? You guys let the NextGear stuff go. That was huge revenue for -- for the business and for me. Meaning the stuff was financed at the purchase price, not on value.

So any money that could have been made, you gave it away. So there's already someone who bought one of the vehicles and they're trying to sell for 20 grand. It's on the market. And I could have sold that vehicle for 20 grand. It would've been $10,000 to the business at profit. Right? Instead, you just let it all go.

So the most value was in the vehicles that were financed, and that's the reason they were financed versus not. And then the other valuable things, you know, assignments which people took back because they said they don't want anything to do with litigation.

So the majority of the value



J. SIMPSON

here is gone. Right? And that's why I think it's sort of laughable what you all are trying to do because if you look through my list and you look at the stuff that's there, there isn't much money left. The dollars we're talking about these legal bills are way, way, way larger than what you will collect and the way you all are trying to auction this stuff.

And I do know better than all of you because I've bought a lot of this stuff over the years. There isn't much money that even the stuff that I'm telling you all belongs to me. It's more of a purpose of what you're trying to do to me.

So the -- we're not talking about big dollars, it's the point here, nothing here is big dollars. My life won't even change. It's frustrating as hell that you've stole more from me if you're successful in defeating the motion.

But other than that, these are small dollar items one by one as I've illustrated to the Court. It's the



J. SIMPSON

principle here that's -- that's ridiculous and absurd. How you've deteriorated the value of everything.

So the shop equipment, for example, the shop equipment in the video, I'm very clear about the things that were part of -- of the property. Jared also explained well. I think Jared did a very good job with that.

He explained there was things bolted to the floor that were there in the shop. He's totally wrong. The shop was a mess. It was one bay. The rest of it was under plastic or had water coming in. So we did buy other things that are bolted to the floor. That's pretty clear; right?

There's -- there weren't any significant tools. The -- the gentleman, Steve, that ran the place took it with him. As far as building construction, the money's in the property. It was already invested there.

So there's just no real sources of what you're trying to seek here. The

J. SIMPSON

sources are gone. You let -- you let the value go, that's the problem.

But anyway, it's not your question, I guess. So tell me what it is you want to know specifically If you looked at the list carefully, which I've urge you to do for over a year; and you've refused to do it.

And you have this fictitious tale of where the money you should go, assuming you collected money on this. I don't know where you think it's going to go under your pocket.

But what is your question? Tell me your question about these items.

Q Yeah. I'll ask another question.

A And I'll do the best I can.

Q So I asked the question. I'm happy to ask another one question. How much does a --

A Ask your question.

Q How much does a portable lift cost, Mr. Simpson?



J. SIMPSON

A A portable lift can cost as little as $800. Or it can cost as much as four or five thousand dollars brand new. It depends.

Q In your schedules of property that you filed shortly after your bankruptcy petition, I believe you claim that there were five portable lifts that belonged to you personally. Is that correct?

A I did not claim that. Just to be clear, there are -- there are the property -- I could tell you a total, there was seven lifts in total and I certainly didn't say five of them were -- were my property at all.

I said there's a red snap-on one, which is in the -- the bay that is facing Windmill Lane that I think I paid like $300 for it. It was used. It's what we call bump lift.

The other lifts in that main building, one was purchased by the business for like eight grand. It was



J. SIMPSON

expensive. It's not on my list. The other one comes on the floor, it was part of the building. And then there's another bump lift that I believe we also bought from the business.

So there's only one there and I believe there's one in the basement as well. And I don't think there's five at all that you're describing that I have in a list. I believe there's two in the list, but we can go back to the list to look at it if you'd like.

Q We can.

A That's my memory.

Q And I'm not sure we're going to do it right now.

A I highly that it was five that I claimed because there aren't -- there aren't five portable lifts that were there. I --

Q So of the --

A The one that are there, I installed, I serviced myself. But let's look if you like.



J. SIMPSON

Q All right. So of the lifts that you're talking about that you claim belong to you, do you have receipts or any documentation --

A As I told you, as I told you --

Q -- that shows the purchase?

A Anything I have we provided to you. We provided to you what we have. We've had this dialogue with a for a year now.

Again, I still -- still have this real quick question for you that hopefully the judge will ask you. What do you do with the money? If you sold all this stuff here, who's it going to? You still don't look at waterfalls, you still don't look at any corporate documents. We've talked about a lot today. Hopefully you were listening.

I still wonder what you're going to do with all these things because you're so adverse to me. But as Cohen told you, there's no one else that matters but me. But okay. Go ahead. So let's --

Page 562

J. SIMPSON

MR. SCHWARTZ: Let's take a five-minute break.

MR. BUNIN: Okay. Five minutes.

THE WITNESS: The clock is ending at the same time if you need a break.

THE REPORTER: Okay. I'm off the record, everyone, 7:37.

(Off the record.)

THE REPORTER: I'll go back on the record first. I'm -- I'm ready. I'm sorry about that.

MR. BUNIN: Okay. Sorry about that, Mr. Breshin.

BY MR. BUNIN:

Q So, Mr. Simpson, I have one additional question, which I think Mr. Schwartz may have asked you when you answered. But I just want to ask it again so I can be clear that I'm remembering the answer correctly. And the question is where is the location other than your home and Water Mill where you are currently repairing and restoring cars?

