# **EXHIBIT B**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

435 CENTRAL CONDO DEVELOPMENT HOLDINGS LLC, BUSHWICK 1010 HOLDINGS, LLC and 1351 DEKALB CONDO DEVELOPMENT HOLDINGS LLC, derivatively on behalf of Nominal Defendant MIDTOWN OAKS JV LLC,

Plaintiffs,

-against-

MIDTOWN OAKS JV HOLDINGS LLC, ARCH REAL ESTATE HOLDINGS LLC and JEFFREY SIMPSON,

Defendants,

-and-

MIDTOWN OAKS JV LLC,

Nominal Defendant.

Index No. 652392/2024

IAS Part 61

Hon. Nancy Bannon

Mot. Seq. No. 002

**AFFIRMATION OF DENIS (DAN) SAKLAKOV**

DENIS (DAN) SAKLAKOV states as follows under penalty of perjury and pursuant to CPLR R. 2106:

1. I am the managing member of Carpe Diem Stock Trading LLC ("Carpe Diem") and the principal of plaintiffs 435 Central Condo Development Holdings LLC ("Central Holdings"), Bushwick 1010 Holdings LLC ("Bushwick Holdings"), and 1351 Dekalb Condo Development Holdings LLC ("Dekalb Holdings") derivatively on behalf of nominal defendant Midtown Oaks JV LLC ("JV LLC") (collectively, "Plaintiffs"). I submit this affirmation in support of Plaintiffs' opposition to the motion for summary judgment ("Motion") filed by defendants Midtown Oaks JV Holdings LLC ("JV Holdings"), Arch Real Estate Holdings LLC ("Arch"), and nominal defendant

JV LLC (collectively, "Defendants") in this action. The matters set forth in this affirmation are based on my own personal knowledge.

**A. My Experience In Real Estate Development And Turnabouts**

2. I have extensive experience as a real estate developer and turnaround specialist.

3. In various real estate projects across New York City, I have been responsible for sourcing and underwriting acquisitions, structuring transactions, arranging financing, managing architects and engineers, developing buildable programs and budgets, curing regulatory and construction issues, and executing projects through permitting, construction, completion, and sale or refinancing.

4. My experience is further described on the website of Balthasar Group of Companies (https://www.balthasarny.com/), a true and correct copy of which is attached hereto as **Exhibit A**.

**B. Carpe Diem's Initial Involvement In The Projects**

5. At all relevant times, I was the managing member of Carpe Diem

6. Carpe Diem is the managing member of Plaintiffs Central Holdings, Bushwick Holdings and Dekalb Holdings.

7. Plaintiffs indirectly held title to three multi-family development projects (collectively, the "Projects") in Bushwick, Brooklyn, New York. Specifically, Central Holdings indirectly held title to the property at 435 Central Avenue ("Central Avenue Property"), Bushwick Holdings indirectly held title to the property at 1010 Bushwick Avenue ("Bushwick Property"), and Dekalb Holdings indirectly held title to the property at 1351-1357 Dekalb Avenue ("Dekalb Property") (collectively, the "Properties").

8. Carpe Diem assumed management over the Projects gradually, first taking control of the Bushwick Property and Dekalb Property in August 2020, and later the Central Avenue Property in 2021.

9. Carpe Diem also assumed development interests in the Projects. I became a sizable investor in the Projects in 2022.

10. When Carpe Diem became the managing member of Plaintiffs, the Central Avenue Property consisted of 17 units and overall construction was approximately 95% complete with working elevator and utilities in place. The Bushwick Property consisted of 23 units, structural concrete walls were 100% complete, and overall construction was approximately 40% complete. The Dekalb Property consisted of 27 units, the foundation and first two concrete floors were complete, and overall construction was approximately 25% complete.

11. The Projects were presented to me by stakeholders seeking my experience to resolve critical challenges. I undertook the Projects to lead their stabilization and completion through structured financing, construction oversight, and regulatory coordination.

12. In 2020, as with virtually all real estate development projects across New York City, the Bushwick Property and Dekalb Property experienced a complete construction halt due to the COVID-19 pandemic.

13. As a result of these construction halts, foreclosure proceedings on the Properties were initiated by the lenders, including Kassin Sabbagh Realty ("KSR") and Avant Capital ("Avant").

14. The foreclosures on the Properties were not completed in 2020. I personally secured the dismissal of the foreclosure case against the Central Avenue Property in the fall of 2021 and delayed the two other foreclosures. As a result, the lenders were forced to restart the foreclosure process from the beginning, buying critical time for the Projects to be reinstated and stabilized.