MR. OSTROW: All right. That was the

Page 563

J. SIMPSON

subject of an objection and direction not to answer. And you can add that to the stuff that --

MR. BUNIN: Okay.

MR. OSTROW: -- want to go to the judge about.

MR. BUNIN: So you're directing him not to answer even though the state court ordered and granted immediate access to the receiver --

THE WITNESS: State court is full of shit.

MR. BUNIN: -- on that property.

THE WITNESS: -- full of shit. That's why I filed bankruptcy, you moron.

MR. OSTROW: Yeah, yeah. That's correct. That is correct.

MR. BUNIN: All right. Well, then I guess we'll --

THE WITNESS: -- prejudicial beyond what you're doing here is ungodly. We have no idea why you're here. How do you justify yourself an American? All right. Are we done here? Is there more anymore

Page 564

J. SIMPSON

to do now? Are we done?

MR. SCHWARTZ: We're going to, you know, Mr. Chassen's going to reserve his rights to go to --

THE WITNESS: Mr. Chassen --

MR. SCHWARTZ: -- to compel an answer to that question.

THE WITNESS: Mr. Chassen will tell us where he works and tell us about and a hundred other things. We we'll reserve our rights on that. We'll ask Chassen on everything's he's done.

MR. SCHWARTZ: And also --

THE WITNESS: -- cheating on his wife and everything he's done, all the theft and narcotics. We got a hundred things to ask Mr. Chassen. I can't wait.

MR. SCHWARTZ: And also to compel an answer to the question Mr. Bunin just asked.

THE WITNESS: Yeah. We're going to compel --

MR. SCHWARTZ: -- which is a matter that the Honorable Joel M. Cohen --

Page 565

J. SIMPSON

THE WITNESS: Yeah. Honorable. All right.

MR. SCHWARTZ: -- directed Mr. Simpson give --

THE WITNESS: Honorable all right. I want your relationship with him. We're going to compel that too. I want your relationship with him Imran Ansari [ph] and Seddio and everybody else.

MR. SCHWARTZ: We would call --

THE WITNESS: I'm leaving now, Alec unless you need me. I'm done with these --

MR. OSTROW: Hold on, hold on. You want to --

MR. SCHWARTZ: We would call the Court right --

MR. OSTROW: We can get the judge now? Go.

MR. SCHWARTZ: If we can get the judge right now, then we can do it. If not, we'll have to come back.

MR. OSTROW: No. I'm going to wait until eight o'clock because we have a hard

J. SIMPSON

stop at eight. You want to try to get the judge now? Try to get the judge now.

MR. SCHWARTZ: Yes. Yes. Let's do it.

MR. BUNIN: All right.

MR. SCHWARTZ: Mr. Ostrow, please make clear that after eight, that I can't, we can't. And so if she's available before --

MR. OSTROW: You are the one who said you had a hard stop at eight.

MR. SCHWARTZ: I do have a hard stop at eight.

MR. OSTROW: All right. So look, you can't get the judge tonight. You could try the judge whenever you like. I mean, I can't --

MR. SCHWARTZ: Mr. Bunin --

MR. OSTROW: -- stop you from asking the judge.

MR. SCHWARTZ: Or maybe Mr. Bunin could stay on for a little bit longer. I would have to drop off at eight.

MR. BUNIN: So can I speak to



J. SIMPSON

Mr. Schwartz offline for a moment?

MR. OSTROW: You want to take another five-minute break? Go ahead.

MR. BUNIN: Make it --

THE WITNESS: Hey, guys, I'm done with this; right? It's --

MR. OSTROW: Jeff, stay on Jeff, stay on, please.

MR. BUNIN: Mr. Ostrow, make it three minutes. It'll be very quick.

MR. OSTROW: Three minutes.

MR. BUNIN: Thank you.

THE REPORTER: Okay. I'll go off the record until they're ready, 7:47.

(Off the record.)

MR. OSTROW: All right, so --

MR. SCHWARTZ: But we reserve our right to do so on Monday.

MR. BUNIN: Or thereafter.

THE WITNESS: We reserve our rights. A lot of questions to compel too, Mr. Ostrow. Lets make sure they're well aware of that because a lot of follow up here.



J. SIMPSON

MR. OSTROW: I'm sorry. I didn't --

THE WITNESS: Chassen doesn't answer any question of substance. Chassen didn't answer any question of substance. So we need --

MR. OSTROW: So all right. So let me just ask for the record.

Mr. Schwartz and Mr. Bunin, you have no further questions this evening; correct?

MR. BUNIN: And yes, that's correct.

MR. OSTROW: Okay. I have no questions. The deposition is concluded. You have your rights to make whatever application you want to the Court.

MR. BUNIN: Understood.

MR. SCHWARTZ: Agreed.

MR. OSTROW: All right. Thank you, everybody.

MR. SCHWARTZ: Okay. Thank you as well, Mr. Ostrow.

MR. BUNIN: Thank you, Doug Breshin for your patience.

THE REPORTER: You're welcome, guys.



J. SIMPSON

I'll go off the record. It's 7:49.

(Signature reserved.)

(Whereupon, at 7:49 p.m., the proceeding was concluded.)