**C. Recovery Plan For The Projects**

15. In my role as turnaround manager, I immediately began executing a structured recovery plan for the Projects. This included engaging architects and engineers, obtaining appraisals, and assembling a phased completion model.

16. I personally spent over $60,000 in the first month of the Projects solely on due diligence, in addition to further sums for appraisals, site safety maintenance, and other immediate operational needs, including performing all the foundational work required for recommencing a development project properly.

17. I engaged US Capital Global to refinance and complete construction on the Projects. US Capital Global is a California investment fund with over $800 million of equity under management.

18. I was able to negotiate with US Capital Global to provide a $28.5 million credit and equity facility for the Projects to refinance the Projects, pay off the existing loans, and complete construction.

19. This phased completion model contemplated completing and selling the Central Avenue Property first to fund the remaining Projects, with an aggregate non-discounted budget of approximately $41,151,514.80, a refinancing package of approximately $33,882,120.23, and a target schedule of roughly 15 months to complete two of the Projects with the third Project to be funded from the sale proceeds, as reflected in the per-building all-in cost figures and projected durations.

20. That financing structure was in place and ready to execute. However, one of the lenders, KSR, did not agree to US Capital Global's proposed closing timeline that was a year and a half earlier than the timeline that KSR has insisted upon.

21. The lenders obstructed not only the proposed US Capital Global refinancing but also other viable refinancing solutions.

22. KSR is known for predatory lending practices through buying the credit notes from third parties, exactly what happened in this case. Avant Capital stood silently behind these practices for their own benefit.

23. Based on the lenders' actions, I believe that the lenders plotted to take the Properties over.

24. For example, on June 11, 2021, at meeting with KSR's owner, Abraham Kassin, offered me $300,000 to abandon the refinancing effort and sell the Bushwick Property and the Dekalb Property. I rejected that proposal as unethical, and continued to seek partners that would bring more suitable capital and expertise.

25. Both of the lenders, KSR and Avant, began pushing Arch as the only alternative to bankruptcy.

26. As a result, Arch was imposed into the Projects that dismantled the already-established solution with US Capital Global.

27. Arch's involvement ultimately destroyed the Projects.

**D. Arch's Representations To Plaintiffs**

28. On February 28, 2022, KSR introduced Arch to me as an acceptable solution to complete the Projects.

29. KSR claimed that Arch was the only alternative to bankruptcy.

30. In early 2022, I began negotiating directly with Arch's principals, including Arch's CEO Jeffrey Simpson, COO Michelle Mille, and Arch's broker Eli Terry.

31. On a March 1, 2022 call, Mr. Simpson assured me that Arch had the resources to finance and develop all three Projects simultaneously.

32. On that March 1, 2022 call, and later during a meeting on March 8 2022, Mr. Simpson represented that Arch had recently acquired over $800 million in assets, adding to an existing $1 billion portfolio. Mr. Simpson also stated that Arch would only consider a transaction if all three Properties were addressed together, because Arch, as a large company, had a minimum deal size that it had to observe.

33. During that March 8, 2022 meeting, Mr. Simpson represented that Arch had a highly capable engineering and construction team with in-house brokerage capabilities.

34. During that March 8, 2022 meeting, Mr. Simpson proposed leveraging affordable housing tax exemptions under section 421-a of the New York Real Property Tax Law ("Section 421-a"). Section 421-a is a property tax exemption that is given to real estate developers that build new multifamily residential housing buildings with affordable housing units in New York City.

35. During that March 8, 2022 meeting, Mr. Simpson proposed retaining the buildings for rental income instead of selling them.

36. Between June 2022 and August 2022, Arch provided a detailed $52 million construction budget for the Projects.

37. Arch also represented and emphasized that transferring title of the companies that owned the Properties to Arch—rather than the buildings themselves, which is a very rare structure for those familiar with real estate deals in New York City—was necessary to best utilize Section 421-a exemption and implement Arch's proposed design changes to improve rental income.

38. As it turned out, this also meant that the lenders could preserve the same foreclosure arrangements with respect to the Properties and ultimately take them over. My belief is this was the plan that the lenders coordinated with Arch.

39. Consistent with that structure, Arch's financial model contemplated substantially higher senior debt across the Properties, approximately $35,241,424 in the aggregate versus

approximately $13,700,000 of combined original principal, and the transaction was tied to lender forbearance arrangements that preserved the lenders' foreclosure and sale rights through consents and related documentation.

40. Arch represented to me that it had the financial capacity, in-house construction team, and a strategic plan to complete all three buildings and retain them as long-term rental assets.

41. Relying on Arch's representations, I agreed, on behalf of Plaintiffs to transfer ownership of the companies holding title to JV Holdings that Arch controlled as its managing member.

42. Relying on Arch's representations, and under lender pressure that left Plaintiffs with little maneuvering room other than the prospect of bankruptcy, on March 29, 2022 and April 14, 2022, I, on behalf of Plaintiffs, signed Arch's Letters of Intent ("LOIs") for all three Properties and authorized Arch to obtain the loan documents and architectural drawings for the Projects.

43. Relying on Arch's representations, Plaintiffs agreed to transfer ownership of the companies holding title to the Properties to JV Holdings that Arch controlled as the managing member of JV LLC.

44. This structure, which involved transferring the companies rather than the Properties themselves, was highly unusual but was presented by Arch as essential to preserving tax benefits —including those under section 1031 of the Internal Revenue Code and Section 421-a—through the structure of 608941 NJ Inc. ("Oak") and implementing Arch's overall rental strategy.

45. That transaction was memorialized in the Second Amended and Restated Limited Liability Company Operating Agreement of Midtown Oaks JV LLC, dated as of August 26, 2022, ("Operating Agreement") between Plaintiffs, JV Holdings, and Midtown Oaks MM JV LLC, and related contribution agreements and assignments of membership interest.

46. Plaintiffs agreed to that structure because Arch represented it would contribute approximately $9,577,419 of its own equity and, as a large owner-operator, would be economically aligned to complete construction, secure the Section 421-a benefits, stabilize the buildings as long-term rentals, and protect and refinance the senior debt.

47. Based on Arch's representations, Plaintiffs delegated operational and strategic control to JV Holdings as the managing member of JV LLC.

48. JV Holdings, through Arch, did not deploy the promised equity or execute the development and financing plan, and instead retained control while the Projects stalled and Plaintiffs' position was left unprotected.

**E. The Actions And Inactions By JV Holdings, Through Arch, Caused The Projects To Not Be Completed**

49. Arch's repeated representations to me proved to be false.

50. JV Holdings, through Arch, never delivered the promised capital of $9,577,419 of equity or $35,241,424 of the debt.

51. JV Holdings, through Arch, failed to provide the equity or debt funding that Arch had modeled and did not implement the approved budgets to finish construction.

52. JV Holdings, through Arch, took no action to secure the necessary construction permits or financing.

53. Over the course of 2022 and 2023, the Projects stalled as JV Holdings, through Arch, repeatedly delayed tasks and provided no substantive updates or funding.

54. JV Holdings, through Arch, did not pursue the Section 421-a exemption as promised, and it took no steps to hire or manage contractors, architects or engineers to complete the work.

55. JV Holdings, through Arch, withheld material information from me and Plaintiffs. As a result, Plaintiffs and I were unable to verify, mitigate, or correct issues facing the Projects.

56. JV Holdings, through Arch, failed to provide me and Plaintiffs updates to the Projects' financial models and construction budgets. JV Holdings, through Arch, also failed to confirm equity distributions to Plaintiffs.

57. I, on behalf of Plaintiffs, made various proposals to JV Holdings, through Arch that would reduce costs on the Projects and allow the Projects to be refinanced. All of these proposals were rejected by JV Holdings, through Arch.

58. For instance, on August 11, 2022, I emailed Ms. Miller of Arch with a proposal that JV Holdings, through Arch, implement a state-of-the-art, non-combustion geothermal technology in the Projects that complied with applicable New York City laws. This geothermal technology equipment serves as a superior alternative to traditional HVAC systems. I was prepared to offer this installation at a lower cost than any conventional HVAC equipment and installation, representing a direct savings of over a million dollars with no profit to me. JV Holdings, through Arch, not only disregarded my no-cost installation proposal, but also refused to let me present on the matter.

59. On May 31, 2023, I emailed Ms. Miller of Arch regarding the expiration of the Section 421-a tax abatement. My email was ignored and eventually, the Section 421-a exemption was lost.

60. On September 1, 2023, I proposed to Ms. Miller of Arch that I manage the Projects. Although I have extensive experience managing these types of projects, JV Holdings, through Arch, refused to agree to my proposal

61. On September 27, 2023, when the possibility of losing the Properties to foreclosure became imminent, I emailed Ms. Miller of Arch a comprehensive proposal that the Projects be

refinanced through a combination of a bridge loan and syndicated lending. Again, JV Holdings, through Arch, ignored Mr. Saklakov's proposal.

62. I was also on emails between the New York City Department of Buildings ("DOB") and Arch. The DOB sent multiple emails in 2022 and 2023 requesting updates, clarifications or actions regarding the Projects, these emails were met with silence, non-substantive responses or incomplete responses. In particular, JV Holdings, through Arch, intentionally failed to respond to the DOB regarding the outstanding items at the Dekalb Property relating to the site's construction and safety protocols.

63. JV Holdings, through Arch, also took no actions to hire architects, engineers, or contractors to complete the construction at the Projects. JV Holdings and Arch's failure to do so further delayed the Projects and demonstrates their intention to not complete the Projects.

64. By late 2023, these failures by JV Holdings, through Arch, had dire consequences. The DOB issued findings of full non-compliance; no engineering paperwork had been initiated; the Section 421-a application procedures were never filed within the prescribed deadlines; and the assignment of an architect was completed only to the limited extent I personally demanded it before being excluded from all further correspondence. JV Holdings, through Arch, failed to attract any equity or debt.

65. I understand that Defendants have represented that Mr. Simpson was removed or resigned from Arch in or around August 5, 2023 and there were lawsuits filed regarding the control and management of Arch thereafter. Plaintiffs were not informed that Mr. Simpson was removed or resigned from Arch or that lawsuits had been filed regarding the control and management of Arch.

66. Plaintiffs were not informed of any analysis of the Properties going over budget and financing-related issues.

67. Plaintiffs were not given any detailed information regarding the amount or terms of the member loans that Oak invested into the Projects or any resulting subordination.

68. By the end of 2023, it became clear to me and Plaintiffs that JV Holdings, through Arch, had no intention to complete the Projects.

**F. Foreclosure Auctions**

69. As a result of the actions and inactions by JV Holdings, through Arch, all three loans fell into default, and foreclosure auctions were scheduled for the Dekalb Property in late October 2023, for the Bushwick Property in early November 2023, and for the Central Avenue Property in early December 2023.

70. I did not learn of these foreclosure actions until only a week or so before the auctions.

71. In the weeks before the foreclosure auctions, Arch—through Ms. Miller of Arch—demanded that I contribute additional funds to stop the sales, even as JV Holdings, through Arch, refused to provide the information necessary to refinance or syndicate the debt.

72. When I urgently tried to line up new investors to rescue the Projects, JV Holdings, through Arch, failed to send me a current financial model, instead they only provided me with an outdated version from a year and a half earlier. In other words, JV Holdings, through Arch, failed to provide Plaintiffs with a financial model with updated information.

73. The actions and deliberate withholding of critical financial details by JV Holdings, through Arch, confirmed my belief that JV Holdings, through Arch, never intended to honor their representations and commitments to Plaintiffs.

74. I became aware of Arch's principal investor—the Wiener family, via Oak—only after Ms. Miller of Arch stopped responding to my inquiries. If, however, as suggested in the Affirmation of Kevin Wiener filed in support of Defendants' Motion (NYSCEF No. 69), this group

had been orchestrating the scheme to defraud Plaintiffs from the outset, Plaintiffs will pursue any and all remedies against those involved.

**G. Plaintiffs Suffered Damages As A Result Of The Actions And Inactions By JV Holdings, through Arch**

75. As a result of the actions and inactions by JV Holdings, through Arch, Plaintiffs have suffered catastrophic damages.

76. Plaintiffs' equity in the venture of approximately $7.9 million (net of debt) in prior investment was wiped out.

77. Arch's own financial model projected that, upon completion, the Projects would have produced over $45 million in total value: including approximately $9.5 million in additional equity upside and the preservation of roughly $35 million in refinanced or protected debt across the three Properties.

78. Of that gain, nearly half would have remained under the control of Plaintiffs; that entire value is now lost. Plaintiffs' roughly 47% equity position in the stabilized buildings was projected to exceed $75 to $95 million in total value, and an upside of well over $20 million was lost as a separate quantified component of Plaintiffs' damages.

79. Additionally, in September 2022, Carpe Diem invested $950,000 to buy out one of Plaintiffs' shareholders, increasing its own cash participation in the Projects, further demonstrating Plaintiffs' reliance on Defendants' representations and providing a separate, quantifiable out-of-pocket component of Plaintiffs' damages in addition to the loss of equity.

80. In short, the loan extensions and joint venture structure Plaintiffs entered into based on the promises by JV Holdings, through Arch, resulted in the complete loss of Plaintiffs' equity and control, despite having advanced the Projects to near-completion before those promises were broken.

81. The failure to perform by JV Holdings, through Arch, has caused severe damages to Plaintiffs and me.

I affirm this 15th day of December, 2025, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

DENIS (DAN) SAKLAKOV

**CERTIFICATION**

I, Ellen M. Halstead, Esq., certify that this affirmation contains 3,128 words, excluding the caption, signature block and this certification, and thus complies with the 7,000 word count limit set forth by Commercial Division Rule 17.

Dated: December 15, 2025

/s/ *Ellen M. Halstead*
Ellen M. Halstead